UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04cv12627

```
* * * * * * * * * * * * * * * * * * * *
                                      *
STEPHEN D. CAIAZZO,                   *
                                      *
        Plaintiff,                    *
v.                                    *
                                      *
THE MEDALLION INSURANCE               *
AGENCIES, INC.,                       *
                                      *
        Defendant.                    *
                                      *
* * * * * * * * * * * * * * * * * * * *
```

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL FURTHER DEPOSITION TESTIMONY OF FORMER PLAINTIFF'S ATTORNEY, THOMAS COLLINS

The defendant moves to compel the plaintiff's former attorney, Thomas Collins, to testify regarding the subject matters outlined below. As grounds for this motion, the defendant states that the plaintiff has waived the attorney-client privilege by testifying regarding attorney-client communications and by placing the information protected by the privilege "at issue" through his claims and testimony. Further support of this motion is set forth below.

### FACTUAL BACKGROUND

The plaintiff, Stephen Caiazzo ("Caiazzo"), brought three separate claims against his former insurance agent, The Medallion Insurance Agencies, Inc. ("Medallion"). Caiazzo's first claim involves an uninsured personal injury claim brought against him by Joseph Cuttichia (the "Cuttichia claim"). The plaintiff asserts that he reported the claim to Medallion and it failed to report the claim to Caiazzo's carrier. Medallion contends that Caiazzo failed to report the claim

until after he was defaulted in two lawsuits and a lien was asserted against his property. Upon

receiving written notice in May 2003 from Caiazzo's former attorney, Thomas Collins, with

information regarding the 1996 loss, Medallion promptly submitted a Notice of Occurrence to

Caiazzo's insurer. The insurer, Pacific, denied the claim because of lack of coverage for the

subject claim, late reporting, and violations of the policy terms.

The plaintiff's second claim involves a disability claim. Caiazzo claims he requested a

disability policy and made a claim under said policy for a disability he suffered in 2001. Caiazzo

claims Medallion failed to obtain the policy and/or failed to report his claim. Medallion asserts

that Caiazzo never requested a disability policy. Caiazzo did not have a disability policy in effect

as of the time he allegedly became disabled.

The plaintiff's third claim involves an alleged business property loss. Caiazzo claims

unknown individuals removed personal property from his premises after he was evicted. At the

time of this alleged loss and per his instructions to Medallion, Caiazzo did not have business

property insurance due to the cost of the premium. Caiazzo's declination of property coverage is

documented, and his other coverages were bound in strict compliance with Caiazzo's specific

request. Medallion did in any event submit the claim, at his request, to Caiazzo's insurer, which

denied the claim due to lack of property coverage.

## ARGUMENT

The plaintiff waived the attorney-client privilege as to communications with Attorney

Collins regarding the three claims asserted against the defendant by placing information

protected by the privilege "at issue" through his own testimony in this case. *Sax v. Sax*, 136

F.R.D. 541, 542 (Dist. of Mass. 1991). "There are, under Massachusetts law, certain exceptions

to the attorney-client privilege and some circumstances in which the privilege may be deemed

waived other than by express waiver." *Darius v. City of Boston*, 433 Mass. 274, 277 (2000),

*citing* P.J. Liacos, Massachusetts Evidence §§13.4.7, 13.4.8 at 786-789 (7th ed. 1999). In *Darius*,

the Massachusetts Supreme Judicial Court found that a "litigant may implicitly waive the

attorney-client privilege, at least partly, by injecting certain claims or defenses into a case." *Id.* at

277-78. The First Circuit held in *Greater Newburyport Clamshell Alliance v. Public Service Co.*,

838 F. 2d 13, 20 (1988) that:

> Fairness requires that the privilege holder surrender the privilege to
> the extent that it will weaken, in a meaningful way, the defendant's
> ability to defend. That is, the privilege ends at the point where the
> defendant can show that the plaintiff's civil claim, and the probable
> defenses thereto, are enmeshed in important evidence that will be
> unavailable to the defendant if the privilege prevails.

The First Circuit offered guidance on determining whether the privilege has been waived.

First, the defendant should "demonstrate that the material to be discovered is relevant to their

case." *Id.* at 22. Second, the defendant should "demonstrate why it would be unreasonably

difficult for them to obtain the information elsewhere or that redundant evidence will be helpful

to their case. *Id.*

Here, the plaintiff waived the attorney-client privilege as to conversations with Attorney

Collins relative to the facts and circumstances leading up to and surrounding the claims against

the defendant. First, the plaintiff waived the attorney-client privilege by stating in Answer No.

12 to Interrogatories Propounded by the Defendant that Attorney Collins is the only witness

known to Caiazzo with knowledge regarding the facts and circumstances of the events alleged in

the Complaint. (Exhibit 1). This is a case of credibility as the plaintiff lacks any physical

evidence to support his claims. When credibility is at issue and Attorney Collins is the only

witness, the privilege should be deemed waived as the defendant will be disadvantaged in its

ability to challenge the plaintiff's claims.  Additionally, the plaintiff waived the attorney-client

privilege through his testimony regarding his three claims, which made Attorney Collins'

involvement and knowledge regarding the claims and the information Caiazzo provided to him

"at issue" in this litigation.

Caiazzo waived the attorney-client privilege as to the Cuttichia claim handled by

Attorney Collins when he made Attorney Collins' involvement and the information provided to

Attorney Collins "at issue" in the case.  The first written notice Medallion received regarding the

Cuttichia claim was a letter received from Attorney Collins dated May 16, 2003.  (Exhibit 2).

The letter indicates that Caiazzo did not have notice of the claim or lawsuits.  Yet, contrary to the

content of the May 16, 2003 letter, Caiazzo testified that he involved Attorney Collins in

resolving the Cuttichia claim once he learned that their was a lien on his property.  (Exhibit 3, pp.

68, 70, 71).  Caiazzo testified that he provided written notice of the claim to Medallion in 1998

but lacks any documentation of this.  Caiazzo testified that he involved Attorney Collins because

of the lack of correspondence from the defendant.  (Exhibit 3, p. 73).  He further testified that

upon learning that various court notices were received by his wife, from whom he was separated,

and not forwarded to him, he asked Attorney Collins to "get this thing squared away."  (Exhibit

3, pp. 107-08).  Caiazzo claims that it was at that time that Attorney Collins drafted the letter

attached as Exhibit 2.

Contrary to Caiazzo's testimony, the only documentation provided indicates the notice

was given in May, 2003.  The information Caiazzo supplied to Attorney Collins with respect to

providing notice to Medallion regarding the Cuttichia claim, when Caiazzo learned of the claim,

when he informed Medallion of the claim, and his communications or lack thereof with

Medallion regarding the claim are highly relevant.  Caiazzo claims that Attorney Collins only

became involved after notice was given to Medallion and because of the lack of response from Medallion. This is contested by the defendant. As reflected in the letter from Attorney Collins, Caiazzo did not know of the claim or report it to Medallion until he discovered the lien on his property and requested Attorney Collins report it to Medallion. (Exhibit 2). It is critical for the defense to learn whether Caiazzo indicated to Collins when he learned of the claim and when, if ever, he reported it. Medallion meets the standard established in *Greater Newburyport Clamshell Alliance* as this information is relevant to the central issue of this claim and it is impossible for Medallion to obtain this information from any other source. *See Greater Newburyport Clamshell Alliance*, 838 F.2d at 22.

Additionally, Caiazzo testified that he provided Attorney Collins with the initial letter he received from the plaintiff's attorney in the Cuttichia matter, the letter he also claims he forwarded a copy of to Medallion. When asked where the letters were from the plaintiff's attorney in the Cuttichia claim, Caiazzo said "Tom Collins had copies." (Exhibit 3, p. 109-10). Whether or not these letters exist and were forwarded to Collins goes to the central question of the timing of the notice provided to the insurer by Medallion. Fairness requires that Medallion have the opportunity to defend this claim and obtain deposition testimony from Attorney Collins on the subject.

Caiazzo also waived the attorney-client privilege relative to his claim to have obtained a disability policy through Medallion when he testified regarding Attorney Collins' involvement in the claim. Caiazzo testified that he received a policy or documentation that he had disability coverage. (Exhibit 3, p. 139). He testified that this documentation to support that he had a disability policy was provided to Attorney Collins. (Exhibit 3, p. 139, 141, 142). Specifically, Caiazzo testified:

> As I said to you earlier, Tom Collins had the sheet. I looked at it,
> handed it to him, told him to do what he had to do to collect
> this...This was when I filed the claim with the BBO and everything
> else because I asked him to send me the document showing the
> disability...The file did not include that sheet of paper obviously
> because he knew how important it was to me.
> (Exhibit 3, p. 142).

Caiazzo further testified that any other documentation of the disability policy was destroyed.

(Exhibit 3, Day 2, p. 20). Medallion denies that Caiazzo ever requested a disability policy.

Caiazzo testified that the only documentation of a disability policy that he ever requested or

obtained rests with Attorney Collins. Given that Caiazzo has brought Attorney Collins into this

claim by stating he has the critical documentation, Attorney Collins' testimony on the subject is

highly relevant to the defense. Further, Medallion is unable to obtain this information from any

other source. Therefore, a waiver of the attorney-client privilege is warranted.

Caiazzo waived the attorney-client privilege with respect to his claim that Medallion

failed to submit his business property claim by involving Attorney Collins in the processing of

the claim. The information Attorney Collins has regarding Caiazzo's claim, the reporting of the

claim to Medallion, and Caiazzo's representations to Attorney Collins regarding coverage is

relevant and Medallion is unable to obtain this information from any other source.

Following the plaintiff's deposition, Medallion deposed Attorney Collins. Given the

claims and prior testimony of Caiazzo, Medallion believed Caiazzo waived the attorney-client

privilege. However, Caiazzo asserted the privilege at the deposition and prevented Attorney

Collins from testifying regarding privileged communications relative to these claims. Although

it is clear from Attorney Collins' testimony that he has information regarding these claims, he is

unable to testify until the privilege question is resolved. (Exhibit 4, pp. 106-07).

Caiazzo points to Attorney Collins both for support of his claims and for an explanation

as to why he lacks documentation relative to his claims, yet seeks to hide behind the attorney-client privilege to prevent Medallion from deposing Attorney Collins to defend these claims. Fairness requires that the defendant be able to obtain this important evidence from Attorney Collins as it has become "enmeshed" in the plaintiff's claims in this matter. *Greater Newburyport Clamshell Alliance*, 838 F.2d at 20. The facts of this case support a waiver of the attorney-client privilege as to the plaintiff's claims in this matter.

## CONCLUSION

WHEREFORE, the defendant moves that this Court allow this motion, and order Attorney Collins to testify regarding his knowledge of the plaintiff's claims against Medallion and information provided to him by Caiazzo relative to these claims as set forth above.

> The Medallion Insurance Agencies, Inc.
>
> By their attorneys,
>
> /s/ Kerry D. Florio
> William D. Chapman BBO #551261
> Kerry D. Florio BBO #647489
> MELICK, PORTER & SHEA, LLP
> 28 State Street
> Boston, MA 02109
> (617) 523-6200

Date: September 28, 2005

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

STEPHEN D. CAIAZZO,　　　　　)
　　　　Plaintiff　　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　　　　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　)　　　　　04-12627  RCL
THE MEDALLION INSURANCE　　　)
AGENCIES, INC.,　　　　　　　　)
　　　　Defendant　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)

## PLAINTIFF'S ANSWERS TO INTERROGATORIES OF DEFENDANT

1Q.　　Please identify yourself fully, stating your full name, date of birth, social security number, residential address, business address, occupation and job title.

1A.　　Stephen Dennis Caiazzo; December 4, 1951; 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; 2106 SW 49 Street, Cape Coral, FL  33914; disabled and unemployed.

2Q.　　Please identify each and every insurance agent and/or insurance broker through whom you obtained any insurance whatsoever from 1990 up to and including the present.

2A.　　Medallion Insurance Agency
　　　　Joe DeVincentis Insurance Agency

3Q.　　For each expert witness whom you expect to call at the trial of this action, and/or whom you have retained or specially employed in anticipation of litigation or in preparation for trail who is not expected to be called at the trial of this action, please state:

　　　　a.　　the name, business address, residential address, educational and employment history;

　　　　b.　　the subject matter on which each such expert is expected to testify or was retained or employed to consider;

　　　　c.　　the substance of the facts and opinions to which each such expert is expected to testify or was retained or employed to consider; and

d.  a detailed summary of all the grounds for each such opinion together with the substance of all facts upon which such opinions are based.

3A.  Not determined at this time.

4Q.  Please state fully and in complete detail each and every fact to support Count I of you Complaint, including any and all facts that support your claim that Medallion alleged failure to report a personal injury claim to your insurer

4A.  John D'Addario completely ignored my calls and correspondence from my attorney regarding this claim. In 2001, John D'Addario, his wife Jean and Joe DeVincentis ignored my calls. I left about thirty messages for Jean D'Addario at the agency and thirty-forty calls for John and Jean D'Addario at their residence. John D'Addario also told me that I didn't have this insurance. Finally, they submitted a letter to the Insurance Board showing cancellation of my policies in November 2001, after the closing of my business.

5Q.  Kindly describe in full and complete detail the notice you received of the personal injury claim set forth in Count I of your Complaint, including in your answer:

   a.  when you received notice of said personal injury claim;

   b.  from who (sic.) did you receive said notice;

   c.  the manner in which said notice was received; and

   d.  each and every action taken by you after receiving said notice.

5A.  a.  I received a letter from the plaintiff's attorney in about 1998, after suit had been filed .

   b.  See my answer to the preceding subpart.

   c.  I do not recall.

   d.  I gave the letter to John D'Addario. I then called him and he told me he would take care of it. I called him again, and the told me he had provided the information to the insurance company. After that, I left numerous messages for him to call me, but he did not return my calls.

6Q.  Kindly describe in full and complete detail reporting the personal injury claim set forth in Count I to Medallion, including in your answer:

   a.  when you reported said personal injury claim to Medallion;

   b.  to whom the claim was reported, including name, address and job title;

c.  the manner in which it was reported; and

d.  any and all conversations with Medallion regarding said personal injury claim.

6A.  See my answer to Interrogatory No. 5.

7Q.  Please state fully and in complete detail each and every fact to support Count II of your Complaint, including but not limited to any and all facts that support your claim that Medallion negligently failed to report your disability claim.

7A.  I requested a disability policy to protect the income I was making and because I moved kegs of beer, cases of beer and liquor, tables and chairs and a stage for bands.  John D'Addario came to my restaurant and went over my income figures to compute the amount of coverage.  I had to submit tax returns to establish my income.  After my knee was reinjured in 2001, I called him regarding my disability policy.  He told me I didn't have one.  I insisted that I did.  He agreed to look in the archives.  After this, he would not return my calls.

8Q.  Do you claim you obtained a disability policy from Medallion insurance for the policy year of 2001?  If your answer is anything other than an unqualified "no", kindly describe in full and complete detail:

a.  from whom you requested said policy;

b.  when you requested said policy;

c.  whether a copy of said policy was sent to you and if so, where it is located; and

d.  any and all documents that support your claim that you requested said policy.

8A.  a.  John D'Addario

b.  I believe that I had such a policy for more than one year that would pay me $1,500.00 per week if I became disabled.  I believe a policy was in effect when I reinjured my knee in 2001.

c.  I saw the policy.  I had to produce tax returns for an audit by the company on my income.

d.

9Q.  Did you make a worker's compensation claim for your injury and disability referred to in Paragraph 10 of your Complaint?  If your answer is anything other than an unqualified "no", kindly describe in full and complete detail"

a.  when you made said claim;

b.    who, if anyone, assisted you in making said claim; including name, address and title; and

c.    the result of said claim, including any monies paid to you as a result.

9A.    a.    In 2001 or 2002

b.    Attorney Tom Collins, 10 Main Street, Andover, MA

c.    $25,000.00 gross.

10Q.    Please state fully and in complete detail each and every fact to support Court III of your Complaint, including but not limited to any and all facts that support your claim that Medallion negligently failed to report your personal injury claim.

10A.    Count III does not refer to a personal injury claim.

11Q.    Please state fully and in complete detail the time, place, parties to, including each parties' full name, last known address, occupation, and job title, and substance of any communication that was ever held with any Medallion representative concerning any insurance claims, including in your answer:

a.    the full name, last known address, occupation and job title of the person at Medallion, with whom you spoke regarding obtaining insurance coverage;

b.    the type or manner of communication;

c.    the date, time and place of each such communication;

d.    what documents were forwarded, if any, and by whom; and

e.    the nature and/or substance of each communication.

11A.    Objection on the grounds that this interrogatory is overly broad and unduly burdensome and seeks information not within the scope of discovery.

12Q.    Please state the full name, last known address, occupation, and job title of every witness known to you or to your attorneys who has any knowledge regarding the facts and circumstances of the events alleged in your Complaint, including, but not limited to, individuals with knowledge of any and all insurance obtained by you and any claims made by you, including claims referenced in your Complaint.

12A.    Myself, Attorney Collins and possibly other individuals unknown to me at this time.

Signing as to objections:

_____
Dean Carnahan, Esq.

Signed under the pains and penalties of perjury this 3 day of April 2005.

_____
Stephen D. Caiazzo

## CERTIFICATE OF SERVICE

I, Dean Carnahan, hereby certify that on this day I served this pleading on defendant by mailing a copy thereof, postage prepaid, to Kerry D. Florio, Esquire, Melick, Porter & Shea, LLP, 28 State Street, Boston, MA 02109

Date: April 27, 2005

_____
DEAN CARNAHAN

B-2274-IA

# Exhibit 2

# THOMAS P. COLLINS
## ATTORNEY AT LAW
### 10 MAIN STREET
### SUITE L9
### ANDOVER, MASSACHUSETTS 01810

Tel. No. 1 (978) 475-8846
Fax No. 1 (978) 475-7947

May 16, 2003

Mr. Joseph DiVincentis
Medallion Insurance Company
110 Florence Street
Malden, MA. 02148

Re: Joseph Cuttichia v. Donna's Pub, Inc. d/b/a Cai's
    Malden District Court Docket No. 9850CV 0237

Dear Mr. DiVincentis,

    I have been able to complete the following research into the above referenced matter that I have been discussing with you and your staff. It is my hope that this information, together with the package that I had previously faxed to Jack Dadario of your office shall aid in the processing of the claim for reimbursement of the funds paid by Steve Caiazzo in settlement of this matter.

    From the Court records, the following are the apparent facts that led to the payment of $ 35,000.00 in settlement of the claim at the time of the closing on real estate owned by Mr. Caiazzo located at 19-21 Skipper Way, Gloucester, MA. on April 23, 2003.

    The incident occurred on September 13, 1996 when Mr. Cuttichia, who was allegedly a patron in the Cai's establishment was struck in the face by another patron at approximately 1:30 AM. The police were evidently not called, and the victim did not seek medical attention until 10:00 AM the following morning at Lawrence Memorial Hospital Emergency Room in Medford, MA. at that time he was treated for a 1 ½ " laceration on his left cheek, a swollen left eye and face. The cut was stitched, and x-rays were taken that revealed no fracture. The total medical bill was $ 741.00 of which the victim was responsible for $ 291.00.

    No further treatment history was reported, nor was there any indication of permanent injury. He was released from the emergency room at 11:55AM that same morning. To the best of my knowledge there was never a licensing board hearing conducted on any complaints raised as a result of the incident.

Suit was commenced in 1998 with two separate counts for relief alleged. The first was a claim that the Defendant had negligently failed to train or retain help, the second a claim of negligent conduct of its business affairs in a manner that caused the injury to occur.

A default judgment entered after hearing on December 10, 1998. The Plaintiff claimed lost wages ( he is a self employed plasterer d/b/a Nino's Plastering in Medford, MA. ) of 3 weeks @ $750.00 / week for a total of $ 2250.00. Judge Cavanaugh, the presiding judge awarded the Plaintiff $ 24,900.00. Execution issued on February 2, 1999.The matter was enforced by a judgment in Essex Superior Court in late 2002, that awarded additional interest for a total recorded execution of approximately $ 41,000.00.

Mr. Caiazzo did not receive notice of the original suit in Malden, or the later Essex Superior Court matter. He was never called before the licensing board nor did the police investigate the incident. Please forward this information to the company who held the insurance policy covering the premises during the period of the incident.

I wish to also inquire concerning Mr. Caiazzo's claim for compensation for the loss of his personal and business memorabilia at the time that Harbor Realty took possession of the former Scuttlebutts location in Salem, MA. I believe that Jack Dadario was handling this claim.

Thank you for your interest and efforts in these matters

Very truly yours,

Thomas P. Collins

# Exhibit 3

68

```
 1        connection with Cai's Food & Spirits?
 2   A.   No.
 3   Q.   And when was it that you first became -- when
 4        in 1998 was it that -- when did Scuttlebutt's
 5        open?
 6   A.   I believe it was in '98.
 7   Q.   Do you remember what month?
 8   A.   I think it was in October.
 9   Q.   To catch the Halloween rush?
10   A.   That's exactly right.
11   Q.   I have to drive by that place so I know about
12        that.
13   A.   Well, we needed to collect that revenue
14        that's for sure because too much was going
15        out and there wasn't enough coming in.  Those
16        two days settled that quickly, though.
17   Q.   Was it part of -- and I want to specifically
18        say on this question I don't want you to tell
19        me any communications that you had with Mr.
20        Collins.  Okay.  But I do need to get an
21        understanding of the scope of his
22        representation, what he was retained to do.
23        Mr. Collins did become involved with the
24        claim by Mr. Cuttichia against you, correct?
25   A.   Correct.
```

70

1   A.   I believe after I spoke with D'Addario and

2        got no response, spoke to Joe DeVincentis,

3        spoke to Jean DeVincentis, got no

4        satisfaction.  When I saw the lien filed

5        against my property without me knowing

6        because I never signed any documentation or

7        any certified letters or being served or

8        anything, a good period of time elapsed

9        before I finally realized that happened.  And

10       at that point, I tried to rectify it and say,

11       "Why wasn't I notified?  Why was this claim

12       paid?  Why did anything not happen on this

13       case and I was not notified?"

14            . As a result of seeing the paperwork

15       which eventually determined the lack of

16       injury that occurred to Mr. Cuttichia as

17       opposed to what he initially said, I believe

18       Mr. Collins submitted a letter to Mr.

19       DeVincentis and also spoke to him regarding

20       how the possibility ever existed that someone

21       would pay $45,000 out, would allow $45,000 to

22       be paid without defending the case and

23       looking into a near -- the hospital records

24       proving that there were no injuries and he

25       was released almost immediately, that I was

71

```
 1        not notified.  And that's what eventually
 2        turned out to be the lack of cooperation
 3        between Joe DeVincentis, John D'Addario, Jean
 4        D'Addario, and the inappropriate way of them
 5        not getting back to me and informing me as my
 6        agent as to why certain things happened and
 7        the money being paid out.
 8    Q.  Let's back up now.
 9    A.  Uh-huh.
10    Q.  Mr. Collins was representing you and
11        Scuttlebutt's -- generally, with regard to
12        the operation of Scuttlebutt's back in 1998,
13        correct?
14    A.  Correct.
15    Q.  And it was fair to say within -- generally
16        within that time period that you got your
17        first notice of the Cuttichia claim, correct?
18    A.  From the attorney, is that the question?
19    Q.  Right.
20    A.  I received notice from the attorney sometime
21        after '96 when this supposedly happened, the
22        incident.
23    Q.  Right.  Okay.
24    A.  The reason why I know that is because the
25        date was on it as to when it supposedly
```

73

```
 1   Q.   Let me ask it this way:  You got a letter

 2        from a lawyer that reflected that Cuttichia

 3        was going to make a claim against you.

 4        You're saying in this case here that you

 5        should have had insurance for the claim

 6        against you by Cuttichia.  Okay.

 7             Here's my question:  Was it part of

 8        Mr. Collins' job to chase any insurance

 9        coverage that might have been available to

10        you for the liability claim against you by

11        Cuttichia?

12   A.   Mr. Collins didn't know anything about

13        chasing anybody until I brought this to his

14        attention because of the lack of

15        correspondence from Joe DeVincentis, Mr. and

16        Mrs. D'Addario, and Medallion.  And when I

17        received all the mail that was sent to my

18        wife's house and she was served and was

19        signing my name that she received it, she

20        held onto all the mail for over a year.  So

21        as a result, there was no way of Mr. Collins

22        going to court and properly representing me

23        in the court case.  Do you see what I mean?

24        So this thing went on for...

25   Q.   Okay.  Whenever -- well, let me try something
```

107

```
 1        letter dated December 12, '02 from the Law

 2        Offices of Stephen Whitman to Thomas Collins.

 3                    MR. CARNAHAN:   Okay.

 4    Q.  Mr. Caiazzo, I'm going to hand you Exhibit 7

 5        and ask if you've ever seen that letter?

 6    A.  (Witness reviews document)  Yes, I have.

 7    Q.  And do you remember seeing that back in

 8        December of '02?

 9    A.  It's familiar.  I remember seeing Stephen

10        Whitman.  And I remember seeing this as one

11        of the envelopes that was taken by my wife

12        and signed because there were two or three of

13        them by the Law Offices of Stephen Whitman.

14    Q.  Okay.  And you see it's a letter addressed to

15        Mr. Collins?

16    A.  Right.

17    Q.  And Mr. Collins was representing you at that

18        time?

19    A.  Yes, he was.

20    Q.  And Mr. Collins was representing you at that

21        time in connection with Mr. Cuttichia's

22        claim, correct?

23    A.  This is when I received all this information

24        from my wife that I started to open it up and

25        said this is the Whitman -- I mean Cuttichia
```

108

1           case that's been lagging.  And this was the
2           reason why the lien was put on the property.
3           And that's when I decided to call Joe and
4           settle it, find out.  And then I went to Tom,
5           and I said, "Here's the guy.  Call him and
6           get this thing squared away."  And that's
7           what this is.
8    Q.     So would it be fair to say that you had
9           engaged Mr. Collins to get involved in the
10          Cuttichia claim prior to the date of that
11          letter?
12   A.     This was part of a stack of letters which I
13          have from the Law Offices of Stephen Whitman
14          that were mailed to King Street, maybe
15          Pleasant Street, all of them.  Some of which
16          were secured by return request mail that was
17          not signed by me.  My wife signed my name.
18          These were opened by me when I found them.
19          These were backdated because the time period
20          extended it from the time she held on.  I
21          called Tom.  I says, "Get something -- this
22          is what the deal is."
23   Q.     Again, I don't want to interrupt you, but
24          that doesn't -- what you just said doesn't
25          apply to this letter.

109

```
 1   A.   Why wouldn't it?

 2   Q.   Because it's not addressed to you.

 3   A.   I understand this.  But this is something

 4        that Collins had called Whitman on because

 5        Whitman is the one that I called Collins on

 6        after I received the stack of mail.

 7   Q.   Yes.

 8   A.   So he contacted Whitman and Whitman

 9        apparently wrote a letter here.

10   Q.   Right.  All I'm saying is this letter that

11        you have that you're holding, Exhibit 7,

12        that's not a letter that was in the stack of

13        documents that you got from your wife and

14        that you gave to Mr. Collins, correct?

15   A.   No.  This is the type of letters from Stephen

16        Whitman that I recognized as being part of a

17        group of letters that were sent to the other

18        address that I never got until later.

19        Subsequently, this was the follow-up letter

20        that I -- after Tom Collins contacted

21        Attorney Whitman.  This is made out to

22        Collins.  But the other ones were made out to

23        me.  This is just a follow up from an

24        attorney to an attorney to try and settle.

25   Q.   And where are all these prior letters from
```

110

```
 1        Whitman's office to you?
 2   A.   Tom Collins has them.  I have a copy.
 3   Q.   Where is the copy you have, because it hasn't
 4        been produced?
 5   A.   Oh, I got plenty of copies.
 6   Q.   Well, where are they?
 7   A.   Where are they?  I have them.
 8   Q.   Where in your possession?
 9   A.   Well, I don't have them with me today.  But I
10        have them.  Tom Collins had copies.  I made
11        enough copies for everybody.  Tom Collins was
12        handling it.  I held on to them.
13   Q.   Where do you keep all these documents?  Is
14        there a particular place?  Are they down in
15        Florida?
16   A.   Yes.
17   Q.   And where -- do you own the property in
18        Florida?
19   A.   No, I don't.
20   Q.   Okay.  Your girlfriend does?
21   A.   Yes.
22   Q.   And is there -- where do you keep it?  Do you
23        have a desk or a filing cabinet?
24   A.   I have them in my garage.
25   Q.   In your garage.  Do you have boxes in the
```

139

```
1    Q.   Okay.  But your testimony is you specifically

2         received a policy or a documentation that

3         told you you had disability coverage?

4    A.   Yes, absolutely.

5    Q.   Okay.  And has that been produced in this

6         case?

7    A.   No.

8    Q.   Why not?

9    A.   Well, number one, the document that I had

10        submitted to Tom Collins that we were sitting

11        in his conference room and I noticed that

12        it's gone beyond me.  I says, "I'm entitled

13        to this income policy.  I forgot about this,

14        and there it is."  I said, "Send this" -- I

15        says, "I need a copy.  After you do what you

16        have to do, submit this to D'Addario" or

17        whatever.  I says, "Call me back.  I need a

18        copy of that."

19             Now, in addition to that, at the end

20        of Scuttlebutt's from the time we had -- we

21        had filed for bankruptcy.  When the lease was

22        broken through Landolphi, they came in and

23        locked the doors.  Okay.  So my office was

24        locked.  All the files were in there when I

25        left.  I was notified that I would have to
```

141

```
 1   A.   Right.

 2   Q.   That showed that you had a disability

 3        coverage?

 4   A.   Correct.

 5   Q.   And the original question was why haven't

 6        those documents been produced?  Okay.  So

 7        that's what I need the answer to.

 8   A.   Okay.  The question is -- I did mention to

 9        you earlier that Tom Collins had that sheet.

10        It was a cover sheet.  It wasn't the actual

11        policy.  It was a cover sheet similar to what

12        you have there in that package.  What was

13        also said was that I under no circumstances

14        was going into my office believing that

15        someone was going to be allowed to trash that

16        thing and take what they wanted and leave

17        paperwork everywhere, which is exactly what I

18        did.

19   Q.   Well, I'll tell you that I have better things

20        to do later on.  I'm trying to make this

21        easy, streamline it as best I can.

22   A.   I understand.

23   Q.   Here's Exhibit 2.  These are all the

24        documents you've produced in this case.

25   A.   Right.
```

142

```
 1   Q.   Do you see any document in here that tells
 2        you that you have disability insurance
 3        coverage?
 4   A.   No, not in these.
 5   Q.   All right.  Where are any disability
 6        insurance documents currently as far as you
 7        know?
 8   A.   As I said to you earlier, Tom Collins had the
 9        sheet.  I looked at it, handed it to him,
10        told him to do what he had to do to collect
11        this.  That's when his communication with the
12        agency started.  Okay.  At that point, this
13        is when I found out that he wasn't doing what
14        he was supposed to do.  And I called him for
15        three months.  He never called back.  This
16        was when I filed the claim with the BBO and
17        everything else because I asked him to send
18        me the document showing the disability.  I
19        had to have the BBO call him and demand that
20        he send me my file.  The file did not include
21        that sheet of paper obviously because he knew
22        how important it was to me.  But in addition
23        to that, copies of that policy were in effect
24        because I was looking right at it.  And I had
25        to produce paychecks for an audit suggested
```

**Page 18**

1     The policy was brought up to me, and I paid
2   as I was supposed to. I remember distinctly
3   having it in '98, '99, 2000 and 2001.
4 Q. Okay. I'm going to stop you right there.
5 A. Okay.
6 Q. To whom would the checks be made payable to
7   for the income disability policy that would
8   have been in effect at the time that you
9   became disabled in August of 2001?
10 A. Again, the checks are all made out to one
11   company.
12 Q. Who is that?
13 A. What the agent disperses, I don't know.
14   Again, Standard Financing.
15 Q. So when you make payments for all of your
16   policies, you write one check? Whether
17   you're paying for your income disability,
18   your liability, your worker's comp, you
19   write one check; is that right?
20 A. On those policies. Initially, you have to
21   understand that when I make a deposit, a
22   down payment on my policies, some of it is
23   paid through the agency. The agent is more
24   than happy to give it to you and verify all

**Page 19**

1   this. All I'm telling you is I have the
2   same insurance every year as a businessman.
3   I know what my needs are and what I have to
4   do in order to take care of my family and to
5   cover myself for liability, all various
6   liabilities. This particular policy as you
7   are asking says that I paid Standard
8   Funding. Yes, I do. But the extenuating
9   circumstances are that there are various
10   policy lapses during that have to be
11   restructured and started up again. So
12   because it doesn't reflect on that doesn't
13   mean that you're going to ask me say, hey,
14   listen, I don't have insurance on that
15   because I do. It just doesn't reflect it on
16   that sheet because it could have overlapped
17   and stopped two months later or six months
18   later.
19 Q. I understand what you're saying,
20   Mr. Caiazzo. I just don't have any
21   documentation to point to which says that
22   there's the income disability policy. Do
23   you have that documentation that you can
24   provide me that says that you actually had

**Page 20**

1   that policy in effect? I would like to see
2   it so I can talk to you about it.
3 A. I explained to you the last time, and I will
4   say it again, that all my documentation and
5   everything that I had was up in Scuttlebutts
6   that was removed without having the proper
7   -- without having that secured. I never got
8   a call. Everything was thrown out. My
9   personal -- most of this stuff I had was in
10   my desk. I filled up my car as best I
11   could. What I couldn't fill up I had to
12   leave at the top of the stairs inside all
13   locked up. So John D'Addario and that
14   agency -- and I will make this quick. I'm
15   sorry because I don't -- but very simply,
16   according to Medallion Insurance, I didn't
17   have any insurance. That's the problem.
18   They said I had no insurance, I had no fire,
19   I had no workman's comp, I didn't have any
20   awning insurance. You can't ask me for
21   paperwork that was thrown out.
22 Q. And that's all you have to say. My question
23   is: Do you have any documentation? You
24   just have to tell me it was thrown away.

**Page 21**

1 A. I told you that last time.
2 Q. Your answer is you don't have any
3   documentation with respect to the income
4   disability policy?
5 A. That's correct.
6 Q. And what you're telling me is that you
7   believe that there may have been some
8   restructuring of that income disability
9   policy that would have made it not appear on
10   this Standard Funding finance agreement. Is
11   that fair to say?
12 A. I believe so, yes.
13 Q. And do you know about when that income
14   disability policy was being renewed? Do you
15   have a memory of that?
16 A. Like I told you, it could overlap for two
17   months, it can go for two years. According
18   to my conversation with John D'Addario, he
19   brought it up and suggested very strongly I
20   take it out. Best of my recollection, I
21   paid it, whether it was part of the deposit
22   back in '98, '99 and then it renewed in 2000
23   and carried over, I don't know. But it was
24   there because we talked about it on a

6  (Pages 18 to 21)

Exhibit 4

1  Q. But you have seen documentation that he

2     made a claim for Social Security

3     Disability?

4  A. My recollection is I think I saw at some

5     point a statement of his monthly benefit.

6  Q. Did you ever see any documentation

7     relating to a claim for a disability

8     policy?

9  A. No.

10 Q. Without getting into the substance of any

11    conversations, did you have conversations

12    with Mr. Caiazzo regarding the Cuticchia

13    claim?

14 A. Respectfully, I'm going to assert the

15    attorney/client.

16 Q. I understand the position you're in, Mr.

17    Collins, but this is not asking for any

18    information regarding a conversation.

19          MR. MANNIX:  I think you can

20    answer the question yes or no.

21 A. The answer is yes.

22 Q. Did you have conversations with Mr.

23    Caiazzo regarding his claim for disability

24    under a disability policy?

25 A. Yes.

1   Q. Did you have conversations with Mr.

2      Caiazzo regarding his claim for property

3      loss when Scuttlebutt's was seized?

4   A. Yes.

5   Q. With respect to the substance of those

6      conversations, you're asserting the

7      attorney/client privilege today; is that

8      right?

9   A. That's correct.

10         MS. FLORIO:  I think I'm just

11     going to suspend my portion of the

12     deposition at this time.  I'm not sure if

13     you have any questions, Mr. Carnahan.

14         But I'm just going to go on the

15     record to say I'm suspending to the extent

16     that there's certainly a number of

17     questions where the privilege was asserted

18     today and we'll have to resolve the issue

19     relating to that privilege.

20         It's certainly our position that

21     Mr. Caiazzo has waived that privilege both

22     in the context of asserting claims against

23     Mr. Collins, which at least in part

24     involve the claims that are present here

25     today, and also waived that claim with