UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                             \*

STEPHEN D. CAIAZZO,        \*

        \*

    Plaintiff,        \*

v.        \*

        \*     CIVIL ACTION NO. 04-12627 RCL

THE MEDALLION INSURANCE    \*

AGENCIES, INC.,        \*

    Defendant        \*

        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant, The Medallion Insurance Agencies, Inc. ("Medallion"), submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1.    Stephen Caiazzo ("Caiazzo") operated Donna's Pub, Inc. d/b/a Cai's Food & Spirit from approximately 1990-1997 or 1998. Exhibit 1, Deposition of Caiazzo, day one, p. 30.

2.    Caiazzo operated Jenna's Pub, Inc. d/b/a Scuttlebutts ("Scuttlebutts") from 1998 through September of 2001. Exhibit 1, Deposition of Caiazzo, day one, p. 31.

3.    Caiazzo, on behalf of Cai's and Scuttlebutts, obtained insurance through Medallion from approximately 1994 - 2001. Exhibit 2, Affidavit of Jean D'Addario, ¶3.

4.    Caiazzo obtained an insurance agent's license in the Commonwealth of Massachusetts. Exhibit 1, Deposition of Caiazzo, day one, 18-19.

### "Disability Policy" Claim

5.    Caiazzo claims he had an "Income Disability Package" in effect when he became disabled in August 2001. He said he had this alleged coverage in place for "a good many years", probably between 1995 and 2001 through Medallion - - yet in this case has failed to

provide any evidence whatsoever it existed. Exhibit 1, Deposition of Caiazzo, day one, pp. 136-142; Exhibit 3, Deposition of Caiazzo, day two, p. 21.

6. Caiazzo failed to provide any cancelled checks to reflect he paid for an income disability policy. Exhibit 4, correspondence from counsel.

7. Caiazzo claims his income disability policy was part of the package policy financed through Standard Funding but the documentation from Standard Funding does not support this assertion. Exhibit 1, Deposition of Caiazzo, day one, pp. 144-45.

8. The financing agreement clearly indicates the types of insurance being financed (LIAB - general liability; LLL - liquor liability and W/C - worker's compensation) and does not indicate that an income disability policy was financed. Exhibit 5, Standard Funding Agreement dated 3/22/01; Exhibit 1, Deposition of Caiazzo, day one, p. 146; Exhibit 3, Deposition of Caiazzo, p. 17.

9. Caiazzo has no documentation to support that a disability policy ever existed, or that he made or tried to make any claim under a disability policy with Medallion. Caiazzo's testimony with respect to this purported disability coverage is hopelessly confused, conflicted, and devoid of documentary support. Exhibit 1, Deposition of Caiazzo, pp. 138 - 162.

10. Caiazzo is not able to identify the particular policy which Medallion failed to place, nor is he able to state or identify the extent to which any such policy would have covered his alleged loss of income damages. Exhibit 1, Deposition of Caiazzo, pp. 138 - 162; Exhibit 3, Deposition of Caiazzo, pp. 9-21; Exhibit 5, Caiazzo's Answers to Interrogatories, Answer No. 8.

2

11.     Attorney Collins never saw a disability policy issued to Caiazzo. He investigated whether

a disability policy existed upon which to make a claim on behalf of Caiazzo and

determined there was not a policy in existence. Exhibit 24, Deposition of Collins, day

two, pp. 14-15; 32.

12.     Caiazzo did have a worker's compensation policy and in fact, made a claim on the

worker's compensation policy directly. Exhibit 12, worker's compensation cover letter;

Exhibit 26, notice of worker's compensation claim. Caiazzo received a settlement of

$24,000 as a result of the worker's compensation claim. Exhibit 1, Deposition of

Caiazzo, pp.165-167.

<div align="center">Property Claim</div>

13.     In December 2000, Scuttlebutts' insurance was cancelled due to non-payment to the

finance company. Exhibit 6, Cancellation Credit.

14.     Medallion issued Scuttlebutts a quote for rewrite of the package (property and general

liability coverage) and liquor liability policies on January 9, 2001. Exhibit 7, Quotations;

Exhibit 1, Deposition of Caiazzo, day one, p. 215.

15.     Caiazzo declined the quote as too expensive and wanted to reduce the premium.

Exhibit 1, Deposition of Caiazzo, day one, p. 212.

16.     Caiazzo then operated the bar without any insurance at all during the approximate period

between January and March 2001, apparently because of financial problems, because he

requested a re-quote after reporting that his receipts were "down dramatically."

Exhibit 8, Medallion request for re-quote.

17.     Medallion issued a quotation for Scuttlebutts on or about March 15, 2001, which included

coverage for general liability and liquor liability.  Exhibit 9, Quotation (the quotation stated, "As discussed, prefer to pass on property due to fact that applicant has been bare.").

18.  Caiazzo declined business property coverage.  Exhibit 2, Affidavit of Jean D'Addario, ¶8; Exhibit 10, binder; Exhibit 1, Deposition of Caiazzo, day one, p. 224 ("Q: And that's because ultimately you wound up purchasing less coverage than what was reflected in Exhibit 12, correct?  A: Correct.").

19.  Scuttlebutts finally secured coverage effective March 22, 2001.  Exhibit 10, binder.

20.  Scuttlebutts financed its insurance through Standard Funding and signed a finance agreement.  Exhibit 11, Finance Agreement; Deposition of Caiazzo, day one, p. 225.

21.  The general liability, liquor liability and worker's compensation policies were sent to Caiazzo, who testified he would read them.  Exhibit 12, cover letters enclosing policies and general liability policy reflecting no property coverage; Exhibit 1, Deposition of Caiazzo, p. 129.

22.  These policies were cancelled for nonpayment by April 27, 2001.  Exhibit 13, Cancellation Notice.

23.  Scuttlebutts operated without coverage until June 15, 2001, when Caiazzo asked to reinstate the policies, and signed a reinstatement warranty covering that period and provided a bank check to cover April, May, and June insurance premiums and to reinstate the coverage for the corporation.  Exhibit 14, Reinstatement Warranty and bank check.

24.  Jenna's Pub, Inc. d/b/a Scuttlebutts ("Scuttlebutts") declared Chapter 11 bankruptcy on May 31, 2001.  Exhibit 15, Bankruptcy Docket Report.

4

25.   The Bankruptcy Court converted the claim to Chapter 7.  Exhibit 15, Bankruptcy Docket
      Report.

26.   Scuttlebutts filed a schedule of its personal property as part of the bankruptcy proceeding,
      which was signed by Caiazzo under the pains and penalties of perjury.  Exhibit 16,
      Personal Property Schedule.

27.   Caiazzo seeks to recover in this suit for the personal property sold as a result of the
      bankruptcy.  Exhibit 1, Deposition of Caiazzo, p. 42 - 46; Exhibit 17, referenced
      deposition exhibits 3, 23, 24, 25A and 25 B.

28.   Additional personal property claimed in this suit was not listed as assets of Scuttlebutts in
      the bankruptcy.  Exhibit 17.

29.   The Statement of Financial Affairs filed in Bankruptcy Court by Caiazzo under the pains
      and penalties of perjury did not include this loss or claim as an asset of Scuttlebutts.
      Exhibit 18, Statement of Financial Affairs.

30.   The Statement of Financial Affairs was never revised to reflect this lawsuit.  Exhibit 15,
      Bankruptcy Docket Report.

31.   The bankruptcy matter was closed on May 16, 2005.  Exhibit 15, Bankruptcy Docket
      Report.

32.   During the pendency of the bankruptcy, on July 18, 2001, Essex Superior Court ruled that
      Scuttlebutts breached its lease with Salem Laffayette.  Exhibit 19, Docket Report; Exhibit
      1, Deposition of Caiazzo, day one, p. 195)

33.   As a result, the sheriff order Caiazzo to vacate the premises.  Exhibit 1, Deposition of
      Caiazzo, day one, pp. 190-191.

5

34.    Caiazzo claims certain property left at the location to be picked up at a later date, was

      stolen. Exhibit 1, Deposition of Caiazzo, pp. 192 - 194.

35.    Caiazzo, in his individual capacity, makes a claim for this property taken from

      Scuttlebutts. Exhibit 1, Deposition of Caiazzo, day one, p. 198.

36.    Caiazzo's personal property would not be covered under a policy of insurance issued to

      Jenna's Pub, Inc. d/b/a Scuttlebutts. (See Deposition of Caiazzo, day 1, pp. 198-99,

      Exhibit 1).

37.    Attorney Collins investigated whether a policy existed upon which to make a property

      loss claim and concluded there was no policy upon which to make a claim. Collins

      investigated the merits of the property loss claim and determined assets claimed as part of

      Caiazzo's loss were included in the bankruptcy accounting as assets of Scuttlebutts.

      Exhibit 24, Deposition of Collins, day two, pp. 20-25.

38.    Collins investigated whether Caiazzo could personally recover for the property loss and

      determined he did not have a good faith basis to make a claim for the property loss on

      behalf of Caiazzo. Exhibit 24, Deposition of Collins, day two, p. 28; 32.

<div align="center">Liability Claim</div>

39.    In 1998, an individual named Joseph Cuttichia sued a corporation known as Donna's Pub

      Inc. d/b/a Cai's Food & Spirits (hereinafter, "Cai's"), in the Malden District Court.

      Cuttichia alleged he sustained personal injuries on or about September 13, 1996 as a

      result of an altercation at Cai's. Exhibit 20, Cuttichia Complaint.

40.    Service was made in hand at the corporate business address of Cai's. Exhibit 20.

41.    Cai's defaulted, damages were assessed, judgment entered, and an execution issued.

<div align="center">6</div>

Exhibit 21, Court Orders.

42.    Cuttichia later filed suit against Caiazzo, individually, in the Essex Superior Court, to

pierce the corporate veil and enforce the underlying judgment.  Exhibit 22, Complaint.

43.    Once again, Caiazzo failed to appear and default judgment was entered against Caiazzo in

his individual capacity.  Exhibit 22, Court Orders.   In her December, 2002 order on the

default judgment, Judge Kottmyer specifically found that Mr. Caiazzo did not appear

although notices were given.  *Id.*

44.    Essex Superior Court issued an execution against Caiazzo in the amount of

approximately $41,000.  Exhibit 22.  In connection therewith, Cuttichia obtained a lien

against Caizzo's real property.

45.    In April, 2003, Caiazzo agreed to pay Cuttichia $35,000 from the sale of his encumbered

property and at that time sought reimbursement from his insurance carrier.  Exhibit 23.

46.    Caiazzo, through his attorney, first reported the Cuttichia matter to Medallion in

December 2002.  Exhibit 24, Deposition of Attorney Thomas Collins, pp. 41 - 44.

47.    Caiazzo lacks any documentation to support his allegation that he reported the claim to

Medallion in approximately 1998.  Exhibit 1, Deposition of Caiazzo, day one, pp. 59-61;

66.

48.    Caiazzo initially claimed he retained a copy of the letter he allegedly forwarded to

Medallion and produced it.  Then, upon examination of his document production

suggested his former attorney retained a copy.  Exhibit 1, Deposition of Caiazzo, day one,

59 - 67.

49.    This also proved to be untrue following a request for production of documents from

Caiazzo's former attorney, Thomas Collins, and the deposition of Thomas Collins.
Exhibit 24, Deposition of Collins, pp. 40-41.

50.  Caiazzo claims he did not receive any further notices of the two lawsuits, defaults and
     judgments because he no longer resided where the notices were being served as he and
     his wife were divorcing.  (See Deposition of Caiazzo, Exhibit 1, pp. 87-88).

51.  When Caiazzo first reported the claim to Medallion, he claimed he had not received prior
     notice of either action. Exhibit 25, Letter of Thomas Collins.  Caiazzo testified he
     provided this information to Attorney Collins, reviewed this letter before it was sent, and
     that the letter was accurate.  Exhibit 1, Deposition of Caizzo, p 83.

52.  After identifying the company that insured Cai's in 1996, Medallion promptly submitted
     a Notice of Occurrence to Pacific Insurance Company ("Pacific").  Exhibit 2, Affidavit of
     Jean D'Addario, ¶13.

53.  Pacific denied the claim because the incident did not arise out of the selling or furnishing
     of alcohol and was therefore not covered under the policy.  Pacific reserved its rights
     relative to the late notice of the claim.  Exhibit 26, Pacific denial.

54.  Upon receiving the denial, Attorney Collins determined he did not have a good faith basis
     to pursue coverage for the loss.  Exhibit 24, Deposition of Collins, pp. 38-39.

THE MEDALLION INSURANCE AGENCIES
By its attorneys,


/s/ Kerry D. Florio
William D. Chapman, BBO# 551261
Kerry D. Florio, BBO# 647489
MELICK, PORTER AND SHEA, LLP
28 State Street
Boston, MA 02109
(617) 523-6200
kflorio@melicklaw.com




## CERTIFICATE OF SERVICE

I, Kerry D. Florio, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.




/s/ Kerry D. Florio
Kerry D. Florio


Date: March 3, 2006

# Exhibit 1A

VOLUME I
PAGES 1 TO 245
EXHIBITS: SEE INDEX

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:04CV12627

STEPHEN D. CAIAZZO,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )
                                   )
THE MEDALLION INSURANCE            )
AGENCIES, INC.,                    )
                                   )
        Defendant.                 )

        DEPOSITION OF STEPHEN D. CAIAZZO, a
witness called on behalf of the Defendant,
pursuant to the Massachusetts Rules of Civil
Procedure before Lisa Abdo, Certified
Shorthand Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the
offices of Melick, Porter & Shea, LLP, 28
State Street, Boston, Massachusetts, on
Friday, May 6, 2005, commencing at 10:11 a.m.

---

APPEARANCES:

Melick, Porter & Shea, LLP
    (by William D. Chapman, Esq.,
    and Kerry D. Florio, Esq.)
    28 State Street
    Boston, Massachusetts  02109
    617.523.6200,
    for the Plaintiff.

Law Offices of Dean Carnahan
    (by Dean Carnahan, Esq., via telephone)
    126 Broadway
    Arlington, Massachusetts 02474,
    for the Defendant.

---

I N D E X

DEPONENT:        DIRECT
Stephen D. Caiazzo

    (by Mr. Chapman)        6

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 1 | Complaint | 53 |
| 2 | Plaintiff's initial disclosure documents sent to Mr. Chapman from Mr. Carnahan on March 11, 2005 | 60 |
| 3 | One-page supplementation faxed to Mr. Chapman from Mr. Carnahan on May 3, 2005 | 60 |
| 4 | Plaintiff's Answers to Interrogatories | 74 |
| 2A | Letter from Mr. Collins to Mr. DeVincentis dated May 16, '03 | 82 |
| 2B | Request For Default Judgment | 87 |
| 5 | Summons and a three-page complaint | 93 |
| 6 | Complaint and a return of service | 101 |
| 7 | Letter dated December 12, '02 from the Law Offices of Stephen Whitman to Thomas Collins | 106 |
| 8 | Order of Notice | 112 |
| 9 | Clerk's Notice | 113 |
| 10 | Workers' Comp Employer's First Report of Injury | 177 |

---

E X H I B I T S

| NO. | | PAGE |
|---|---|---|
| 11 | Workers' Comp Employer's First Report of Injury | 182 |
| 2C | Handwritten List | 201 |
| 2D | Handwritten List | 201 |
| 12 | Proposal For Insurance For Scuttlebutt's | 207 |
| 2E | Draft Financing Contract | 213 |
| 13 | Quotation | 214 |
| 14 | Quotation | 220 |
| 15 | Premium Financing Agreement | 222 |
| 16 | Certificate of Insurance and Commercial General Liability Coverage Declarations | 235 |
| 17 | Reinstatement Warranty | 237 |
| 18 | Bank Check | 239 |
| 19 | Notice of Cancellation | 239 |

5

```
 1          P R O C E E D I N G S
 2          MR. CARNAHAN:  What about the usual
 3  stipulations?
 4          MR. CHAPMAN:  Yes.  That's what I
 5  would propose.  So we would reserve --
 6          MR. CARNAHAN:  Yes.  And put it in
 7  the record.
 8          MR. CHAPMAN:  Right -- reserve
 9  objections, except as to the form of the
10  question, until trial.  Reserve motions to
11  strike until trial.
12          Dean, I'll leave it up to you as to
13  what you would like to do in terms of reading
14  and signing.
15          MR. CARNAHAN:  Yes.  Okay.  Yes, we
16  can do that.
17          MR. CHAPMAN:  So would you like to
18  do that within 30 days of receipt of the
19  transcript?
20          MR. CARNAHAN:  Yes.
21          MR. CHAPMAN:  So the witness will
22  read and sign.  And maybe I should state for
23  the record that Plaintiff's attorney, Dean
24  Carnahan, is participating by telephone today
25  at his request which we were agreeable to.
```

6

```
 1  And I should also say that we're going to be
 2  going through some documents today, which
 3  I'll be happy to make copies of the exhibits
 4  and send them to you after the deposition.
 5  Okay?
 6          MR. CARNAHAN:  All right.
 7          STEPHEN D. CAIAZZO
 8  a witness called for examination by counsel
 9  for the Defendant, being first satisfactorily
10  identified and duly sworn, was examined and
11  testified as follows:
12          DIRECT EXAMINATION
13  BY MR. CHAPMAN:
14  Q.  Could you state your name for the record,
15      please.
16  A.  Stephen Caiazzo.
17  Q.  And what's your date of birth?
18  A.  December 4, 1951.
19  Q.  Where do you currently reside?
20  A.  2106 Southwest 49th Street in Cape Coral,
21      Florida.
22  Q.  How long have you lived at that address?
23  A.  A little over a year.
24  Q.  And do you live there with anybody?
25  A.  Yes.
```

7

```
 1  Q.  Who?
 2  A.  My girlfriend.
 3  Q.  What's her name?
 4  A.  Susan.
 5  Q.  What's her last name?
 6  A.  Ciccarelli, C-i-c-c-a-r-e-l-l-i.
 7  Q.  And are you currently employed?
 8  A.  No.
 9  Q.  When is the last time you were employed in
10      any capacity?
11  A.  It was probably 2000, 2001.
12  Q.  And what was your last employment?
13  A.  For a short period of time in 2002 for a
14      couple of months.
15  Q.  And what was the employment that you had in
16      2002?
17  A.  I worked at the Blue Parrot in Peabody,
18      Massachusetts, as one of the coordinators and
19      managers.
20  Q.  Where is the Blue Parrot.  What street
21      address is it on?
22  A.  It was on Route 1 in Peabody.
23  Q.  And did you have any ownership interest in
24      the Blue Parrot?
25  A.  No.
```

8

```
 1  Q.  Who was the owner of the Blue Parrot, do you
 2      know?
 3  A.  It was a Joe Bocelli.
 4  Q.  And for what period of time in 2002 did you
 5      work at the Blue Parrot?
 6  A.  I believe it was maybe February -- I'm sorry.
 7      Probably November -- November to January
 8      2002.
 9  Q.  So November '01, right?
10  A.  Yes.
11  Q.  To February '02?
12  A.  Uh-huh.
13  Q.  And just for the record, you have to say --
14  A.  Yes.
15  Q.  -- "yes," "no."  She can't take down the --
16  A.  Yes.  Sorry.  Yes.
17  Q.  And maybe for the record, I should say -- it
18      appears you've been involved in litigation
19      before, so I'm assuming you've had a
20      deposition before?
21  A.  Yes.
22  Q.  So I assume you know the process.  But just
23      for the record, obviously I'm going to be
24      asking you a series of questions.  If you
25      don't understand any of my questions, please
```

**Page 9**

1  just say so. If you'd like me to rephrase,
2  please just say so. If you want to take a
3  break at any time, you're free to do that.
4  And let me know if anything is unclear to
5  you. What I'm trying to do here is ask
6  questions that are clear, that we can get a
7  clear answer to --
8  A. Absolutely. Understood.
9  Q. -- so that the written record is clear.
10        Now, what were your job duties and
11  responsibilities as the coordinator at the
12  Blue Parrot?
13  A. Well, basically, Mr. Bocelli contacted me
14  based on my history. And he wanted me to get
15  involved in ownership, combined ownership of
16  the restaurant and to build it. It was still
17  under construction, to handle that part and
18  to eventually be co-owner with him.
19  Q. And so what became of that?
20  A. Opened up the restaurant, and it wasn't
21  exactly the way we had discussed. He had his
22  underage children working there. He had his
23  wife working there. He had another manager
24  that was -- didn't understand basically the
25  same philosophy we were both agreeable on.

**Page 10**

1  A. And as a result, I had brought all my people
2  from the last bar to work there and was just
3  very disillusioned, upset the way it was
4  going in the wrong direction.
5  Q. Did you have any kind of formal agreement
6  with Mr. Bocelli about how your ownership
7  interests would be handled? Was there any
8  kind of written contract between you and
9  Mr. Bocelli?
10  A. It wasn't written. It was oral.
11  Q. As a result of you and Mr. Bocelli parting
12  ways, was there any kind of claim or
13  litigation?
14  A. No, not yet. He had taken all my equipment,
15  tables and chairs, things of that sort. We
16  haven't got to that yet.
17  Q. Do you anticipate a suit?
18  A. Absolutely.
19  Q. Have you retained counsel in connection with
20  the dispute with Mr. Bocelli?
21  A. No, not yet.
22  Q. Do you know if Mr. Bocelli has?
23  A. I don't know that either.
24  Q. Have there been any kind of written claims,
25  correspondence going back and forth?

**Page 11**

1  A. No, no. He's aware of what happened. And no
2  one's been able to find him. He's changed
3  the corporation name I think about three or
4  four times, sold all the assets. And when I
5  found out about it, that's when we decided to
6  .pursue this.
7  Q. And what's the nature of your gripe with
8  Mr. Bocelli? Is it because he's got some of
9  your business equipment? Or is it something
10  else, something in addition to that?
11  A. No. I had no problem other than the fact
12  that I gave all tables, chairs, all
13  restaurant equipment to him based on the fact
14  that this was going to be as part of my
15  ownership. And when that fell through, he
16  kept all the equipment and then sold it at
17  auction without -- refusing to return it
18  basically is what happened.
19  Q. And did you ever make any kind of written
20  demand upon him to return the equipment?
21  A. Yes, I did.
22  Q. And did you do that on your own, or did you
23  do that through counsel?
24  A. I did it on my own.
25  Q. When did you move to Florida?

**Page 12**

1  A. February of last year, February 1st, I
2  believe, February 2nd.
3  Q. And where were you residing just before you
4  moved to Florida?
5  A. In Malden.
6  Q. And the street address?
7  A. 30 -- I think it was 42 -- or was it
8  Ledgewood -- Ledgewood Estates. I don't know
9  the exact street, but it's Ledgewood Estates.
10  I believe it's 42.
11  Q. Is Ledgewood Estates a neighborhood?
12  A. A townhouse community.
13  Q. And number 42 refers to, what, the street
14  address; but you don't know the street?
15  A. Right.
16  Q. How long you did you live at that address?
17  A. Probably for a year and a half, a year and a
18  half, two -- yes, probably about a year and
19  a half.
20  Q. And where did you live prior to that?
21  A. Rockport, Massachusetts.
22  Q. So what's the last address you had prior to
23  Ledgewood Estates?
24  A. I think it was 6 King Street.
25  Q. In Rockport?

13

```
 1   A.  Yes.
 2   Q.  And how long did you live at 6 King Street in
 3       Rockport?
 4   A.  I believe about a year.
 5   Q.  And where did you live prior to 6 King
 6       Street?
 7   A.  Lynnfield, Massachusetts, 325 Edgemere Road.
 8   Q.  How long did you live at that address?
 9   A.  Thirteen years.
10   Q.  And so do you recall when you first -- what
11       year it was that you first moved into 325
12       Edgemere in Lynnfield?
13   A.  We built a house in 1986, I believe,
14       somewhere around there.
15   Q.  So you lived at 325 Edgemere from
16       approximately 1986 until approximately 1999?
17   A.  Probably pretty close to -- well, maybe to
18       '96, '97, somewhere around there.
19   Q.  And so when you left 325 Edgemere in
20       Lynnfield is when you moved to Rockport?
21   A.  Correct.
22   Q.  Correct me if I'm wrong, but we seem to be
23       missing -- is there any other address that
24       you've lived at since 1986?
25   A.  I know a short period when we -- I don't
```

14

```
 1       know, three or four months in Rockport.  We
 2       were in the process of building a house.  We
 3       purchased a piece of land after selling
 4       Edgemere Road.  And we moved to Rockport at
 5       two locations while we were getting ready to
 6       undergo construction.
 7   Q.  What was the other address in Rockport where
 8       you --
 9   A.  The other address was -- it was a main road,
10       a main road in Gloucester on the
11       Gloucester/Rockport line.  I'm sorry.  I
12       don't have it offhand right now.
13   Q.  And you lived at this other address at the
14       Gloucester/Rockport line for roughly six
15       months or so?
16   A.  Maybe six months to a year.  I don't know
17       exactly.
18   Q.  Now, can you tell me -- first of all, where
19       did you grow up?
20   A.  Malden, Massachusetts.
21   Q.  And did you go to Malden -- high school in
22       Malden?
23   A.  Yes, I did.
24   Q.  And is that Malden High?
25   A.  Yes.
```

15

```
 1   Q.  How did you first -- who do you know from the
 2       Medallion Insurance Agency?
 3   A.  I know Joe DeVincentis was the owner.  And I
 4       know John D'Addario who was an insurance
 5       representative with them.
 6   Q.  Do you know anyone else from the Medallion
 7       agency?
 8   A.  I did business with his wife on a couple of
 9       occasions.  She insured my boat.  And I never
10       really -- I never really met her except for
11       one time, I believe.  She also worked there.
12   Q.  And is there anyone else you know at
13       Medallion?
14   A.  I don't believe so.
15   Q.  And how did you first meet Joe DeVincentis?
16   A.  We played together on the same team in high
17       school.  He was a year behind me.
18   Q.  What kind of team are we talking about?
19   A.  Junior football team.
20   Q.  And when did you first meet Mr. D'Addario?
21   A.  Babe Ruth League, junior high school.  He was
22       associated with football and baseball.  You
23       know, we kind of grew up together in the
24       system, went to high school together.
25   Q.  What's John D'Addario's age relative to
```

16

```
 1       yours?
 2   A.  We're the same age, I believe.
 3   Q.  So were you in high school together at Malden
 4       High?
 5   A.  Yes, we were.
 6   Q.  How would you describe your relationship with
 7       Joe DeVincentis?
 8   A.  Well, I didn't know him very well.  I mean we
 9       weren't good friends, didn't hang in the same
10       group.  He was younger than I was.  And that
11       was about it.
12   Q.  And how would you characterize your
13       relationship with John D'Addario?
14   A.  I knew Jack fairly well.
15   Q.  Would you say that growing up he was a friend
16       of yours or...
17   A.  We didn't really hang out together in the
18       same group, again, but periodically.
19   Q.  And just to get some background, what did you
20       do after high school?
21   A.  Went to junior college in Nebraska and then
22       transferred to University of Minnesota.
23   Q.  Did you graduate from the University of
24       Minnesota?
25   A.  No, no.  Three or four credits short.  I hurt
```

```
                                                  17
 1      my knee so I couldn't return my senior year.
 2   Q. Were you playing football at the University
 3      of Minnesota?
 4   A. Yes.
 5   Q. What year was it that you hurt your knee?
 6   A. 1972 or '73.  It was in the late fall.  It
 7      was during winter conditioning.
 8   Q. So was it about that time, late '72 or
 9      early '73, when you left the University of
10      Minnesota?
11   A. I left in the spring of '73.
12   Q. And which knee was it that you hurt back
13      then?
14   A. My right knee.
15   Q. And what did you do after you left the
16      University of Minnesota in 1973?
17   A. I was rehabilitating my knee and took some
18      courses at a couple of universities.
19   Q. But you haven't obtained a college degree; is
20      that correct?
21   A. That's correct.
22   Q. What did you first do for work of any kind
23      after you left the University of Minnesota?
24   A. I went to work for the Department of
25      Correction.
```

```
                                                  18
 1   Q. In Massachusetts?
 2   A. Yes.
 3   Q. And for what period of time did you work for
 4      the Mass. Department of Correction?
 5   A. I started in 1977.  I worked there
 6      approximately just about ten years.
 7   Q. Were you employed at all between when you
 8      left the University of Minnesota in 1973 and
 9      when you started at the Mass. Department of
10      Correction in 1977?
11   A. I had worked -- I obtained my insurance
12      license through the Commonwealth of
13      Massachusetts.  I worked there for a short
14      period of time while I was training.  And
15      then I had signed with the New England
16      Patriots.  And then I also worked with
17      Beneficial Finance, their management program,
18      for about seven, eight months.
19   Q. Now, when you say you got your insurance
20      license in the Commonwealth of Massachusetts,
21      are we talking about an insurance broker's
22      license?
23   A. No, just an agent.
24   Q. An agent license?
25   A. Uh-huh.
```

```
                                                  19
 1   Q. Yes?
 2   A. Yes.
 3   Q. And when did you get that license?  What
 4      year?
 5   A. I believe it was maybe '76.
 6   Q. And do you still have a Massachusetts
 7      insurance agent's license?
 8   A. No, I don't.
 9   Q. When is the last time you had a license?
10   A. I just never renewed it once it was
11      originally issued to me.
12   Q. Do you know how long the license was in
13      effect?
14   A. I have no idea.
15   Q. I trust you had to take a test of some kind
16      to get the license?
17   A. Yes, I did.
18   Q. And did you take some insurance courses
19      before taking the test?
20   A. Yes.
21   Q. Do you remember where you took those courses?
22   A. It was kind of a training module at the
23      insurance company, classes, things of that
24      sort.
25   Q. And have you ever worked for an insurance
```

```
                                                  20
 1      company?
 2   A. No.
 3   Q. Which insurance company did you take the
 4      classes at?
 5   A. Metropolitan Life.
 6   Q. And how was it that you were getting your
 7      insurance license in the first place?
 8   A. It just happened to be a job that was offered
 9      to me while I was working out, getting my
10      knee -- rehabilitating it and getting ready
11      to sign with New England or one of the two or
12      three teams that showed interest.
13   Q. And who was it that you got a job offer from?
14   A. I've got a friend of mine that worked for
15      Metropolitan Life.  And I forget his name,
16      but the sales manager called me in,
17      interviewed me and offered me a job.
18   Q. And you took the insurance agent's license
19      test as a result of having this offer?
20   A. Yes, I did.
21   Q. Did it get to the point -- I understand you
22      never worked for MetLife, correct?
23   A. Yes, I did work for MetLife.
24   Q. You did?
25   A. Yes.
```

**21**

```
 1   Q.  Okay.  So what period of time did you work
 2       for MetLife?
 3   A.  Probably nineteen -- somewhere in 1976, '75,
 4       late -- no.  It was before -- it was probably
 5       around late '75, '76, somewhere in that
 6       vicinity.
 7   Q.  Until when?
 8   A.  We only lasted a few months.
 9   Q.  And why did you leave that job?
10   A.  To go to work.  I had another offer with the
11       state, Department of Correction.
12   Q.  Other than the job -- I'm assuming -- I
13       shouldn't assume.  But what was your job at
14       MetLife?  In sales?
15   A.  Yes.
16   Q.  And selling life insurance?
17   A.  Basically life insurance.
18   Q.  And did you sell any disability insurance?
19   A.  I don't believe disability, no.  It was a
20       combination life insurance, term.  At that
21       point, I think they described it as -- you
22       know, it was kind of like -- it was
23       retirement funds.  I forget.  They've since
24       changed the terminology, but that's basically
25       what -- whole life conversions and things of
```

**22**

```
 1       that sort.
 2   Q.  Fair to say that under the license you got
 3       from the Commonwealth of Massachusetts, you
 4       would have been able to sell disability
 5       insurance policies?
 6   A.  I don't remember exactly, but I believe it
 7       may have been part of it.
 8   Q.  And do you remember taking classes on
 9       disability insurance in connection with
10       getting your license?
11   A.  I believe there was a section in there on
12       that.
13   Q.  Now, was it within this period of time that
14       you were working for Metropolitan that you
15       had some tryouts with the Patriots and some
16       other teams?
17   A.  Yes.
18   Q.  So what became of these tryouts?
19   A.  I had -- I received information from the New
20       England Patriots.  And they invited me for
21       the mini spring camp on a try-out basis.  And
22       after the weekend tryout, they offered me a
23       contract.  I signed as a free agent with
24       them.
25   Q.  And did you have any tryouts with any other
```

**23**

```
 1       teams?
 2   A.  The Toronto Argonauts, the Canadian league,
 3       the following year.
 4   Q.  Was there ever a time where you played either
 5       for the Patriots or the Argonauts?
 6   A.  Not in a regular game, but the training camp
 7       with both of them and scrimmages.  I never
 8       played in a regular game.
 9   Q.  Now, by the time you started with the Mass.
10       Department of Correction in 1977, by that
11       time, was football out of the question?
12   A.  I believe so.
13   Q.  And was that a decision you made to not
14       pursue football, or did it have to do with an
15       injury?
16   A.  No.  I just -- I was a little bit
17       disillusioned after coming back from Toronto,
18       that's all because they had different rules
19       up there, the Canadian rules, as to how many
20       Americans were allowed on the roster.  And at
21       that point, I just wanted to get on with my
22       life.  My wife at that time -- or my wife to
23       be was kind of pressuring me to get married
24       and settle down and get a regular job as
25       opposed to flying around the country of
```

**24**

```
 1       different -- hopefully hooking on with a
 2       team.
 3   Q.  How many times have you been married?
 4   A.  Once.
 5   Q.  And what was your wife's name?
 6   A.  Donna.
 7   Q.  Now, does Donna still live in the Boston
 8       area?
 9   A.  I believe she's living in Maryland.
10   Q.  When were you divorced?  When were you
11       married and when were you divorced?
12   A.  We were married in November of 1979.  And we
13       were divorced in 2003, June.
14   Q.  And what's Donna last name?
15   A.  Durant.
16   Q.  D-u-r-a-n-t?
17   A.  Correct.
18   Q.  And do you know her current street address?
19   A.  No, I don't.
20   Q.  Do you know what town she lives in in
21       Maryland?
22   A.  No, I don't.
23   Q.  She's remarried?
24   A.  No.
25   Q.  Is Durant her maiden name?
```

**Page 25**

```
 1   A.  Yes, it is.
 2   Q.  Do you have any alimony or child support
 3       obligations to Donna currently?
 4   A.  Yes, I do.
 5   Q.  What is that?  Just -- you know, you don't
 6       have to go into the details.  But what amount
 7       do you pay?  How often do you pay the child
 8       support?
 9   A.  $87.50 a week until my daughter graduates
10       from college.
11   Q.  So that's for child support?
12   A.  Child support and college tuition and
13       expenses.
14   Q.  And how about alimony?
15   A.  There wasn't any alimony.
16   Q.  How many kids do you have?
17   A.  One.
18   Q.  And what's her name?
19   A.  Jenna.
20   Q.  And how old is Jenna now?
21   A.  21.
22   Q.  And when did you first separate from Donna?
23   A.  It was sometime in 2002.  I believe it was in
24       the spring.  I'm not exactly sure.
25   Q.  Were you represented by a lawyer in the
```

**Page 26**

```
 1       divorce?
 2   A.  No.  I represented myself.
 3   Q.  And when you first separated, was there any
 4       kind of temporary order entered with regard
 5       to support payments of any kind?
 6   A.  Just a restraining order which normally
 7       precedes the court hearing.
 8   Q.  But any preliminary financial orders of any
 9       kind?
10   A.  No, not that I remember.
11   Q.  Did you continue to pay for -- whether or not
12       there was an order when you first separated
13       in '02, did you pay for Jenna's expenses?
14   A.  Yes, I did.
15   Q.  Aside from the insurance agent's license that
16       you got, have you ever had any other
17       professional licenses of any kind?
18   A.  I just went to the training academy of law
19       enforcement associated through the Department
20       of Correction.  I was issued a firearm's
21       license through the Commonwealth under care
22       and custody.
23   Q.  And for how long did you work at the Mass.
24       Department of Correction?
25   A.  Almost ten years.
```

**Page 27**

```
 1   Q.  And what was your job?
 2   A.  I started out, I was the recreation director
 3       and working in the capacity of program
 4       director.
 5   Q.  And what did you do as recreation director?
 6   A.  Well, there was a new construction.  It was a
 7       minimum security facility that they just
 8       newly introduced to Massachusetts.  So I
 9       coordinated the building of the exterior,
10       interior, grounds, weight room, ball fields,
11       things of that sort.
12   Q.  And where is this?
13   A.  In Norfolk, Massachusetts.
14   Q.  And what were your duties as the program
15       director?
16   A.  That included coordinating high school
17       diploma efficiency exams, local college
18       courses by UMass Boston, Boston University,
19       Bunker Hill Community College, coordinating
20       the inmates in their specific needs and
21       additional educational requirements.
22   Q.  And was that also working out of the Norfolk
23       facility?
24   A.  Yes, it was.
25   Q.  And you left the Department of Correction in
```

**Page 28**

```
 1       approximately 1987, then?
 2   A.  Somewhere in that vicinity.
 3   Q.  And why did you leave that job?
 4   A.  I was working in that capacity, and I wasn't
 5       making enough money.  I was working two or
 6       three jobs on state payroll, obviously.  And
 7       I wanted to get into private business.
 8   Q.  So what did you first do for work after you
 9       left the Department of Correction?
10   A.  While I was still employed for the
11       department, I was looking around for a
12       restaurant, my brother and myself.  And we
13       opened one in Malden, Mass.
14   Q.  What's your brother's name?
15   A.  David.
16   Q.  And his last name is also Caiazzo?
17   A.  Yes, it is.
18   Q.  Okay.  Where does David live now?
19   A.  He lives in Malden.
20   Q.  What's his address?
21   A.  I don't know the exact address.
22   Q.  Do you know what street he lives on?
23   A.  No.  I stayed there last night, and I don't
24       know.  I'm sorry.
25   Q.  And so you opened up a restaurant or a bar
```

29

```
 1       with David?
 2   A.  Yes.
 3   Q.  What was the name of that?
 4   A.  It was called Caiazzo's Playoff Pub.
 5   Q.  And where was that located?  Do you remember
 6       the street address of that?
 7   A.  Yes, that was in Pearl Street in Malden.
 8   Q.  Now, did you operate that as a d/b/a?  Did
 9       you form a corporation to operate that?
10   A.  We formed a corporation.
11   Q.  What was the name of the corporation?
12   A.  I believe it was Caiazzo's Pub, Inc., I
13       believe.
14   Q.  And were you and David 50-50 in that?
15   A.  Yes, we were.
16   Q.  And how long did that operate?
17   A.  We opened it in 1982.  And we moved -- we
18       built another facility.  So that lasted until
19       maybe '88, '89.
20   Q.  So it was at Pearl Street from '82 to '89?
21   A.  Correct.
22   Q.  And where did you move it to?
23   A.  We built a new facility on Exchange Street in
24       Malden.
25   Q.  So how long did the Caiazzo's Playoff Pub
```

30

```
 1       operate on Exchange Street?
 2   A.  That was a different name.  That was Cai's
 3       Food & Spirits.  It was a new corporation, a
 4       new facility that we built from scratch.
 5   Q.  So was there a new corporation formed for
 6       Cai's Food & Spirits?
 7   A.  Yes, there was.
 8   Q.  And what was the name of that corporation?
 9   A.  Donna's Pub, Inc.
10   Q.  And for what period of time did Cai's Food &
11       Spirits operate?
12   A.  Probably from 1990 until 1997, '98.
13   Q.  And were you 50-50 in that with David?
14   A.  No.  I owned that 100 percent.
15   Q.  And did you open another establishment after
16       Cai's -- did Cai's close in '97 or '98?
17   A.  Yes, it did.
18   Q.  And did you open another establishment after
19       that?
20   A.  We built another one in Salem, Mass.
21   Q.  And was that Scuttlebutt's?
22   A.  Yes, it was.
23   Q.  And were you the sole owner of that as well?
24   A.  Yes.
25   Q.  And for how long did Scuttlebutt's do
```

31

```
 1       business?
 2   A.  A little over three years.
 3   Q.  And if you can tell me the years when that
 4       did business.
 5   A.  I believe we opened in 1998 and closed
 6       September of 2001.
 7   Q.  And was there a new corporation formed to
 8       operate Scuttlebutt's?
 9   A.  Yes.  That was Jenna's Pub, Inc.
10   Q.  And have you operated any establishments
11       after Scuttlebutt's, and setting aside the
12       one that you've already told us about on
13       Route 1 in Peabody?
14   A.  No.
15   Q.  Have you ever had either an ownership
16       interest in or been involved with operating
17       any establishment other than Caiazzo's
18       Playoff Pub, Cai's Food & Spirits, or
19       Scuttlebutt's?
20   A.  There was just the Blue Parrot.  And after
21       that, for a couple of months there was -- it
22       was the Brick House on Route 1.  And we
23       attempted to go in and purchase the whole
24       building, take over the business.  What
25       happened was of the one license, the owner of
```

32

```
 1       the one license tried to sell half of the
 2       license to a different entity.  And we looked
 3       into it and found out that that was -- you
 4       couldn't properly do that.
 5   Q.  When did you get involved with the Brick
 6       House?
 7   A.  Probably about -- maybe the end of 2002,
 8       early 2003.
 9   Q.  So the Brick House came after the Blue
10       Parrot?
11   A.  Right.
12   Q.  And did you have a partner in the Brick House
13       endeavor?
14   A.  No.
15   Q.  And this -- first of all, it sounds like
16       something that didn't get off the ground,
17       right?
18   A.  Well, basically what happened was we had
19       someone who had a license for a particular
20       spot.  Now, under the Commonwealth's law, you
21       can only have one license per facility.  What
22       he did was -- unbeknown to us, was he
23       offered -- it was a big building.  And one
24       was a restaurant, and the other one was the
25       bar side.  What he did was he was selling
```

33

```
 1    half of the interests on the other side of
 2    the building supposedly with a new license
 3    for X amount of money.  He was controlling
 4    the purchase of the liquor and everything
 5    else.  So you had to pay him for the liquor
 6    and everything else.  It just wasn't a legal
 7    entity.
 8  Q.  And who is this person that you're referring
 9    to, that you were dealing with?
10  A.  I don't even remember his name.  I'm sorry.
11    It doesn't come to mind.  It was a short
12    period of time there.
13  Q.  As a result of this issue that came up about
14    the license, is there any kind of claim
15    expected arising out of this Brick House
16    operation?
17  A.  No.  It's just -- you couldn't make any money
18    there.  He was taking everything under his
19    license and dictating and coordinating
20    everything under his own rules.  Rather than
21    having my people have one half of the
22    restaurant there, it was coordinated -- it
23    was just a very racial mixture that was very
24    undesirable to my group of customers.
25  Q.  Did you say a racial mixture that was
```

34

```
 1    undesirable?
 2  A.  Well, he was promoting Brazilian nights on
 3    Saturday, you know, hip hop on Friday.  And
 4    he was charging a fee outside.  And there was
 5    a line.  It was just too -- it was too
 6    bizarre.  There were fights every single
 7    night outside, inside.  It was just very,
 8    very dangerous.
 9  Q.  Now, what town on Route 1?
10  A.  Saugus.
11  Q.  And is it currently going by the name of the
12    Brick House?
13  A.  I have no idea.
14  Q.  When you were involved with looking into it,
15    it was going by the -- it was doing business
16    as the Brick House?
17  A.  There was another name.  It started out as
18    the Brick House.  I don't recall what the
19    other name was, the other side of it, the
20    nightclub part.
21  Q.  Was it on the northbound or the southbound
22    side of Route 1?
23  A.  Northbound.
24  Q.  Did you ever draw any kind of income of any
25    kind from the Brick House, that operation?
```

35

```
 1  A.  Very tiny.  That's one of the reasons why I
 2    couldn't make any money there.  There wasn't
 3    enough money to be made to pay the employees,
 4    not to mention pay myself.  I was there kind
 5    of seven days a week, and it just wasn't
 6    financially solvent.
 7  Q.  Now, you were involved with the Brick House
 8    in 2002 and 2003.  Did I get that right?
 9  A.  It may have been late 2001, 2002, you know,
10    give or take a couple months here, whether
11    it -- 2001 through into 2002 or whatever.
12    You know, there's those two entities that
13    didn't last very long.  It was a couple of
14    months on each of them.  I don't remember
15    exactly which...
16  Q.  So your best testimony would be that you
17    worked at the Blue Parrot for a couple months
18    and worked at the Brick House for a couple
19    months?
20  A.  Right.
21  Q.  And for each of those several month periods,
22    were you working seven days a week regularly
23    or did that vary?
24  A.  Every day, seven days a week.
25  Q.  Just so I'm clear, at the Blue Parrot you
```

36

```
 1    were working seven days a week while you were
 2    involved with that operation and the same for
 3    the Brick House?
 4  A.  Correct.
 5  Q.  Now, what did your work at these places
 6    involve?  Was it -- it sounds like some of it
 7    had to do with -- well, strike that.
 8        You tell me what your work at Blue
 9    Parrot -- let's start with the Blue Parrot.
10    What did that involve when you were working
11    there seven days a week?
12  A.  Just to help him coordinate the building, the
13    building of their supposedly sports bar, to
14    get it open and to be the coordinator.
15    Basically what he did was he was looking to
16    get my -- I had a very big following, and he
17    was looking to use me to build the place up
18    to get it off the ground.
19  Q.  And what about the Brick House?  What were
20    you actually doing there during those seven
21    days a week when you did that for a number of
22    months?
23  A.  Basically the same thing.  It was already --
24    just rebuilding a section of his restaurant
25    that was nonexistent.  So he sold that
```

**37**

```
1    interest to a couple who were already
2    involved with him.  And then she had found
3    out that this was illegal to do that, you
4    know, one license split down the middle, him
5    collecting rent, him coordinating and buying
6    all of the liquor and then charging you
7    accordingly.  And so everyone just kind of
8    ran when they found out that.
9  Q.  If I'm understanding this right, at the Brick
10      House operation, there was one big space
11      which he was kind of splitting and this guy
12      was going to be -- but he was proposing to
13      have you run basically a separate business
14      but under his liquor license?
15 A.   It was under his liquor license.  There were
16      two rooms.  One was a nightclub which he was
17      promoting all these crazy nights.  And on the
18      left side apparently for quite a few years
19      prior to that was more of a pizzeria.  So
20      that's what we were looking to build up.
21      Come to find out it was too small.  It was
22      inappropriate, the facilities.  And like I
23      said, we were paying on what we found out was
24      his license which was unacceptable.  I mean
25      you couldn't -- so he was collecting money
```

**38**

```
1    from everyone over there under his license,
2    and there should have been a new license
3    issued for that different location.
4  Q.  Now, you just said a second ago that you had
5      a particular following.  How would you
6      describe what that was?
7  A.  Well, being in business since 1982, I have a
8      tremendous following, a lot of the athletes,
9      a lot of the local sport celebrities.  And
10     that was basically how Caiazzo's Playoff Pub
11     started, with local friends that were playing
12     with the Bruins and my friends with the
13     Patriots and so on and so forth.  And it just
14     became such a big entity that people traveled
15     from bar to bar.  And that was it.  Supported
16     wherever I went.
17 Q.  Now, so we've talked about Caiazzo's Playoff
18     Pub, Cai's Food & Spirits, Scuttlebutt's, the
19     Blue Parrot, the Brick House.  Have you ever
20     been involved with either operating or owning
21     any other establishment?
22 A.  No.
23 Q.  And any of the places that we've talked
24     about, have you ever operated any of those
25     simultaneously with each other, or has it
```

**39**

```
1    always been -- you know, has each
2    establishment been separate and independent?
3  A.  All separate and independent.
4  Q.  For example, during the period of time when
5      you were operating Cai's, did you do anything
6      else for income while you were operating that
7      place?
8  A.  No.  Collected -- I don't know, for a couple
9      months -- unemployment.  We used the majority
10     of the money to build the new bars.  So there
11     was a couple of months there where I
12     collected that.  But other than that, it was
13     just the money that we had put aside.
14 Q.  What are you doing for income currently?
15 A.  I'm on disability, Social Security
16     disability.
17 Q.  And when did you first file a Social Security
18     disability claim?
19 A.  Probably 2002.
20 Q.  And that's your only source of income
21     currently?
22 A.  Yes, it is.
23 Q.  And what's the nature of your disability?
24 A.  I have a torn ligament in my right knee.  I
25     have torn cartilages on both sides.  I need a
```

**40**

```
1    knee replacement, but I can't do that because
2    I got my knee infected on the original
3    operation in '72 in Minnesota.  On a
4    cartilage -- a simple cartilage procedure, it
5    got infected.  That's it.  Just bone on bone
6    and arthritis throughout.
7  Q.  Have you ever -- have you explored any kind
8      of employment possibilities since you've
9      moved to Florida?
10 A.  No, because I can't stand for a period of
11     time.  I can't carry any extra weight.  And
12     to perform -- the doctors that I saw, they're
13     just surprised that I lasted this long
14     without the operation.  So I'll sit down.
15     This is perfect right here.  But if I was
16     sitting up without the recliner, then I would
17     have to constantly keep moving.  And it
18     throbs and I have to sit down.  I can't stand
19     up or move very well, so I can't carry
20     anything or handle that capacity.
21 Q.  Now, when did you first do any insurance
22     business of any kind with either Mr.
23     DeVincentis or Mr. D'Addario?
24 A.  It was probably 1990, maybe 1991.  I think it
25     was basically when we were building Cai's.  I
```

41

1     think that's when we started.  And he handled

2     all the insurance from that point on.

3  Q.  And who of the -- which one between

4     DeVincentis and D'Addario did you first deal

5     with?

6  A.  John D'Addario.

7  Q.  Okay.  So Cai's, we're talking about the

8     place on Exchange Street that you owned by

9     yourself?

10  A.  Correct.

11  Q.  Did you get insurance for Caiazzo's Playoff

12     Pub?

13  A.  Yes, I did.

14  Q.  And what kinds of insurance did you have for

15     the Playoff Pub?

16  A.  I don't remember exactly.  It was the basic

17     package.  That was the first time we were

18     associated with business of any kind.  So I

19     was working that, plus working at the

20     Department of Correction at the same time.

21     So it was 24/7, about an hour sleep.  So as

22     far as back as I can remember, we had the

23     basic coverage that DeVincentis recommended

24     at that time.

25  Q.  And was there ever a period of time where you

42

1     operated Caiazzo's Playoff Pub uninsured?

2  A.  We received some notices for cancelation.

3     And those were the preliminary notices that

4     we eventually paid.  I think there was one

5     period of time -- it may have been a month or

6     two months -- where there was -- the policy

7     lapsed.  And I believe Jack came down and

8     took care of it.  But it was just one of

9     those things where there was a lack of

10     communication on his part for various

11     reasons.

12  Q.  Now, you got the insurance for Caiazzo's

13     Playoff Pub from someone other than Mr.

14     D'Addario or Mr. DeVincentis, correct?

15  A.  Uh-huh.

16  Q.  Yes?

17  A.  Yes.

18  Q.  Off the top of your head, you don't remember

19     the name of that agent, correct?

20  A.  No, I don't.

21  Q.  Do you remember where that agency was?

22  A.  I don't remember exactly if there was one or

23     two.  I believe one of them was located on

24     Highland Ave. in Malden.  I can't remember

25     the name.

43

1  Q.  Do you remember ever dealing with an agency

2     called B.K. McCarthy?

3  A.  B.K. McCarthy was associated with John

4     D'Addario in his employment with them.  I

5     believe that was prior to John D'Addario

6     going to work or combining forces to join

7     DeVincentis.

8  Q.  So if I understand you correctly, whatever

9     agent it was that got you the insurance for

10     Caiazzo's Playoff Pub, it was not McCarthy?

11  A.  Correct.

12  Q.  Have you ever been involved with a bar or

13     restaurant establishment called Trickers?

14  A.  That was Caiazzo's Playoff Pub.  That was --

15     Trickers was the previous restaurant.

16  Q.  For what period of time did it go under the

17     name of Trickers?

18  A.  It went for years.  Ten, fifteen, twenty

19     years, maybe even longer.

20  Q.  Did you and your brother ever operate it

21     under the name of Trickers?

22  A.  No.

23  Q.  But you do recall that there were situations

24     when you were operating Caiazzo's Playoff Pub

25     where there would be relatively brief periods

44

1     where you'd be uninsured because of notices

2     of cancelation for nonpayment?

3  A.  No, I never said Caiazzo's Playoff Pub.  I

4     said it may have been Cai's.  It wasn't

5     Caiazzo's Playoff Pub.

6  Q.  Okay.  Well, I want to be clear on that

7     because --

8  A.  Well, that's what I just said to you a minute

9     ago was it was Cai's, not Caiazzo's Playoff

10     Pub.

11  Q.  Right.

12  A.  I believe that's what I --

13  Q.  Just so -- I mean I'm not trying to trick you

14     or anything, but the question I had asked and

15     the reason I'm following up now is because

16     the question was about the Playoff Pub.

17     Okay.  But you don't -- as you sit here

18     today, you don't recall any periods of being

19     uninsured with Caiazzo's Playoff Pub; is that

20     correct?

21  A.  I don't recall any period of time.

22  Q.  Okay.  Do you recall when it was that Mr.

23     D'Addario started his relationship with

24     Medallion?  Oh, back then it was known as the

25     DeVincentis agency, right?

**Page 45**

| | |
|---|---|
| 1 | A. That's correct. |
| 2 | Q. Okay. Do you know when that happened? |
| 3 | A. When they converted and merged? Is that what |
| 4 | you're asking? |
| 5 | Q. No, no. I'm sorry. Let me rephrase it. |
| 6 | When you set up Cai's Food & Spirits, was |
| 7 | that also called Cai's Pub? |
| 8 | A. No. |
| 9 | Q. It was Cai's Food & Spirits was the -- |
| 10 | A. That was the name. |
| 11 | Q. The name of the business? |
| 12 | A. Correct. |
| 13 | Q. The person you went to for insurance for that |
| 14 | Cai's Food & Spirits was Mr. D'Addario, |
| 15 | correct? |
| 16 | A. Mr. D'Addario showed up and suggested during |
| 17 | construction to see if we could get together |
| 18 | and he could be the agent. |
| 19 | Q. And fair to say at that time he had a |
| 20 | relationship with the McCarthy insurance |
| 21 | agency? |
| 22 | A. I believe so. I'm not too positive as to |
| 23 | what it was. I remember McCarthy, he was |
| 24 | working. I believe it may have been up in |
| 25 | Beverly. I believe he was working there with |

**Page 46**

| | |
|---|---|
| 1 | McCarthy. And then there was a problem with |
| 2 | him and one of the secretaries. I don't |
| 3 | know. And then that's when he moved down to |
| 4 | DeVincentis. |
| 5 | Q. And do you remember approximately when it was |
| 6 | that he moved to DeVincentis? |
| 7 | A. No. It had to have been sometime in -- I |
| 8 | believe it was early to mid '90s. That would |
| 9 | make sense, I think. |
| 10 | Q. So you recall it was a period of years that |
| 11 | your insurance through Mr. D'Addario came |
| 12 | through the McCarthy agency, correct? |
| 13 | A. Yes. |
| 14 | Q. And once Mr. D'Addario went to the |
| 15 | DeVincentis agency, did you deal -- did you |
| 16 | continue to deal with him or did you deal |
| 17 | with anyone else from the DeVincentis agency |
| 18 | about your insurance? |
| 19 | A. For the most part, it was John D'Addario who |
| 20 | showed up with policies, wrote them. |
| 21 | Occasionally his wife would call or send one |
| 22 | of the -- we always had fairly large |
| 23 | packages, combined packages. And I believe |
| 24 | there was a couple times when she would send |
| 25 | down certain policies and other times John |

**Page 47**

| | |
|---|---|
| 1 | D'Addario would sign or bring them. But for |
| 2 | the most part, John was the one who was |
| 3 | handling it himself. |
| 4 | Q. And in terms of different types of insurance |
| 5 | that you got through -- I want to start |
| 6 | focusing in on the time once D'Addario moved |
| 7 | to DeVincentis, okay, and go from that point |
| 8 | forward. Once you were getting your |
| 9 | insurance through the DeVincentis agency, |
| 10 | what is your best memory as to what different |
| 11 | types of insurance you had for Cai's Food & |
| 12 | Spirits? |
| 13 | A. We had the regular dram shop, liquor |
| 14 | liability, workman's comp. I had business |
| 15 | interruption. I had disability income |
| 16 | insurance, fire protection, all the various |
| 17 | packages. |
| 18 | Q. And did you also have a general liability |
| 19 | coverage? |
| 20 | A. Yes. |
| 21 | Q. And you understood that general liability |
| 22 | coverage came under -- when you're operating |
| 23 | a bar, general liability coverage comes under |
| 24 | one policy and liquor liability coverage |
| 25 | comes under a different policy? |

**Page 48**

| | |
|---|---|
| 1 | A. Yes, I know that. |
| 2 | Q. Okay. And fair to say from having an |
| 3 | insurance agent's license as well as your |
| 4 | experience in getting insurance for the |
| 5 | different businesses over the years, you |
| 6 | realize in order to have insurance you have |
| 7 | to pay a premium for it, right? |
| 8 | A. I understand that. |
| 9 | Q. Now, is it also fair to say that when you |
| 10 | would get the -- well, you tell me. What |
| 11 | would typically be the process that you'd go |
| 12 | through when you were getting insurance for - |
| 13 | let's take Cai's Food & Spirits. How would |
| 14 | that work? |
| 15 | A. John D'Addario would show up, make |
| 16 | recommendations as to what type of insurance |
| 17 | he felt was necessary based on his |
| 18 | experience. And as a result, we would get |
| 19 | into negotiations and discuss various options |
| 20 | and other variables which included my |
| 21 | disability income if something should happen |
| 22 | to me seeing I was the sole owner and |
| 23 | 24-hour-a-day owner/manager with a new house, |
| 24 | summer home and everything that goes on along |
| 25 | with it. Business interruption insurance, |

```
                                                            49
 1    which was something we were certainly
 2    interested in in case of some type of fire or
 3    unbeknown interruption.  And basically by law
 4    workman's comp package, general liability,
 5    fire, and the liquor liability.
 6  Q.  Now, I take it that you -- during the period
 7    of time you were operating Cai's, that you
 8    had -- you had a home, you had one or more
 9    cars.  Where did you get the personal
10    insurance?
11  A.  My personal insurance?  Jack D'Addario always
12    wanted the car insurance.  But we had another
13    friend that was handling our personal
14    insurance, the house insurance and the cars.
15  Q.  And who was that?
16  A.  He was out of Everett.  Leo Barrett Insurance
17    Agency.
18  Q.  And so for what period of time did you do --
19    did you get insurance through the Leo Barrett
20    Insurance Agency?
21  A.  At what time?
22  Q.  Yes.  For what period of time?
23  A.  We had gone through maybe one other agency
24    over the period of time.  Green Insurance was
25    handling it for a while, then Leo Barrett.
```

```
                                                            50
 1    My wife usually handled the autos and things
 2    of that sort and the house insurance.
 3  Q.  And so Green Insurance came before Barrett?
 4  A.  I believe so.
 5  Q.  So were you getting your personal insurance
 6    through the Barrett agency from the mid '90s
 7    up until the time you closed Scuttlebutt's?
 8  A.  Yes.  I think that's a fair assumption,
 9    somewhere in that vicinity.
10  Q.  And so other than Green Insurance, Barrett
11    Insurance Agency, and D'Addario/McCarthy/
12    DeVincentis/Medallion, have you ever used any
13    other insurance agents?
14  A.  Nothing really comes to mind.  I'm not too
15    sure.  I can't remember.
16  Q.  Aside from this case here that we're sitting
17    here talking about, have you ever filed any
18    claims or suits against any other insurance
19    agents?
20  A.  Yes.  Workman's comp.
21  Q.  What other insurance agent have you filed a
22    suit or a claim against?
23  A.  I believe it was workman's comp under Legion
24    Insurance.
25  Q.  Well, I understand you made a comp claim
```

```
                                                            51
 1    before.  But I'm talking about a claim like
 2    what you have in your complaint here that an
 3    insurance agent did something wrong.
 4  A.  I don't remember.  Other than the workman's
 5    comp, I believe that's it.  Medallion,
 6    workman's comp, Legion.  Nothing else comes
 7    to mind right now.
 8  Q.  Well, first of all, what workers' comp claim
 9    are we talking about?
10  A.  We're talking about a workman's comp claim at
11    Jenna's Pub, Inc., at Scuttlebutt's.
12  Q.  And this was an injury that you sustained
13    while you were at work?
14  A.  Correct.
15  Q.  And when did you have this injury?
16  A.  The first time I injured it was 2000.  The
17    second time was in 2001.
18  Q.  And this is injuries to what?  Your knee?
19  A.  My right knee.
20  Q.  And so are you saying that in connection with
21    either of these workers' comp injuries that
22    any insurance agent did anything wrong with
23    respect to either the processing of either of
24    these workers' comp claims or the handling of
25    the workers' comp policy?
```

```
                                                            52
 1  A.  I was denied when I originally applied to
 2    Legion Insurance, and that was through either
 3    Medallion or DeVincentis.  For whatever
 4    reason, they denied it.  And I had to go out
 5    and get an attorney.  And he eventually -- we
 6    collected on it.
 7  Q.  So that, if I understand you correctly, this
 8    claim that you're talking about now was a
 9    claim that was ultimately paid by the
10    workers' comp insurer which was Legion,
11    correct?
12  A.  Yes, it was.
13  Q.  So there wasn't any formal claim made against
14    Medallion or DeVincentis in connection with
15    Legion's original denial, correct?
16  A.  Yes, there was because he was the agent.
17  Q.  Okay.
18  A.  We filed that through D'Addario, Medallion,
19    or DeVincentis.  There were at least three or
20    four different claims.  We always had to go
21    through the agent --
22  Q.  Sure.
23  A.  -- because the insurance company refused to
24    talk to us and negotiate.  That's the reason
25    for the agent being the middleman.
```

53

1  Q.  Well, put it this way:  In connection with --
2      ultimately Legion paid your workers' comp
3      claim, correct?
4  A.  Yes, they did.
5  Q.  And ultimately there was no payment made to
6      you by Medallion, correct?
7  A.  Medallion never paid.
8  Q.  Correct.  Okay.
9          MR. CHAPMAN:  Dean, you still with
10     us?
11         MR. CARNAHAN:  I'm still here.
12         MR. CHAPMAN:  I'm going to mark our
13     first exhibit now.  All right?
14         MR. CARNAHAN:  All right.
15         MR. CHAPMAN:  It's going to be the
16     complaint.  That will be No. 1.
17          (Document marked as Caiazzo
18          Exhibit 1 for identification)
19 Q.  Mr. Caiazzo, I'm going to show you Exhibit 1
20     and ask you if you've ever seen that before?
21 A.  (Witness reviews document)  This looks like
22     the complaint.
23 Q.  Okay.  You understand that's the complaint
24     that brings us together here today?
25 A.  Correct.

54

1  Q.  And did you read that before it was filed?
2  A.  Yes, I did.
3  Q.  And did you approve it?
4  A.  Yes, I did.
5  Q.  Now, without asking you anything about the
6      legal allegations in the complaint but just
7      focusing you in on the factual allegations in
8      the complaint, if you would take a moment to
9      look at this and let me know, as you sit here
10     today, do you believe all the factual
11     allegations in this complaint are true?
12 A.  (Witness reviews document)  This is correct.
13 Q.  Okay.  So you've had a chance to go through
14     Exhibit 1 and, as you sit here today, your
15     testimony is all the factual allegations in
16     the complaint are true and accurate and
17     correct?
18 A.  Yes.
19 Q.  Now, keep that in front of you.  I'm going to
20     ask you some questions about Count I.  If you
21     look at Paragraph 6, it talks about a
22     personal injury claim which was asserted
23     against you?
24 A.  Uh-huh.
25 Q.  What's the name of the person that made the



55

1      personal injury claim?
2  A.  I called D'Addario and Medallion to explain
3      to them about the injury.
4  Q.  You're about five minutes ahead of me.  And
5      I'm sorry if the question was unclear.  Who
6      is the person -- what's the name of the
7      person that made a personal injury claim
8      against you?
9  A.  No one made a personal injury claim against
10     me.  I made the personal injury claim against
11     the company by way of the --
12 Q.  No.  You better take another look at this.
13     Look at Paragraph 6.
14 A.  Uh-huh.
15 Q.  It says a personal claim was asserted against
16     Caiazzo which was pending in court in 2002.
17     Do you see that?
18 A.  Correct.
19 Q.  Now --
20 A.  Oh, I'm sorry.  I'm sorry.  I know which one
21     you're talking about.  That was the Cuttichia
22     claim.
23 Q.  Okay.
24 A.  Okay.  I'm sorry.
25 Q.  Now, do you know the person's first name?

56

1  A.  Joseph.
2  Q.  And when did Mr. Cuttichia say he was
3      injured?
4  A.  I believe it was somewhere in '96.
5  Q.  And how did Mr. Cuttichia say he was injured?
6  A.  By way of the information I received,
7      supposedly he got in a fight and whatever,
8      lost consciousness.  I don't know.  It was
9      beyond comprehension as the injuries.  But I
10     was never notified through the licensing
11     board.  I never saw a police report or
12     anything of that sort.  So I was unaware of,
13     number one, this particular account of a
14     so-called incident, nor did I see the
15     specifics regarding his so-called injuries.
16 Q.  I want to ask you some questions about what
17     it was he was alleging.  I'm not asking you
18     to --
19 A.  Well, that's what I'm saying.  I don't know
20     because I never received any documentation
21     that would verify the extent of his injuries
22     by way of, you know, the proper authorities.
23 Q.  Well, do you understand that he was saying he
24     was involved in a fight with another patron
25     of Cai's?

57

1   A.   That's what he said.

2   Q.   Were you there the day that this fight

3        supposedly happened?

4   A.   I was there seven days a week from eight

5        o'clock in the morning until closing at 2:00.

6        And I don't particularly remember.  I saw

7        everything that happened because it wasn't

8        that large of a place.  I don't remember

9        anyone getting into a fight that Joe

10       Cuttichia said happened, whether it was

11       inside or outside.  And no one ever relayed

12       any information to me by way of the doormen

13       that I had situated outside, inside and

14       everything else.  So this was new to me at

15       this point.

16  Q.   So if I understand correctly, your schedule

17       when you're operating Cai's was -- did you

18       say 8:00 in the morning until 2:00?

19  A.   I was there at 8:00 in the morning until two

20       o'clock, 2:30.  We had a two o'clock license.

21  Q.   Okay.  2:00 a.m., right?

22  A.   2:00 a.m., correct.

23  Q.   And as far as you know, then, you were

24       there -- did this fight supposedly happen at

25       night?

58

1   A.   The majority of our business took place at

2        night, so I'm assuming that's what he said.

3        I don't believe anything could have happened

4        during the day.  But no one -- you know,

5        they've gone unnoticed.

6   Q.   But just in terms of what your understanding

7        is now, as you sit hear today, as to what he

8        was alleging, do you remember if he was

9        alleging that he got in a fight at nighttime?

10  A.   I believe the document that I saw was that,

11       yes, it did happen at night.

12  Q.   And as far as you know, you were there that

13       night?

14  A.   I was there every night.

15  Q.   And you don't remember any such fight

16       happening in September of '96, correct?

17  A.   No, I don't.

18  Q.   Now, when did you first learn that Mr.

19       Cuttichia was making a claim against you as a

20       result of this supposed fight in September

21       '96?

22  A.   I believe I received a letter from his

23       attorney regarding the incident.

24  Q.   And when did you get that letter?

25  A.   That I don't remember.  It had to have been

59

1        after -- obviously after the incident, after

2        '96.  I don't know whether it was '96, '97

3        when he finally got around to it.  But the

4        letter came to me.  And I did what I normally

5        did.  I called D'Addario and told him to come

6        down, pick up the letter.  And he would at

7        that point submit it to the agency and submit

8        it, go through the procedure procedures to

9        defend the case.

10  Q.   Now, do you still have this letter that you

11       got from Cuttichia's lawyer?

12  A.   Yes.

13  Q.   And has that been produced in this case?

14  A.   I'm sure it is.

15  Q.   Well, I'll tell you what I'm going to do.

16       I'm going to hand you -- and I'm going to

17       represent for the record, I've got two

18       packages of documents here.  One consists of

19       roughly 60 pages or so, and the other

20       consists of one page.  And I'll represent to

21       you that these are all the documents I've

22       received from your lawyer in this case in

23       terms of your document production.  Okay.

24            MR. CHAPMAN:  Before I get into

25       these, I'm going to mark these as -- why

60

1        don't we mark them as Exhibit 2 and Exhibit

2        3.  And for the record, Exhibit 2 will be the

3        package that we received from Mr. Carnahan on

4        March 14, 2005 under a letter dated March 11,

5        2005, representing the Plaintiff's initial

6        disclosure documents.  Exhibit 3 will be the

7        fax that we received on May 3, '05 from Mr.

8        Carnahan that is, in essence, a one-page

9        supplementation.

10            (Documents marked as Caiazzo

11            Exhibits 2 to 3 for identification)

12  Q.   So, Mr. Caiazzo, I'm going to hand you

13       Exhibit 2.  And if you'd take -- now, this

14       might take a couple minutes.  But if you'd go

15       through that.  And I want to know if that

16       package contains the letter that you got from

17       Cuttichia which was your first --

18       and correct me if I'm wrong, the letter that

19       you got from Cuttichia's lawyer was the first

20       notice that you got of any kind about his

21       supposed claim, right?

22  A.   Correct.

23  Q.   So take a look at Exhibit 2 and tell me if

24       you find that letter in there.

25  A.   (Witness reviews document)  No, it's not

61

1    here.

2    Q. Well, just to be complete, I'll show you

3       Exhibit 3. And that's -- what you have in

4       Exhibit 3 is not the letter either, correct?

5    A. No.

6    Q. All right. So you've gone through the entire

7       document production that I've received on

8       your behalf in this case; and it does not

9       contain the letter that you got from

10      Cuttichia's lawyer, correct?

11   A. Correct.

12   Q. When is the last time you saw this letter?

13   A. There were follow-up letters all the time.

14   Q. I've just got to focus in on the one letter,

15      though.

16   A. The first letter came. I gave it to

17      D'Addario, didn't hear anything. I received

18      another letter from the attorney. I believe

19      I called D'Addario and said, "What's going

20      on? You never submitted it. Why?" And

21      that's when this little roundabout scenario

22      started. At that point, I believe because he

23      didn't answer it or submit it to the

24      insurance company is that the attorney took

25      it through the next process and went to

62

1    court, got the necessary information, took it

2    another step further and further until they

3    obtained a lien against my property.

4    Q. Now, do you have a memory of -- to try to

5       zero you in a little bit more about when you

6       got this letter, do you remember when

7       relative to the supposed accident date of

8       September '96 that you got it? I mean was it

9       within a matter of months after that? Was it

10      a year after that? What's your best memory

11      as to when you got it?

12   A. I don't recall because I don't remember,

13      number one, the incident; number two, when I

14      did get it, it was a simple procedure where I

15      called up D'Addario, handed it to him and

16      expected him to follow up as the agent in his

17      responsibility. Obviously that didn't

18      happen. So that delayed the process. And

19      obviously the attorney sent another letter

20      and that -- we got to the next level, though.

21   Q. Let me stop you, though, because you're kind

22      of going afield of my question. And if you

23      start doing that, it's going to take longer.

24   A. No, I understand. But like I told you, I

25      honestly don't. As it came in, it goes out.

63

1    I really never held onto them.

2    Q. So your best memory in terms of when you got

3       it was -- if this accident happened in

4       September of '96, your best memory, as you

5       sit here today, was that you got the letter

6       sometime in '96 or '97?

7    A. I have no idea when I received it. I don't

8       remember the date. I remember it coming in.

9       And I remember a second letter. And I

10      remember a third. And I can't give you an

11      exact date. It was somewhere in the

12      vicinity. I couldn't focus on it.

13   Q. How many different letters do you remember

14      getting in all from Cuttichia's lawyer?

15   A. It was probably about a minimum of two, a

16      maximum of -- excluding the court?

17   Q. Right.

18   A. Excluding or including?

19   Q. Excluding.

20   A. Excluding the court probably two, maybe

21      three.

22   Q. And including the court once it was in suit?

23   A. I saw the documents later on. It was

24      probably about maybe three, four

25      additionally.

64

1    Q. Now, the two letters that you got from

2       Cuttichia's lawyer before the case went into

3       suit --

4           MR. CARNAHAN: Objection.

5    Q. -- do you have any idea where those are

6       today?

7           MR. CARNAHAN: Did you get my

8       objection to the form of the question?

9           MR. CHAPMAN: Yes. We can hear you.

10   A. The letters when they came in were sent out

11      to the proper representatives, that being

12      John D'Addario. And they could be -- he

13      could have them. The insurance company could

14      have them. But they never responded, so I

15      doubt that. I don't really know. They could

16      be anywhere.

17   Q. Well, you said a few moments ago that you

18      still had the letter and you had seen it

19      before -- sometime before today. So what I'm

20      trying to find out is when is the last time

21      you saw either of these two letters that you

22      got -- maybe Mr. Carnahan's objection is well

23      taken. I should ask you, the two letters --

24      you said two letters outside of court or

25      before court or something like that. The two

65

```
 1   letters that you're referring to, are those
 2   letters that, as far as you know, you
 3   received before suit had been filed?  In
 4   other words, were they letters threatening to
 5   file suit?
 6   A.  The first one definitely was explaining his
 7       injuries or the circumstance which at that
 8       point I didn't understand and gave it to Jack
 9       D'Addario.  The second letter was a follow up
10       of either -- oh, it specifically included the
11       fact that because there was no response, they
12       were going to take additional steps.
13   Q.  Okay.  And go into court?
14   A.  Correct.
15   Q.  Now, when is the last time you saw either of
16       these letters?
17   A.  It could have been with the other attorney
18       that had filed the paperwork with Medallion
19       and the court and everything associated with
20       Cuttichia.  It could have been the paperwork
21       that was filed afterwards.  It could have
22       been --
23   Q.  Can I stop you there again.
24   A.  Sure.
25   Q.  As soon as you say "could have been," that
```

66

```
 1       sends up a red flag for the lawyers.  Do you
 2       have a memory of when you last saw either of
 3       these two letters?
 4   A.  No.  There's a box of documents.  And as I go
 5       through them as needed, I will come across
 6       certain things.  I had passed on certain
 7       documents to the other attorney, and that's
 8       it.  I can't remember or give you an exact
 9       time when I last saw it.
10   Q.  Now, the attorney that you're referring to is
11       who?
12   A.  That would be Tom Collins.
13   Q.  And his office is where?
14   A.  Andover.
15   Q.  And is he still in Andover as far as you
16       know?
17   A.  I couldn't tell you.
18   Q.  Do you have a memory of ever providing either
19       of the two pre-suit letters, either the
20       letters themselves or copies of them to Mr.
21       Collins?
22   A.  I don't know if they were given to Mr.
23       Collins.  But I certainly sat down with him
24       when we received notification that defaults
25       were in process and it was supposed to go to
```

67

```
 1       court and everything else, to get on it and
 2       find out what happened to D'Addario and
 3       DeVincentis or Medallion at that point, to
 4       certainly get to the bottom of it and get
 5       proper representation.
 6   Q.  When is the first time you ever retained Mr.
 7       Collins for any reason?
 8   A.  Probably in 1998, somewhere around there.
 9   Q.  And was that for Cuttichia or something
10       other?
11   A.  No.  He was just the attorney representing
12       the restaurant.
13   Q.  So generally represented the restaurant?
14   A.  Yes.
15   Q.  And did you ever have a fee agreement with
16       Mr. Collins?
17   A.  He handled what was necessary.  And I believe
18       it was $300, $400 a week.
19   Q.  So Mr. Collins got involved with the
20       Cuttichia claim in connection with his
21       representation of Cai's, generally speaking?
22   A.  Correct.  Scuttlebutt's.
23   Q.  Was it Scuttlebutt's in 98?
24   A.  Yes.
25   Q.  Okay.  Did Mr. Collins ever represent you in
```

68

```
 1       connection with Cai's Food & Spirits?
 2   A.  No.
 3   Q.  And when was it that you first became -- when
 4       in 1998 was it that -- when did Scuttlebutt's
 5       open?
 6   A.  I believe it was in '98.
 7   Q.  Do you remember what month?
 8   A.  I think it was in October.
 9   Q.  To catch the Halloween rush?
10   A.  That's exactly right.
11   Q.  I have to drive by that place so I know about
12       that.
13   A.  Well, we needed to collect that revenue
14       that's for sure because too much was going
15       out and there wasn't enough coming in.  Those
16       two days settled that quickly, though.
17   Q.  Was it part of -- and I want to specifically
18       say on this question I don't want you to tell
19       me any communications that you had with Mr.
20       Collins.  Okay.  But I do need to get an
21       understanding of the scope of his
22       representation, what he was retained to do.
23       Mr. Collins did become involved with the
24       claim by Mr. Cuttichia against you, correct?
25   A.  Correct.
```

69

```
 1   Q.  And he was involved in defending that claim
 2       that was made against you, correct?
 3   A.  I believe so.
 4   Q.  And do you know if he ever filed an
 5       appearance in court on your behalf?
 6   A.  That I don't know.
 7   Q.  Do you recall that there were essentially two
 8       different suits that Cuttichia filed against
 9       you and the bar?
10           MR. CARNAHAN:  Objection.
11   Q.  You can answer.
12   A.  I never received any of the information
13       regarding any lawsuits in court.
14   Q.  No.  Well, I'm asking you right now for your
15       understanding as you sit here today.  You've
16       already said somewhere along the line you got
17       some of this stuff.  I'm saying do you
18       understand there were -- as you sit here
19       today, do you understand that there were two
20       different lawsuits filed?
21           MR. CARNAHAN:  Objection.
22   A.  No.  I don't know how many were filed.
23   Q.  And was Mr. Collins retained to pursue any
24       insurance that might be available to you for
25       the Cuttichia claim?
```

70

```
 1   A.  I believe after I spoke with D'Addario and
 2       got no response, spoke to Joe DeVincentis,
 3       spoke to Jean DeVincentis, got no
 4       satisfaction.  When I saw the lien filed
 5       against my property without me knowing
 6       because I never signed any documentation or
 7       any certified letters or being served or
 8       anything, a good period of time elapsed
 9       before I finally realized that happened.  And
10       at that point, I tried to rectify it and say,
11       "Why wasn't I notified?  Why was this claim
12       paid?  Why did anything not happen on this
13       case and I was not notified?"
14           . As a result of seeing the paperwork
15       which eventually determined the lack of
16       injury that occurred to Mr. Cuttichia as
17       opposed to what he initially said, I believe
18       Mr. Collins submitted a letter to Mr.
19       DeVincentis and also spoke to him regarding
20       how the possibility ever existed that someone
21       would pay $45,000 out, would allow $45,000 to
22       be paid without defending the case and
23       looking into a near -- the hospital records
24       proving that there were no injuries and he
25       was released almost immediately, that I was
```

71

```
 1       not notified.  And that's what eventually
 2       turned out to be the lack of cooperation
 3       between Joe DeVincentis, John D'Addario, Jean
 4       D'Addario, and the inappropriate way of them
 5       not getting back to me and informing me as my
 6       agent as to why certain things happened and
 7       the money being paid out.
 8   Q.  Let's back up now.
 9   A.  Uh-huh.
10   Q.  Mr. Collins was representing you and
11       Scuttlebutt's -- generally, with regard to
12       the operation of Scuttlebutt's back in 1998,
13       correct?
14   A.  Correct.
15   Q.  And it was fair to say within -- generally
16       within that time period that you got your
17       first notice of the Cuttichia claim, correct?
18   A.  From the attorney, is that the question?
19   Q.  Right.
20   A.  I received notice from the attorney sometime
21       after '96 when this supposedly happened, the
22       incident.
23   Q.  Right.  Okay.
24   A.  The reason why I know that is because the
25       date was on it as to when it supposedly
```

72

```
 1       happened.  As to when I received it, I can't
 2       remember because I worked day and night, and
 3       I just handed over to the proper procedure.
 4   Q.  But you've already said that somewhere along
 5       the line you talked about the notice -- well,
 6       strike that.
 7           Somewhere along the line, Mr.
 8       Collins was retained to represent you in
 9       connection with the claim by Cuttichia
10       against Caiazzo and --
11   A.  He wasn't represented or retained to handle
12       Joe Cuttichia.  This was a simple procedure
13       that has happened four or five times previous
14       in my other restaurants when someone alleges
15       something and there's specific medical
16       evidence that is provided.  And I've sat in
17       other downtown Boston firms representing me
18       and arguing that point.  And eventually the
19       people didn't get any money because of lack
20       of evidence.  This did not occur in this.  So
21       I performed what I normally did based on a
22       so-called injury, gave it to my
23       representative who in turn is supposed to
24       handle it and defend this case, none of which
25       was ever told to me.
```

73

1  Q.  Let me ask it this way:  You got a letter
2      from a lawyer that reflected that Cuttichia
3      was going to make a claim against you.
4      You're saying in this case here that you
5      should have had insurance for the claim
6      against you by Cuttichia.  Okay.
7          Here's my question:  Was it part of
8      Mr. Collins' job to chase any insurance
9      coverage that might have been available to
10     you for the liability claim against you by
11     Cuttichia.  Okay.
12  A.  Mr. Collins didn't know anything about
13     chasing anybody until I brought this to his
14     attention because of the lack of
15     correspondence from Joe DeVincentis, Mr. and
16     Mrs. D'Addario, and Medallion.  And when I
17     received all the mail that was sent to my
18     wife's house and she was served and was
19     signing my name that she received it, she
20     held onto all the mail for over a year.  So
21     as a result, there was no way of Mr. Collins
22     going to court and properly representing me
23     in the court case.  Do you see what I mean?
24     So this thing went on for...
25  Q.  Okay.  Whenever -- well, let me try something

74

1      else here.
2          MR. CHAPMAN:  Dean, the next exhibit
3      which is going to be No. 4 is going to be the
4      Plaintiff's answers to interrogatories.
5      Okay?
6          MR. CARNAHAN:  All right.
7          (Document marked as Caiazzo
8          Exhibit 4 for identification)
9  Q.  Mr. Caiazzo, I'm going to hand you what we've
10     marked as Exhibit No. 4.  Just take a look at
11     that.  And then my question to you is going
12     to be is that your signature on the last
13     page?
14  A.  (Witness reviews document)  Yes, it is.
15  Q.  Okay.  So the signature on the last page is
16     yours, correct?
17  A.  Yes.
18  Q.  And you recognize that these were signed
19     under oath?
20  A.  Yes.
21  Q.  And having had a chance to read these
22     interrogatory answers just now, are they true
23     and accurate?
24  A.  To the best of my knowledge, yes.
25  Q.  Having just read these over, is there

75

1      anything in here that you need to change at
2      this point?
3          MR. CARNAHAN:  What was that
4      question?
5          MR. CHAPMAN:  Is there anything in
6      the answers that he needs to change at this
7      point.
8          MR. CARNAHAN:  All right.
9  A.  I believe everything is pretty accurate as to
10     the way everything was handled for the two
11     cases.
12  Q.  Is there anything in these answers that
13     you're at all uncomfortable with right now?
14  A.  No.  I believe everything is fairly much the
15     way it was done.
16  Q.  Okay.  Now, when you got -- well, take a look
17     at Answer No. 5.
18  A.  (Witness reviews document)
19  Q.  And you see that Question No. 5 is asking you
20     some questions about the notice that you
21     received of the Cuttichia claim?
22  A.  (Witness reviews document)  Correct.
23  Q.  Do you see that?
24  A.  Uh-huh.
25  Q.  Now, the answer says, "I received a letter

76

1      from the Plaintiff's attorney in or about
2      1998."  Do you see that?
3  A.  Correct.
4  Q.  What's your basis in the answers for saying
5      that you got the letter in 1998?
6  A.  It was approximately a couple years
7      afterwards because of the time -- the time
8      period.  I remember receiving -- we were up
9      at Scuttlebutt's building it at that point.
10     And I remember getting -- or handing a letter
11     to Jack D'Addario and then calling him again
12     and asking him why he didn't do anything with
13     it.  So it was all within that time period,
14     you know, that 1998 carried over from '97.
15     It was right around that period of time.
16  Q.  And where was the letter addressed to?  To
17     your home, or was it --
18  A.  I don't remember.  The first one came to --
19     the first one came to Cai's on Exchange
20     Street.
21  Q.  And was Cai's still operating at that time?
22  A.  Yes, it was.
23  Q.  And when did Cai's last do business on
24     Exchange Street?  If you can give me the
25     month and date, if you know.

77

```
1    A.   It was sometime in '98, also.
2    Q.   And just so I'm clear, what is the first
3         thing you did with this letter you got from
4         Cuttichia's attorney?
5    A.   Like I told you before, called D'Addario.
6    Q.   You called D'Addario?
7    A.   Called D'Addario.
8    Q.   And at Medallion?
9    A.   Oh, I don't know where he was or what he was
10        doing.  I had his cell phone number.  I had
11        his work number.  I mean I spoke to him on
12        his cell phone and at work on numerous
13        occasions.
14   Q.   And what number did you call him from?  Did
15        you use your cell phone or --
16   A.   I have no idea whether I called from the bar,
17        from my cell phone.  I can't recall that far
18        back.
19   Q.   And what did you say to Mr. D'Addario in this
20        first phone call you had with him about this
21        letter you had gotten?
22   A.   It was very simple.  "Take care of it."
23   Q.   What did he say to you?
24   A.   "I will."
25   Q.   Did he ask you to do anything?  Did he ask
```

78

```
1         you any questions?
2    A.   He never really mentioned anything.  When a
3         situation occurred like that, I just passed
4         the paperwork on to the people who were
5         responsible and that was it.
6    Q.   Did he ask you to send a copy of the letter?
7    A.   Send a copy of the letter to who?  I had just
8         handed it to him.
9    Q.   Oh, you handed -- okay.  Now I'm confused.
10        The question was, what's the first thing you
11        did when you got the letter?  You said you
12        called D'Addario?
13   A.   Called D'Addario.  I handed him the letter at
14    .   the bar because he spent enough time down
15        there.
16   Q.   Okay.  I'm trying to focus in on the phone
17        call now.  Okay?  The first thing you did
18        when the got the letter is you called
19        D'Addario?
20   A.   Correct.
21   Q.   And you say, in essence, "I've got a letter.
22        Take care of it."  He says, "Okay."  Did he
23        ask you to send him a copy of the letter?
24   A.   I don't believe so.  Usually when I call Jack
25        and let him know about something of that
```

79

```
1         regard, he would say, "All right.  I'll stop
2         down later."  And that's what he did on a
3         regular basis.
4    Q.   And did he stop down later?
5    A.   Yes, he did.
6    Q.   And stopped down where?  Where are we talking
7         about now?  To Cai's?
8    A.   Cai's on Exchange Street.
9    Q.   And was he alone?
10   A.   Yes.
11   Q.   And what was said between the two of you at
12        that time once he had stopped down on
13        Exchange Street?
14   A.   Like I just told you, very simple, "I'll take
15        care of it."  That was it.  I mean it wasn't
16        a long detailed question and answer period if
17        that's what you're asking because that never
18        happened.  A letter came in, someone alleged
19        something, and he was to take care of it.
20   Q.   Right.  And did you give him the letter at
21        that time?
22   A.   Yes.
23   Q.   Did you give him the original or a copy?
24   A.   I don't remember.
25   Q.   It could have been either?
```

80

```
1    A.   It could have been.  I don't really recall.
2    Q.   Did you have a copy machine there at Cai's?
3    A.   I believe I did.
4    Q.   Now, once you gave Mr. D'Addario the letter,
5         what's the next thing that happened with
6         regard to this Cuttichia claim?
7    A.   Nothing really happened until such time we
8         received another letter.
9    Q.   Okay.  How much time passed until you got the
10        second letter?
11   A.   That I don't know.  As I explained on an
12        earlier question, I don't remember that.  The
13        time period lapsed because D'Addario didn't
14        properly submit it initially, so the
15        attorney --
16   Q.   Just to -- you get the first letter.  You
17        have a phone conversation and then a meeting
18        with D'Addario?
19   A.   Correct.
20   Q.   Can you give me a range or a ball park as to
21        how much time passed until the second letter
22        came in?
23   A.   That I don't know.  I worked seven days and
24        seven nights.  The least of my concerns,
25        believe me, was a letter coming in from an
```

```
                                                   81
1    attorney when the agent's responsibility is
2    to handle that type of stuff.  My
3    responsibility was not at that point.  I
4    relieved myself once I passed it on to him.
5  Q. What do you do when you get the second
6    letter?
7  A. What do I do?  Get a little upset and ask him
8    why he didn't take care of it.
9  Q. Where did you receive the second letter?
10 A. That I don't remember.
11 Q. And as a result of getting the second letter,
12   did you call D'Addario or did you meet with
13   him or what --
14 A. I have no idea.  Like I said, Jack was at the
15   bar fairly frequently to not only spend
16   personal time there but also to keep me
17   updated or whatever.  You know, he had to do
18   new policies.  Just spent a lot of time
19   there.  So a lot of times he was on premise.
20 Q. Well, do you have any specific memory of what
21   you did with the second letter vis-à-vis Mr.
22   D'Addario?
23 A. No.
24 Q. And you say in the answers to interrogatories
25   that you got the letter in 1998.  Was there
```

```
                                                   82
1    ever a point in time where you got any kind
2    of response from your insurance company about
3    the Cuttichia claim?
4  A. I don't remember receiving anything from the
5    insurance company regarding Cuttichia at that
6    point.  From that point on, Cai's was closed.
7    That was it.  We were living in Lynnfield.
8    So I'm sure that someone would have been able
9    to find my address.
10 Q. I'm going to direct your attention to one of
11   the documents in your document production,
12   which is Exhibit 2.
13        MR. CHAPMAN:  And why don't we mark
14   this as 2A.  And, Dean, this is the letter
15   from Mr. Collins to Mr. DeVincentis dated May
16   16, '03.
17        MR. CARNAHAN:  All right.
18        (Document marked as Caiazzo
19        Exhibit 2A for identification)
20 Q. Mr. Caiazzo, directing your attention to
21   Exhibit 2A, take a moment to look at that if
22   you'd like.  But the question is going to be
23   is that a letter that Mr. Collins wrote on
24   your behalf?
25 A. (Witness reviews document)  Yes, it is.
```

```
                                                   83
1  Q. And this is the letter that references the
2    Cuttichia claim against you, correct?
3  A. Correct.
4  Q. Did you review this letter before it was
5    sent?
6  A. Yes, I did.
7  Q. And so you approved the letter?
8  A. Well, I gave him all the information.  He put
9    it together and sent it off.
10 Q. So the letter is accurate, in other words,
11   right?
12 A. Yes, absolutely.
13 Q. Now, I'm going to represent to you that in
14   terms of the documents you've produced, this
15   is the first written notice on your behalf to
16   anyone at the DeVincentis agency about the
17   Cuttichia claim.  My question is:  Do you
18   know of any written notice on your behalf to
19   DeVincentis about the Cuttichia claim sent
20   prior to this Exhibit 2A?
21 A. I don't know if anyone had called an
22   insurance agent and submitted something to
23   writing to them.  You call your agent, tell
24   them you had an accident or there was an
25   accident or the house caught on fire, and the
```

```
                                                   84
1    agent takes it from there.  So I wouldn't
2    have any reason whatsoever to put anything in
3    writing submitting something as simple as to
4    what happened in the previous ten years of me
5    being in business.  This is just a normal
6    procedure, you know what I'm saying?  It's
7    just -- in other words, my responsibility is
8    not to document, write down and submit it in
9    writing to the agent.  That's what the agent
10   is there for.
11 Q. In the typical situation I might agree with
12   you.  But in this situation what we're
13   talking about is a claim that you had
14   received '96, '97, '98?
15 A. Uh-huh.
16 Q. And by the time this letter was written,
17   there were judgments against you and the
18   corporation?
19 A. Correct.
20 Q. And so it had gone -- you'd agree with me
21   that it had gone considerably further than
22   the typical insurance claim, correct?
23 A. Absolutely.
24 Q. That's why the question is:  Prior to this
25   May 16, '03 letter, was there ever an
```

85

```
1    occasion where any other written demand was
2    made to DeVincentis or anyone at the
3    DeVincentis agency or Medallion agency?
4  A. No one realized obviously how far the court
5    proceedings were going until such time as the
6    defaults kept happening. And that was by way
7    of me not being properly made aware of, which
8    is beyond my comprehension because even if
9    the insurance company or the attorney did his
10   job and tried to send me notice, okay, John
11   D'Addario, Jean D'Addario, or even Joe
12   DeVincentis was certainly aware of this case
13   by them being the agent. They knew where I
14   lived, where I worked, and I spoke to Jack
15   D'Addario very frequently. So for me not to
16   be notified of default after default which
17   eventually led to a payment and a lien on my
18   property is what I'm concerned about.
19 Q. Whose handwriting is that on this Exhibit 2A?
20 A. (Witness reviews document) That's mine.
21      MR. CHAPMAN: Off the record for a
22   second.
23         (Discussion off the record)
24         (Luncheon recess taken from
25         12:15 p.m. to 1:01 p.m.)
```

86

```
1         AFTERNOON SESSION
2         STEPHEN D. CAIAZZO, RESUMED
3         DIRECT EXAMINATION, CONTINUED
4  BY MR. CHAPMAN:
5  Q. Again, Mr. Caiazzo, with reference to
6    Exhibit 2, which is your document production,
7    I'm showing you a -- one of the documents in
8    here is a request for default judgment in the
9    Cuttichia vs. Caiazzo case that is dated
10   October 7, 2002. And my question is --
11      MR. CARNAHAN: Well, wait. Could
12   you hold on one second, please?
13      MR. CHAPMAN: Sure.
14      MR. CARNAHAN: You referred to this
15   as an exhibit?
16      MR. CHAPMAN: This is part of
17   Exhibit 2. I can --
18      MR. CARNAHAN: Okay. You just
19   didn't mark it specifically yet?
20      MR. CHAPMAN: That's right.
21      MR. CARNAHAN: Okay.
22      MR. CHAPMAN: And perhaps I should.
23   Why don't we call this as 2B.
24      MR. CARNAHAN: All right.
25
```

87

```
1         (Document marked as Caiazzo
2         Exhibit 2B for identification)
3  Q. So referring you to the document we've now
4    marked as 2B, Mr. Caiazzo, when did you first
5    get this and how did you first get this?
6  A. I believe I received this and all the other
7    default notices all in one lump sum
8    approximately eight to -- eight months to a
9    year after they were sent to my wife's
10   residence. And she held them. And then when
11   I finally realized that I was being sued and
12   they were applying the -- you know, all the
13   necessary defaults and whatever, that's when
14   I called Collins to do something about it.
15   Because I actually thought everything went
16   away. Because this was all the stuff that
17   was mailed to my -- or presented to my wife.
18 Q. So is it your testimony that the service of
19   the complaint and the initial request for
20   default and then the request for default
21   judgment that we have were served at the home
22   that you owned where your wife was then
23   living? Is that your understanding?
24 A. All the notifications subsequent to the
25   initial -- you know, one letter or two, I
```

88

```
1    can't remember exactly. But all the
2    important documents regarding court that I
3    found out about is by way of those people not
4    contacting me at my business or at my
5    residence. So they went -- they served or
6    mailed or did whatever they had to do to
7    where my wife was living. And I never
8    received any of those in time to justify it.
9    So, therefore, the insurance agency should
10   have, you know, caught that one and did
11   something. And I'm surprised that Jack
12   didn't.
13 Q. Well, let's not get too far afield with the
14   question. So I know what you're talking
15   about, when you refer to your wife's
16   residence as compared to where you were
17   living in your last answer, what's the wife's
18   residence that you're referring to?
19 A. King Street, 6 King Street. And I forget the
20   other address.
21 Q. That was in Rockport, right?
22 A. Yes. And I forget the other address. We
23   stayed for a couple of months.
24 Q. You're referring to the other --
25 A. Where she lived.
```

**Page 89**

| | | |
|---|---|---|
| 1 | Q. | Okay.  She lived at 6 King Street? |
| 2 | A. | I lived with her and my daughter at King |
| 3 | | Street for a very short time.  And that's |
| 4 | | when I left there.  And apparently the |
| 5 | | service and mailings and whatever were |
| 6 | | continually sent to King Street.  And instead |
| 7 | | of her -- she was just signing for them.  And |
| 8 | | all she was saying is, "You're in a lot of |
| 9 | | trouble with this."  I says, "Like what?" |
| 10 | | And she wouldn't explain.  And then finally I |
| 11 | | had to put pressure on her to deliver a bag |
| 12 | | full of mail that she held, which included |
| 13 | | most of all these documents that you have now |
| 14 | | regarding the court decisions.  I thought |
| 15 | | everything had gone away. |
| 16 | Q. | When you moved out of 6 King Street, you went |
| 17 | | to the address on the Rockport/Gloucester |
| 18 | | line? |
| 19 | A. | No. |
| 20 | Q. | Okay.  Where did you next reside after 6 King |
| 21 | | Street? |
| 22 | A. | My boat. |
| 23 | Q. | And where was your boat docked? |
| 24 | A. | It was in Salem. |
| 25 | Q. | What was the name of the boat? |

**Page 90**

| | | |
|---|---|---|
| 1 | A. | Plumb Crazy. |
| 2 | Q. | Do you still have the boat? |
| 3 | A. | No. |
| 4 | Q. | When did you last have the boat? |
| 5 | A. | 2001. |
| 6 | Q. | And for what period of time did you live on |
| 7 | | the boat? |
| 8 | A. | Probably for a couple of months after I left |
| 9 | | King Street.  Somewhere in the spring of |
| 10 | | 2002, maybe. |
| 11 | Q. | All right.  I've got to back up.  You said |
| 12 | | you got rid of the boat in 2001? |
| 13 | A. | Sometime in 2001, 2002.  I don't know |
| 14 | | exactly.  I lived on the boat for a couple of |
| 15 | | months.  It was windy during the winter. |
| 16 | | Yes.  It probably could have went right |
| 17 | | into -- see, you're catching December, |
| 18 | | January.  So 2001.  It could be 2002 and so |
| 19 | | on and so forth.  So by me saying 2001, a |
| 20 | | difference of two weeks would be 2002.  The |
| 21 | | question is, again?  I'm sorry. |
| 22 | Q. | Yes.  What's your best memory as to the month |
| 23 | | and year that you moved out of 6 King Street |
| 24 | | in Rockport? |
| 25 | A. | Like I had said, somewhere in the spring of |

**Page 91**

| | | |
|---|---|---|
| 1 | | 2002. |
| 2 | Q. | Spring 2002 you moved out of 6 King Street, |
| 3 | | but that's when you moved into your boat? |
| 4 | A. | Correct. |
| 5 | Q. | Did you ever live on your boat at any time |
| 6 | | while Scuttlebutt's was still operating? |
| 7 | A. | No. |
| 8 | Q. | Scuttlebutt's closed when? |
| 9 | A. | September of 2001. |
| 10 | Q. | So when is your -- if you moved onto the boat |
| 11 | | in the spring of 2002, when is your best |
| 12 | | memory as to when -- you were still married |
| 13 | | at that time; you just separated, right? |
| 14 | A. | Right. |
| 15 | Q. | When is your best memory as to when your wife |
| 16 | | gave you this bag of mail? |
| 17 | A. | It had to have been somewhere around 2003.  I |
| 18 | | have no idea.  This is during the bitter |
| 19 | | divorce proceedings.  So you can understand |
| 20 | | how difficult that was for me or anybody in |
| 21 | | the family to kind of -- but it really was |
| 22 | | later on in the -- later on during the course |
| 23 | | of the divorce. |
| 24 | Q. | Again, I don't want to cut you off.  But just |
| 25 | | for the sake of trying to move this along if |

**Page 92**

| | | |
|---|---|---|
| 1 | | nothing else, if the answer is you really |
| 2 | | don't know, you don't have a memory, it's |
| 3 | | much easier to just say that.  I'm not trying |
| 4 | | to tell you what to say. |
| 5 | A. | No, I know.  I'm just trying to give you the |
| 6 | | best case scenario.  But everything is |
| 7 | | just -- you know, everything was kind of |
| 8 | | caught up in that -- you know, the mailings |
| 9 | | that I never got, so that was creating a |
| 10 | | problem.  I don't remember what, but... |
| 11 | Q. | Okay.  Now, in 1998 you were still operating |
| 12 | | Cai's Food & Spirits on Exchange Street, |
| 13 | | correct? |
| 14 | A. | I believe we were still in business.  We were |
| 15 | | under construction up at Scuttlebutt's.  And |
| 16 | | we were still operating Cai's down to the |
| 17 | | wire, yes. |
| 18 | Q. | And do you have a memory in 1998 of what |
| 19 | | month it was down to the wire? |
| 20 | A. | No, I have no idea. |
| 21 | Q. | Do you know who Karen Ware is? |
| 22 | A. | Karen Ware?  Not really. |
| 23 | Q. | Have you ever heard that name? |
| 24 | A. | It sounds familiar, but I can't really place |
| 25 | | it. |

93

```
 1   Q.  Did anyone named Karen Ware ever work for
 2       you?
 3   A.  It rings a bell.  We had an awful lot of
 4       people working for us.  It doesn't ring a
 5       bell.
 6   Q.  The correct address of Cai's Food & Spirits
 7       was 131 Exchange Street in Malden?
 8   A.  Correct.
 9   Q.  I'm going to hand you a --
10           MR. CHAPMAN:  This will be the next
11       exhibit, Dean.  This will be No. 5.  It's a
12       summons.
13           MR. CARNAHAN:  All right.
14           (Document marked as Caiazzo.
15           Exhibit 5 for identification)
16           MR. CHAPMAN:  And for the record,
17       Dean, Exhibit 5 is going to consist of a
18       summons and a complaint, a three-page
19       complaint.
20           MR. CARNAHAN:  Okay.
21   Q.  Mr. Caiazzo, can you look at Exhibit 5 and
22       tell me if you've ever seen that before
23       today.
24   A.  (Witness reviews document)  Yes, I have.
25   Q.  And do you recognize that -- well, what do
```

94

```
 1       you recognize that to be?
 2   A.  This is the correct address at 131 Exchange,
 3       Donna's Pub, Inc.  The summons came to
 4       Exchange Street.  It looks like one of the
 5       demands or the correspondence, the summons or
 6       whatever, that was associated with the claim.
 7   Q.  So do you recognize that to be Mr.
 8       Cuttichia's complaint against you that was
 9       filed in the Malden District Court?
10   A.  It doesn't say anything about Cuttichia here.
11       I don't see it.
12   Q.  If you look in the upper left-hand corner, do
13       you see Mr. Cuttichia's name?
14   A.  Okay.  There it is.
15   Q.  And it's a suit filed against Donna's Pub,
16       Inc., correct?
17   A.  Right, yes.  No, I didn't recognize Ronald
18       Dunbar maybe because it was the second
19       attorney.  That would be a possibility.
20   Q.  But now that you've seen that, do you
21       recognize that to be the summons and
22       complaint that was filed against you in
23       Cuttichia's case in the Malden District
24       Court?
25   A.  I didn't receive this.  I see it as now
```

95

```
 1       seeing it somewhere.  I don't remember
 2       receiving this in hand.
 3   Q.  Okay.  And do you understand that a sheriff
 4       served that at the bar on Exchange Street in
 5       March of '98?
 6   A.  That's what it says.
 7   Q.  Okay.  And do you remember getting that back
 8       then at that time?
 9   A.  If I did, I got it and handed it to
10       D'Addario.
11   Q.  Well, do you specifically remember whether or
12       not you got this particular document?
13   A.  No.  I don't remember receiving this.  If I
14       did, like I said, everything associated with
15       that was just handed to the proper agent.
16   Q.  And now that you've seen Exhibit 5, would it
17       be fair to say that before the time reflected
18       on this document was when you got the two
19       letters from Cuttichia's lawyer, the pre-suit
20       letters that we talked about before?
21   A.  Well, the letters obviously came before
22       February of 1998.
23   Q.  Right.
24   A.  So whenever they happened, they happened.
25       You know what I mean?  This is February 25.
```

96

```
 1       So he had all of February, all of January.
 2       And then if it was in '97, late part, yes, I
 3       was in the area.
 4   Q.  Sure.  Now that we've got this document in
 5       front of us, you'd agree that you got the two
 6       pre-suit letters from Cuttichia's lawyer
 7       before --
 8   A.  Wait a second.  I got the first letter prior
 9       to this because the letter was a threatening
10       letter explaining about the incident that
11       occurred.
12   Q.  And threatening to file suit?
13   A.  Right.  After that, everything was --
14   Q.  There was another letter you've already said?
15   A.  Yes.  And after that, everything was a blur
16       because I never -- I thought this went away.
17       Either Cuttichia had died or he decided not
18       to file a fraudulent claim is what we
19       perceived it to be in that particular case
20       later on or that D'Addario handled it.
21   Q.  Is it fair to say now that you've seen
22       Exhibit 5 you cannot testify one way or the
23       other as to what was done with this?
24   A.  I don't remember.
25   Q.  Okay.  Now, in -- have you ever lived at 54
```

97

```
1    Pleasant Street in Rockport?
2  A. 54?  Yes.  That was the other address there
3     for a short time.
4  Q. Okay.  And is that the address -- now that
5     I've said it, does that refresh your
6     recollection as to the address that was near
7     the Gloucester/Rockport line?
8  A. Uh-huh.
9  Q. Yes?
10 A. Well, that's not the one that I -- I mean I
11    lived there for a short time.  But my wife
12    moved back to there without me.  See, this is
13    the problem:  Back and forth to different
14    locations.
15 Q. Okay.
16 A. But I believe that was the one --
17 Q. Just so I'm clear, 54 Pleasant Street in
18    Rockport is the address that you referred to
19    earlier that was right near the
20    Gloucester/Rockport line, correct?
21 A. No, no, no.
22 Q. Which address was near the Gloucester/Rock-
23    port line?
24 A. No.  That was the one long street in -- that
25    ran from Gloucester and Long Beach down into
```

98

```
1     Rockport.  That's where we stayed for the
2     longest time prior to me leaving King Street.
3     This one here on Pleasant, that was only a
4     couple of months.
5  Q. Now I've got to go back to the beginning
6     because at the beginning we said that you
7     identified two different places in Rockport
8     that you lived:  6 King Street and near the
9     Gloucester/Rockport line, right?
10 A. No.  I said I lived in King Street in
11    Rockport and I lived in Gloucester on the
12    line.
13 Q. Right.
14 A. In Gloucester.
15 Q. Okay.  In Gloucester?
16 A. In Gloucester.
17 Q. But you don't recall the street address at
18    that --
19 A. No.
20 Q. Okay.  Now, when -- for what period of time
21    did you live at 54 Pleasant Street in
22    Rockport?
23 A. I can't remember.  I have no idea.
24 Q. What was the sequence of when you lived at
25    the 6 King Street, the Gloucester residence,
```

99

```
1     and 54 Pleasant Street, what was the sequence
2     in which you lived at those three different
3     addresses?
4  A. King was the last residence that I stayed at.
5     Prior to that, it was Pleasant Street for a
6     very short time.  Prior to that, it was the
7     address in Gloucester.
8  Q. And how long did you stay at the Gloucester
9     address?
10 A. I don't remember exactly.  Somewhere
11    between -- I don't know.  It was probably six
12    months to a year, maybe.
13 Q. And how long did you live at King Street?
14 A. I have no idea.  Probably a few months, at
15    least.
16 Q. And what's the last address at which you
17    lived with your wife -- your ex-wife?
18 A. King Street.
19 Q. And did you reside at Pleasant Street with
20    your ex-wife?
21 A. For a short time.
22 Q. For a short time of that few months that you
23    were there?
24 A. No.  King Street with my wife was the last
25    time we lived together.
```

100

```
1  Q. Right.
2  A. Prior to that, we lived at Pleasant Street
3     for a very short time.  She went on her own
4     from King Street to Pleasant and then back
5     when I was gone.  So I don't know the exact
6     sequence.  But we lived in Gloucester for a
7     sequence -- I mean for the sequence purpose,
8     that was No. 1 residence.  No. 2 residence
9     was Pleasant Street, and the third residence
10    would be King Street.
11 Q. Did you own any of these properties?
12 A. No.  I explained to you before that we
13    purchased a piece of land after selling
14    Lynnfield, and we were waiting to start
15    construction.  So we sold Lynnfield, moved to
16    the apartment and waited to start building
17    at --
18 Q. So each of these three --
19 A. Were all rentals.
20 Q. Were all rentals?
21 A. Uh-huh.
22 Q. And do you remember who the landlord was on
23    each?
24 A. No.  It was about eleven people living --
25    eleven different apartments, you know what I
```

101

```
 1     mean?  It was one of those.
 2  Q. And do you have any memory as to whether or
 3     not in March of '02 you were living at 54
 4     Pleasant Street?
 5  A. I have no idea.
 6  Q. I'm going to hand you --
 7         MR. CHAPMAN:  And, Dean, the next
 8     exhibit is going to be another complaint and
 9     a return of service.
10         MR. CARNAHAN:  All right.
11         THE WITNESS:  I think by March of
12     '02 I was in -- we weren't anywhere near
13     there.  That's the time maybe she was there
14     and I had moved to the boat, I think.  But I
15     can't remember exactly how many times she
16     moved back from -- she moved from Pleasant to
17     King and then back or King to Pleasant and
18     then back.
19         MR. CHAPMAN:  Sorry.  She's got
20     to -- hold on one second.
21         THE WITNESS:  Okay.
22         (Document marked as Caiazzo
23          Exhibit 6 for identification)
24  Q. Mr. Caiazzo, I'm going to hand you Exhibit 6
25     which consists of three pages and take a look
```

102

```
 1     at that.  And then my question is, do you
 2     recognize that?
 3  A. (Witness reviews document)  Uh-huh.
 4  Q. And what do you recognize that to be?
 5  A. These are one of the documents that I
 6     received from my wife in that whole big
 7     package.
 8  Q. Okay.  And what's the date on the document?
 9  A. March 26, 2002.
10  Q. Okay.  And when relative to March 26, '02 did
11     you get that document from your wife?
12  A. I don't -- I don't know exactly when I
13     received this or who received this.  But
14     March 26, 2002 when I was still living with
15     her, whether it was over here at Pleasant
16     Street or it was at King Street, it was just
17     one of the two places.  I mean this one here,
18     March 26, 2002, this doesn't -- you know,
19     this is the address.  54 Pleasant Street is
20     where we lived for a short time.  And then
21     she moved back, you know, without me.  And
22     then we moved to King Street.  So this -- if
23     what you're asking is -- I never received
24     this in hand.
25         Now, if my wife received it in hand,
```

103

```
 1     she was the one that kind of ran up and down
 2     the stairs screaming and yelling if I
 3     received anything like this.  So I would
 4     certainly remember that because that was a
 5     pet peeve of hers.  "What is it?  Who's it
 6     from?  What is it about?" and the whole
 7     works.  So I don't know anything about this
 8     until I recognize that it is part of the
 9     documents.
10  Q. Okay.  Well, you do recognize that the
11     address that -- where it's represented this
12     was served is accurate, correct?  I mean that
13     is an address that you lived at?
14  A. Right.
15  Q. And do you have -- specific question now:  Do
16     you remember when relative to March 26, '02
17     you got this?
18  A. No, because I was never served with this.  No
19     one ever came to the door and served me this
20     particular summons.
21  Q. Okay.  And it doesn't indicate -- if you look
22     at the return, it doesn't indicate that
23     anyone is saying that?
24  A. No.
25  Q. You testified just a minute ago that you
```

104

```
 1     think this is one of the documents that your
 2     wife gave you at some time with this bag of
 3     documents she handed you.  I'm just asking
 4     now that you've seen this document, when is
 5     the first time that you saw it?
 6  A. Like I told you, I was handed a stack of
 7     documents, pages for which were my wife's --
 8     my signature for which my wife signed by way
 9     of mail.  This is one of the ones that came
10     in the -- you know, it could have been in an
11     envelope because they serve you in hand, and
12     they send you in the envelope.  And that's
13     what happened a lot.  So there was a stack of
14     them.
15  Q. But you don't -- if I'm understanding you
16     correctly, you basically don't know when it
17     was that she delivered this stack of
18     documents to you, correct?
19  A. No, no.  It was around -- like I told you,
20     after the proceedings, the divorce
21     proceedings.  So that started in 2002, I
22     believe.  It was after that.  Probably close
23     to the end of 2002, 2003.  I don't know
24     exactly, but that's...
25  Q. And as of March of '02 you were still
```

**105**

```
1     married, correct?
2  A. Yes.
3  Q. And your wife had permission to receive your
4     mail?
5  A. To receive my mail?
6  Q. Right.
7  A. Yes. Not sign for it. Or if she signed for
8     it, why I was never handed. There's no
9     reason I would sign your name if we were
10    living in the same complex and -- you know,
11    do whatever. But I was never handed this.
12 Q. Right. But all I'm saying is when you
13    were -- mail would come to where she was
14    living addressed to you; and she would accept
15    it and then later give it to you, correct?
16 A. Oh, that happened on quite a few occasions.
17    But it also didn't happen because I was never
18    there all the time. I mean I would come in.
19    I was there for an hour and a half, two
20    hours, and then I'd get up and gone.
21 Q. Right.
22 A. This certainly would have come to mind as
23    being an important document. It was left on
24    the kitchen table along with, you know, an
25    hour and a half of, "What happened? What's
```

**106**

```
1     going on?" blah, blah, blah, so on and so
2     forth. That does not ring a bell. So that
3     got there, or whether it was returned -- it
4     could have been returned. I don't know.
5  Q. In terms of -- I mean obviously it's a
6     summons and complaint. And if I understood
7     one of your prior answers correctly, this is
8     the kind of thing that your wife would become
9     excited about basically, right?
10 A. Absolutely.
11 Q. And she would say -- the gist of it would be,
12    "Oh, no. What's this? It's a lawsuit. You
13    better take a look at this"? She would say
14    that kind of thing to you, right?
15 A. Exactly.
16 Q. And would it be fair to say based upon, you
17    know, how she was during your marriage this
18    is the kind of thing that she would try to
19    bring to your attention as soon as possible?
20 A. I would think so. It's not something to be
21    hanging around the house for long, I'll tell
22    you that.
23         (Document marked as Caiazzo
24          Exhibit 7 for identification)
25          MR. CHAPMAN: Dean, Exhibit 7 is a
```

**107**

```
1     letter dated December 12, '02 from the Law
2     Offices of Stephen Whitman to Thomas Collins.
3          MR. CARNAHAN: Okay.
4  Q. Mr. Caiazzo, I'm going to hand you Exhibit 7
5     and ask if you've ever seen that letter?
6  A. (Witness reviews document) Yes, I have.
7  Q. And do you remember seeing that back in
8     December of '02?
9  A. It's familiar. I remember seeing Stephen
10    Whitman. And I remember seeing this as one
11    of the envelopes that was taken by my wife
12    and signed because there were two or three of
13    them by the Law Offices of Stephen Whitman.
14 Q. Okay. And you see it's a letter addressed to
15    Mr. Collins?
16 A. Right.
17 Q. And Mr. Collins was representing you at that
18    time?
19 A. Yes, he was.
20 Q. And Mr. Collins was representing you at that
21    time in connection with Mr. Cuttichia's
22    claim, correct?
23 A. This is when I received all this information
24    from my wife that I started to open it up and
25    said this is the Whitman -- I mean Cuttichia
```

**108**

```
1     case that's been lagging. And this was the
2     reason why the lien was put on the property.
3     And that's when I decided to call Joe and
4     settle it, find out. And I went to Tom,
5     and I said, "Here's the guy. Call him and
6     get this thing squared away." And that's
7     what this is.
8  Q. So would it be fair to say that you had
9     engaged Mr. Collins to get involved in the
10    Cuttichia claim prior to the date of that
11    letter?
12 A. This was part of a stack of letters which I
13    have from the Law Offices of Stephen Whitman
14    that were mailed to King Street, maybe
15    Pleasant Street, all of them. Some of which
16    were secured by return request mail that was
17    not signed by me. My wife signed my name.
18    These were opened by me when I found them.
19    These were backdated because the time period
20    extended it from the time she held on. I
21    called Tom. I says, "Get something -- this
22    is what the deal is."
23 Q. Again, I don't want to interrupt you, but
24    that doesn't -- what you just said doesn't
25    apply to this letter.
```

# <u>Exhibit 1B</u>

109

```
1   A.  Why wouldn't it?
2   Q.  Because it's not addressed to you.
3   A.  I understand this.  But this is something
4       that Collins had called Whitman on because
5       Whitman is the one that I called Collins on
6       after I received the stack of mail.
7   Q.  Yes.
8   A.  So he contacted Whitman and Whitman
9       apparently wrote a letter here.
10  Q.  Right.  All I'm saying is this letter that
11      you have you're holding, Exhibit 7,
12      that's not a letter that was in the stack of
13      documents that you got from your wife and
14      that you gave to Mr. Collins, correct?
15  A.  No.  This is the type of letters from Stephen
16      Whitman that I recognized as being part of a
17      group of letters that were sent to the other
18      address that I never got until later.
19      Subsequently, this was the follow-up letter
20      that I -- after Tom Collins contacted
21      Attorney Whitman.  This is made out to
22      Collins.  But the other ones were made out to
23      me.  This is just a follow up from an
24      attorney to an attorney to try and settle.
25  Q.  And where are all these prior letters from
```

110

```
1       Whitman's office to you?
2   A.  Tom Collins has them.  I have a copy.
3   Q.  Where is the copy you have, because it hasn't
4       been produced?
5   A.  Oh, I got plenty of copies.
6   Q.  Well, where are they?
7   A.  Where are they?  I have them.
8   Q.  Where in your possession?
9   A.  Well, I don't have them with me today.  But I
10      have them.  Tom Collins had copies.  I made
11      enough copies for everybody.  Tom Collins was
12      handling it.  I held on to them.
13  Q.  Where do you keep all these documents?  Is
14      there a particular place?  Are they down in
15      Florida?
16  A.  Yes.
17  Q.  And where -- do you own the property in
18      Florida?
19  A.  No, I don't.
20  Q.  Okay.  Your girlfriend does?
21  A.  Yes.
22  Q.  And is there -- where do you keep it?  Do you
23      have a desk or a filing cabinet?
24  A.  I have them in my garage.
25  Q.  In your garage.  Do you have boxes in the
```

111

```
1       garage?
2   A.  Yes.
3   Q.  So it's your testimony that you have some
4       letters that pertain to this case in your
5       garage in Florida but that haven't been
6       produced yet; is that accurate?
7   A.  I have a whole lot of documentation that is
8       relevant to this case, none of which would
9       excuse the fact that the Joseph Cuttichia
10      case was not handled properly.  You know,
11      copies of letters and stuff are fine.  But
12      the bottom line is this is years.  And
13      obviously two attorneys are trying to get
14      ahold of me that they couldn't do and, you
15      know, attach my real estate, attach the lien
16      on my real estate and got paid $45,000 for an
17      injury that never occurred.
18          MR. CHAPMAN:  And, Dean, I'll say
19      this for the record, I am requesting that any
20      other letters -- any documents that are
21      within the scope of either the pending
22      document requests or the scope of the initial
23      disclosure obligations be produced.  Okay?
24          MR. CARNAHAN:  Yes.  I made a note
25      of that.
```

112

```
1   Q.  Now that you've seen Exhibit 7, does that
2       help you to tell me when relative to the date
3       of this letter that you engaged Mr. Collins
4       to help you with the Cuttichia claim?
5   A.  Well, this letter is dated December 12, 2002.
6   Q.  Right.
7   A.  So I probably received this maybe a month
8       before.  I mean it was a short time.  As soon
9       as I received all the mail and went through
10      it, I immediately went up to Collins.  And he
11      then did what he had to do to write a letter
12      to Whitman or call him.  And then, you know,
13      Attorney Whitman got in touch with Collins.
14  Q.  So your best testimony is you retained or you
15      engaged Mr. Collins to help with the
16      Cuttichia claim sometime in November of '02?
17  A.  I mean, that's what it looks like.
18          (Document marked as Caiazzo
19          Exhibit 8 for identification)
20          MR. CHAPMAN:  Dean, No. 8 is an
21      order of notice.
22          MR. CARNAHAN:  Okay.
23  Q.  I'm handing you Exhibit 8.  And do you
24      remember getting that document back in late
25      '02?
```

113

```
 1   A.   (Witness reviews document)  No, I don't.
 2        This says 1/7/03 is when the hearing was.
 3   Q.   Right.
 4   A.   Yes.  So, no.  I think this is one of the
 5        ones I didn't -- I was unaware of.
 6             (Document marked as Caiazzo
 7              Exhibit 9 for identification)
 8        MR. CHAPMAN:  Dean, No. 9 is a
 9        clerk's notice.
10        MR. CARNAHAN:  All right.
11   Q.   I'm going to hand you Exhibit 9 and ask, do
12        you recognize that document?
13   A.   (Witness reviews document)  This is another
14        one that I got at a later date.
15   Q.   When did you first get that document?  It's
16        dated in January of '03, correct?
17   A.   Yes.  I have no idea because everything --
18        this was sent to -- this wasn't even sent to
19        me.
20   Q.   Well, I'm not saying it was sent directly to
21        you.
22   A.   Yes, this wasn't sent to me.  So you're
23        asking when I noticed this?
24   Q.   Well, yes.  When did you first see this
25        document?
```

114

```
 1   A.   This was part of the group of paperwork that
 2        Tom Collins and myself, either by way of
 3        communication with him in Whitman's office --
 4        I never received this.  This wasn't mailed to
 5        me.
 6   Q.   By January '03, Mr. Collins was representing
 7        you in connection with the Cuttichia case?
 8   A.   Right.
 9   Q.   And do you recall learning that there was
10        going to be an assessment of damages hearing
11        against you that was scheduled for early
12        January of '03?
13   A.   No, because this was a shock to me as to how
14        this was assessed.  And when I got it, I kept
15        calling D'Addario.  I flipped out, called
16        over to Tom.  I says, "How could this be?"
17        There was no injury.  I was never notified.
18        And he went ahead and did the research and
19        found out there wasn't a police report.
20        There was no -- he called the hospital and
21        that was in reference to the letter saying
22        that was no damage and there was no injuries.
23             And this is what was so shocking:
24        that I was never notified; I couldn't
25        properly be represented; and that nobody came
```

115

```
 1        to find me.  D'Addario, the agency, nobody
 2        could find me.  But yet I was doing business.
 3        I was seeing D'Addario.  He was on my boat.
 4        And everything associated with the
 5        representation of this case -- for all
 6        practical purposes, this was out of sight,
 7        out of mind.  I didn't know if this guy moved
 8        to Canada or he looked at it and says, "I
 9        wasn't hurt.  I can't win this.  Why am I
10        going to do it?"  It was out of sight, out of
11        mind.
12             Do you honestly think that I would
13        allow someone to go unnoticed over at court
14        and have them apply a $36,000 lien on my
15        property without defending this at all?
16   Q.   Well, that's my question.  In January of '03,
17        Mr. Collins was on this case for you?
18   A.   Uh-huh.
19   Q.   And do you know if he or anyone else on your
20        behalf appeared in court on --
21   A.   December?  No.
22   Q.   December 5th --
23   A.   No.  January 7, 2003, right?  A motion was
24        going to be held at the courthouse in
25        Lawrence, the Superior Court on 1/7/03,
```

116

```
 1        right?
 2   Q.   Right.  That's for a real estate -- okay.
 3        That's for real estate attachment.  My
 4        question is:  With regard to Exhibit 9, do
 5        you know if anyone appeared in court on your
 6        behalf on December 5, 2002 to defend the
 7        assessment of damages hearing?
 8   A.   I just told you, I was unaware of any type of
 9        hearings or assessments or court decisions.
10        That's what this whole shocking incident is
11        about.
12   Q.   So is the answer to the question you don't
13        know; you're not aware of it?
14   A.   Right.
15   Q.   Okay.  And the next question is with regard
16        to Exhibit 8.  Do you know if anyone appeared
17        in court on your behalf on January 7, '03 to
18        defend the motion for a real estate
19        attachment?
20   A.   I have no idea because I hit the roof when I
21        found out about it.
22   Q.   Now, have you ever made any kind of claim
23        with the Board of Bar Overseers or otherwise
24        against Mr. Collins?
25   A.   Yes.
```

117

1   Q.  And when did you make out that complaint?
2   A.  Last year sometime.
3   Q.  And what's the status of that complaint now
4       with the BBO?
5   A.  Well, based on what happened, he was held
6       responsible to handle certain matters which
7       he didn't.  And as a result, I questioned his
8       validity in getting back to me on a timely
9       basis which eventually turned out to be
10      disastrous for me financially because of
11      these -- I'm not saying this was the only
12      one.  There was other issues.  And that was
13      it.  So they looked at it and decided that
14      based on all of the other associations which
15      have no relevance to this or this case here
16      were questioned by me through the BBO.
17  Q.  So what's the outcome of your complaint in
18      the BBO against Mr. Collins?
19  A.  On my other cases.  They don't have the --
20      what I initially filed with the BBO against
21      Tom Collins, okay, none of the paperwork ---
22      it was incomplete because I was supposed to
23      get another attorney to finish and go after
24      him.  That's the way the BBO left it, and
25      that's what we did.

118

1   Q.  Did your complaint against Mr. Collins
2       include any allegation of mishandling of the
3       Cuttichia claim?
4   A.  I don't remember.  I don't know whether it
5       was the Cuttichia claim or not.  I know it
6       was the workman's comp.  I know it was my
7       divorce, the way he handled the divorce.  I
8       don't remember much after that, what other
9       things were available.
10  Q.  And have you ever filed any kind of civil
11      claim against Mr. Collins?
12  A.  I don't know if the civil claim has been
13      filed.  It may have.  It may already.
14  Q.  Have you engaged a lawyer to represent you in
15      a civil claim against Collins?
16  A.  We've discussed it with a few people.
17  Q.  Okay.  And the civil claim against Collins
18      would arise out of his alleged mishandling of
19      a workers' comp claim, of your divorce case;
20      and anything else specifically?
21  A.  Unemployment case.
22  Q.  You mean an unemployment claim of yours
23      personally?
24  A.  Right.
25  Q.  Who did you make an unemployment claim



119

1       against?
2   A.  It was out of Gloucester District Court.
3   Q.  And who did you file that claim against?
4   A.  The unemployment -- Division of Employment
5       and --
6   Q.  Yes, but arising out of your employment
7       where?
8   A.  Out of a combination of Scuttlebutt's when we
9       closed and the Blue Parrot.
10  Q.  And how is it that you alleged he mishandled
11      these unemployment claims?
12  A.  It was defaulted.
13  Q.  In other words, a claim was filed, and
14      failure to prosecute, and then it was
15      dismissed?
16  A.  They apparently sent him a letter asking him
17      to follow up in a letter and produce the
18      necessary documents as opposed to the initial
19      ones.  And I found out later on, seven, eight
20      months later on a year.  And I thought it
21      was still on hold and it got dismissed
22      because he never returned -- never followed
23      up on it.
24  Q.  Have you ever filed any BBO claims against
25      any other lawyer beside Mr. Collins?

120

1   A.  Yes.
2   Q.  And who else?
3   A.  Mr. Kelly Landolphi.
4   Q.  Anyone else?
5   A.  No.
6   Q.  And when did you file the claim against Mr.
7       Landolphi?
8   A.  Last year.
9   Q.  And what is it that you've alleged that he
10      did wrong?
11  A.  Mismanaged, made some misrepresentations on
12      the bar -- on the lease, never got back to
13      the landlord in time on a letter that was
14      sent suggesting payment of the water bill
15      that was in dispute which caused the lease to
16      be broken in Superior Court in Salem.
17  Q.  We're talking about Scuttlebutt's, right?
18  A.  Yes.  So I haven't had very good luck with
19      attorneys.
20          MR. CARNAHAN:  Except for me.
21          THE WITNESS:  Except for you.
22          MR. CHAPMAN:  I knew you'd perk up
23      at that one.
24          THE WITNESS:  I mean prior.  I'm
25      sorry.

121

```
 1   Q.  And have you filed or do you anticipate
 2       filing any kind of civil claim against Mr.
 3       Landolphi?
 4   A.  Mr. Landolphi was disbarred for three years.
 5       And this was based on previous accounts of
 6       misappropriation of funds and things
 7       associated with his law practice.
 8   Q.  Disbarred on account of anything involving
 9       you?
10   A.  No, because they didn't need that.  They told
11       me, "Steve, we don't need it.  But we would
12       like you to come forth at the hearing late
13       this summer," I believe so we could extend it
14       to a point where he may not be able to get
15       reinstated.
16   Q.  And how about a civil claim against Mr.
17       Landolphi?
18   A.  No.
19   Q.  Okay.  Have not filed one?  Don't plan to
20       file one?
21   A.  We're still looking into it because he's out
22       of -- no one can find him.
23   Q.  And have you retained any counsel to look
24       into that for you?
25   A.  No.  I just talked to a few different people.
```

122

```
 1       I haven't made a decision yet.
 2   Q.  So have we now talked about all the BBO
 3       claims or potential civil claims against any
 4       lawyer that you've ever brought?
 5   A.  Yes, I think we've covered it all.
 6   Q.  You've already testified that when you found
 7       out about this claim against you by
 8       Cuttichia, you told Mr. D'Addario.  Did you
 9       ever attempt to get in touch directly with
10       the insurance company?
11   A.  Yes.
12   Q.  And what insurance company as far as you're
13       concerned should have responded to this
14       Cuttichia claim?
15   A.  I don't know which one it was because all
16       different -- there was Lloyd's of London.
17       There was Legion for the workman's comp.
18       There was a -- you know, there was four or
19       five different companies with each different
20       insurance package.  So there could have
21       possibly been three or four different
22       companies.  I forget which one I called or
23       who was associated with it.  But I called a
24       lot of them, and they all -- you know, no one
25       would talk to me about it.  "You have to go
```

123

```
 1       through your agent."  And that's when I said,
 2       "I can't.  They won't respond" and blah,
 3       blah, blah.  And one thing led to another,
 4       and that's what this whole, you know,
 5       problem.
 6   Q.  Did you ever send any written notices to any
 7       insurance company about the Cuttichia claim?
 8   A.  No, not that I know of.
 9   Q.  Based upon your --
10   A.  I sent it to the agency, though.
11   Q.  Right.
12   A.  Right.
13   Q.  Based upon -- as a guy who at least at some
14       point had an insurance agent's license and in
15       connection with your experience with
16       getting different --
17   A.  Life insurance, life insurance, possibly
18       disability.
19   Q.  Right, as you said.  In connection with that
20       experience and in connection with your
21       experience in getting different types of
22       insurance for the different bars you've
23       owned, what type of coverage would a claim
24       like Cuttichia's come under, if any?
25   A.  If he was hurt while within the confines of
```

124

```
 1       the square footage of that leased area, the
 2       insurance company would cover it unless there
 3       was some --
 4   Q.  Which type of insurance?
 5   A.  Well, it would be a dram shop or some type of
 6       liability.  And all the different packages
 7       were explained in the sheets.
 8   Q.  Now, as the years went by, you know, the
 9       years during which you were getting the
10       insurance from DeVincentis or the Medallion
11       agency, you'd get your policies in the mail,
12       correct?
13   A.  Sometimes we'd get them in the mail.
14       Sometimes Jack would deliver them in hand in
15       a folder similar to this.
16   Q.  And when you'd get these -- and we're talking
17       about all the different types of policies,
18       right?
19   A.  Correct.
20   Q.  Did you have different renewal dates such
21       that you would get the policies at different
22       times during the year?  Or did they all come
23       at the same time basically, or what's your
24       memory on that?
25   A.  No.  The whole package, the deposit was made.
```

125
```
 1   The renewal date we'll say was June 1st.  He
 2   would let me know in April or something or
 3   May, "It's coming up, your renewal.  Let's
 4   discuss it."  And if everything was going
 5   well and we wanted to increase or -- you
 6   know, sometimes I was more concerned with the
 7   liquor liability because that was the one
 8   that went up.  It was so expensive.  And
 9   sometimes we had to downgrade that.  But most
10   of all, he would say, "Okay.  We're going to
11   go through the same company" or "I'm going to
12   get a quote.  This is a better deal from this
13   company" and so on and so forth.  And then
14   shortly before that, he would come down, sign
15   the paperwork.  They'd calculate -- they'd
16   give me a sheet which included the deposit,
17   all the different packages and how much it
18   was going to be per month to the company.
19   And that was it.
20  Q.  Right.  And how was your experience with
21   Medallion and the DeVincentis agency in terms
22   of getting the written policies, receiving
23   them?  I mean was that --
24  A.  Obviously for the renewals it was in their --
25   you know, it was to their benefit that we
```

126
```
 1   renewed as soon as possible because the
 2   checks were sent directly to them.  And a lot
 3   of my deposit checks were like -- some were
 4   $4,000 and some were $7,000 which reduced the
 5   monthly payment.  Because I think at one
 6   point I said to Jack, "Can we lower the
 7   liquor liability and increase the down
 8   payment?"  And then the monthlies were
 9   reduced somewhat.  So, yes, I mean everything
10   was done that way on, you know, the things
11   that were included on claims, three or four
12   different claims over a three, four -- period
13   were almost ignored.  And some of them
14   weren't even, you know, answered properly.
15   That's all I asked for was someone just to
16   clarify an answer.  I knew I had the
17   insurance.  But they would just say, "No, you
18   don't have any insurance."
19  Q.  When you were operating Cai's Food & Spirits,
20   was there a particular place you kept your
21   insurance records?
22  A.  I kept them in my file cabinet.
23  Q.  So you'd get -- during the course of the
24   year, you'd service a workers' comp policy
25   from the agency; you'd receive a general
```

127
```
 1   liability policy; you'd receive a liquor
 2   liability policy, all these different
 3   policies; and you'd get them and you'd put
 4   them in the filing cabinet?
 5  A.  Right.
 6  Q.  And would you read any of these policies?
 7  A.  Pretty much so, yes.
 8  Q.  Okay.  And why would you read them?
 9  A.  Because based on the knowledge of the
10   insurance industry, there's all kinds of
11   exclusions that would indicate that most
12   people who were buying insurance initially to
13   find out that there would be no necessity to
14   pay $3,000 for a particular policy when the
15   time came.  There was going to be an
16   exclusion on that.  And the exclusion rights
17   and the exclusion clauses were defined
18   clearly just so everybody knew what to
19   expect.
20  Q.  Okay.  And so during the course of reading
21   these different insurance policies, would it
22   be fair to say that you generally understood
23   that if you had any claim under any of your
24   insurance policies, it was important that the
25   company get notice of the claim quickly?
```

128
```
 1  A.  The agent is to be notified, not the company.
 2  Q.  Right.  But the company says in the policy
 3   that you need to notify us, the company;
 4   right?  You the insured need to --
 5  A.  No.  An agent is the one who handles all
 6   types of correspondence.  I do not -- I never
 7   remember reading anything associated with me
 8   contacting the insurance company.  It was the
 9   agent directly, and that was it.  I mean I
10   was --
11  Q.  Well, let me ask it this way:  Do you
12   understand from reading different insurance
13   policies that the company needs to get notice
14   of a claim promptly?
15  A.  Exactly.
16  Q.  And is that -- would that be a fair statement
17   in terms of whatever kind of insurance policy
18   we're talking about, whether it be a liquor
19   liability, general liability, workers' comp,
20   whatever, correct?
21  A.  I would think so.
22  Q.  Now, when you were operating Scuttlebutt's,
23   was it the same situation?  You'd receive the
24   written policies, and you'd put them
25   somewhere at Scuttlebutt's?
```

129

1   A.  I had them in the file cabinet.
2   Q.  So you had -- you also had a file cabinet at
3       Scuttlebutt's in which you'd keep your
4       insurance policy?
5   A.  Yes.
6   Q.  And was it the same situation when you were
7       operating Scuttlebutt's, that you'd get the
8       policies either in the mail or by hand
9       delivery from the agency, you'd look at them,
10      you'd read them over, and then you'd put them
11      in the cabinet?
12  A.  Most likely.
13  Q.  Other than -- I mean you've already testified
14      that you talked to Mr. D'Addario on
15      apparently multiple occasions about the
16      Cuttichia claim.  Do you have any other
17      evidence or any documents of any kind that
18      would support your testimony that Medallion
19      received notice of the Cuttichia claim at any
20      time before February of '03?
21  A.  Any documentation, like I said, I wasn't
22      required to put in writing to anybody about
23      any claim.
24  Q.  Okay.  So let's see if you can answer that
25      yes or no.

130

1   A.  That would be obviously no.
2   Q.  All right.  Do you remember talking with Jean
3       D'Addario in February of '03 about the
4       Cuttichia claim?
5   A.  I don't remember discussing anything exactly
6       with her.  All I know is every time I called
7       her, there was only a couple of times I spoke
8       with that woman.  And one was that she was
9       going to look into the archives and get back
10      to me.  And then I never heard anything.
11      Kept calling and calling and calling.  I was
12      put on hold.  When I asked for her, they
13      said, "Who's calling?"  "Steve Caiazzo."  I
14      was on hold for half an hour, 35, 40 minutes.
15      Just hung up.  Called again, wouldn't answer.
16      Called again, "She's not in."  She never
17      returned my calls for a long period of time.
18      And then finally she called or I got ahold of
19      her, I forget, or D'Addario called.  I forget
20      exactly what was said, but it was similar
21      to --
22  Q.  Well, I don't want you to guess.  If you
23      don't remember --
24  A.  What I'm saying is what they basically said
25      was -- they could have said it a month before

131

1       or two months; I forget exactly what the time
2       was -- "You don't have insurance for that.
3       It's not covered" or "We can't find it" or
4       something.  Number one was we couldn't find
5       it.  And then -- there was just too much
6       inconsistencies regarding the coverage and
7       they couldn't find it.  And I know Joe
8       DeVincentis said at one point, "We can't find
9       anything.  We don't have any copies of
10      anything."
11  Q.  Do you remember talking to Jean in February
12      of '03 about the Cuttichia claim and her
13      saying to you in essence, "We never heard
14      about this before"?
15  A.  No, I don't.
16  Q.  Do you remember her telling you in February
17      of '03 that their records didn't even go back
18      to 1996 and they were going to have to go
19      back and try to find out who the insurance
20      company was in 1996 when Cuttichia's accident
21      supposedly happened?
22  A.  No, not at all.  It was quite the contrary
23      that she says, "We're going to find out.
24      It's the first I heard of it."  I said, "I
25      gave it to Jack.  He said he was going to

132

1       give it to you."  Apparently he didn't.  And
2       subsequently this next set of events trickled
3       on into court.  And as a result, the land
4       was -- you know, that was liened.  And then
5       she did say, "We're going to have to look
6       into the archives."  As far as her hearing
7       about it, I don't know.  But I don't think I
8       was given that much information on any given
9       conversation with Jean D'Addario.  It was
10      short and sweet when I was lucky enough to
11      speak with the woman.
12  Q.  Do you remember -- well, as you sit here
13      today, do you understand who the different
14      insurance companies were that might have been
15      obligated to cover the Cuttichia claim from
16      1996?
17  A.  No.
18  Q.  Do you remember ever having any direct
19      contact of any kind with anyone from
20      Interstate Insurance Company?
21  A.  It could have been one of the companies I
22      called.  Like I said, I pulled out a lot of
23      the files and started calling people.
24  Q.  But I'm asking you again for a specific
25      memory.  If you don't-

133

1   A.  I mean the name -- you could say John Jones
2       Insurance, Tommy Smith's.  I don't know.
3       That name sounds familiar.  And I called a
4       bunch of them as I explained to you earlier,
5       but I don't know.
6   Q.  I bet you've got something better to do later
7       on today.  So we can --
8   A.  Not necessarily.  If you've got a pillow and
9       a blanket, I'll stay here.  I'm living in
10      Florida.
11   Q.  All right.  Okay.
12   A.  No, I'm serious about that.  I just -- the
13      name sounds familiar.  But I called a lot of
14      them which I told you earlier.  I don't
15      remember exactly.
16   Q.  I'm going to try one more, though.  Do you
17      remember ever having any direct contact of
18      any kind with anyone from Pacific Insurance
19      Company?
20   A.  That rings a bell.  I may have called them,
21      too.
22   Q.  Do you have any specific memory?
23   A.  I remember a whole list of names which I took
24      off a printed sheet, and that's all I
25      remember.  I remember Lloyd's of London.  I

134

1      remember Legion.  Interstate I believe was
2      one.  I can't remember exactly what the other
3      ones were, but I know there was at least
4      three or four.
5   Q.  Your claim against -- if we look at the
6      complaint which is Exhibit 1, you're
7      basically complaining that Medallion didn't
8      provide proper notice and that's the reason
9      you don't have insurance for this claim,
10      correct?
11   A.  Proper notice for what?
12   Q.  For the Cuttichia claim.
13   A.  Notice to me?
14   Q.  In other words, you're saying you notified
15      D'Addario?  D'Addario didn't notify the
16      insurance company; therefore, you don't have
17      insurance for the Cuttichia claim?  Is that
18      what you're saying in this case?
19   A.  No, no.  What I'm saying is I wasn't properly
20      notified.  I handled my responsibility
21      according to procedure.  From that link, it
22      obviously didn't get done from D'Addario to
23      his office or to the insurance company.  As a
24      result, during the course of the next two
25      years, three years, I was never notified by

135

1      them or associated with anyone involved with
2      representing this case or attempting to
3      defend the fact that someone was not hurt but
4      said they were.  That's a fraudulent
5      insurance claim.
6           After Tom Collins wrote this letter
7      justifying the hospital, the patient, you
8      know, the decision from the hospital based on
9      his medical condition when he left there did
10      not add up.  So why was this allowed to
11      continue without nobody caring to let me
12      know?  And as a result, the $45,000 was
13      placed in lien on my property.  And
14      subsequently a check was paid out of the sale
15      of my personal property to a person named Joe
16      Cuttichia who was never hurt in my bar.
17           And instead of fighting this and
18      defending this -- it could have ended up
19      being $5,000.  Who knows?  That's what I
20      thought.  It was just a quick settlement to
21      get rid of them.  I didn't know two, three
22      years down the line that this was going to be
23      a mark on my personal property and then
24      eventually a check sent to this guy.
25   Q.  I'm going to ask you a specific insurance

136

1      question now.  All right?
2   A.  Uh-huh.
3   Q.  Can you identify any particular insurance
4      policy that you say should have covered the
5      Cuttichia claim?
6   A.  I don't know exactly what company during
7      which time liability was assigned.  It is not
8      that specific in the disclosure sheets.  It
9      did say on my income disability "Income
10      Disability Package."  It did say "Workman's
11      Comp Package," "General Liability," and so on
12      and so forth.  It did not say anything
13      specifically about an injury to a patron in
14      your bar that was not going to be covered or
15      was going to be covered based on the ability
16      to prove it or to disprove it.  That's all.
17      It's hard to --
18   Q.  So if I can distill that answer down to its
19      basic part, is it fair to say you are not
20      able to identify a specific policy that you
21      say should have covered the Cuttichia claim?
22   A.  Correct.
23   Q.  Okay.  Now, if we take a look at Count II of
24      your complaint in Exhibit 1, you're alleging
25      that Medallion failed to provide notice of a

137

1   disability claim. Do you see that?
2   A.  Which one was it?
3   Q.  Count II. It starts at the top of the page.
4   A.  (Witness reviews document) Yes.
5   Q.  Now, have you ever had a disability insurance
6       policy?
7   A.  Absolutely.
8   Q.  And when is -- for what period of time have
9       you had disability insurance?
10  A.  I had it at Cai's, and it ran into
11      Scuttlebutt's. Because I specifically asked
12      for that in case I got hurt because I had
13      mortgages on two properties and everything
14      else.
15  Q.  Okay. So you're saying you had a disability
16      insurance policy in effect for roughly how
17      many years?
18  A.  A good many years. It probably happened more
19      so at the end of operation of Cai's, probably
20      between, I don't know, anywhere between 1995
21      to 2001 at Scuttlebutt's, somewhere within
22      that vicinity.
23  Q.  And so like the other policies, you would
24      receive the disability policy either in the
25      mail or by hand delivery?

138

1   A.  Yes.
2   Q.  And where did you get this disability policy?
3   A.  From what company?
4   Q.  Exactly.
5   A.  From what company did I get --
6   Q.  Right.
7   A.  I didn't obtain that. I purchased it as part
8       of the package through John D'Addario who in
9       turn dropped off a package of insurance
10      policies, some of which included -- as I read
11      across it said "Disability Income Package."
12      And it has a figure at the end as to how much
13      it's going to be for the entire quote for the
14      year.
15  Q.  All right. So if I understand right, you're
16      saying you got some disability coverage
17      through Mr. D'Addario?
18  A.  Correct.
19  Q.  And who was the insurer on your disability
20      coverage?
21  A.  I don't know.
22  Q.  Was it always one insurer, or was it
23      multiple?
24  A.  I don't remember because he would vary in his
25      quotes from renewal to renewal.

139

1   Q.  Okay. But your testimony is you specifically
2       received a policy or a documentation that
3       told you you had disability coverage?
4   A.  Yes, absolutely.
5   Q.  Okay. And has that been produced in this
6       case?
7   A.  No.
8   Q.  Why not?
9   A.  Well, number one, the document that I had
10      submitted to Tom Collins that we were sitting
11      in his conference room and I noticed that
12      it's gone beyond me. I says, "I'm entitled
13      to this income policy. I forgot about this,
14      and there it is." I said, "Send this" -- I
15      says, "I need a copy. After you do what you
16      have to do, submit this to D'Addario" or
17      whatever. I says, "Call me back. I need a
18      copy of that."
19              Now, in addition to that, at the end
20      of Scuttlebutt's from the time we had -- we
21      had filed for bankruptcy. When the lease was
22      broken through Landolphi, they came in and
23      locked the doors. Okay. So my office was
24      locked. All the files were in there when I
25      left. I was notified that I would have to

140

1       contact the bankruptcy trustee, set a date up
2       to go in and get my personal property.
3               We went in two days later, and the
4       landlord had completely trashed the office.
5       I have pictures of that. And everything --
6       checkbooks, everything was gone. And that
7       was part of, you know, the package. I mean I
8       have periodical pieces of paper here that I
9       had that was left on the floor or on the
10      table, on the desk or wherever. But for the
11      majority of everything, everything associated
12      with the lease was gone. Certain documents
13      were gone. The whole office was trashed.
14              And normally I would be able to
15      produce that, but you would figure the
16      insurance agency would know what company
17      represented that or provided that coverage.
18  Q.  Well, I'm afraid I'm not following your last
19      answer because the documents with Cai's --
20      I'm sorry -- the documents with Scuttlebutt's
21      were gone as of September '01. And you said
22      a minute ago that you were looking at some
23      documents with Mr. Collins which took place
24      in 2002, if I understand your answer
25      correctly?

141

1   A.   Right.
2   Q.   That showed that you had a disability
3        coverage?
4   A.   Correct.
5   Q.   And the original question was why haven't
6        those documents been produced?  Okay.  So
7        that's what I need the answer to.
8   A.   Okay.  The question is -- I did mention to
9        you earlier that Tom Collins had that sheet.
10       It was a cover sheet.  It wasn't the actual
11       policy.  It was a cover sheet similar to what
12       you have there in that package.  What was
13       also said was that I under no circumstances
14       was going into my office believing that
15       someone was going to be allowed to trash that
16       thing and take what they wanted and leave
17       paperwork everywhere, which is exactly what I
18       did.
19  Q.   Well, I'll tell you that I have better things
20       to do later on.  I'm trying to make this
21       easy, streamline it as best I can.
22  A.   I understand.
23  Q.   Here's Exhibit 2.  These are all the
24       documents you've produced in this case.
25  A.   Right.

142

1   Q.   Do you see any document in here that tells
2        you that you have disability insurance
3        coverage?
4   A.   No, not in these.
5   Q.   All right.  Where are any disability
6        insurance documents currently as far as you
7        know?
8   A.   As I said to you earlier, Tom Collins had the
9        sheet.  I looked at it, handed it to him,
10       told him to do what he had to do to collect
11       this.  That's when his communication with the
12       agency started.  Okay.  At that point, this
13       is when I found out that he wasn't doing what
14       he was supposed to do.  And I called him for
15       three months.  He never called back.  This
16       was when I filed the claim with the BBO and
17       everything else because I asked him to send
18       me the document showing the disability.  I
19       had to have the BBO call him and demand that
20       he send me my file.  The file did not include
21       that sheet of paper obviously because he knew
22       how important it was to me.  But in addition
23       to that, copies of that policy were in effect
24       because I was looking right at it.  And I had
25       to produce paychecks for an audit suggested

143

1        by John D'Addario and also had to produce my
2        tax returns in order to justify the $1,500 a
3        week policy.
4   Q.   Now, this was a -- well, when the BBO ordered
5        Collins to send your file back, did he do
6        that?
7   A.   Yes.
8   Q.   He sent you back some documents anyway,
9        right?
10  A.   Uh-huh.
11  Q.   And where are the documents that you got back
12       from Collins currently?
13  A.   The same place where the other ones are, in
14       my garage.
15  Q.   In Florida?
16  A.   Yes.
17            MR. CHAPMAN:  Dean, same request.
18       Okay?
19            MR. CARNAHAN:  For what
20       specifically?
21            MR. CHAPMAN:  For these -- well, the
22       formal request that I'm making now on the
23       record is for all documents that he got back
24       from Mr. Collins since -- I think I should be
25       able to see those since they apparently in

144

1        large part pertain to the insurance issues in
2        this case.  So that's my general request.
3             I'm also making a specific request
4        for any documents in the Collins file that he
5        got back that is now in Florida that hasn't
6        been produced to us yet that pertains to this
7        disability coverage that he's talking about.
8        Okay?
9             MR. CARNAHAN:  All right.
10  Q.   Now, you know that in order to have
11       disability insurance coverage you have to pay
12       for it, right?
13  A.   That's usually the way it goes.
14  Q.   Right.  And those payments are called
15       premiums, right?
16  A.   Absolutely.
17  Q.   And did you ever pay any premium payments for
18       disability coverage?
19  A.   Every month.
20  Q.   And what was the amount of the monthly
21       payment?
22  A.   I don't know.  Like I told you, it was broken
23       up.  The sheets that you have here, if you
24       look at them, it shows the coverage with the
25       amount to the right for various coverages,

145

1   workman's comp. You see this one here for
2   workman's comp, disability, general
3   liability, and a lump sum. And that is
4   divided by 12 minus the 30 percent down or
5   whatever it was.
6   Q. So just focusing in on the disability --
7   A. Right.
8   Q. -- you already recognize that Exhibit 2
9   doesn't contain any disability?
10  A. Right. That's part of my monthly check and
11  payment for the entire insurance package
12  which included liquor liability, my income
13  disability, my workman's comp, my general
14  liability, my fire and theft, and everything
15  associated with the proper insurance for that
16  particular business and location.
17  Q. Well, obviously, you've been able to produce
18  some documents with regard to these other
19  policies. There are some documents in
20  Exhibit 2, in other words, relative to the
21  workers' comp. There's some documents in
22  there about the general liability, about the
23  liquor liability. Okay?
24  A. Uh-huh.
25  Q. There aren't any documents in here whatsoever

146

1   with regard to this liability coverage that
2   you're talking about, nor is there any
3   evidence of any premium payments made, nor is
4   there any evidence of that any premium for
5   disability coverage was financed. Because
6   you were financing some of your premiums,
7   right?
8   A. Everything was financed. A lump sum payment
9   package was financed, all of them. I didn't
10  write a check to Empire State Insurance for
11  my income disability and then another check
12  for my workman's comp and then write another
13  check for the fire. Everything was
14  associated with the general insurance package
15  which included all these different
16  complements and paid once a month.
17  Q. Right. And the premium financing document
18  that you'd get identified the different
19  policies that were being financed, right?
20  A. Correct.
21  Q. And none of those premium financing documents
22  refer to a disability policy, do they?
23  A. No. The one I saw did. The ones that you
24  have do not.
25  Q. How would you -- would you pay the premium

147

1   for your insurance on a personal account or a
2   business account? How did you do it?
3   A. It was a business corporation. It was a
4   business insurance package. And it was
5   associated with my disability because I was
6   the manager/owner and I was the one who was
7   getting the paycheck for that amount weekly.
8   Q. So the premium payments for the disability
9   policy were written on what account, then?
10  What was the name of it?
11  A. It was under Scuttlebutt's, or Jenna's Pub,
12  Inc. There was a couple of checkbooks there
13  which...
14  Q. And what bank was that with?
15  A. We used about four or five different banks.
16  Q. Which ones?
17  A. We used U.S. Trust, Eastern Bank, Salem Five.
18  There may have been one more. Sovereign.
19  Q. And do you have the canceled checks still?
20  A. Absolutely.
21  Q. And where are those?
22  A. At home in my --
23  Q. In the garage?
24  A. -- garage.
25        MR. CHAPMAN: Dean, do I need to say

148

1   it?
2        MR. CARNAHAN: You want canceled
3   checks for what?
4        MR. CHAPMAN: For the premium
5   payments for the different insurance
6   policies.
7        MR. CARNAHAN: Okay. For what
8   period of time?
9        MR. CHAPMAN: For the -- well, for
10  any time that the disability coverage was in
11  effect. But based upon the answers we've
12  heard, it sounds like the time period
13  according to Mr. Caiazzo's testimony is 1995
14  to 2001.
15  A. You're not going to see a check that shows
16  nine different categories of insurance on my
17  business check. It says income disability,
18  fire and theft, workman's comp, general
19  liability, income disability, and the whole
20  works. It should have been stamped. It
21  isn't done that way. The policies are sent
22  out. It's all incorporated in one monthly
23  payment, and I make it out to Standard
24  Funding. And it ranges from $900 to $1,400 a
25  month which includes payment to all the

149

```
 1    subsequent --
 2  Q.  Okay.  And I understand that.
 3  A.  Okay.  But I didn't think you -- I just
 4      wanted you to know that it doesn't -- there's
 5      no highlights underneath saying -- you know,
 6      Standard handled that.
 7  Q.  Just so we're clear on the record, I'm
 8      looking for production from you of all checks
 9      that you say went towards disability
10      insurance.  Okay?
11  A.  Checks were sent to the liability company,
12      the fire and theft, my workman's comp, my
13      disability insurance.  The payments to those
14      insurance companies was sent out by whoever.
15      Not me.  That was not my responsibility.  I
16      was required to send one check to Standard
17      Funding who in turn sent out checks to
18      everybody else.  So that was not my
19      responsibility.
20  Q.  When you say "Standard Funding," you're
21      talking about the premium finance company,
22      right?
23  A.  Correct.
24  Q.  Again, so with that understanding --
25  A.  But you know what I'm saying?  I can't
```

150

```
 1      produce anything other -- you know, we're not
 2      in the business to provide coverage.
 3  Q.  Yes.  I mean this is pretty simple.  I'm
 4      looking for the checks that you say went for
 5      the premium payments including for this
 6      disability policy.  I know that you're
 7      saying --
 8  A.  And I'm going to say it again as you just
 9      asked that there is no differentiating the
10      difference between me sending a check that
11      says income disability and the next one
12      saying fire and theft and general liability
13      and workman's comp.  That was not --
14          MR. CARNAHAN:  Steve, I understand
15      what he is requesting.  I'll discuss it with
16      you.
17          THE WITNESS:  Okay.  I just didn't
18      want -- I can't produce something that I
19      don't have.
20  Q.  But you are saying that you would get a
21      specific disability policy over the years?
22  A.  Correct.
23  Q.  You'd get a written policy that you would
24      read and file away along with the other
25      policies, correct?
```

151

```
 1  A.  Correct.
 2  Q.  And some of those you were getting when you
 3      were still -- back at the time when you were
 4      still operating Cai's Food & Spirits,
 5      correct?
 6  A.  Right.
 7  Q.  So those policies would have went into the
 8      file cabinets -- the file cabinet that you
 9      had there in Malden, right?
10  A.  Well, those files are gone.
11  Q.  What happened to these files?
12  A.  You can ask Jack D'Addario what happened
13      there.  There was a flood in the bar, the
14      entire office.  He walked down.  I called him
15      without touching anything.  He came down.  It
16      was a small claim of -- maybe it was the only
17      claim over all those years of a short amount
18      of money for the water damage.  But he came
19      down, saw all the -- everything that was on
20      the floor, all the books.  Everything was all
21      trashed and covered with water due to the
22      problem they had there.  It backed up in the
23      back.
24  Q.  So are you saying that the disability
25      policies you received at Cai's in Malden no
```

152

```
 1      longer exist?
 2  A.  I do not have copies of those policies way
 3      back when.  Everything that was in the office
 4      for the most part back then for what I could
 5      not salvage was covered with water due to an
 6      overflowing or flooding from the downstairs.
 7  Q.  So you threw those policies away?
 8  A.  Right.
 9  Q.  Now, when you first -- how did the subject of
10      disability insurance first come up between
11      you and Mr. D'Addario?
12  A.  My interest and his interest.  It was based
13      on his suggestion because you have to get
14      covered if something happens to you because
15      you're the sole -- you're the only owner.
16      You're here doing it all the time.  Who's
17      going to subsidize your income if something
18      would happen?  And I'm sure it was to his
19      advantage also to get a percentage of it.
20      And I said, "You're absolutely right."  And
21      then we did it.  He says, "How much do you
22      make a week?"  And I told him.
23          Shortly afterwards he called me and
24      said, "The audit company won't produce that
25      until they see copies of the checks and
```

153

```
1    verification of your weekly payments from the
2    corporation and your tax returns in order to
3    justify that type of insurance.  I have those
4    checks, too.
5          MR. CHAPMAN:  Dean, I would like to
6    propose just a brief five- or ten-minute
7    break?
8          MR. CARNAHAN:  Sure.
9          (Recess taken)
10         MR. CHAPMAN:  Back to the disability
11   insurance.
12         MR. CARNAHAN:  Yes.
13   BY MR. CHAPMAN:
14   Q.  Now, Mr. Caiazzo, do you remember that --
15       specifically that an application for a
16       disability policy was completed?
17   A.  I believe so.
18   Q.  And where were you when that was completed?
19       Where did you do that?
20   A.  I think D'Addario, usually what he did is he
21       would fill it out, all the information he
22       needed.  And then he'd either call me up or
23       come down in person and we'd fill in whatever
24       the necessary information that he didn't
25       have, the figure that he needed, the whole
```

154

```
1    works.  And I would sign it.
2    Q.  You're phrasing this in terms of what would
3        have happened.
4    A.  Yes.
5    Q.  Do you specifically remember taking --
6    A.  Yes, of course.  We did it for a good number
7        of years.  They didn't handle my insurance
8        one year, now.  They handled my insurance
9        every year for a long time.
10   Q.  I want to be clear on this, though.  Do you
11       have a specific memory of taking an original
12       application for your disability policy?
13   A.  Yes, because the company called me back or
14       called him back and sent me a letter that
15       some type of documentation was needed in
16       order to make sure that the policy was in
17       effect.  And I needed -- they needed
18       documentation of the checks which I provided
19       to D'Addario and copies of my tax returns
20       which I also gave to Mr. D'Addario.
21   Q.  And then the checks were your paychecks?
22   A.  Paychecks.
23   Q.  From the corporation?
24   A.  Yes.
25   Q.  Now, what type of disability coverage were
```

155

```
1    you looking for?
2    A.  Anything that would disable me from working a
3        full-time basis at the restaurant and I was
4        to be compensated if something would happen
5        to me that was serious enough -- you know, an
6        injury that would...
7    Q.  Was it a short-term or a long-term
8        disability?
9    A.  Short- or long-term?
10   Q.  Yes.
11   A.  It was a year to year renewal.
12   Q.  What was the benefit period?
13   A.  The benefit period?
14   Q.  Right?
15   A.  Meaning?
16   Q.  Do you not know?
17   A.  No.  It goes from year to year, that's all I
18       know.  The benefit period was -- the amount
19       is what I was concerned about.  And it was
20       part of the package that went from year to
21       year and that's all that concerned me.
22   Q.  Okay.  And was it an accident and sickness
23       disability policy or accident only?
24   A.  I believe it was just disability is what it
25       said.  "Income Disability Insurance Policy"
```

156

```
1    is what it said verbatim across the cover
2    sheet.
3    Q.  Do you remember what type of -- do you
4        remember that it only covered you for certain
5        types of disabilities, certain situations in
6        which you were disabled and excluded other
7        situations in which you might be disabled?
8    A.  Well, if you're asking if I sprained an ankle
9        on a Monday and I couldn't work until the
10       following Monday, I don't believe that they
11       would be willing to pay for five days.  I
12       think it was an extended period of time.  If
13       I was hurt to the point where I was severely
14       hurt or could not perform on a regular basis
15       my regular duties, I think that's when it
16       kicked in.  I think there was probably a...
17   Q.  Do you remember what the renewability
18       provisions were?
19   A.  No.  It was never brought to my attention.
20       Just that every year, things were renewed.
21   Q.  And do you remember what the monthly benefit
22       was?
23   A.  $1,500 a week is what the policy was.
24   Q.  $1,500 a week referring to what?
25   A.  $1,500 a week is what the policy was to
```

157

```
1        reimburse me for my weekly paycheck from
2        Scuttlebutt's.
3    Q.  What was your weekly paycheck from
4        Scuttlebutt's?
5    A.  $1,500 a week.  Now, $100 here, $200 more
6        there on the machines and stuff.  But
7        basically it was right around $1,500 a week.
8        And that was in my tax return, and that was
9        in my paychecks.
10   Q.  Are you saying that the benefit payment under
11       the policy was the same as your regular
12       weekly income?
13   A.  That's exactly what I asked for.
14   Q.  What was the -- and believe me, we don't have
15       to go through the whole thing again.  I
16       remember what you said about how you wrote
17       the checks.  But what was the cost of this
18       insurance?
19   A.  I don't remember.
20   Q.  Did you ever get a written quote for the
21       disability coverage?
22   A.  Yes.
23   Q.  And you got that from whom?
24   A.  It was on the cover sheets that D'Addario or
25       Medallion sent or he brought by.
```

158

```
1    Q.  Do you know where any of those quotes are
2        currently?
3    A.  Aside from the ones that were produced here,
4        which I don't know some of these companies
5        and their association with what particular
6        insurance was --
7    Q.  Well, we've already agreed that Exhibit 2
8        doesn't contain anything that refers to
9        disability, right?
10   A.  No, we don't know that.  Like I said, I don't
11       have anything specifically stated -- Personal
12       Injury Disability Policy is what was across
13       here.  See how this says $3,000?
14   Q.  Uh-huh.
15   A.  Well, it had the same one that I read across
16       in Tom Collins's office.  And I saw it, only
17       it was whatever.  It was $1,000, maybe.  It
18       wasn't that much.  But the whole package was
19       like $13,000, $15,000 sometimes.  Maybe it
20       went more.  Sometimes it went a little less.
21   Q.  Do you remember what the elimination period
22       was on your disability coverage?
23   A.  No.
24   Q.  Do you understand that an elimination period
25       is basically a deductible for a disability
```

159

```
1        policy?
2    A.  Well, I'm assuming that there was a
3        deductible on that.  I just went on the
4        assumption Jack being my friend and handling
5        my business, the insurance business all these
6        years, when I asked him a question, he would
7        give me a direct answer that would directly
8        reflect whether it was worth my purchasing
9        this policy, what that included.
10   Q.  Well, I just want to be clear on this.  Do
11       you remember how much time had to elapse from
12       the time you first became disabled until you
13       were entitled to collect?
14   A.  No.
15   Q.  Now, would you get this policy -- you've
16       already testified that you had this policy in
17       effect for approximately six years.  Would
18       you get a new policy in the mail every year?
19   A.  I didn't say it was six years.  I said it
20       ranged between -- roughly between 1995 and
21       2001.  Now, I know for a fact I had it for a
22       good number of years.  I don't know
23       specifically whether it was exactly 1995 or
24       it started in '96 or it started in '94, you
25       know what I'm saying?  It was a good period
```

160

```
1        of time.  But when the policy came in, they
2        came in at different levels there.
3            And basically what he did is when he
4        showed up with that, there was a delay
5        because there was a process involved to
6        expedite this policy for which they needed an
7        audit.  And the audit verbatim according to
8        Jack D'Addario was that they needed to
9        justify my weekly paycheck in order to
10       qualify for this policy.
11   Q.  Well, in regard to the clarification you just
12       did about the time of the disability
13       coverage, was there ever any interruptions to
14       that coverage?  In other words, was it ever
15       canceled for nonpayment; or did it lapse for
16       any reason in the period of time you had it
17       through --
18   A.  If anything lapsed, it was the entire policy
19       by way of a letter that was sent and on such
20       and such a date, they give you twenty days to
21       procure it.  And that was it, and that was
22       fine.  It didn't specifically say, you know,
23       "You don't have insurance.  Your disability
24       insurance is going to be canceled, but your
25       fire and theft is going to continue and your
```

161

```
 1    workman's comp is going to continue."  It was
 2    all one package.  And I paid it every single
 3    month.  And I did get an occasional notice
 4    that said, "Cancellation notice is effective"
 5    in whatever, two, three weeks.  And I always
 6    was good about that.
 7  Q.  And if I understand your prior clarification
 8    correctly, you're not saying necessarily that
 9    you had a disability policy in effect at all
10    times between 1995 and 2001; you're saying
11    there was some disability coverage in effect
12    at some time within that period, right?
13  A.  No.  What I'm saying is when we first
14    initially discussed that is when my business
15    started really building.  That's when it
16    occurred to me and obviously Jack D'Addario
17    that I needed this income disability.  And at
18    that point, from that point on when he
19    suggested this to me and I said, "That's a
20    good idea; I do need this, along with
21    business interruption insurance," these
22    things carried over from that point.  I just
23    didn't say, "Give me coverage for 1996 and
24    we'll forget about it for '97 and '98 and
25    then let's pick it up again in '99."  It was
```

162

```
 1    not that expensive.  That was part of my
 2    yearly package, my renewal package.  It was
 3    part of my business decision.  It was
 4    necessary.
 5  Q.  So what's your best testimony as to the
 6    number of years that you had disability
 7    coverage in effect?
 8  A.  I would say somewhere between 1995 through
 9    2001.  And maybe it started earlier, in '93.
10  Q.  Okay.  Now, during the period of time --
11    during those years that you just said, did
12    you ever submit any claims under the
13    disability policy?
14  A.  No.
15  Q.  And what is the disability that you're
16    claiming under this disability coverage that
17    you say should have been there for you?
18  A.  Well, I completely tore my knee.  I could not
19    stand up for periods of time, had to sit at a
20    table and most of the times on the off nights
21    lie down on my couch in the office.  I could
22    not perform.  I completely tore my ligament
23    in my knee.
24  Q.  When exactly did this knee injury happen that
25    you say should have been covered under
```

163

```
 1    disability?
 2  A.  Oh, it happened a couple times like I told
 3    you.  I was -- on a daily basis, I would get
 4    there 7:30, 8:00, 8:30 in the morning,
 5    rearrange the kegs for delivery, the beer,
 6    the liquor; take down the stage which the
 7    bands played on the night before; move tables
 8    and chairs.  And on two or three occasions,
 9    hurt my knee pretty bad.  And it got worse
10    and worse.  And the last time was the,
11    quote -- I'll quote the doctor's report --
12    that it was the straw that broke the camel's
13    back.  And I was unable to work anywhere in
14    the capacity that I did before.
15  Q.  Well, I need to know exactly when the first
16    knee injury happened that you say should have
17    been covered under disability coverage.
18  A.  The year 2000, happened 2001 was the more
19    severe one.  2000 was severe.  And prior to
20    that maybe around '98.  And none of which any
21    claims were put in.
22  Q.  Why were no claims put in?
23  A.  Because I had hurt my knee and it didn't
24    restrict me from doing what I was doing.  I
25    was still playing basketball.  I was still
```

164

```
 1    lifting, walking, running around, doing
 2    everything I had to do, moving and recreating
 3    space, doing everything that I could.  It
 4    would hurt for a while and then be fine.
 5    Nothing like this last one -- the last two.
 6  Q.  So if I understand you correctly, you're
 7    saying you injured your knee in 1998 but
 8    there was no disability and, therefore, no
 9    disability claim, right?
10  A.  No, I did not say that.
11  Q.  Okay.  Did you put in a -- when you injured
12    your knee in 1998, did you try filing a
13    disability insurance claim?
14  A.  No, I did not.
15  Q.  When you injured your knee in 2000, did you
16    try making a disability insurance claim?
17  A.  No, I did not.
18  Q.  What's the specific date in 2000 when you
19    injured your knee?
20  A.  I can't recall exactly.  I explained it and
21    brought it to the attention of Jack but never
22    followed through on it because I just worked
23    it out.  I went to see the doctor, and that
24    was fine.
25  Q.  Okay.  When you injured your knee in 2000,
```

**Page 165 (left)**

```
 1    you made a decision to not put in a
 2    disability claim, correct?
 3  A. Correct.
 4  Q. When you injured your knee in 2001, did you
 5    put in a disability claim?
 6  A. A claim that I put in was what I normally
 7    verbally communicated to John D'Addario which
 8    was never carried out.  And then called the
 9    agency numerous upon numerous upon numerous
10    times.
11  Q. I've got to stop you.  This is a yes or no.
12    When you injured your knee in 2001, did you
13    put in a disability claim?
14  A. Not required.  No.
15  Q. And what's the date in 2001 when you injured
16    your knee?
17  A. I think it was the first week in August, late
18    July, August, somewhere around there.
19  Q. And was that an injury you had at work?
20  A. Yes.
21  Q. And was the 2000 knee injury an injury you
22    had at work?
23  A. Yes.
24  Q. Did you make workers' comp claims in
25    connection with the 2000 knee injury and the
```

**Page 166 (right)**

```
 1    2001 knee injury?
 2  A. 2001 injury.
 3  Q. Okay.
 4  A. Only.
 5  Q. And did you receive any workers' comp benefit
 6    payments as a result of the 2001 knee injury
 7    claim?
 8  A. Yes.
 9  Q. And did you receive workers' comp benefits
10    relative to medical expenses?
11  A. Yes.
12  Q. Did you receive workers' comp benefits
13    relative to regular weekly wage payments?
14  A. $48 a week.
15  Q. So the answer is yes, you received --
16  A. Yes.
17  Q. -- whatever the workers' comp rate is for the
18    weekly wage, correct?
19  A. Correct.
20  Q. Okay.  And was there any -- was there any
21    other workers' comp recovery received by you
22    such as for a lump sum settlement?
23  A. Yes.
24  Q. Did you get a lump sum settlement in the
25    workers' comp case?
```

**Page 167 (left)**

```
 1  A. Yes.
 2  Q. And how much was it?
 3  A. $25,000.
 4  Q. What was the total amount paid between the
 5    lump sum settlement, the medical expenses,
 6    and the indemnity payments, if you know, on
 7    the workers' comp case?
 8  A. The medical expenses weren't paid.  They're
 9    not paid yet, not until I have the knee
10    replaced.
11  Q. There's some future medicals that are --
12  A. Right.  I don't have a figure on that.
13    $25,000 was paid on the lump sum payment.
14    And, I don't know, maybe $1,000 on the
15    weeklies.
16  Q. And there are some prior medicals that were
17    paid as well?
18  A. They paid doctors' visits.
19  Q. Right.  Do you have any idea how much those
20    doctors' visits, medical visits that have
21    already been paid is?
22  A. No.
23  Q. But the company that paid those benefits is
24    what?
25  A. Legion.
```

**Page 168 (right)**

```
 1  Q. Now, before filing your complaint that's
 2    Exhibit 1, did you ever tell Medallion that
 3    you wished to make a disability claim?
 4  A. Yes.
 5  Q. And the disability claim that you wished to
 6    make, did that arise out of the 2001 knee
 7    injury?
 8  A. Yes.
 9  Q. When did you first tell Medallion that you
10    wanted to make a claim?
11  A. I don't remember exactly when, but it was
12    shortly after I realized that my knee was
13    beyond repair at that point, when it was
14    totally -- that I needed a knee replacement.
15    I don't know exactly when it was.  But I
16    brought it to Jack's attention.  And then one
17    thing led to another, and then I started
18    calling down and couldn't get any response.
19  Q. Well, if the subject knee injury happened in
20    August of 2001, when did you find out that
21    your -- when relative to that did you find
22    out that your knee was beyond repair and that
23    you needed to make a claim?
24  A. Shortly after that.
25  Q. Within how many months?
```

169

```
1   A.  Well, I have no idea.  I have no idea.  My
2       concern was my properties which were being
3       taken away because of the divorce.  The last
4       thing on my mind -- I still had a lot of
5       money left.  The last thing on my mind was
6       going through a period of time where I
7       couldn't communicate with D'Addario or
8       DeVincentis or anybody -- those people going
9       through what I was going through in
10      representing myself.  So, no, that wasn't a
11      clear-cut important decision immediately
12      based on what I was about to lose.
13  Q.  Well, did you have a particular doctor's
14      visit where you learned the significance of
15      the August '01 knee injury?
16  A.  Yes.
17  Q.  And who was your doctor that you were
18      treating for that particular injury?
19  A.  I believe Dr. Sweetland.
20  Q.  And where does Dr. Sweetland operate out of?
21  A.  Salem.
22  Q.  Is he at Salem Hospital?
23  A.  No.  He's in Salem, Mass.  I don't believe
24      he's out of Salem Hospital.  I saw him as an
25      orthopedic specialist.
```

170

```
1   Q.  So you would see him at his office in Salem
2       which was where?
3   A.  On the main street, 1A, I believe.
4   Q.  And do you remember -- you know, again,
5       relative to the August '01 date of injury,
6       did you -- had you had this visit with him by
7       Christmas of '01, or was it sometime in '02?
8   A.  I don't remember.  That was a very confusing
9       time in my life.
10  Q.  Would it be fair to say -- now, Scuttlebutt's
11      closed in roughly August/September of '01,
12      correct?
13  A.  Uh-huh.
14  Q.  And in the months leading up to the closing
15      of Scuttlebutt's, would it be fair to say --
16      well, why did you close Scuttlebutt's?
17  A.  As I explained before, the lease was broken
18      because of Attorney Landolphi not getting
19      back to the landlord on the water dispute.
20      Remember I told you that?  So they brought it
21      to Superior Court in Salem, and they broke
22      the lease.
23  Q.  Your landlord was who?
24  A.  Lafayette, LLC, I believe.  Salem Lafayette,
25      LLC.
```

171

```
1   Q.  Well, if I understand the reference to a
2       water loss, the landlord was saying that
3       there was some kind of damage caused to the
4       building that you were responsible for that
5       led them to declare the lease broken?
6   A.  No, no.
7   Q.  All right.  So tell -- the landlord declared
8       the lease broken by you?
9   A.  The judge declared it broken.
10  Q.  Okay.  Who initiated this landlord-tenant
11      dispute?  I assume it was the landlord,
12      right?
13  A.  After I had paid $90,000 in leasehold
14      improvements from the beginning that he was
15      responsible for, not only for a reduction in
16      rent but in the first floor leasehold
17      improvements that I was forced to pay for, it
18      was evident that he was a little upset.  He
19      owned a small little bar down the South
20      Shore, whatever.  And it was evident through
21      D'Addario, who is also his friend, that we
22      were doing so well that Jack quote/unquote
23      was saying he was getting very envious and
24      jealous.  He was going to try and break the
25      lease because he wants that facility.  We've
```

172

```
1       already built it up and one thing led to
2       another.  At that point, he was faxing daily
3       paperwork to the attorneys squawking about
4       every single thing that you could imagine.
5           Well, what happened was instead of
6       -- we were doing so well at night that I
7       didn't need the daytime food business.  So we
8       had a reduction in water consumption.  Okay.
9       So there was no lunch.  We didn't have to use
10      any water for that.  And we weren't really
11      getting busy until 8:30, nine o'clock at
12      night.  So the reduction in water was
13      massive.  So instead of paying $4,000 every
14      two or three months, we got a bill for
15      $12,000, which was impossible.  Instead of it
16      going down, it went up.
17          So the dispute was after I wrote a
18      check out for 4,000, Mr. Landolphi disputes
19      this, this is impossible.  He never got
20      back --
21  Q.  Who did you get this big water bill from?
22  A.  From the landlord.  So that's what happened.
23      So Landolphi was going back and forth with
24      Salem Lafayette.  And I found out later on --
25      I saw a document that said the attorney
```

173

```
 1    representing Salem Lafayette sent him a
 2    letter saying, "Look, the water dispute is --
 3    we're in dispute of that. Let's settle it.
 4    But in the meantime, send a check over." So
 5    I just sent a check over for $5,000, 4,800.
 6    "Send over a small amount to keep it going,
 7    and we'll discuss it." Landolphi never
 8    passed that on to me.
 9            As a result, he turned around and
10    wrote back or faxed back to the attorney
11    saying, "I don't want to be bothered with
12    that anymore." And as a result, they used
13    that to go to superior court and said the
14    water bill was not paid. And, therefore, the
15    judge ruled that as the lease break, not that
16    I was very happy.
17  Q.  Okay. So your alleged failure to pay the
18    water bill was the grounds for declaring a
19    breach of the lease?
20  A.  Correct.
21  Q.  And the landlord filed suit against you in
22    the Essex Superior Court on that?
23  A.  Yes.
24  Q.  And did you have Landolphi defend that?
25  A.  Yes.
```

174

```
 1  Q.  But evidently the defense was unsuccessful
 2    because it got to the point where a judge had
 3    to --
 4  A.  Well, I never went there. And I found out
 5    later on that he didn't perform again the way
 6    he was supposed to. And we found out that
 7    she broke the -- the judge broke the lease.
 8    And then another attorney come in and
 9    recommended that we file for bankruptcy in
10    order to hold it up. And one thing led to
11    another, and it was just one big mess.
12  Q.  Now, in the months leading up to -- let's
13    take the first -- from January '01 up until
14    the time that Scuttlebutt's ceased operating,
15    how would you describe the financial
16    condition of the corporation during that
17    period?
18  A.  We were doing very well.
19  Q.  Were you having any kind of financial
20    problems during that period?
21  A.  No, not really.
22  Q.  Did you ever have any issues with regard to
23    keeping your insurance enforced during that
24    period?
25  A.  Never had a problem with that.
```

175

```
 1  Q.  Did you have insurance enforced at all times
 2    starting from January '01 up until
 3    Scuttlebutt's stopped operating?
 4  A.  Absolutely, yes. The check was actually paid
 5    in August for the entire month of August.
 6    And we wouldn't have received -- not received
 7    that payment, the cancelation notice which
 8    was carried into September. So we were
 9    covered right through September.
10  Q.  And during -- again, looking at the time
11    period from January '01 up until September
12    '01, were there ever any problems with any of
13    your vendors or suppliers during that period?
14  A.  No. We filed for the bankruptcy in April, I
15    believe. So that changed the complexion of
16    instead of your credit signing for the liquor
17    and everything like that, once you file for
18    bankrupt, they cannot put you on a credit
19    list anymore. You have to pay cash. So that
20    was the only thing that changed the operation
21    of the place.
22  Q.  And when was it that you filed for
23    bankruptcy?
24  A.  April.
25  Q.  April of '01?
```

176

```
 1  A.  Correct.
 2  Q.  Well, wouldn't you describe the filing of
 3    bankruptcy relative to the corporation that
 4    operated Scuttlebutt's as a financial problem
 5    during that period?
 6  A.  No. Quite the contrary. We were -- we
 7    didn't have any financial problems
 8    whatsoever. The only reason we filed for
 9    bankruptcy was upon suggestion of an attorney
10    by saying the only way that we can hold up --
11    hold Salem Lafayette and work out a deal is
12    file for bankruptcy. Because it was obvious
13    to everybody, including the people in the
14    city, that he was acting on trying to break
15    lease. He told it to Jack D'Addario a
16    hundred times who told me that he was going
17    to try and get me out of there. He couldn't
18    believe the lines around and corner and so on
19    and so forth. So that was...
20  Q.  So the idea with bankruptcy, if I understand
21    your testimony correctly, was a ploy to
22    forestall the landlord from trying to get you
23    out of there basically?
24  A.  That's exactly -- that was the only reason.
25
```

**Page 177**

1         (Document marked as Caiazzo.

2         Exhibit 10 for identification)

3 Q. I'm going to hand you a two-page exhibit that

4     we've marked as No. 10.

5         MR. CHAPMAN: And, Steven, this a

6     workers' comp employer's first report of

7     injury. I said "Steven." I meant to say

8     "Dean."

9 Q. Now, do you recognize what that is?

10 A. (Witness reviews document) Yes, I do.

11 Q. And what is it?

12 A. It's a copy of the industrial accident board,

13     the first report of the injury.

14 Q. Okay. And is that a first report that was

15     generated at your request?

16 A. I'm trying to look at the date here.

17 Q. If you look in Box No. 22, you might find it.

18 A. 10/31/2000, uh-huh.

19 Q. And so this exhibit reflects that you made a

20     workers' comp claim for an accident that

21     happened on October 31, 2000?

22 A. That's what it looks like.

23 Q. Correct?

24 A. Uh-huh.

25 Q. And did you -- fair to say you submitted that

**Page 178**

1     claim directly to the insurer as compared to

2     through the agency?

3 A. This was, I believe, through Mr. Landolphi

4     who was handling this. Because the

5     Lindsey -- those are the people that we

6     called directly and told them about the

7     injury, and they denied this claim.

8 Q. So, again, just so I'm clear, this exhibit

9     which is No. 9, correct?

10 A. Uh-huh.

11 Q. This was denied?

12 A. Right.

13 Q. This was a claim you and Mr. Landolphi

14     submitted directly to the insurance company

15     and not through Medallion, correct?

16 A. That's I don't know about Medallion. I know

17     because of the name, Lindsey Wagon, I know he

18     tried to contact them. This was the

19     second -- I tried calling these people

20     because of no response with --

21 Q. You tried calling the Lindsey outfit?

22 A. Yes. I spoke with those people, yes, because

23     of the lack of response with the agent. And

24     subsequently I called these people. They did

25     what they had to do, then I passed it on to

**Page 179**

1     Kelly Landolphi.

2 Q. Now, did you have an accident on 10/31/2000?

3 A. Yes. I told you that.

4 Q. And is that the date of the accident that you

5     were referring to about 15 minutes ago when

6     you talked about a year 2000 knee injury?

7 A. I don't know whether it was exactly then.

8     But it was right around that time, yes, 2000.

9 Q. Well, let me ask you this: Did you have any

10     other injuries in the year 2000 for which you

11     submitted a workers' comp claim other than

12     this exhibit that you have in front of you?

13 A. No, because I never submitted anything that

14     went through. This was it. This was the

15     first. This was a denial. This was the one

16     where I was forced to get an attorney and go

17     through the proper procedure. And then as a

18     result, compounds taking care of that and

19     doing it where we eventually collected.

20 Q. Now, Exhibit 10 indicates that you prepared

21     and submitted this particular form, correct?

22     It doesn't reference that you had a lawyer do

23     it for you?

24 A. Which number did you say?

25 Q. Down at the bottom where it says, "Preparer's

**Page 180**

1     information"?

2 A. Right.

3 Q. So you'd agree that the form, anyway,

4     indicates that you sent this claim in, right?

5 A. Okay. I didn't have a typewriter, so I

6     couldn't have done this.

7 Q. All right. What's your understanding as to

8     who generated this form, then?

9 A. I have no idea. It was probably Landolphi

10     because it certainly wasn't me. And I know

11     it wasn't -- it couldn't have been the

12     Medallion Group because they ignored it and

13     caused me to initially call these people

14     anyway.

15 Q. Okay. Do you know whether -- do you see that

16     Exhibit 10 here references that your injury

17     occurred on October 31, 2000?

18 A. Uh-huh.

19 Q. And that this particular form was prepared on

20     January 9, 2001. Do you see that?

21 A. I do.

22 Q. Okay. Do you know if a first report was

23     prepared on your behalf other than this one

24     at any time before January 9, '01?

25 A. I have no idea. I know one thing is when

181
```
 1        I -- the only reason I called and dealt with
 2        that company was because I got no response
 3        from the Medallion Group.  And as a result, I
 4        was forced to call the Lindsey people.  And
 5        they were out in the western part of the
 6        state.  And she -- the person I spoke with
 7        who originally shot it down says, "No, you're
 8        not entitled to this, that and the other
 9        thing," and that's what it led to.
10   Q.   Now, you say that this claim was denied,
11        right?
12   A.   Yes.
13   Q.   Now, why was it denied?
14   A.   I have no idea.  They did send me a couple of
15        checks, though.
16   Q.   For this claim?
17   A.   They did.
18   Q.   So it wasn't denied?
19   A.   They sent me a couple of checks initially and
20        then stopped them.  You know how when you
21        call up, they send you a check?  That's what
22        they did.
23   Q.   No one has ever done that for me before.
24   A.   With a car and with a -- and then all of a
25        sudden, they decided that -- but they sent me
```

182
```
 1        a check or two, and that was it.  And then
 2        they just stopped it.
 3   Q.   Why did they stop it?
 4   A.   I have no idea.
 5             (Document marked as Caiazzo
 6             Exhibit 11 for identification)
 7             MR. CHAPMAN:  Exhibit 11.  And,
 8        Dean, for the record this is another first
 9        report.  Okay?
10             MR. CARNAHAN:  All right.
11   Q.   Exhibit 11, do you recognize that?
12   A.   (Witness reviews document)  What does that
13        say?  8/15/2001.
14   Q.   Do you recognize what this is?
15   A.   Yes.
16   Q.   Okay.  What is it?
17   A.   That's one of the times I got hurt.
18   Q.   And is this an employer's first report that
19        was sent in on your behalf for a workers'
20        comp claim?
21   A.   I don't know if it was the first one, but
22        this was -- yes, this was part of the
23        process.
24   Q.   Well, when I say "first report," you see
25        that's the title of the form, right?
```

183
```
 1   A.   Uh-huh.
 2   Q.   That's what I'm referring to.  So in other
 3        words, do you recognize Exhibit 11 to be your
 4        workers' comp claim relative to your injury
 5        on 8/15/01?
 6   A.   I don't remember filling this out.  Whoever
 7        filled it out -- obviously, I didn't sign it.
 8        But whoever filled it out was working on my
 9        behalf.  So I don't know who that was.  The
10        piece of paper on the back says Cunningham,
11        Lindsey.  That's the Legion affiliate or
12        someone, whoever it is.
13   Q.   Okay.  Well, take a look at the information
14        that's typed onto Exhibit 11.  And is there
15        anything on there that you disagree with?
16   A.   (Witness reviews document)  It says Jenna's
17        Pub, Inc., on 11.
18   Q.   Do you disagree with that?  Is that
19        inaccurate?
20   A.   Jenna's Pub, Inc., is the employer.
21   Q.   Right.
22   A.   Right.
23             (Ms. Florio and Mr. Chapman confer)
24   Q.   Okay.  I don't want to confine the question
25        to Box No. 11 on Exhibit 11.  I want you to
```

184
```
 1        take a look at the whole form.  All right?
 2   A.   Okay.  I'm sorry.
 3             MR. CHAPMAN:  (To Ms. Florio)  Thank
 4        you.  I wasn't quite following that.
 5   A.   That looked kind of normal, so I was --
 6   Q.   Right.  Take a look at the whole thing.  And
 7        I'm representing to you that this is a first
 8        report that was filed on your behalf for a
 9        workers' comp claim.  The question simply is:
10        Is there any factual information on this form
11        that is inaccurate?
12   A.   Well, the average weekly wage says $1,300
13        here.  But I also told you that there was
14        extra monies on that and it fluctuated.  But
15        I have documentation for that.
16   Q.   Well, is $1,300 accurate or inaccurate?
17   A.   No.  I told you, I had the insurance for
18        $1,500.  On certain weeks, I wrote checks for
19        $3,000.  And then two weeks later, I wouldn't
20        write a check.  You know what I mean?  It was
21        one of those.  $1,300 to $1,500 to $1,700 was
22        the actual -- it fluctuated that much.  Now,
23        there was other times where the machines did
24        well and I had more money than that.  But,
25        yes, this is in range.
```

185

```
1    Q.   Okay.
2    A.   I'm self-insured.  What does that mean?  No?
3         Service industry.  Everything looks fine.
4         Strained his neck and knee, correct.
5         Manager, I guess that covers it.
6    Q.   Okay.  So Exhibit 11 is essentially correct
7         with an asterisk about the average weekly
8         wage?
9    A.   Right.
10   Q.   What about Exhibit 10?  This one reports that
11        you have an average weekly wage of $1,000.
12        Was that accurate or inaccurate as of January
13        '01?
14   A.   At the time, $1,000 could have been accurate
15        based on the position of the corporation at
16        that time seeing we had to pay cash for
17        deliveries as opposed to being 60 days which
18        was enforced because of the bankruptcy.
19        That's probably what that has to do with.  So
20        instead of me writing a check for $1,500,
21        $2,000, it may have been $1,000 more
22        frequently than a larger one.
23   Q.   And it was as a result of the claim you
24        submitted as reflected in Exhibit 11 that you
25        received the workers' comp payments that you
```

186

```
1         talked about a minute ago, the $25,000 lump
2         sum, et cetera, right?
3    A.   This was not filed by Tom Collins.  We turned
4         around and filed the proper claims.  They had
5         to calculate my weekly wage, not realizing
6         that my tax status was paid through the
7         corporation personally and then later on paid
8         personally to justify my $85,000, 90,000 a
9         year salary.  Okay.  The original
10        calculations for $48 a week were based on the
11        judge's inability to see the tax return and
12        the substantial paperwork that provided that
13        which the accountant later did.
14   Q.   Well, all I'm asking you is when we look at
15        Exhibit 11, this is the injury and this is
16        the claim that led to the lump sum payment
17        that you've already testified?
18   A.   Right.  No.  I just want to be clear how this
19        was a misfigure until it was later worked
20        out.
21             MR. CARNAHAN:  Steve, that wasn't a
22        question.  Try to confine your answers to the
23        questions asked.
24             THE WITNESS:  Okay, Dean.  But I was
25        asked some questions earlier that I gave
```

187

```
1         answers to and then shortly afterwards
2         additional questions were asked --
3              MR. CARNAHAN:  Okay.  Just to move
4         this along.
5              THE WITNESS:  Okay.
6              MR. CARNAHAN:  Just try to answer
7         the questions that are asked.  Okay?
8              THE WITNESS:  Uh-huh.
9    Q.   Now, back to Exhibit 1 which is the
10        complaint.  And I want to make sure I'm clear
11        on this.  In Paragraph 10 where you say you
12        became injured and you became disabled in
13        2001, that's a reference to the August 15,
14        '01 injury?
15   A.   Yes.
16   Q.   And then it says you notified Medallion of
17        your injury.  And when exactly did you notify
18        Medallion?
19   A.   That I don't remember.
20   Q.   Okay.  And you say, "Medallion negligently
21        failed to report the claim."  When exactly
22        was it that you told Medallion you wished to
23        make a claim arising out of the August 2001
24        injury?
25   A.   I just told you that I don't remember.
```

188

```
1    Q.   Okay.  And you don't have -- you've never
2         seen any documents whereby you are telling
3         Medallion that you want to make a claim on
4         your disability coverage for the August --
5    A.   There's no documents required in putting a
6         claim together.
7    Q.   So the answer is there are no documents,
8         correct?
9    A.   Correct.
10   Q.   Now, on Paragraph 12 you say you lost
11        $234,000.  Where does that number come from?
12   A.   I think it was calculated on the amount of
13        money that I should have been paid up to that
14        point from the injury.  August 15th injury
15        occurred justified with my checks of $1,500 a
16        week.  Policy paid $1,500 a week calculated
17        over a period of X amount of years comes up
18        to $234,000.  And I think that's where the
19        figure came from.
20   Q.   So that $234,000 number is not with reference
21        to any limited liability under the disability
22        policy; it doesn't take a deductible into
23        account or anything, correct?
24   A.   I don't believe so.  I don't know about any
25        deductible.  It was strictly $1,500 a week is
```

189

```
 1      what I was going to be paid.
 2   Q. And I didn't do too well in math when I was
 3      in school.
 4   A. Neither did I.
 5   Q. How many weeks does this represent?
 6   A. I don't know.
 7           MR. CHAPMAN:  We can -- I guess we
 8      can figure that out with a calculator.
 9           MS. FLORIO:  Would you like me to
10      get one?
11           MR. CHAPMAN:  No.
12   Q. Now I'm going to ask you some questions about
13      Count III.  Take a look at Count III.  And my
14      question is going to be when was it exactly
15      that you lost the personal property that
16      you're talking about in that count?
17   A. When they assigned -- when they locked the
18      place up, they assigned a keeper which was
19      Harbor Realty.  Kelly Landolphi contacted me
20      and said, "In order to get your personal
21      stuff out, you have to contact Harbor Realty;
22      and they will let you in at your
23      convenience."
24   Q. Can I stop you there.  When did they -- they
25      locked you out of the Scuttlebutt's?
```

190

```
 1   A. Correct.
 2   Q. When did they put the locks on the door?
 3   A. I don't remember exactly.  It was probably
 4      right around the 1st of September, somewhere
 5      around there.
 6   Q. And did you know ahead of time they were
 7      going to lock you out?
 8   A. I got a call from Kelly saying that it didn't
 9      go well and I will get back to you.  We don't
10      know what the judge did.  The judge overruled
11      and changed it from an 11 to a 7.
12   Q. When did you find out that the bankruptcy
13      case wasn't going so well?  Before or after
14      you had your August 15, '01 injury?
15   A. We didn't know because it kept getting --
16      going into different phases.  The bankruptcy
17      attorneys kept calling saying you should be
18      in business because you didn't have a
19      negative balance in your checking account.
20      You were doing well.  I didn't have a
21      mortgage on the business.  I didn't have any
22      loans out, and it was doing substantially
23      well.  So the justification wasn't there.  I
24      can't remember when.
25   Q. And did the landlord tell you ahead of time
```

191

```
 1      when they intended to lock you out?
 2   A. No.
 3   Q. How did you find out that you had been locked
 4      out?
 5   A. I believe someone came to the door.
 6   Q. The door where?
 7   A. Scuttlebutt's.
 8   Q. Okay.  Did you go to the door of
 9      Scuttlebutt's, or was it someone else?
10   A. No.  Someone came to the door, came upstairs
11      and said, "We're the sheriffs, and we have to
12      lock it up."
13   Q. Did this happen while you were there?
14   A. Yes.
15   Q. Okay.  Now, the property -- so this visit by
16      the sheriffs happened in early September '01?
17   A. Correct.
18   Q. And in Count III, you're claiming a loss of
19      personal property, right?
20   A. Correct.
21   Q. Did you have a homeowner's policy or any
22      other personal insurance that might have
23      covered your personal property at that time?
24   A. Not that I know of.
25   Q. Did you have a homeowner's policy in effect
```

192

```
 1      as of September '01?
 2   A. We were renting at that point, so I don't
 3      know if we had that or not.  My wife would
 4      have handled it.  I don't know.
 5   Q. Did you have renter's coverage, property
 6      coverage?
 7   A. I don't know.  I was too busy handling the
 8      bar.  She handled that.  I don't know what
 9      she did or not.
10   Q. Okay.  So you get locked out.  At the time
11      you're locked out, you're saying the property
12      that you're complaining about in this case
13      was in the Scuttlebutt's premises at that
14      time, right?
15   A. Correct.
16   Q. So what happened next?  The sheriffs come and
17      they put the locks on the door.  How was the
18      property lost?  What happens next?
19   A. Well, we had to leave.
20   Q. Right.
21   A. And then they went ahead and did their thing
22      into the night and whatever.
23   Q. Right.
24   A. Contacted by Landolphi to call Harbor Realty
25      to set up a date to take all the equipment
```

193

1  out that I had repurchased back from the
2  bankruptcy. I set up a date, went in there,
3  and noticed that everything was trashed. We
4  took what we could take out. It was brought
5  up to the Parrot. My personal belongings
6  that were the majority of the stuff that I
7  held onto, we left at the top of the stairs.
8  We had no more time. Everyone were tired and
9  exhausted from taking all the equipment.
10          I asked the girl representing Harbor
11  Realty when I could come back. She said, "No
12  problem, Steve. Finish it. Just give me a
13  call. You can come back and take it at
14  another time." I said, "Okay. Fine." I
15  really didn't want to bring that to a
16  location that wasn't mine anyway, my personal
17  things.
18  Q.  And so when -- you say you set a date. What
19      was the date where you went in and took out a
20      lot of the stuff?
21  A.  A month, month and a half after it was locked
22      up. I don't know exactly.
23  Q.  So sometime in October of '01?
24  A.  Somewhere around there. It may have been
25      September. I don't know exactly.

194

1  Q.  And who helped you take the stuff out?
2  A.  A bunch of people.
3  Q.  Who?
4  A.  Some employees, some friends.
5  Q.  I need names.
6  A.  I provided the names.
7  Q.  Where are they?
8  A.  Well, why don't I just write them down? It's
9      easier.
10  Q.  Well, let me show -- maybe I can make it
11      easier for you. We asked you to identify
12      witnesses in the interrogatories. Actually,
13      now that I look at it -- and this is Exhibit
14      4 -- the only witnesses you've identified are
15      yourself and Attorney Collins.
16  A.  It says on one of the questions who were you
17      going to bring in for witnesses.
18  Q.  Right.
19  A.  I said not yet to be determined because
20      there's about 15 people that helped out. I
21      said to be determined at a later date is what
22      the answer is.
23  Q.  Let's -- as you sit here, do you remember the
24      names of any of the people that helped you
25      move the stuff out in October of '01?

195

1  A.  Yes.
2  Q.  Just gave me the names you can remember.
3  A.  David Lonegan, Russell Lewis, Tom Hancard,
4      Norm Pelletier. Let me see. There was a
5      couple other people there. I don't know
6      whether -- those are the people that handled
7      the majority of the moving.
8  Q.  Okay. So you go with this group of people.
9      You take a lot of the property out. You
10      leave some behind. And the reason you leave
11      it behind is because it's late and you're
12      tired. Did I get that right?
13  A.  No, not at all. The reason why I left it is
14      because that was my personal items. And I
15      did not want to include my personal items
16      that were worth an awful lot of money that I
17      had over a good period of years, to bring
18      them to an undisclosed location where -- all
19      kinds of tables and chairs in an unsecured
20      area where we were going to have to chance --
21      you know, that was the way it was.
22  Q.  So where -- you left these items behind in
23      the Scuttlebutt's premises?
24  A.  At the top of the stairs.
25  Q.  At the top of the stairs?

196

1  A.  Correct.
2  Q.  And was the top of the stairs within the
3      locked space?
4  A.  Yes.
5  Q.  And you've already said that you talked to a
6      woman on behalf of the landlord who said
7      there would be no problem, "Give me a call
8      when you want to come back to get it." What
9      happened next after that?
10  A.  I kept calling her and calling her. No
11      answer. I kept calling and calling. No
12      answer. Finally -- Kelly Landolphi
13      represented her also. And I said, "This
14      woman will not call me back. How am I going
15      to get in there?"
16          He says, "She knows how to get in
17      touch with you." He says, "I represent her,
18      too. And she knows I represent you, Steve."
19          Come to find out -- I called and
20      called and called for over a month, left
21      messages at Harbor Realty and everywhere.
22      Didn't call me back. Finally, Kelly
23      Landolphi said, "Oh, she left Harbor Realty."
24          I said, "Well, can you get in touch
25      with her and tell her I want to get back in

197
```
1    there to get my personal items."
2         He called me back, says, "She's
3    going to give you a call and she said, 'Oh,
4    that stuff is gone.'"
5         I said, "What do you mean, gone?"
6         He says, "The bank hired a cleaning
7    company to go in there and they threw it all
8    away."
9         I says, "No one in their right mind
10   would throw that stuff away.  It was worth a
11   lot of money.  That wasn't garbage at all."
12        And that's what the problem was.
13 Q. By the time you got this feedback through Mr.
14    Landolphi, when are we talking about now if
15    you had taken this stuff out in October of
16    '01?
17 A. This was probably -- I called her every day,
18    two, three times, sometimes four times a day,
19    even went -- drove down there.  A month,
20    month and a half.
21 Q. So by roughly November of '01, you learn that
22    all this personal property you had at
23    Scuttlebutt's is gone?
24 A. Correct.
25 Q. When did you tell Medallion that your
```

158
```
1    personal property was gone?
2  A. I don't remember because I had called them to
3    find out how I could get this back and get
4    coverage.  And Jack says, "Well, no, you
5    can't."
6         I says, "Well, how about my
7    insurance company?  Why don't I -- why don't
8    you come in here, take care of it because I
9    had insurance for that.  And then you go
10   after the other insurance company through the
11   bank or Harbor Realty that was responsibile."
12        So after going after Harbor Realty
13   and trying to get them to expedite the claim,
14   they gave me the runaround.  Everybody else
15   gave me the runaround.  And then when I
16   suggested to D'Addario that he submit it
17   under my policy and then go after those
18   people, that's when the communication
19   dropped.
20 Q. Do you have -- okay.  Strike that.
21        In Count III in the complaint, we're
22   talking strictly about the personal property
23   that you own, though, right?
24 A. Correct.
25 Q. And the property -- when you look at
```

199
```
1    Exhibit 3, is that the property you're
2    talking about?
3  A. (Witness reviews document)  Yes, it is.
4  Q. And is there any property that you're talking
5    about in Count III other than that one page
6    on Exhibit 3?
7  A. Yes.
8  Q. And what did the other property consist of?
9  A. There was a whole bunch of things.  I had --
10    there's an addendum to that.
11 Q. Okay.  We'll come back to that -- anything
12    else in a second.  Now, whatever is on the
13    addendum is also your personal property,
14    right?
15 A. Right.
16 Q. Now, you recognized that the insurance that
17    you got through Medallion covered your
18    business -- at some point in time covered
19    your business property, right?
20 A. Correct.
21 Q. So you understand that your business property
22    coverage would not apply to your personal
23    property, correct?
24 A. My personal property is the business
25    property.  That was the theme of all my bars.
```

200
```
1    That was the stuff that was on the walls at
2    all my other bars.  These are the things that
3    made Scuttlebutt's and Cai's famous because
4    of all the pictures and memorabilia that I
5    had given to me by various athletes.
6    Personal things as way of shoes and hats and
7    stuff like that didn't apply to these things.
8    These are all memorabilia and stuff that
9    decorated the walls of the business that was
10   confined to that leased area that's
11   associated with my sports bar image and
12   business.
13 Q. So the personal property that's reflected on
14   Exhibit 3 here, is that -- well, let me show
15   you two documents that are in Exhibit 2.  We
16   got a handwritten list consisting of two
17   pages.
18 A. Right.
19 Q. Take a look at that list.
20 A. (Witness reviews document)  Uh-huh.
21 Q. And is that your handwriting?
22 A. Yes, it is.
23 Q. And on both pages?
24 A. Yes.
25 Q. And is that the remainder of the personal
```

201

```
 1    property that you say was lost in late 2001?
 2  A. Yes.  And now, since then, there's additional
 3    ones that I had thought of.  There's all
 4    kinds of video equipment and amps that I
 5    forgot all about was on top of the walk-in,
 6    so that hadn't been included.  And I told
 7    Dean there was additional items that come to
 8    mind periodically and I'll write them down.
 9        MR. CHAPMAN:  Let me -- just for the
10    record here, let's mark the two handwritten
11    pages as 2C and 2D.
12        (Documents marked as Caiazzo
13        Exhibits 2C and 2D for
14        identification)
15  Q. Okay.  Just so I'm clear for the record, when
16    we look at Exhibit 3 and Exhibit 2C and 2D,
17    which you've got in front of you right now,
18    fair to say that this is the entire
19    documentation that you've supplied so far
20    reflecting your personal property claim?
21  A. Correct, and in addition to that small little
22    list that I -- since we spoke that Dean has.
23  Q. Okay.  So you're saying you've given a list
24    of additional items that were lost in
25    November '01 beyond Exhibits 3, 2C and 2D?
```

202

```
 1  A. Correct.  I know I have them at home.  I
 2    don't know if I had submitted -- I thought I
 3    faxed them to Dean; but if not, I have them
 4    at home.
 5        MR. CHAPMAN:  Dean, is there
 6    something you want to say?
 7        MR. CARNAHAN:  I seem to recall I
 8    have an additional list with -- have values
 9    assigned to it.
10        MR. CHAPMAN:  Is there any good
11    reason why since we have Mr. Caiazzo up here
12    from Florida that I don't have the list now?
13    Because I'm obviously going to have to
14    suspend this deposition because of the
15    absence of apparently a great deal of
16    relevant discoverable documents.
17        THE WITNESS:  This was just the last
18    couple of days that I was sitting down in
19    preparation for this that I went over in
20    deciding what else was involved over there.
21    There wasn't a delayed reaction two months
22    ago when this started.  This is recent in
23    preparation for this going through the boxes,
24    I mean.
25        MR. CHAPMAN:  Well, the problem is
```

203

```
 1    you're here now and I don't have the list
 2    now, so I can't ask you anything about it.
 3        THE WITNESS:  Okay.
 4        MR. CHAPMAN:  As well as the stuff
 5    in the boxes down in Florida.  Well,
 6    obviously, you know, another request to
 7    produce this and, again, we'll have to
 8    suspend.
 9    BY MR. CHAPMAN:
10  Q. Okay.  So when we look at the list in
11    Exhibit 3, this was a list written up by Phil
12    Castinetti, correct?
13  A. Yes.
14  Q. And is this in his handwriting as far as you
15    know?
16  A. Yes, it is.
17  Q. And how do you know him?
18  A. Phil Castinetti has been to all my bars.
19    He dealt with a lot of the memorabilia that
20    was either purchased there or given to me by
21    the players and friends for birthday,
22    whatever.  So that's how he knows about it.
23  Q. Now, when did Castinetti prepare this list?
24  A. A couple years ago.
25  Q. Before the November 3, '01 loss?
```

204

```
 1  A. Before?
 2  Q. Or after?
 3  A. After.
 4  Q. Okay.  Well, if he prepared the list after
 5    the loss and the stuff was gone when the time
 6    he prepared the list, how would he know what
 7    values to ascribe to the items on this list?
 8  A. Because I submitted to him what was taken.
 9    He knew by coming to all my bars what was on
10    the wall.  That is his business on how he
11    deals and assesses what the paraphernalia and
12    all the other stuff is worth.  And since
13    then, it's increased.  So he looks at a
14    Lyndon Byers signed photograph, he knows
15    instantly what it costs because he sells them
16    all the time.  He looks at a hockey stick.
17    He looks at all these things.  That's his
18    business.
19  Q. Well, doesn't the value of any one of these
20    items depend on what kind of condition it's
21    in?
22  A. Absolutely.
23  Q. So he never had an opportunity to see the
24    condition of any of this stuff, did he?
25  A. Oh, absolutely.
```

205

```
1   Q.  When was the last time Castinetti saw any of
2       this stuff on this list before this list was
3       generated?
4   A.  He saw it on my walls.  Many times, he was up
5       at Scuttlebutt's.  In addition to that,
6       everything was secured on the walls covered
7       by plastic.  This wasn't stuff that was just
8       thrown up against the wall, you know, with an
9       elastic band stuck up on a screw up there.
10      These things are worth a lot of money.  And
11      they were screwed in and done professionally
12      by carpenters that secure these things all
13      the time.  So he was well aware of it.  We
14      didn't put junk on any of my walls.  We
15      didn't put things that were ripped or torn
16      down or in bad, scratched-up material.  This
17      was all top quality stuff that was
18      hand-delivered to me, given to me as gifts
19      and that I accumulated over the years.
20  Q.  If this is special -- in essence, special
21      purpose, special value property, do you know
22      whether or not even if it did qualify as
23      business property, whether in order to be
24      covered, it would have had to have been
25      scheduled?
```

206

```
1   A.  Scheduled for what?  Under the bankruptcy?
2   Q.  No.  Scheduled under the insurance policy
3       with specific values based upon a specific
4       appraisal.
5   A.  No, I wouldn't think so.
6   Q.  Did you ever check your policy to see
7       whether -- what you would have to do to get
8       coverage for stuff like this under your
9       business coverage?
10  A.  Jack D'Addario said, "Take pictures of it,"
11      which we did.  And everything was all listed.
12      It was clear.  We took upfront pictures of
13      the whole place, all three bars, over the
14      course of the years.
15  Q.  Did you ever give any pictures to D'Addario
16      of what Scuttlebutt's looked like and what
17      was hanging on the walls?
18  A.  He could have told me what was hanging on the
19      walls.  I never had to take pictures to give
20      to Jack D'Addario.  Why would I have to give
21      them to him?  I think we did -- no, no.  Tom
22      Collins did submit it to him.  Yes, he did.
23      Copies of every picture, that's correct.
24  Q.  And when did Collins do this?
25  A.  I don't know when he handled it.  Yes, he
```

207

```
1       did.
2               (Document marked as Caiazzo
3               Exhibit 12 for identification)
4   Q.  I'm going to hand you and mark a series of
5       Exhibits that are taken out of Medallion's
6       files just so the record is clear.
7               MR. CHAPMAN:  And, Dean, for the
8       record, the first one which we've marked as
9       Exhibit 12 consists of nine pages.  And the
10      first page of which is a letter from
11      Medallion, or it looks like a fax January 9,
12      '01 to Mr. Caiazzo.
13  Q.  I hand you that and ask you if you recognize
14      that document.
15  A.  (Witness reviews document)  The first page
16      only or the rest of it?
17  Q.  Yes, take a minute and look through it, if
18      you would.
19              MR. CARNAHAN:  Can I say something?
20              MR. CHAPMAN:  Sure.
21              MR. CARNAHAN:  I've located that
22      other list, and I can fax it to you now.
23              MR. CHAPMAN:  Okay.
24              MR. CARNAHAN:  Yes.  Let's see.  Do
25      you just have one fax machine?
```

208

```
1               MR. CHAPMAN:  Yes.
2               MR. CARNAHAN:  I can fax it right
3       now if you could --
4               MR. CHAPMAN:  Yes.  It's 523-8130.
5               MR. CARNAHAN:  Okay.  I'll just do
6       it without a cover sheet and just do it right
7       now.  All right?
8               MR. CHAPMAN:  Sure.  Not that that
9       changes what I said about suspending, but
10      we'll chip away at it.
11              MR. CARNAHAN:  Yes.
12              (Discussion off the record)
13              (Recess taken)
14  BY MR. CHAPMAN:
15  Q.  So you've had a chance to look through
16      Exhibit 12, correct?
17  A.  Yes.
18  Q.  Do you recognize that document?
19  A.  Yes, I do.
20  Q.  And what is that?
21  A.  It is the insurance proposal for the rewrite
22      finance agreement from John D'Addario dated
23      1/9/01.
24  Q.  And that was faxed to you at that time?
25  A.  Yes, I think it was faxed.  Or he brought it
```

209

```
 1       down or something, yes.
 2    Q. And do you remember getting that at that
 3       time?
 4    A. Yes.
 5    Q. And fair to say that this is a proposal for
 6       your insurance for Scuttlebutt's?
 7    A. Yes, it is.
 8    Q. Now, do you recall that at that time they
 9       were proposing to write the package -- and do
10       you understand that the package refers to
11       your property and general liability coverage?
12    A. The package for which I dealt with John
13       D'Addario?
14    Q. Right.
15    A. The package included all the complements of
16       my insurance.  That's what the package means.
17    Q. Well, that's not -- you can tell from the
18       letter that that's not the reference here,
19       though, correct?
20    A. No, I don't believe so.  Because if you go to
21       the next page, it clearly shows what we were
22       looking for:  The business personal property
23       for $150,000; the loss of earnings for
24       $120,000; the awnings for which I argued for
25       $2,000; and then there's a deductible for
```

210

```
 1       $1,000; and it goes down to the
 2       comprehension, correct?
 3    Q. Right.  Let me -- if we look at his cover
 4       letter here, right, he's referring to a
 5       rewrite of the package and liquor policies;
 6       and then he makes a reference further down
 7       below to workers comp, correct?  Do you see
 8       that?
 9    A. Right.
10    Q. So he's referring to the package as something
11       in addition to the liquor and the workers'
12       comp, right?
13    A. I again refer to the second page, third page,
14       it says "Package Policy" at the top.
15    Q. Right.
16    A. And under it, it says, "Effective 1/10/2001
17       through 01/10/2002," and that includes
18       coverage for personal property, loss of
19       earnings, deck addition, awning deductible.
20       Then it goes down to all risk, flood and
21       earthquake, and it lists that under medical
22       and fire.  It goes to the next page, liquor
23       liability which is separate from package
24       policy --
25    Q. Right.
```

211

```
 1    A. -- and says each common cause $1 million and
 2       the aggregate is $1 million.  That's based on
 3       $600,000 in liquor receipts.  That to me is
 4       clearly the liquor liability aside from the
 5       package which includes everything that I
 6       just said.
 7    Q. Exactly.  I agree with everything you just
 8       said.
 9    A. Okay.
10    Q. Now, you recall that the premium -- combined
11       premium for the package and liquor policies
12       as he had originally quoted and proposed it
13       was $17,193?
14    A. Correct.
15    Q. Do you see that?
16    A. Correct.
17    Q. It says it on the proposal itself, and it
18       says it on the cover letter.  See?
19    A. Yes.
20    Q. And in addition, the worker's comp premium
21       was going to be $2,564?
22    A. Correct.
23    Q. And then he told you how he was going to need
24       to get payment from you to effectuate all
25       those different coverages, right?
```

212

```
 1    A. Correct.
 2    Q. Now, isn't it fair to say that these
 3       coverages as outlined in this proposal were
 4       not effectuated at that time and with these
 5       features?
 6    A. No, that's incorrect.  We removed -- we
 7       lowered because that was I think a little
 8       higher than what I wanted to pay at that
 9       point.  We reduced the liquor liability from
10       $1 million to $500,000, if I'm not mistaken.
11       And he can correct me or you can if I'm
12       wrong.  And we worked it down to I think
13       $15,000.  And I'm pretty much on line with
14       that.  So that includes my earnings which is
15       here, that includes the business personal
16       property which I'm looking for, the awning,
17       and everything else was disputed.
18    Q. Okay.  So if I understand your last answer,
19       you got Exhibit 12, you talked about it with
20       D'Addario, and you said in essence, "We need
21       to try to reduce this"?
22    A. Correct.
23    Q. Okay.  And it was reduced and later
24       effectuated, correct?
25    A. Correct.
```

213

1  Q.  Now, isn't it fair to say that one of the
2      reductions aside from reducing the liability
3      limit on the liquor liability, you also
4      reduced the premium by eliminating the
5      business personal property coverage?
6  A.  The only thing that I remember eliminating
7      was the business interruption which was very
8      expensive.  Not business coverage personal
9      property which is yearly.  It's very
10     reasonable.  It was the business interruption
11     insurance that he quoted me as saying "that's
12     exceptionally high," and that was what was
13     dropped.
14 Q.  Okay.
15 A.  I stand to be corrected, of course.
16 Q.  Well, I'm getting ready to do that.  Okay.
17     Well, let me actually -- on this one, let me
18     refer you to a document from your own
19     production.
20         MR. CHAPMAN:  If we could mark
21     Exhibit 2E.
22         (Document marked as Caiazzo
23         Exhibit 2E for identification)
24         MR. CHAPMAN:  And, Dean, I've marked
25     as Exhibit 2E one of the documents from the

214

1      Plaintiff's production.  And this is a draft
2      financing contract.
3          MR. CARNAHAN:  All right.
4  Q.  Now, Exhibit 2E, which you produced to us, do
5      you recognize that document?
6  A.  (Witness reviews document)  Uh-huh.
7  Q.  And what do you recognize that to be?
8  A.  It's the finance agreement.  And if I can see
9      the date -- beginning 3/23/01.  It says 1901,
10     but...
11 Q.  Now, is that a --
12 A.  That's a rewrite of what you just saw in the
13     package starting with March.
14 Q.  Right.  And this is a financing agreement
15     which was presented to you to finance the
16     premium referenced in Exhibit 12, correct?
17 A.  Correct.
18 Q.  Now, fair to say you did not sign this
19     premium financing agreement?
20 A.  No, I didn't sign this one.
21 Q.  Right.  And you wound up financing a lesser
22     premium, correct?
23 A.  Yes.
24         (Document marked as Caiazzo
25         Exhibit 13 for identification)

215

1          MR. CHAPMAN:  Dean, No. 13 is a
2      quotation.
3          MR. CARNAHAN:  All right.
4  Q.  I'm going to hand you a document entitled
5      "Quotation."  Do you recognize that?
6  A.  (Witness reviews document)  It says
7      January 9, 2001.
8  Q.  Which is the same date as Exhibit 12,
9      correct?
10 A.  Okay.  It says the contents, $150,000;
11     business income, 80 percent of the $1,500 a
12     week, I believe.  And that's how we came to
13     the 13 if it comes to 120.  So it's only
14     80 percent coverage.  So there's the answer
15     for the deductible.  It's only 80 percent
16     coverage.
17 Q.  Well, that's actually a reference to a
18     co-insurance clause.  It doesn't have
19     anything to do with an amount or money.
20 A.  Okay.  But it still says 80 percent.  It's
21     not 100 percent.  So that would indicate the
22     difference there.  It also includes -- this
23     is the -- unless I'm wrong and I'm seeing
24     something different, it says my income, the
25     awning, the contents.  And it goes to

216

1      commercial liability, general aggregate,
2      products, personal injury, prior damage,
3      medical.
4  Q.  Well, the reason I'm showing this to you is
5      this is a quote that you got on January 9,
6      '01 for that particular policy in connection
7      with Exhibit 12, correct?  I mean this was
8      the quote for the policy referenced in the
9      draft financing agreement, correct, Exhibit
10     12?
11 A.  I don't remember seeing this.  But this
12     obviously has to do with Scuttlebutt's.  So
13     at one point, yes, this had to have been part
14     of --
15 Q.  Okay.  And you see that the premium
16     referenced on the quote, Exhibit 13, matches
17     up with the premium on the financing
18     agreement that's stated in here.  When you
19     total all these up, you come down to the
20     $19,757 number.  Do you see that on
21     Exhibit 12?
22 A.  I see that.
23 Q.  Okay.  So in other words, this quote,
24     Exhibit 13, reflects coverage that you did
25     not purchase because as you said previously

217

1    the business income was deleted, correct?
2  A.  No, that's incorrect.  It says Lloyd's of
3      London package which included my loss of
4      income and the business products and
5      everything to be $7,450 which clearly
6      includes what this quote says under the
7      Lloyd's of London.
8  Q.  Right.  But this is the one --
9  A.  The Lloyd's of London package which you just
10     said did not happen because it was separate
11     from the liquor liability is not true because
12     that hits it exactly what you just said.
13     That's the exact package associated with
14     Lloyd's of London which includes the package
15     here.  Here's the heading:  "Package Policy."
16     There's all the earnings.  The only item I
17     eliminated and whether it was in this policy
18     or the previous one was the business
19     interruption.  This has nothing -- this is
20     loss of income.
21  Q.  Business interruption is referred to as loss
22     of earnings, correct?
23  A.  No, no.  Loss of earnings is my personal loss
24     of earnings.  Business interruption says
25     business interruption.  That would be

218

1    business that loss of earnings.  There's no
2    such thing as earnings for the business.
3    This is earnings, my personal earnings, you
4    know what I mean?  The business interruption
5    would be they'd pay the mortgage and
6    everything associated with the interruption
7    of the business by way of a bomb or a flood
8    or something like that.  This still includes
9    my earnings.
10  Q.  Okay.
11  A.  And it's clearly under the package.  It says
12     it right there in both of them.
13  Q.  Well, in any event, let me ask it this way:
14  A.  Excuse me.  Am I seeing that's not here?  Is
15     that what you're trying to say?  I don't
16     understand.  This clearly shows my coverage
17     on the sheets that you said I couldn't come
18     up with that they provided.  It clearly shows
19     my coverage right here clear as day.
20  Q.  Well, as we discussed a minute ago, this is a
21     proposal you received -- Exhibit 12 is a
22     proposal you received from Medallion.
23     Exhibit 13 is a quotation.
24  A.  Right.  You just referred to that in saying
25     Lloyd's of London is not included on this,

219

1    but yet it is.  There it is right there.  The
2    exact same number matches it.  It's a
3    package.
4  Q.  We're missing each other right now.  We've
5      already -- you've already testified that the
6      policies reflected on Exhibit 12 that were
7      totaled out to a premium of $19,757 --
8  A.  Correct.
9  Q.  And I'm going to represent to you, okay, that
10     the $19,757 on Exhibit 12 includes the
11     premium referenced on Exhibit 13.  I'm just
12     telling you that.
13  A.  Okay.  But that's irrelevant from what the
14     package shows.
15  Q.  But my point is we've already established
16     that you elected not to go with the proposal
17     that resulted in a $19,757 premium.  That's
18     all I'm saying.
19  A.  But the quote on your page which is the quote
20     which was my insurance clearly shows my loss
21     of salary earnings and the products.
22  Q.  Right.
23  A.  Okay.
24  Q.  Let's move on from that because --
25  A.  Okay.

220

1  Q.  Now, what I want to show you next is another
2      quotation which we'll mark as Exhibit 14.
3          (Document marked as Caiazzo
4          Exhibit 14 for identification)
5  Q.  Take a look at the quotation we've marked as
6      Exhibit 14.  And do you see when that
7      quotation was generated?
8  A.  (Witness reviews document)  The date...
9  Q.  Well, I'll just suggest to you -- do you see
10     a fax date of March of '01 at the top
11     left-hand corner?
12  A.  Yes, March 10, 2001.
13  Q.  Now, do you remember receiving a quotation
14     for your coverage in March of '01?
15  A.  Yes.
16  Q.  And do you understand that you did not have
17     insurance on the business between January,
18     February up until March of '01?
19  A.  No.  I had insurance.  I saw I have the
20     paperwork that clearly shows the coverage --
21     the renewal coverage from January, then March
22     until March of 2002.
23  Q.  And the insurance for that period for that
24     year was financed, correct?
25  A.  Yes, it was.

221

1    Q.   So before you would have any insurance, you'd
2         have to have a signed financing agreement,
3         right?
4    A.   The insurance never lapses. When you get
5         close to the period of time where it's going
6         to lapse, this is why the quote comes out two
7         months ahead of time which you just showed me
8         in January. I submit a payment and the
9         renewal kicks in.
10   Q.   Well, you know the financing company isn't
11        going to pay the premium on all these
12        policies on your behalf until you've given
13        them a signed financing contract, right?
14   A.   Everything is done prior to them coming down
15        and picking up in that particular situation a
16        money order for $4,900. That's over here in
17        Jean's. She put it right down here. And
18        that coverage sheet that I gave you, that's
19        also included on there clearly shows from
20        March 2001 until March 2002. I was covered
21        by all of these which I've been saying all
22        along.
23             MR. CHAPMAN:  Off the record.
24             (Discussion off the record)
25             MR. CHAPMAN:  Back on. We're going

222

1         to mark the next exhibit.
2             (Document marked as Caiazzo
3             Exhibit 15 for identification)
4    Q.   Okay. This is No. 15, and this exhibit
5         consists of seven pages. I'm going to hand
6         this to you. And first of all, do you
7         recognize that the first page is a photocopy
8         of an envelope?
9    A.   (Witness reviews document)  Yes.
10   Q.   And is that your handwriting on the envelope?
11   A.   Yes, it is.
12   Q.   And take a look at the rest of the exhibit
13        and let me know if you recognize generally
14        what that is.
15   A.   This is the $6,893.25 payment that I made to
16        Medallion Insurance for the deposit of that
17        new renewal with a premium balance of $9,191.
18        So it was $9,000 plus the $6,000 is close to
19        the $15,000 which I said we reduced. It's
20        closer to sixteen-something which reduced the
21        original $19,000 by a couple of thousand.
22   Q.   So this document enables you to say that you
23        did not get all the insurance that's
24        reflected in Exhibit 12, correct?
25   A.   No, that does not say that at all. That

223

1         reinforces mine because you showed me there
2         was only $7,000, whereas this is now $15,000.
3    Q.   Set aside Exhibit 13 because I'm just going
4         to tell you you're misunderstanding this.
5         Okay. Let's stick with Exhibit 12 which is
6         the proposal. Okay. Now, under the proposal
7         for your package policy, your liquor
8         liability policy, and your workers' comp,
9         okay, you can see if you go through the
10        premiums that the package and the liquor
11        liability were going to total to $19,757 and
12        the comp was going to be an additional
13        $2,564, okay?
14   A.   Uh-huh.
15   Q.   Now, the financing agreement and all these
16        policies that you identify as reflected in
17        Exhibit 12, those are all going to be
18        financed?
19   A.   Correct.
20   Q.   The financing agreement that you have in
21        front of you now that's Exhibit 15 reflects
22        that you paid -- you were financing a premium
23        of less than roughly -- nineteen plus two and
24        a half -- $21,000, correct?
25   A.   Well, no. The whole package is $17,000 -- I

224

1         mean $19,000.
2             MR. CARNAHAN:  Yes. It was $17,000
3         plus $2,000 so it's $19,000.
4    A.   The whole total is $19,000.
5    Q.   So if we look at Exhibit 12, the package and
6         the liability -- I'm sorry -- the package and
7         the liquor liability and the workers' comp
8         totaled out to $19,757, correct?
9    A.   Correct.
10   Q.   What you wound up financing as reflected in
11        Exhibit 15 was something less than $19,757,
12        correct?
13   A.   Correct.
14   Q.   Okay. And that's because ultimately you
15        wound up purchasing less coverage than what
16        was reflected in Exhibit 12, correct?
17   A.   Correct.
18   Q.   Okay. Now, the reason you were sending the
19        envelope back to Medallion -- that's the
20        first page of Exhibit 15 -- is because you
21        needed to return the signed fee agreement,
22        right -- I'm sorry, the signed --
23   A.   No. I had to send them a check.
24   Q.   You had to send them a check, and you also
25        had to return the signed financing agreement,

225

```
1     correct?
2  A. Uh-huh.
3  Q. Yes?
4  A. Right. I think so. I know I had to send
5     them the check. I don't know about the
6     financing agreement.
7  Q. Well, you know just from common sense you had
8     to sign a financing agreement, right?
9  A. Right, but not necessarily put in envelope,
10    mail it back. He could have come to the
11    place. I could have signed it. But I know I
12    had to send -- he said, "Send the check,"
13    which I did.
14 Q. Okay. The third page of Exhibit 15 is a
15    Standard Funding Corp. Premium Finance
16    Agreement. Do you see that?
17 A. (Witness reviews document) Yes.
18 Q. And is that your signature on the financing
19    agreement?
20 A. Yes.
21 Q. And you signed that on or about March 22,
22    '01?
23 A. Correct.
24 Q. And the finance agreement that you signed
25    reflected that your premium for the -- which
```

226

```
1     is which? Okay. The premium for the package
2     policy was going to be $3,000 plus a $205 tax
3     or fee, correct? Do you see that?
4  A. Yes.
5  Q. And the package -- the premium for the liquor
6     liability policy was going to be $4,000 plus
7     a tax or fee, correct?
8  A. Correct.
9  Q. And the premium for the workers' comp was
10    going to be $1,826, correct?
11 A. Correct.
12 Q. And you add all those up and you come out
13    with a total finance amount of $9,191,
14    correct?
15 A. Right.
16 Q. Okay. So when we compare Exhibit 12 from
17    January '01 to Exhibit 15 of March '01, by
18    reducing coverages, you reduced your premium
19    on the policy that went into effect in March
20    of '01 by over $10,000, correct?
21 A. Correct.
22 Q. And isn't it fair to say that one of the
23    reductions in coverage you made on the
24    package policy was to delete the business
25    property coverage?
```

227

```
1  A. I don't see that.
2  Q. I will show you what I'm talking about. When
3     you put Exhibit 14 side by side with the
4     premium finance agreement, Exhibit 15, which
5     is -- now, Exhibit 14 is the quotation,
6     four-year package policy. You see that this
7     quotation, Exhibit 14, does not include
8     property coverage, correct? And if you want,
9     compare that quote to the quote in
10    Exhibit 13.
11 A. There's the $4,000. That's $4,000 that's
12    listed there. The date, that's January.
13    These are both the same.
14 Q. Let me ask you about that. Isn't it fair to
15    say that Medallion quoted it for you two
16    different ways in January? They quoted it
17    for you with property coverage and without
18    property coverage, right?
19 A. That I don't remember. But I'm looking at it
20    now.
21 Q. Okay. Let's look at it now. We've got
22    Exhibit 13 and Exhibit 14 side by side,
23    right?
24 A. Correct.
25 Q. One of those quotes is for a policy that
```

228

```
1     includes property coverage; one is for a
2     policy that does not include property
3     coverage, correct?
4  A. No, because here's the $7,833.
5  Q. Right. And that's Exhibit 13?
6  A. And that includes all this.
7  Q. Right. And that includes -- you see the
8     reference to property coverage on Exhibit 13,
9     right?
10 A. Okay. $7,833 plus this is the $9,000.
11 Q. No, no, no. Exhibit 14 is a quote for the
12    same policy but without property coverage,
13    correct?
14 A. Where is it?
15 Q. When we look at Exhibit 13, the first thing
16    quoted is your content, your business income,
17    your awning, and your deck. You see that?
18 A. Okay. And how much is that?
19 Q. The coverage limit is to the right.
20 A. Okay. But it says $500 deductible.
21 Q. Then it drops down to give you coverage
22    limits for your general liability and so
23    forth, right? So you see that in Exhibit 13.
24    Exhibit 14 starts off with the commercial
25    general liability which is the second item
```

229

1    down on Exhibit 13. So you can see, correct,
2    that Exhibit 14 is a quote for liability
3    coverage but without the property coverage
4    that you see in Exhibit 13? Correct?
5  A. I don't see that because it lists identically
6    the same coverage on both sheets.
7  Q. It lists the same coverage on both sheets for
8    liability. It doesn't list any coverage for
9    property, does it?
10 A. The check -- where is the coverage for the
11   check that was sent over? How much was that?
12   It's right here. How much was the check?
13   $4,900? Well, there's the difference right
14   there. There's the difference that I paid.
15   So that's $6,000 and I carried over -- here's
16   the figure right there. $6,000 removes this,
17   what you're looking at. Without this $6,000,
18   this would have been -- you're correct --
19   completely different from this one. But it
20   wasn't because that $6,700 reduced the total
21   number that package was trying to say
22   that the total package was reduced by X
23   amount. So the $6,900 reduced everything
24   substantially and now put me in the same
25   category as this original quote?

230

1  Q. No.
2  A. It's there, right there.
3  Q. No. Respectfully, it's not there because
4    that's the premium for the entire policy.
5    Okay.
6  A. I have -- how much is $600 times 12?
7  Q. Let's --
8  A. No, no, no. $600 times 12 is what?
9  Q. Let's try to stick with my questions just so
10   we can try to --
11 A. It's not there because --
12       MR. CHAPMAN: Are you still with us,
13   Dean?
14       MR. CARNAHAN: Yes.
15 A. -- $6,900 was paid. Okay. My monthly
16   payments I believe were $700, $600, something
17   like that. That comes to much greater than
18   the figure you're saying that happened. Add
19   the two of them together and then my
20   monthlies.
21 Q. We've already added together what we need to
22   add together. This is my point. And, you
23   know, if you don't see it, just tell me.
24   Okay?
25 A. No, I understand what you're saying. But

231

1    when I saw the coverage page, the coverage
2    page that I saw that went from March 2001 to
3    March 2002 at Tom Collins' office, it
4    specifically said, "Income Disability
5    Policy." And now that reflects the quote
6    here which is carried -- it carried in this
7    entire policy. The only thing that was
8    reduced was the liquor liability, but they
9    had more money down, and that reduced the
10   figure that you're looking at.
11 Q. Okay. Again, just try to stick with my
12   questions.
13 A. Okay.
14 Q. When the day comes, Mr. Carnahan will be able
15   to ask you -- can say whatever you want, but
16   you've got to try to stick to my questions
17   here. All right?
18 A. Okay.
19 Q. Now, I'm suggesting to you that Exhibit 14 is
20   a quote for your package policy not including
21   property coverage. Exhibit 13 is a quote for
22   the package policy to include property
23   coverage. Okay. Do you agree or disagree
24   with that?
25 A. I can't say because --

232

1  Q. Okay. Next question: You see here -- you
2    see in Exhibit 15, when you look at the
3    premium finance agreement that you signed,
4    you would agree with me that you wound up
5    taking the coverage reflected in Exhibit 14
6    because you can match up the premium amount
7    on the package policy. I'm representing to
8    you that the top policy referenced in the
9    premium financing agreement is for the
10   package policy. It says, "Liability." Okay?
11 A. Right.
12 Q. And you can match up the premium amounts.
13   $3,000 for the premium for liability and $205
14   for the taxes and fees?
15 A. Okay.
16 Q. So you agree with everything I've said so far
17   on that issue?
18 A. That includes the income.
19 Q. We're not talking about that.
20 A. Okay. But it does include the income.
21 Q. I'm not asking any questions about income.
22   I'm asking you questions about property
23   coverage right now.
24 A. I don't see the property being omitted
25   because I see the transfer of the same amount

of money on this quote sheet, the second page from Jean D'Addario, that carries the package coverage that did not reduce this the way the liquor liability did. So the package gets transferred identically with a reduction of the liquor liability with more money down.

And if you look at it and see how much I paid a month, which I included and times 12 months, add the $6,900, and you'll see that it's much greater than the figure that you're showing.

Q. On Page 2 of the premium finance agreement that's part of Exhibit 15 -- and just for the record, it's a page entitled "Further Provisions of the Premium Finance Agreement" -- are those your initials at the bottom of the page?
A. (Witness reviews document) No. No, those are not. That's my signature.
Q. Right.
A. But I don't -- that isn't my initials. I initial it SDC. I do not initial that. That's not my signature. My other one is; the initials aren't.

(Document marked as Caiazzo Exhibit 16 for identification)

Q. Now, the next exhibit is a certificate of insurance and a commercial general liability coverage declarations which I've marked as Exhibit 16. Take a look at that.
A. (Witness reviews document) Okay. It says the person -- it says the products right here. No. Wait a minute. Wait a minute. I'm sorry.
Q. Hold on. The question is -- take a look at it, if you want. The question is, do you recognize what that document is?
A. Yes.
Q. Okay. What is it?
A. This is just the declaration page.
Q. For what?
A. For Lloyd's of London.
Q. Okay. Which policy?
A. It says for the general liability.
Q. Right. And this is a -- what you've got in front of you now is a policy that you got through Medallion, correct?
A. Correct.
Q. And this is the general liability policy that

you got through Medallion in effect from March of '01 beginning on, right?
A. Right.
Q. Now, did you receive -- you received this policy shortly after it was -- shortly after it went into effect, correct?
A. Well, that's not a policy.
Q. The first page is a certificate of insurance. You know what that is, right?
A. Right. It's a declaration, but that's not the policy.
Q. Well, maybe you're saying that because you haven't looked at it yet. Take a look through the rest of the pages and tell me whether or not that is the GL policy you got through Medallion.
A. (Witness reviews document) This is a personal injury part in exclusions. Well, here's the employer's liability for injury to me before I get to the other one. You know what I'm saying? I just haven't come across that. You thought I was going to bypass it, but I'll stick to the other.
Q. All I'm trying to find out is is this the general liability policy you got from

Medallion?
A. It is. But that's what you said to read it over. But it's long and it's -- yes, this is. That's what it says.
Q. Okay. All right. Now, did you get this policy and did you get this certificate of insurance back in April of '01?
A. Yes.
Q. And when you got it, did you look it over? Did you read it?
A. For the most part, yes.
Q. And then you put it in your file cabinet at Scuttlebutt's, correct?
A. Correct.
Q. Now, you can see then and you can see now that the only coverage you had purchased was liability coverage, correct? And you had not purchased property coverage, correct?
A. Under this policy, yes, the general liability.
Q. Right. Now, once the policy in Exhibit 16 went into effect, fair to say there were times when the policy was canceled for nonpayment, correct?
A. No.

237

1  Q.  Nonpayment of the premium finance agreement
2      payments, correct?
3  A.  It was not canceled.
4  Q.  It was noticed for cancelation, though,
5      correct?
6  A.  Notice of intent to cancel.
7  Q.  Well, as a matter of fact, it was canceled
8      for a period of almost two months, wasn't it?
9  A.  No, not at all.
10 Q.  Well --
11 A.  Not during that period of time, absolutely
12     not.
13 Q.  Are you sure you want to say absolutely not?
14 A.  I wrote the checks.
15          MR. CHAPMAN:  The next exhibit is
16     No. 17.
17          (Document marked as Caiazzo
18          Exhibit 17 for identification)
19 Q.  I'm going to hand you Exhibit 17 which is a
20     reinstatement warranty and ask you if that's
21     your handwriting on that document?
22 A.  No, this is not.  This is not my signature,
23     no way near.  This is not my handwriting.
24 Q.  Okay.  And from -- well, have you ever seen
25     this document before today?

238

1  A.  It doesn't look like it.  This was a
2      reinstatement.
3  Q.  Do you know what a reinstatement warranty is?
4  A.  First of all, the insurance was never lapsed.
5      So I believe -- and if you look at that, that
6      is not my signature.  That was not my
7      signature.  Someone forged that obviously on
8      the bottom.
9  Q.  Well, do you have an understanding that your
10     policy lapsed for nonpayment?
11 A.  Never, never did.  And I have all the
12     payments, every check every month.  This
13     brings up the fact of maybe what the
14     possibility of Jack D'Addario or someone at
15     Medallion did to cover themselves.  Now it's
16     starting to make sense.  Compare the two
17     signatures.
18 Q.  What about the handwriting on this check?  Do
19     you recognize that?
20 A.  (Witness reviews document)  This is my
21     handwriting.
22          MR. CHAPMAN:  Okay.  Let's mark that
23     as an exhibit.
24 A.  April, May, June insurance payments.
25          MR. CHAPMAN:  That will be No. 18.

239

1          (Document marked as Caiazzo
2          Exhibit 18 for identification)
3  Q.  Now, showing you Exhibit 18, is that your
4      handwriting in the lower left-hand corner
5      under the memo section of the check?
6  A.  Correct.
7  Q.  And is that a bank check that you went and
8      got?
9  A.  Yes.
10 Q.  And why did you get that check?
11 A.  I have no idea.
12 Q.  Isn't it because your insurance had been
13     canceled for nonpayment?
14 A.  No, I do not believe that.  Because when I
15     filed for bankruptcy, they require you each
16     and every month to declare the insurance
17     which I have the sheets.  I have no idea
18     what's that for.  As a matter of fact, I have
19     another copy that says June, Standard
20     Funding, too.  So I have no clue as to what
21     that is.
22          (Document marked as Caiazzo
23          Exhibit 19 for identification)
24 Q.  Exhibit No. 19 is an insured's notice of
25     cancelation dated April 26, '01.  And do you

240

1      remember getting that in April of '01?
2  A.  Date of notice 4/26.  So date of notice 4/26
3      and effective date of cancelation 4/27.
4  Q.  My question is simply do you remember getting
5      that notice of cancellation?
6  A.  I'm looking.  It says it's going to be
7      canceled on 4/27.  Yes.
8  Q.  Okay.  So you remember getting this in April
9      of '01, correct?
10 A.  Yes.
11 Q.  Okay.  So your insurance -- now that you've
12     seen this and -- well, strike that.  Let me
13     back up.
14          At that time, fair to say the
15     correct mailing address for Scuttlebutt's and
16     Jenna's Pub, Inc., was 73 Lafayette Street,
17     Salem, Mass.  01970?  Right?
18 A.  Correct.
19 Q.  And you know, now that you've seen
20     Exhibit 19, that your insurance for
21     Scuttlebutt's was canceled, correct?
22 A.  I never received a notice of cancelation
23     where this was not paid.  The date on here is
24     April 15th.  Cancelation over here was 4/27.
25 Q.  I think the date on the check that you wrote

241

1    or that you obtained in Exhibit 18 was June,

2    isn't it?

3    A.   (Witness reviews document)  Okay.  Yes.  So

4         June 15th.  So it says effective date of

5         cancelation is 4/27.  Why did I put April,

6         May, June.  That wouldn't --

7    Q.   Well, isn't it because that you received

8         Exhibit 19, the notice of cancelation, in

9         April and didn't do anything about it until

10        June 15th?

11   A.   That's not correct at all.

12              MR. CHAPMAN:  I think we just lost

13        him.

14              THE WITNESS:   I think the

15        deposition is over.

16              (Discussion off the record)

17              MR. CHAPMAN:  We apparently just

18        lost Mr. Carnahan.  He had told us -- and I

19        don't think you got this on the record so

20        I'll say it now.  When we had a break a short

21        while ago, Mr. Carnahan warned us that he has

22        a battery-powered phone and the battery was

23        running low.  And he anticipated that it was

24        going to run out soon.  So we said that if

25        that happened, we would agree to suspend.

242

1    And so he just cut out on us.  And so that's

2    what we're going to do now.  We're going to

3    suspend the deposition.  And we will resume

4    this at a time that's convenient for

5    everybody.

6              And, again, just for the record, let

7    me say that I am making a formal request for

8    the documents that we've identified during

9    the course of the deposition.

10             (Whereupon, the deposition was

11             suspended at 4:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit 3A

```
                    VOLUME:  II
                    PAGES:  1 - 191
                    EXHIBITS:  14
```

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CA NO. 04CV12627

\* \* \* \* \* \* \* \* \* \*

STEPHEN D. CAIAZZO
         Plaintiff,

vs.

THE MEDALLION INSURANCE
AGENCIES, INC.
         Defendant.

\* \* \* \* \* \* \* \* \* \*

THE CONTINUED DEPOSITION OF

STEPHEN D. CAIAZZO, called on behalf of the

Defendant, pursuant to the Massachusetts

Rules of Civil Procedure, before Aida

Correia, Court Reporter and Notary Public

within and for the Commonwealth of

Massachusetts, at Melick, Porter & Shea, 28

State Street, Boston, Massachusetts,

commencing at 10:45 a.m. on Friday,

June 10, 2005.

Page 2

```
 1  APPEARANCES:
 2
 3  DEAN CARNAHAN
 4  (By Dean Carnahan, Esq.)
 5  126 Broadway
 6  Arlington, Massachusetts 02474
 7  For the Plaintiff
 8
 9  MELICK, PORTER & SHEA
10  (By Kerry D. Florio, Esq.)
11  28 State Street
12  Boston, Massachusetts 02109
13  For the Defendant
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1            I N D E X
 2
 3  DEPONENT                 PAGE
 4  STEPHEN D. CAIAZZO
 5  Examination by Ms. Florio      4
 6
 7       E X H I B I T S
 8
 9  NO.  DESCRIPTION          PAGE
10  20   Cover Letter      37
11  21   Cover Letter      37
12  22   Cover Letter      37
13  23   Cover Letter      42
14  24   Document          46
15  25   Full Supplemental      46
16       Production
17  25A  Typewritten Exhibit A   46
18  25B  Handwritten List        46
19  26   Package of Information    125
20  26A  Document          130
21  27   Two-Page Letter      136
22  28   Two-Page Document     136
23  29   Settlement Statement    158
24  30   Letter          158
```

Page 4

```
 1            PROCEEDINGS
 2       STEPHEN D. CAIAZZO, a witness called
 3  on behalf of the Plaintiff, having been duly
 4  sworn under oath, deposes and says as
 5  follows:
 6       Examination by Ms. Florio:
 7  Q. Mr. Caiazzo, you have the pleasure of
 8     dealing with me today instead of
 9     Mr. Chapman.
10  A. Either way.  Makes no difference to me.
11  Q. Thanks for coming back.
12  A. I tried to get here earlier.  But coming
13     from Fort Myers, this is the earliest that I
14     can land in Boston believe it or not.
15  Q. I appreciate it.  We are going to pick up
16     where we left off last time.  We were
17     talking about the policy you had in effect
18     in 2001.
19  A. Yes.
20  Q. And it's my understanding that it's your
21     testimony that you had a package policy in
22     effect during 2001; is that right?
23  A. I believe it was two years prior to that.
24     It ran for about three or four years, but
```

Page 5

```
 1     2001 is exactly what it was.  Right.
 2  Q. Focusing just on 2001, it's your testimony
 3     that you had a package policy in effect
 4     during that time period; is that correct?
 5  A. Absolutely.
 6  Q. What is your understanding of what was
 7     covered under that package policy?
 8  A. It was the package that I had for probably
 9     12 to 15 years with these people.  It was
10     basic dram shop, liquor liability, fire,
11     personal contents.  And at this particular
12     time -- and I know it was 2001 because I
13     asked Jack about it.  It was my income
14     disability package or policy.  It was
15     included in the package.
16  Q. Did you refer to it as a package policy?  Is
17     that how you referred to it?
18  A. I referred to it -- that's what they gave
19     you is a package.
20  Q. Okay.
21  A. All the components together.
22  Q. It's your testimony that it included the
23     dram shop or liquor liability, fire,
24     personal contents, meaning the personal
```

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 6

```
 1    property, right?
 2  A. Right.
 3  Q. And also your disability income; correct?
 4  A. Workman's comp, disability, liquor
 5     liability. That's a whole package. Every
 6     year it's basically the same. It doesn't
 7     really vary at all.
 8  Q. It's your testimony that you had one policy
 9     that covered all of those components?
10  A. No. They are all individual policies, and
11     it's called one package, one payment.
12     There's a company out of New York, Standard
13     Funding, it finances the entire package. I
14     make one check to Standard Funding, and they
15     distribute it to the individual companies
16     like Lloyd's of London and so on and so
17     forth.
18  Q. So it's your testimony that the policies
19     were all financed through Standard Funding;
20     correct?
21  A. Correct.
22  Q. So the Standard Funding finance agreement
23     would include all of the different policies
24     that had been financed for that policy year?
```

Page 7

```
 1  A. Yes.
 2  Q. I want you to look at what we previously
 3     marked as Exhibit 15. On Page 2 of that
 4     exhibit, do you see that that is the
 5     Standard Funding finance agreement?
 6  A. Page 2 -- okay.
 7  Q. Right. Do you recognize that as the finance
 8     agreement?
 9  A. This is one of them, yes. Because they keep
10     sending them back and forth. One was --
11     this -- it says finance agreement. I don't
12     know.
13  Q. I'm not trying to trick you here. Do you
14     recognize it as a finance agreement right in
15     front of you?
16  A. That's what it says.
17  Q. And you have seen this before because you in
18     fact signed it, right?
19  A. Correct.
20  Q. And this is the finance agreement that was
21     in effect for the policy year beginning on
22     March 22, 2001; correct?
23  A. Correct.
24  Q. And the different policies are listed here
```

Page 8

```
 1     in the middle of the page; correct?
 2  A. No. I don't see them listed.
 3  Q. You see where it says "name of insurance
 4     company?"
 5  A. Just says Lloyd's of London, Llyod's of
 6     London. It doesn't say all the package and
 7     policies. It doesn't say anything about
 8     policies unless I'm --
 9  Q. Well, let me see if we can go through it
10     step by step. Do you see here in the middle
11     it includes some policy information in
12     general?
13  A. It says "Insurance Innovators Lloyd's of
14     London" on two of them. And that's all it
15     says.
16  Q. Then it's continued onto this next page.
17  A. That goes to workman's comp legion
18     insurance.
19  Q. So let's just start with the first one
20     listed here which says Lloyd's of London as
21     the insurance company; correct?
22  A. Uh-huh.
23  Q. Is that a yes?
24  A. Yes.
```

Page 9

```
 1  Q. And the effective date of that first policy
 2     is March 22, 2001?
 3  A. Correct.
 4  Q. And as you follow that policy along, you get
 5     under the category that says "coverage";
 6     correct?
 7  A. Right.
 8  Q. And you see under that it says "LIAB."
 9  A. Correct.
10  Q. And do you understand that that is referring
11     to your liability coverage?
12  A. Yes, I do.
13  Q. And then there's a premium listed for that
14     for $3,000?
15  A. Yes.
16  Q. And then there's the second policy listed
17     which also is effective March 22, 2001;
18     correct?
19  A. Yes.
20  Q. And that's with Lloyd's of London?
21  A. Yes.
22  Q. And then under coverage, it says "LLL?"
23  A. Right.
24  Q. Do you understand that to be the liquor
```

3  (Pages 6 to 9)

Page 10

1    liability coverage?
2  A. Yes.
3  Q. And the premium that's listed for the liquor
4    liability coverage is $4,000. Do you see
5    that?
6  A. Yes, it is.
7  Q. Okay. And then the third policy that's
8    listed on the next page is the worker's
9    compensation policy. Do you see that?
10 A. Yes, I do.
11 Q. That's effective February 23, 2001.
12 A. Right.
13 Q. And the coverage that's listed says "W"
14   slash "C", and you understand that to be
15   worker's comp?
16 A. Yes, I do.
17 Q. The premium listed there is?
18 A. It's $1,826.
19 Q. That's the last policy that's listed;
20   correct?
21 A. Yes, it is.
22 Q. So that includes the policies that were
23   financed with Standard Funding for that
24   policy period beginning in February and

Page 11

1    March of 2001; correct?
2  A. Right. Come March that was a carryover, and
3    that was a continuation of the previous
4    policies. So there is other policies over
5    there that probably didn't expire on that
6    date because there's letters in there that
7    determine what carries over and what has to
8    be refinanced and whatever. That's what I
9    see on that particular one.
10 Q. Well, this is the only finance agreement
11   that you had in effect starting in March of
12   2001, right? You only had --
13 A. We have to finance $200 or $300 because that
14   I believe is somewhere in the vicinity with
15   the package plan for my disability, and so
16   they would not have to finance $200 because
17   I paid $4,000 down, and so that would
18   certainly cover the majority. See what I'm
19   saying?
20 Q. Actually I'm a little confused.
21 A. Okay.
22 Q. Let's back up for a second. I thought it
23   was your testimony that all of your policies
24   were financed through Standard Funding so

Page 12

1    you would only have to write one check.
2  A. Exactly.
3  Q. All of the policies that you had in effect
4    let's say in August of 2001 would have been
5    financed through Standard Funding?
6  A. No.
7  Q. Okay. It seems a little inconsistent.
8  A. It's not inconsistent. When you're dealing
9    with insurance and you buy a package plan --
10 Q. Hold on a second. I'm going to ask the
11   questions today.
12 A. I will try and answer them. But you will
13   have to ask them correctly because you're
14   missing a point here, a very important
15   point.
16 Q. The problem is you're stuck with the
17   questions I ask you, and so you will have to
18   just answer them the best you can.
19 A. That's fine.
20 Q. But you have to respond to the questions,
21   and you can't just talk as you see fit.
22 A. Well, I have to explain. I'm certainly not
23   going to give you an answer that's not
24   correct and then you interpret that as being

Page 13

1    the only answer, and that's incorrect.
2  Q. I understand what you're saying, but there
3    wasn't a question pending. That was my only
4    point.
5  A. Okay.
6  Q. Is it your testimony that in addition to the
7    policies listed on this finance agreement
8    you had additional policies in effect?
9  A. No. I'm not saying that. I'm saying just
10   because that says March of 2001, that was
11   the renewal policy for those particular
12   policies. Now, having gotten my income
13   disability insurance the year before and the
14   year before, there was a certain time period
15   there that it ran. And I don't believe it
16   was enough money for that to be incorporated
17   -- I don't know how long it ran. It may
18   have run for six months, or it may have run
19   for a year, two years. That's just a
20   renewal policy for the existing policies
21   that ran from that time period.
22 Q. You testified that the package policy
23   included your income disability policy;
24   correct?

4 (Pages 10 to 13)

**Page 14**

1  A. Very simply John D'Addario was my agent. I
2    asked for a specific policy because I had an
3    awful lot to lose. We did this not once, we
4    did it not twice, it was at least three
5    years consecutively. This was his
6    recommendation, not mine. This was his. So
7    what I'm saying to you is I know you're
8    reading that, but I don't interpret your
9    question as being legitimate in that term.
10   I'm not going to answer a question that
11   doesn't -- you're trying to get me to answer
12   yes to a package here when I know I had a
13   policy through John D'Addario, and that
14   particular finance agreement shows that that
15   doesn't include it but I did have it. And
16   it carried over for -- I don't know whether
17   it ran two or three years.
18  Q. I understand what you're saying, and I'm not
19   trying to get you to say anything that you
20   don't believe. I just want to understand
21   where you're coming from.
22  A. I don't know what happened the last couple
23   of questions with Mr. Whatever, and he tried
24   to pull a little maneuver on me. That's not

**Page 15**

1    the way it is. I'm just trying to tell you
2    the truth here, and that's all there is to
3    it.
4   Q. I understand. We'll get through it baby
5    steps though because what I first want to
6    establish is that -- and you have insurance
7    background so you understand that the income
8    policy is not reflected on the Standard
9    Funding finance agreement we just went over?
10  A. Right. I have life insurance. I took a
11   test, and I got a life insurance
12   certificate. I didn't deal with this
13   particular --
14  Q. Well --
15  A. That's the question you asked so I have to
16   answer that.
17  Q. As a small business owner -- and I mean you
18   reviewed it with me. You understand that --
19  A. I have no reason to lie. I'm telling you
20   the truth. That's all there is. You ask me
21   a question, and I'm telling you. I paid for
22   disability insurance because it was
23   recommended to me and brought to my
24   attention by my agent and followed through.

**Page 16**

1   Q. I understand, Mr. Caiazzo. But let me just
2    ask you, I believe what you're saying is you
3    understand that it's not reflected on this
4    finance agreement --
5   A. Well --
6   Q. I believe what you're saying is you
7    understand that the income disability policy
8    is not reflected on the Standard Financing
9    agreement, but it's your testimony that you
10   had the policy in effect, it just wasn't
11   financed through this financing company?
12   Is that fair to say?
13  A. Yes. Exactly.
14  Q. So these three policies; the liability
15   policy, the liquor liability policy and the
16   worker's comp policy were the ones that were
17   financed through Standard Funding?
18  A. On that sheet, on that renewal time period,
19   right.
20  Q. For this policy period beginning in February
21   and March of 2001?
22  A. Correct.
23  Q. And that's what I'm focusing on for right
24   now.

**Page 17**

1   A. Yes.
2   Q. It's your testimony that during that time
3    period you also had an income disability
4    policy, it just was not financed through
5    Standard Funding. Is that fair to say?
6   A. Correct.
7   Q. So you during that time period wrote
8    separate checks for the income disability
9    policy?
10  A. No. I never ever said I wrote separate
11   checks. There was documentation that show
12   that various policies are started up and
13   terminated and restructured at different
14   time periods. All I'm saying to you is I
15   always mail one check according to Jack
16   D'Addario and who to send it to. I gave him
17   a $5,000 or $4,500 down payment which I do
18   believe that was part of the income
19   disability policy because we discussed it
20   for a good period of time. This was his
21   recommendation again. Now, because this
22   package here from Standard does not reflect
23   the income disability, that doesn't mean
24   that I didn't have the policy in effect.

5 (Pages 14 to 17)

Page 18

1    The policy was brought up to me, and I paid
2    as I was supposed to. I remember distinctly
3    having it in '98, '99, 2000 and 2001.
4  Q. Okay. I'm going to stop you right there.
5  A. Okay.
6  Q. To whom would the checks be made payable to
7    for the income disability policy that would
8    have been in effect at the time that you
9    became disabled in August of 2001?
10 A. Again, the checks are all made out to one
11    company.
12 Q. Who is that?
13 A. What the agent disperses, I don't know.
14    Again, Standard Financing.
15 Q. So when you make payments for all of your
16    policies, you write one check? Whether
17    you're paying for your income disability,
18    your liability, your worker's comp, you
19    write one check; is that right?
20 A. On those policies. Initially, you have to
21    understand that when I make a deposit, a
22    down payment on my policies, some of it is
23    paid through the agency. The agent is more
24    than happy to give it to you and verify all

Page 19

1    this. All I'm telling you is I have the
2    same insurance every year as a businessman.
3    I know what my needs are and what I have to
4    do in order to take care of my family and to
5    cover myself for liability, all various
6    liabilities. This particular policy as you
7    are asking says that I paid Standard
8    Funding. Yes, I do. But the extenuating
9    circumstances are that there are various
10    policy lapses during that that have to be
11    restructured and started up again. So
12    because it doesn't reflect on that doesn't
13    mean that you're going to ask me say, hey,
14    listen, I don't have insurance on that
15    because I do. It just doesn't reflect on
16    that sheet because it could have overlapped
17    and stopped two months later or six months
18    later.
19 Q. I understand what you're saying,
20    Mr. Caiazzo. I just don't have any
21    documentation to point to which says that
22    there's the income disability policy. Do
23    you have that documentation that you can
24    provide me that says that you actually had

Page 20

1    that policy in effect? I would like to see
2    it so I can talk to you about it.
3  A. I explained to you the last time, and I will
4    say it again, that all my documentation and
5    everything that I had was up in Scuttlebutts
6    that was removed without having the proper
7    -- without having that secured. I never got
8    a call. Everything was thrown out. My
9    personal -- most of this stuff I had was in
10    my desk. I filled up my car as best I
11    could. What I couldn't fill up I had to
12    leave at the top of the stairs inside all
13    locked up. So John D'Addario and that
14    agency -- and I will make this quick. I'm
15    sorry because I don't -- but very simply,
16    according to Medallion Insurance, I didn't
17    have any insurance. That's the problem.
18    They said I had no insurance, I had no fire,
19    I had no workman's comp, I didn't have any
20    awning insurance. You can't ask me for
21    paperwork that was thrown out.
22 Q. And that's all you have to say. My question
23    is: Do you have any documentation? You
24    just have to tell me it was thrown away.

Page 21

1  A. I told you that last time.
2  Q. Your answer is you don't have any
3    documentation with respect to the income
4    disability policy?
5  A. That's correct.
6  Q. And what you're telling me is that you
7    believe that there may have been some
8    restructuring of that income disability
9    policy that would have made it not appear on
10    this Standard Funding finance agreement. Is
11    that fair to say?
12 A. I believe so, yes.
13 Q. And do you know about when that income
14    disability policy was being renewed? Do you
15    have a memory of that?
16 A. Like I told you, it could overlap for two
17    months, it can go for two years. According
18    to my conversation with John D'Addario, he
19    brought it up and suggested very strongly I
20    take it out. Best of my recollection, I
21    paid it, whether it was part of the deposit
22    back in '98, '99 and then it renewed in 2000
23    and carried over, I don't know. But it was
24    there because we talked about it on a

6 (Pages 18 to 21)

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 22

1   regular basis. That's all I know.
2   Q. You understand that general liability
3       coverage does not cover business property,
4       right? You understand that?
5   A. No, I don't.
6   Q. Is it your contention that the liability
7       policy in effect that was reflected on the
8       Standard Funding finance agreement would
9       have covered your business property?
10  A. No. I don't know because it's all --
11      there's all subsidiaries to each policy.
12      Now, one of the papers that I sent you
13      reflected that I was covered for electronic
14      equipment, awnings, money in there, the
15      whole works. And that was clearly listed
16      over there. But John D'Addario and
17      everything -- like they said I had no
18      insurance, I wasn't covered with anything.
19      Now, you see how complicated it is from my
20      point of view. They give you a coverage
21      sheet. And then when you call them, they
22      tell you that you have no coverage.
23  Q. Okay.
24  A. Yet, the sheet is right there in front of

Page 23

1   them.
2   Q. Let's look at that. Is this the sheet
3       you're referring to?
4   A. That's one of them, correct.
5   Q. I'm just looking at what we previously
6       marked as Exhibit 2.
7   A. That's the other sheet I'm telling you
8       about. It just lists liability but doesn't
9       show individually. But yet, each individual
10      sheet that I have shows employees, it shows
11      income disability, it shows payroll. All
12      this stuff. So there's a whole list of
13      things.
14  Q. Let's go over that. Now --
15  A. Medical coverage. I mean I had medical
16      coverage on that too. They just said you
17      had no insurance. I was entitled to medical
18      insurance for my disability. That's not --
19      they said I had no insurance there either.
20      So how do you go from having -- you pay
21      $1,400 a month to getting no insurance. I
22      have no insurance whatsoever. This is the
23      complication that we are dealing with here.
24  Q. This medical coverage you're talking about

Page 24

1   is different from your income disability
2       policy?
3   A. Correct. That's when I go to a hospital and
4       I would go see a doctor, and they said I had
5       no insurance there.
6   Q. But --
7   A. Clearly shows it there, doesn't it?
8   Q. Well --
9   A. Yes or no.
10  Q. Let me ask you, you already testified you
11      read the policies when they came in;
12      correct?
13  A. Not as soon as they come in, no. Because I
14      had them for so many years, I know what I
15      have.
16  Q. But you understand that this medical
17      payments coverage applies to people that are
18      on your premises that are injured, right?
19  A. I understand that.
20  Q. So this isn't a disability policy. This is
21      a part of your --
22  A. That's in addition.
23  Q. Please don't interrupt. It's just not going
24      to get us very far very quickly, okay,

Page 25

1   because I'm just going to have to repeat it
2       again.
3   A. Okay.
4   Q. The medical payments coverage under your
5       liability policy deals with the liability
6       aspect of somebody getting injured on your
7       premises; correct?
8   A. That's part of one of the policies.
9   Q. And that's the part that you're pointing to?
10  A. No. It says medical payment coverage.
11  Q. Do you know what that means?
12  A. I do know what it means.
13  Q. What does it mean?
14  A. It means if someone who is injured on the
15      premises gets hurt, if they go to the
16      hospital, if they have to have x-rays and
17      they have to have medical treatment, that
18      covers that up to a certain degree.
19  Q. And is it your understanding that it would
20      cover anybody injured on the premises?
21  A. Well, if you look at the other papers, it
22      says employees and everyone listed on there.
23  Q. There's a different policy for employees,
24      right?

7  (Pages 22 to 25)

Page 26

1   A. That's exactly what I'm saying to you.
2       There's about seven different variations of
3       all of these so it's so confusing. That's
4       exactly what you said, ma'am.
5   Q. This is separate from what would cover
6       employees?
7   A. Yes -- well, I don't know. I haven't read
8       this yet. This is one whole page. All I'm
9       saying to you is exactly what I did five
10      minutes ago. There's so many different
11      variations of coverages under liability that
12      you're asking me specific questions on one,
13      you know, particular item, and it's not
14      true. It's all in the package.
15  Q. Well, what I understand that you're saying
16      is that -- you're not alleging that you had
17      coverage for medical payments under your
18      liability policy but rather you were
19      entitled to income disability payments;
20      correct?
21  A. No. I didn't say that at all. I said I had
22      an income disability insurance policy for a
23      good many years with that company in
24      addition to medical insurance on premise for

Page 27

1       someone that got injured, and my answer was
2       that according to D'Addario and those
3       people, I had no insurance at all to cover
4       anything. That's what I'm upset about.
5   Q. So D'Addario told you that when you were
6       injured that you did not have an income
7       disability policy?
8   A. That's correct.
9   Q. When you made a claim for your property
10      damage, he told you that you did not have
11      property damage coverage; correct?
12  A. That's correct.
13  Q. Okay. Now, I'm looking at Exhibit 14, and
14      I'm going to ask that you put your documents
15      away so we can focus on these unless you
16      have something you want to provide me.
17  A. I'm all set.
18  Q. These are yours as well.
19  A. Okay.
20  Q. This is what we marked as Exhibit 14. Do
21      you recognize that as a quote for a policy?
22      And I will represent to you that the date is
23      cut off there, but it's from March of 2001.
24      Do you see that that's a quote for a policy?

Page 28

1   A. Yes.
2   Q. And it has a breakdown of the different
3       coverages under the general liability
4       policy. Do you see that?
5   A. Yes.
6   Q. Do you see that under this particular quote
7       there's no breakdown, no listing of coverage
8       for business property as reflected on this
9       quote in front of you. Do you see that?
10  A. Yes. It doesn't say it on this, but that
11      doesn't surprise me.
12  Q. Okay. So your answer is no; is that
13      correct?
14  A. I don't see it there, no.
15  Q. Okay. On this Exhibit 16, that's the common
16      declarations for the Lloyd's policy that was
17      in effect. Do you see any premium listed
18      under commercial property coverage?
19  A. No, I don't. But like I told you before,
20      this is a balance of $4,000 or $4,500 that I
21      deposited, I put down on it. So my question
22      to you is: Where is the $4,500 on my down
23      payment going to? It's going to some sort
24      of coverage. See what I'm saying? That's

Page 29

1       obvious.
2   Q. But just focusing on my question --
3   A. I just answered that. No, I don't.
4   Q. On Exhibit 16 there's no premium?
5   A. I don't see it on that, no.
6   Q. There's the premium listed on the cover
7       sheet for the general liability; is that
8       right?
9   A. That's correct.
10  Q. Okay.
11  A. That's one of the sheets that we have.
12      There's numerous ones.
13  Q. When you were here before with Mr. Chapman,
14      you went over how in January of 2001 you
15      were initially quoted a policy, and you had
16      some discussion with D'Addario about
17      restructuring that so it would be a little
18      bit more affordable. Do you recall
19      discussing that?
20  A. Exactly.
21  Q. And you understand that when you change a
22      policy to reduce the premium that you
23      sacrifice coverage in some respect. You
24      understand that, right?

8  (Pages 26 to 29)

Page 30

1  A. The only time in 10 or 15 years that I had
2     coverage with this company, with this
3     agency, the only time we knocked down
4     coverage was regarding liquor liability
5     because it went from $25,000 a year down to
6     $10,000 depending on whether it was -- but
7     that's the only discussion we had regarding
8     a drop or a reduction of coverage in all
9     those years.
10 Q. So when you had the quote in January of 2001
11    and you had a discussion regarding making
12    the premium a little bit more affordable,
13    you specifically reduced the coverage under
14    liquor liability?  Is that what you're
15    saying?
16 A. I don't remember reducing a liquor
17    liability.
18 Q. Well, the premium was reduced, right?
19 A. It was reduced, but it could have been for a
20    lot of other reasons.  I mean that gets
21    reduced -- like I said, if someone gets
22    killed leaving your restaurant, they can pay
23    them 10 million or they can pay them 1
24    million.  That's a reduction which reflects

Page 31

1     possibly the difference between $25,000 and
2     $5,000 a year.
3  Q. Okay.
4  A. So I believe that was part of it, yes.
5  Q. But in a general sense, Mr. Caiazzo, you
6     understand that in order to reduce premium,
7     you have to reduce coverage in some area?
8  A. Exactly.
9  Q. And you understood when you went back to
10    D'Addario in January of 2001 to get a better
11    premium that coverage in some aspect of your
12    insurance was going to be reduced; correct?
13 A. Right.
14 Q. I want to be complete here.  This is
15    pointing out the obvious, Mr. Caiazzo, but
16    on Exhibit 16 we discussed how there's no
17    property coverage listed under this general
18    liability policy with Lloyd's.  There's also
19    no premium listed down here for income
20    disability; correct?
21 A. On this sheet, I do not see it.  But there's
22    25 other sheets that subcategorize
23    everything including the one that you saw.
24    It's hard for me to give you an answer to

Page 32

1     note something that's obvious right here,
2     but the follow-up pages clearly show
3     products and everything and liability and
4     personal liability, personal items.
5  Q. Let's focus on this.
6  A. You keep showing me this.  I'm saying I
7     don't see this here.  I'm trying to -- I'm
8     trying to give you the answers here, but I
9     can't lie.
10 Q. Hold on.  There's a way that this works,
11    Mr. Caiazzo.
12 A. Okay.
13 Q. And unfortunately, you have to play by the
14    rules.
15 A. I understand the rules.  I have been through
16    this before.
17 Q. Hold on one second.  One of the rules is as
18    out of respect for me and for the court
19    reporter, you have to not interrupt.  And
20    out of caution to you, it's probably best
21    for the question to be fully on the table
22    before you provide an answer.  Now,
23    unfortunately, you have to answer the
24    questions I ask.  When --

Page 33

1  A. Gladly.
2  Q. When Mr. Carnahan has the opportunity to ask
3     you questions, you will be able to provide
4     all the information you would like to with
5     respect to the other documentation for your
6     policies.
7  A. Okay.
8  Q. But for now it's my turn.
9  A. That's fine.  I just want the jury there.
10    Is that what you're saying?  When he
11    cross-examines, I can give the answers to
12    these -- I'm giving an answer to something
13    that states specifically on one sheet of
14    paper and there's a policy another 25 pages
15    that subcategorizes everything under the
16    main one, and that's why I can't answer
17    this.  And I apologize if that's the way I'm
18    coming across, but I can't answer something
19    that I do not believe and I know not to be
20    true.  You keep showing this to me.
21 Q. Let's just focus on increment steps here.
22    You understand that a declaration page lists
23    various components of policies; correct?
24 A. Yes.

9  (Pages 30 to 33)

Page 34

1  Q. You understand that this is a declaration
2     page in front of you?
3  A. Yes.
4  Q. According to this declaration page for this
5     particular policy, the Lloyd's of London
6     policy that has the inception date of
7     March 22, 2001, the only coverage listed
8     here with the premium is the general
9     liability coverage?  Is that fair to say?
10 A. Yes.
11 Q. Okay.
12        MR. CARNAHAN:  I would like to point
13     out for the record that that particular
14     exhibit has several copies, and you're just
15     referring to the first page of the exhibit.
16        THE WITNESS:  That's what I keep
17     saying.  She keeps putting this in front of
18     me all the time.
19 Q. I think I was specific in stating I was just
20     referring to the declarations.  So as I flip
21     to the second page of the policy, it states
22     that there is limits of insurance for a few
23     different categories here including the
24     general aggregate limit, products, personal

Page 35

1     and advertising injury, each occurrence
2     limit, fire damage limit and medical
3     expenses limited.  Have I read that
4     correctly?
5  A. Yes.
6  Q. And those are the different categories that
7     is included in the coverage and the various
8     coverage amounts for those categories; is
9     that right?
10 A. Right.  So each occurrence --
11 Q. You don't have to explain it.  I understand
12     very well.
13 A. Okay.
14 Q. And then the next part of this document is
15     the specific policy language, and you're
16     familiar with that because you have read
17     these policies before, right?
18 A. Correct.
19 Q. Okay.  And that's what is included in
20     Exhibit 16, correct, the actual policy plus
21     the two pages I just read to you?  Is that
22     fair to say?
23 A. No.
24 Q. Okay.

Page 36

1  A. Do you have everything -- all these pages
2     coincide with this particular Lloyd's of
3     London?
4  Q. All I'm asking you --
5  A. There's about a hundred pages of all my
6     policies and the declarations and
7     everything.
8  Q. I just want to note for the record that I
9     have gone over with you everything that's
10     included in Exhibit 16.  Is that fair to
11     say?
12 A. No.
13 Q. Just in what we marked as the exhibit.
14 A. All these --
15        MS. FLORIO:  Do you want to go off
16     the record?
17        MR. CARNAHAN:  Yes.
18        (Off the Record.)
19 Q. Although you contend there are other
20     documents that support your insurance
21     coverage, what I'm asking you is if I have
22     fully gone over what I have put in front of
23     you as Exhibit 16; correct?
24 A. Correct.

Page 37

1        (Exhibit No. 20, Cover Letter, so
2     marked.)
3        (Exhibit No. 21, Cover Letter, so
4     marked.)
5        (Exhibit No. 22, Cover Letter, so
6     marked.)
7  Q. Okay.  Just looking at what we marked as
8     Exhibits 20, 21 and 22, these are three
9     cover letters from Jean D'Addario.  Do you
10     have those in front of you now for the
11     record?
12 A. Yes, I do.
13 Q. And these are cover letters for insurance
14     policies that were sent to you by Medallion;
15     is that right?
16 A. Yes.
17 Q. And there are three separate cover letters
18     marked Exhibit 20, 21 and 22; correct?
19 A. Yes.
20 Q. Exhibit 20 refers to forwarding you a copy
21     of the general liability policy, Policy No.
22     LGL02160 effective 3/22/01.  Do you have
23     that in front of you?
24 A. Yes.

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 38

1  Q.  This was included in your document
2      production, and you have seen that before?
3  A.  Correct.
4  Q.  It just was the cover letter that was
5      included when they sent you that general
6      liability policy, right?
7  A.  This letter -- no.  I mean this is one of
8      them.  But they --
9  Q.  Just for that particular policy?
10  A.  For that one right there.
11  Q.  Then 22 is a cover letter dated May 8, 2001.
12      Exhibit 20 refers to the general liability
13      policy, Policy No. GHL01342; is that right?
14  A.  Yes.
15  Q.  And that's effective 3/22/2001?
16  A.  Yes.
17  Q.  That's for the liquor liability policy;
18      correct?
19  A.  Yes.
20  Q.  And the third one Exhibit 22 dated
21      May 3, 2001 refers to the worker's
22      compensation policy; is that right?
23  A.  Yes.
24  Q.  With the effective date of 3/23/2001?

Page 39

1  A.  Yes.
2  Q.  And these were the cover letters that were
3      included when these policies were forwarded
4      to you; is that right?
5  A.  No.
6  Q.  That's not fair to say?
7  A.  No.
8  Q.  You have never seen these before?
9  A.  Oh, yes.  I have seen this, but it doesn't
10      say Medallion on it, and it's not signed by
11      her.
12  Q.  I'm going to represent to you that these
13      were their file copies.  You also produced
14      your copies as well.  I can pull them out
15      for you if you would like.  For example, do
16      you see as part of your initial disclosure
17      documents, Exhibit 2, there's also another
18      copy of the same letter that was forwarded
19      to you?  Do you see that?
20  A.  Why doesn't it say Medallion on it, and why
21      didn't she sign it?
22  Q.  Well --
23  A.  I have to sign mine.  I have to sign the
24      acceptance of this.  Is there something in

Page 40

1      there that shows my signature on it?
2  Q.  All I'm asking you is -- and this was
3      something that you produced, so this is
4      something that you had in your possession.
5  A.  Right.  But this is one of the -- this isn't
6      necessarily the one that was sent to me and
7      sent back.  She sent things all the time.
8  Q.  I understand.  I'm just asking you if this
9      is the cover letter that was enclosing a
10      copy of the actual policy which is what it
11      says, and you have seen this before;
12      correct?
13  A.  Yes, I have.
14  Q.  Because these were included in your document
15      production?
16  A.  Correct.
17  Q.  So these letters -- and I may have marked
18      the file copies, but you have those in your
19      possession because they sent you these
20      policies; correct?
21  A.  She sent me those letters reflecting the
22      possibility of the policies.  Now, if it
23      isn't signed by her, that means that that
24      was just a representation as to what we

Page 41

1      could possibly do.  It was changed.  I don't
2      see the Medallion signature on it.
3  Q.  But this doesn't -- this isn't part of the
4      process of getting the policy.  It's
5      actually sending you the policy if you read
6      it --
7  A.  No.  You said to me that's -- that's them
8      sending me -- that's confirming that these
9      policies were in effect.
10  Q.  Right.  But it's sending you -- it's
11      enclosing a copy of the --
12  A.  It says this is the confirmation of it, but
13      this isn't what the original -- this is the
14      final file that she sent me, but it's not
15      signed.  This is the one she just
16      recommended?  Is that what you're saying?
17  Q.  I'm saying that according to the letters --
18  A.  I know what the letter says.  I'm
19      interpreting it right.  But she sent these
20      letters a good many times without us
21      necessarily signing off on it.  Do you see
22      what I'm saying?
23  Q.  But the policies were in effect on
24      March of 2001?

11 (Pages 38 to 41)

Page 42

1   A. Right.
2   Q. And then sent the letter saying
3      enclosing the copy of that policy that was
4      effective in May; correct?
5   A. Exactly, yes.
6      (Exhibit No. 23, Cover Letter, so
7      marked.)
8   Q. I want to talk to you about the property
9      that was lost after Scuttlebutts closed.
10     Can you tell me again approximately when the
11     sheriffs came and shut down the business?
12  A. It was right after the judge, the bankruptcy
13     judge, changed from 11 to a 7; therefore, we
14     had to evacuate the premises.
15  Q. Do you have an approximate date?
16  A. It was sometime in August 2001.
17  Q. Okay. And do you know how long after the
18     judge's ruling the sheriffs came? Was it
19     the next day or a couple of weeks?
20  A. No. The ruling came down that day.
21  Q. They came out the same day and shut it down?
22  A. That's what they did.
23  Q. So the judge changed it from an 11 to a 7,
24     and the sheriffs were there that day and

Page 43

1      said we have to shut it down?
2   A. Right.
3   Q. That was sometime in August of 2001?
4   A. Right.
5   Q. Okay. And we have previously marked as
6      Exhibit 3 the appraisal from Phil Castinetti
7      which is appraising some of the memorabilia
8      items that were lost?
9   A. Right.
10  Q. And then on the day of your deposition, your
11     attorney sent a supplemental list of
12     additional items --
13  A. Yes.
14  Q. -- that we just marked as Exhibit 23?
15  A. Okay.
16  Q. Now, does this Exhibit 23 and Exhibit 3
17     encompass all of the property damage that
18     you claim with respect to the --
19  A. The property that was thrown out you mean?
20  Q. Well, as a part of this lawsuit, you brought
21     a claim for the fact that you didn't receive
22     insurance for the loss of this property;
23     correct?
24  A. No. The lawsuit stated that whether it's

Page 44

1      commercial or whether it's residential, if
2      someone is forced to come in through the
3      sheriffs and lock the door, they have an
4      obligation by law to make a list of all the
5      personal property and everything is listed
6      there and send me and make every attempt --
7      you have to put it in storage, and they have
8      to send me a certified letter and give me
9      60, 90 days --
10  Q. I understand, Mr. Caiazzo. But that doesn't
11     have to do with the insurance claim.
12  A. Why wouldn't it?
13  Q. What I'm asking you is you made a claim
14     against the agency to be reimbursed for the
15     loss of this property; is that right?
16  A. Right. But you didn't properly address --
17     these things -- these items were thrown out
18     according to them.
19  Q. I understand. And I'm not concerned about
20     the circumstances to how it was lost. All
21     I'm concerned about is the actual property.
22  A. Well --
23  Q. My question to you is: Do we have in front
24     of us the full extent of the property that

Page 45

1      you claim was lost on the day that the
2      sheriff came and shut down the business?
3   A. It wasn't lost on the day the sheriff came.
4   Q. Why don't I rephrase the question.
5   A. Okay.
6   Q. Do these two lists encompass all of the
7      property, the business property loss, that
8      you're claiming in this lawsuit?
9   A. These items were left behind not when the
10     sheriffs were there.
11        MS. FLORIO: Can we go off the record
12     for a second?
13        (Off the Record.)
14  Q. I understand after talking with you and your
15     attorney off the record that in addition to
16     the list of the appraisal list from Phil
17     Castinetti marked as Exhibit 3 and the
18     supplemental list that was sent by your
19     attorney on May 6, 2005 marked as
20     Exhibit 23, that there are additional items
21     that you're claiming were lost; is that
22     correct?
23  A. Yes.
24  Q. Okay. So if you can tell me first and

12 (Pages 42 to 45)

Page 46

1    foremost what isn't included on these lists
2    so then I can have a full understanding. In
3    addition to Exhibit 3 and 23, what else was
4    lost?
5         MS. FLORIO: Off the record.
6         (Off the Record.)
7         (Exhibit No. 24, Document, so
8         marked.)
9         (Exhibit No. 25, Full Supplemental
10        Production, so marked.)
11        (Exhibit No. 25A, Typewritten Exhibit
12        A, so marked.)
13        (Exhibit No. 25B, Handwritten List,
14        so marked.)
15        MS. FLORIO: We have the full
16    supplemental production from you dated
17    May 24, 2005 as Exhibit 25. And 25A is
18    marked Exhibit A, and it's the typewritten
19    Exhibit A from the bankruptcy proceeding.
20    And then 25B is another handwritten list
21    which I believe is also faxed, but I just
22    wanted to mark it to be sure.
23 Q. Okay. We have now marked the typewritten
24    list from the bankruptcy proceeding as 25A

Page 47

1    which includes some additional items; is
2    that right?
3 A. Yes.
4 Q. And then 25B is a handwritten list, and this
5    is actually the same list as we previously
6    marked as Exhibit 23, right?
7 A. Yes.
8 Q. And then we have Exhibit 24 which is the
9    supplemental list that you prepared with the
10    items that are circled being the new items
11    on the list; is that right?
12 A. Correct.
13 Q. So with these exhibits; Exhibit 3, 23, 24
14    and 25A and B, do I have in front of me the
15    items that you presently claim were lost?
16 A. Yes.
17 Q. And this encompasses your property damage
18    claim?
19 A. Yes.
20 Q. Looking at Exhibit 3, this is an appraisal
21    sheet made out by Phil Castinetti of Sports
22    World; is that right?
23 A. Yes.
24 Q. He's in the business of sports memorabilia;

Page 48

1    is that right?
2 A. Yes.
3 Q. Do you know when this list was prepared?
4    It's not dated.
5 A. No. I think it was in 2002. Somewhere in
6    that vicinity. I know it's been a couple --
7    two, two and a half years since he's done
8    it.
9 Q. That was sometime after the loss?
10 A. Right.
11 Q. So he didn't have these items in front of
12    him when he was completing this appraisal;
13    correct?
14 A. No.
15 Q. Okay. And --
16 A. They were gone.
17 Q. I understand. I'm just trying to get it on
18    the record. And I believe you previously
19    testified that Mr. Castinetti was aware of
20    the condition of all of these items because
21    he was a customer at your bar; is that
22    right?
23 A. Some items were purchased at his place by
24    various people as gifts to me. He also

Page 49

1    spent a good 10 to 12 years at three of my
2    bars, and each time he took these things and
3    placed them in the new bar so he's well
4    aware of the condition. And he is well
5    aware of all the bars and what was on the
6    wall and all the items.
7 Q. So it's my understanding that it's your
8    testimony that he created this appraisal
9    based on his memory of the condition of the
10    items when they were sold to you in addition
11    to his memory of the condition of the items
12    based on his --
13 A. Expertise.
14 Q. Well, and his exposure to them when he came
15    to the bar; is that right?
16 A. Correct.
17 Q. Now, the first item listed, what is that?
18 A. Lyndon Byers game used road jersey.
19 Q. And when did you obtain that?
20 A. Probably sometime in -- it was at the middle
21    bar, and it was at Cai's.
22 Q. Okay.
23 A. So it was probably between 1989, 1990 to
24    2001.

13 (Pages 46 to 49)

Page 50

1   Q. And how did you get that?
2   A. Mr. Byers gave it to me.
3   Q. Was it signed?
4   A. Yes, it was.
5   Q. How did you keep it?
6   A. I had all the items in glass or hanging
7       behind the bar on the wall.
8   Q. So all of the items listed here whether they
9       are jerseys or photos I guess except for
10      things like hockey sticks would have been
11      kept in glass? Is that your testimony?
12  A. Most of them were in glass, all the
13      pictures. And the other ones were screwed
14      in the wall.
15  Q. What about the jerseys?
16  A. There was a couple of them in glass, couple
17      of them were framed, and they were drilled
18      into the wall.
19  Q. So it was a combination of drilled into the
20      wall and framed?
21  A. Yes. They were just secured.
22  Q. And what about this Byers jersey? Do you
23      remember how that was kept?
24  A. I think it was behind the bar, and I think

Page 51

1       it was screwed into the wall.
2   Q. Did you ever have any of these items
3       appraised prior to the loss?
4   A. No.
5   Q. And do you have any receipts for any of
6       these items?
7   A. Why would I have a receipt for a gift?
8   Q. Are they all gifts?
9   A. No.
10  Q. I asked if you had receipts for any of the
11      items.
12  A. You asked me if I had a receipt for Lyndon
13      Byers game jersey, and I said no.
14  Q. Well, hopefully you can listen to my
15      questions a little better unless I have a
16      bad memory, but I believe I asked you if you
17      have receipts for any.
18  A. I thought you said Byers game jersey.
19  Q. That's besides the point. Do you have
20      receipts for any of these items?
21  A. I may have a few of them. I think I
22      produced them -- I gave you copies of some
23      of the items that I purchased. Most of
24      these were gifts. The other copies that I

Page 52

1       have for like armoires and things like that,
2       yes, I have copies of the receipts.
3   Q. What I'm referring to is these things in
4       Exhibit 3 that were appraised by Castinetti.
5       Do you have receipts for any of the items in
6       Exhibit 3, or were they all gifts?
7   A. Well, you're going to have to give me a
8       second to look down.
9   Q. Okay.
10  A. Thank you. In this particular exhibit, all
11      of them were gifts from various players and
12      people except for the fiberglass shark which
13      I purchased after a fishing trip down to
14      Florida.
15  Q. So all of the sports memorabilia items
16      included in Exhibit 3 were gifts; correct?
17  A. Exactly.
18  Q. So you don't have any receipts for those
19      items?
20  A. Not as gifts.
21  Q. Okay. I understand. And what was the
22      condition of the Byers game jersey?
23  A. Everything that was given to me was in
24      excellent condition.

Page 53

1   Q. Okay. So it's your testimony that all of
2       the sports memorabilia items included in
3       Exhibit 3 were in excellent condition?
4   A. They were handed to me in excellent
5       condition, and I secured them and kept them
6       that way.
7   Q. Is your answer yes?
8   A. Yes.
9   Q. Of the Craig Janny game jersey, do you see
10      that, the second item?
11  A. Yes, I do.
12  Q. That's appraised at $1,500?
13  A. Correct.
14  Q. When did you get that?
15  A. About the same time that Lyndon Byers gave
16      me his.
17  Q. And how did you secure that one?
18  A. That was screwed into the wall also.
19  Q. Also in excellent condition?
20  A. Yes, it was.
21  Q. Was that one signed?
22  A. I don't know if it was or not. That was
23      given to me by one of the Bruins. That
24      wasn't given to me by Craig Janny. That was

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 54

1   given to me by the equipment manager of the
2   Bruins that gave me an awful lot of these.
3   That was given to me, but I can't remember
4   if it was signed or not.
5   Q. The third item, the Lyndon Byers team signed
6   sharks jersey?
7   A. Yes.
8   Q. And that was appraised at $2,000?
9   A. Yes.  That was from -- the whole team signed
10   that.
11   Q. The next item was the Drew Bledsoe signed
12   Patriots jersey for $250; is that right?
13   A. Yes.
14   Q. And how did you get that one?
15   A. I think Lyndon Byers gave me that also.
16   Yes, he did.
17   Q. How did you secure that one?
18   A. Bledsoe's jersey, that was smaller believe
19   it or not.  That was secured -- I can't
20   remember if it was under glass, but it was
21   secured on the wall.
22   Q. Okay.  And that was in excellent condition?
23   A. It was -- yes.  That was brand new.
24   Q. And the next thing is the Nolan Ryan limited

Page 55

1   edition signed print?
2   A. Yes.
3   Q. And that was appraised at $500?
4   A. Yes.
5   Q. And how did you get that?
6   A. I bought that one.  Someone came into the
7   bar and asked me if I wanted to buy it, and
8   I said sure.
9   Q. What did you buy it for?
10   A. I don't know.  I think it was $100 maybe.
11   Q. I understand you don't have a receipt for
12   that?
13   A. No.  I don't think I wrote them a check.  I
14   gave them cash.  It came off the street, and
15   periodically they come in.
16   Q. How was that print secured?
17   A. That was in glass.
18   Q. Was that framed on the wall?
19   A. Yes.
20   Q. What kind of frame was that in?
21   A. It was a matted frame glass enclosed with
22   three different pictures of Nolan Ryan when
23   he was with the Astros, the Mets and one
24   other team and had a seal and his victories

Page 56

1   and the whole thing.
2   Q. The next item is the Ray Bourque signed
3   8 by 10 photo?
4   A. Right.
5   Q. It was appraised for $100?
6   A. Yes.
7   Q. And how did you get that?
8   A. Ray gave it to me.
9   Q. And how was that secured?
10   A. That was in glass.
11   Q. Was that hanging on the wall?
12   A. Bolted into the wall, yes.
13   Q. In a frame?
14   A. In a frame.  These are all the photographs
15   here -- the 8 by 10 were all screwed in and
16   all in glass framed on the wall.
17   Q. And the next one is the Cam Neely signed
18   8 by 10 photo?
19   A. Yes.
20   Q. For $75?
21   A. Yes.
22   Q. I guess that probably recently would have
23   gone up, right?
24   A. I'll be speaking to him tonight, but I'm

Page 57

1   sure it is.  That's why I was happy to have
2   a couple of more years under our belt in
3   this.
4   Q. And how did you get that?
5   A. Cam also gave it to me.
6   Q. And how did you have that one secured?
7   A. In glass screwed into the wall.
8   Q. And that was in a frame as well?
9   A. All of them were, yes.
10   Q. What kind of frame was that one in?
11   A. Wooden frame with a glass, regular 8 by 10
12   picture frame.
13   Q. And the next one, was that Gerry Cheevers?
14   A. Yes.
15   Q. Signed 8 by 10 photo?
16   A. Same.
17   Q. And that's for $50?
18   A. Yes.
19   Q. And that was secured the same way in a frame
20   on the wall?
21   A. Yes.
22   Q. And then how did you get that?
23   A. Gerry Cheevers gave it to me.
24   Q. When did you obtain that one?

15  (Pages 54 to 57)

Page 58

1  A. He didn't come to the first bar, but he came
2     to Cai's.
3  Q. Okay.
4  A. So that was between 1990 and 1995.
5  Q. What about the Cam Neely one, when did you
6     get that?
7  A. Probably the same time.
8  Q. At Cai's?
9  A. Yes.
10 Q. I believe I asked you for the Ray Bourque
11    photo when you got that?
12 A. I don't know if that was the first bar or
13    not, but there was some of them that had
14    been given to me in the first bar and -- I
15    don't know exactly.
16 Q. You don't remember?
17 A. No.
18 Q. Nolan Ryan, do you know when you got that?
19 A. I got it up at Scuttlebutts.
20 Q. You said that Drew Bledsoe you got right
21    before he was traded?
22 A. Yes.
23 Q. What year was that? Was it 2001, 2000?
24 A. I got it probably -- no. In 1999 maybe.

Page 59

1  Q. Is that your best estimate 1999?
2  A. Yes. Somewhere around there.
3  Q. Okay. And then you have a signed 8 by 10
4     photo of Lyndon Byers?
5  A. Yes.
6  Q. Did Lyndon give that one to you?
7  A. Yes.
8  Q. When did he give that one to you?
9  A. He gave me a bunch of them. I don't know
10    which one this was, but it could be any
11    time -- it could be anywhere from 1987 to
12    2001. I mean they were -- Lyndon and a
13    couple of these players had two or three
14    different, you know, two different pictures.
15    Some of them were steel ones, some were game
16    ones that they gave. And they just kept
17    putting them up so I don't know exactly
18    which ones.
19 Q. Is it fair to say you don't know exactly
20    when you got that photograph, but it was
21    sometime during your business?
22 A. Yes.
23 Q. And that's appraised at $25?
24 A. Yes.

Page 60

1  Q. And was that secured in the 8 by 10 wood
2     frame as well?
3  A. Yes.
4  Q. And then you have a Ken Hodge signed 8 by 10
5     photo?
6  A. Yes.
7  Q. Appraised for $25?
8  A. Yes.
9  Q. Also in excellent condition?
10 A. Yes.
11 Q. Secured in a 8 by 10 wood frame?
12 A. Yes.
13 Q. And then how did you obtain that?
14 A. Ken Hodge gave it to me.
15 Q. Do you have a memory as to when that was?
16 A. A lot of them were in the second bar. So
17    like I said, probably '87, '88, '89, '90 or
18    somewhere around there.
19 Q. Okay. And the next one, which one is that?
20 A. Andy Moog.
21 Q. Signed 8 by 10 photo?
22 A. Yes.
23 Q. Appraised for $40?
24 A. Yes.

Page 61

1  Q. And how did you get that?
2  A. Andy gave it to me. He was my neighbor up
3     in Lynnfield.
4  Q. Do you have a memory as to when he gave that
5     to you?
6  A. Same time probably.
7  Q. During Cai's?
8  A. Yes.
9  Q. And was that secured the same way in a wood
10    frame?
11 A. Yes.
12 Q. On the wall?
13 A. Yes.
14 Q. Do you have that hanging on the wall?
15 A. Yes.
16 Q. What was the next one?
17 A. Gary Doak.
18 Q. That was a signed 8 by 10 photo appraised
19    for $25?
20 A. Yes.
21 Q. How did you get it?
22 A. Gary Doak gave it to me.
23 Q. Do you remember when?
24 A. No, I don't.

Page 62

1  Q. And also in excellent condition?
2  A. Yes.
3  Q. Secured in a glass frame?
4  A. Yes.
5  Q. Hanging on the wall?
6  A. Yes.
7  Q. And then you had an 8 by 10 Bobby Orr signed
8     photo?
9  A. Yes.
10 Q. And appraised for $150?
11 A. Yes.
12 Q. How did you get that?
13 A. That was given to me I think by one of the
14    players.
15 Q. Do you know when?
16 A. No. Because I had two pictures of Bobby
17    Orr. I don't know which one.
18 Q. How was that one secured?
19 A. They were all secured on the wall in glass
20    frames, glass and wood frames.
21 Q. And was that in excellent condition as well?
22 A. Yes, it was.
23 Q. Then you have one box of lesser name players
24    at $15 each for a total of $675?

Page 63

1  A. Yes.
2  Q. Now, how did you and Mr. Castinetti come up
3     with that figure of $15 each for these
4     players?
5  A. Well, he looked at the pictures on the wall,
6     and most of them were rookies that only
7     played maybe one year with them. And they
8     weren't as well known, but they were still
9     on the wall. So he put down lesser name
10    players and then just said, you know, they
11    are not the Cam Neely, Lyndon Byers, Gerry
12    Cheevers and so on and so forth. These are
13    players over the three bars that came in
14    that didn't necessarily spend a whole lot of
15    time with the Bruins, but they signed a
16    picture and put it on the wall.
17 Q. What's the next one listed here?
18 A. Robert Urich.
19 Q. Another signed 8 by 10 photo?
20 A. Correct.
21 Q. Also secured in a frame on the wall?
22 A. Yes.
23 Q. Excellent condition?
24 A. Yes.

Page 64

1  Q. How did you get that?
2  A. Mr. Urich gave to me.
3  Q. That appraised for how much?
4  A. It says here $100.
5  Q. Do you know when approximately he gave that
6     to you?
7  A. I believe that was the first bar between '83
8     and '87, '88.
9  Q. Okay.
10 A. Somewhere around there.
11 Q. Okay. Still in excellent condition?
12 A. Absolutely.
13 Q. The next one Denis Leary 8 by 10 photo?
14 A. Yes.
15 Q. It's signed by him?
16 A. Yes.
17 Q. And how did you get that?
18 A. Denis gave it to me.
19 Q. And that's appraised for $75?
20 A. Yes.
21 Q. And when did you get that?
22 A. When he was filming the movie I think in
23    1994 or 1995 whenever he shot the movie in
24    Malden.

Page 65

1  Q. Was that secured in a frame on the wall?
2  A. Yes, it was.
3  Q. And what about the Sly Stallone photo?
4  A. Yes.
5  Q. When did you get that?
6  A. I got that in the late '80s.
7  Q. And signed by him?
8  A. Yes.
9  Q. For $200?
10 A. Yes.
11 Q. How did you get it?
12 A. A friend of mine was in the movie with him
13    "Over the Top", that arm wrestling movie,
14    and he had a picture with Stallone so he
15    sent it to me.
16 Q. And did you have that also in a wood frame
17    on the wall?
18 A. Yes, I did.
19 Q. And then you have a large Bruins photo that
20    had Neely, Byers, et cetera?
21 A. Yes.
22 Q. And that was appraised for $200?
23 A. Yes.
24 Q. What is that?

17 (Pages 62 to 65)

Page 66

1   A. That was a picture of Mr. Neely, Mr. Byers,
2      couple of other players, and it was just
3      blown up. It was probably maybe 3 by 2.
4      Something like that.
5   Q. Was it them playing?
6   A. No.
7   Q. Just personal pictures?
8   A. Right.
9   Q. I guess I wouldn't ask that question if I
10     knew the years that they played or whether
11     they played together.
12  A. Right.
13  Q. So this was just a personal photo that you
14     had of them blown up?
15  A. Correct. At one of the breakup parties,
16     correct.
17  Q. And so was this a picture of them at your
18     bar, one of the bars?
19  A. Yes.
20  Q. And who took the photo?
21  A. I can't remember.
22  Q. And --
23  A. That day there, there was probably 50
24     cameras in the place and about 300 people so

Page 67

1      everybody running around.
2   Q. When was it?
3   A. It ran for seven consecutive years.
4   Q. And you're not sure which one this --
5   A. No.
6   Q. And did you have that -- you said the 3 by 2
7      you said --
8   A. Yes.
9   Q. 3 feet by 2 feet?
10  A. Yes. It was pretty big.
11  Q. You had that framed or more like a poster?
12  A. No. It was a picture, and it was framed in
13     glass.
14  Q. And the next one you had a 4 by 7 Bruins
15     team photo?
16  A. Yes.
17  Q. And is that for $1,000?
18  A. Yes.
19  Q. Which team was it? Do you know what year?
20  A. It was the 1987 team I believe or '88.
21  Q. How did you get it?
22  A. Well, the whole team gave it to me. We used
23     to do security. We did security for them
24     for the Wives' Carnival at the Boston Garden

Page 68

1      every year, and so they brought it over.
2      And they, one at a time, the entire team
3      walked behind the bar and signed it.
4   Q. So that was also signed even though it
5      doesn't say that?
6   A. The entire team signed that including the
7      coaches.
8   Q. I'm just clarifying because it doesn't say
9      that.
10  A. Right.
11  Q. So it was actually signed, and that's
12     probably why it is appraised for $1,000?
13  A. Well, I'm a little upset over that. I think
14     if you talked to Mr. Castinetti right now,
15     it's worth a lot more than that.
16  Q. Okay.
17  A. But he seen it.
18  Q. Just going by what this says, right?
19  A. There's a picture I produced that shows all
20     the different signatures.
21  Q. We'll get to that.
22  A. Okay.
23  Q. Then you have a Ray Bourque game used stick
24     for $350?

Page 69

1   A. Yes.
2   Q. And did Ray give that to you?
3   A. Ray gave me one, and the equipment manager
4      gave me another one. I had a lot of sticks.
5      It was probably about 30 of them throughout
6      the bar so there could have been.
7   Q. How did you secure that one?
8   A. With screws on the wall.
9   Q. It's not in anything, right? It's just
10     screwed in?
11  A. No. They just bolted screwed right in. We
12     had the carpenters do all the sticks in
13     various forms.
14  Q. Okay. And did you have a particular person
15     you used to secure these things?
16  A. Whoever happened to be the contractor at
17     hand. Gary Goodcheck (Phonetic) was one.
18     It was a bunch of people. But it was done,
19     you know, to secure them. They just weren't
20     stuck on the wall there.
21  Q. What's the next thing?
22  A. Assorted game used sticks by Neely, Hodge.
23     Like I said, there would be 20, 30, maybe
24     more sticks throughout the entire bar.

18  (Pages 66 to 69)

Page 70

1  Q. Do you know how many sticks this $1,000
2     appraisal is including?
3  A. I just said it was somewhere between 25, 30.
4     There were a lot of sticks.
5  Q. They were all in excellent condition?
6  A. They were used now. They weren't falling
7     apart if that's what you mean, but they were
8     -- there's scrapes and little chips coming
9     out of them.
10 Q. Because they are hockey sticks, right?
11 A. Yes.
12 Q. And then you have Cam Neely game used hockey
13    gloves?
14 A. Right.
15 Q. At $1,500?
16 A. Correct.
17 Q. And did Cam give those to you?
18 A. Yes, he did.
19 Q. And when did he give those to you?
20 A. We decorated the second bar with them, and
21    so it was probably in '89, '90, '91 or
22    somewhere around there.
23 Q. Okay. Excellent condition?
24 A. They were used, but they weren't falling

Page 71

1     apart.
2  Q. Okay. Did you know how used they were,
3     meaning one game, ten games, two years?
4  A. Really doesn't make a difference when Cam
5     Neely is using them. His used gloves, they
6     could go for a heck of a lot more than that
7     but you know what I mean. It's used because
8     he used them in a game. As far as falling
9     apart, they weren't in that type of
10    condition. They were from game used
11    condition.
12 Q. The last thing is the 8-foot fiberglass
13    shark that you had mounted on the wall?
14 A. Yes.
15 Q. And that was appraised at $1,500?
16 A. That's what I paid for it.
17 Q. Okay. So Mr. Castinetti really doesn't have
18    any specialized expertise in appraising
19    fiberglass sharks, does he?
20 A. I don't know whether he does or not, but he
21    goes around the country and does all these
22    various, you know, shows, so I'm sure he's
23    aware of something like that. I mean
24    whether he does or not, that's what I paid

Page 72

1     for it. So whatever it's worth.
2  Q. I was really just being lighthearted about
3     it. But what I was getting at is all of
4     these other things, you're saying
5     Mr. Castinetti has an expertise in sports
6     memorabilia; correct?
7  A. Yes.
8  Q. He would have more of an understanding as to
9     the appraisal value of these various sports
10    memorabilia items; correct?
11 A. Yes.
12 Q. Did you ask him to include the fiberglass
13    shark with the amount that you paid for it?
14 A. Yes. Because we went over everything that
15    he saw on a daily basis or how often he
16    came.
17 Q. So that figure, the $1,500, was what you
18    paid for the shark?
19 A. Yes.
20 Q. And when did you get that?
21 A. It was in 1998, '97.
22 Q. Where did you get it?
23 A. I had it -- I caught the shark -- it was a
24    tag and release program, and the company was

Page 73

1     PSI I believe out of somewhere in Florida.
2     But they did a fiberglass replica based on
3     the size of the shark and everything else,
4     and they ship it up to you.
5  Q. Where did you have that in the bar?
6  A. It was up in Scuttlebutts on the top wall.
7     That was up about 10-foot high, so I don't
8     know if I have a picture of it. I may.
9  Q. In your supplemental document production
10    that we marked as Exhibit 25, there are a
11    number of photographs that you provided of
12    the bars; is that correct?
13 A. Yes.
14 Q. There are ten pages here. Let's just go
15    through these.
16    MS. FLORIO: Do you have additional
17    copies of this?
18    MR. CARNAHAN: No.
19 Q. Just looking at the first page, are both of
20    these pictures in the same bar?
21 A. No.
22 Q. Okay. The top picture on the first page of
23    the photographs in Exhibit 25, where was
24    that taken?

19  (Pages 70 to 73)

Page 74

1  A. That's at Scuttlebutts.
2  Q. That was the last bar?
3  A. Yes. There's a Michael Roozioni (Phonetic)
4     picture.
5        THE WITNESS: Do we have that one?
6        MR. CARNAHAN: No. I don't think so.
7  A. This is what I do when I look at these and
8     then I remember. That's Michael Roozioni,
9     and there's Andy Berkley. There was two
10    other ones. I'm sorry. When I see the
11    pictures, they just -- that was
12    Scuttlebutts.
13 Q. Okay.
14 A. And this was Cai's.
15 Q. The top one is Scuttlebutts, and the bottom
16    one is Cai's?
17 A. Yes.
18 Q. In general, in looking at the photographs
19    that are depicted in the top copy of the
20    photograph, there are a number of
21    photographs depicted; correct?
22 A. Yes.
23 Q. And then I can see that the photographs that
24    are depicted are secured on the wall and the

Page 75

1     wood frames of various sizes; is that right?
2  A. Right.
3  Q. And that what you're saying is how the
4     majority of --
5  A. Yes.
6  Q. Let me just finish. Is this how the
7     memorabilia was typically secured?
8  A. Yes.
9  Q. And what you have mentioned is that now that
10    you're looking at this first picture at
11    Scuttlebutts, you see there's a couple of
12    things that weren't included in your initial
13    appraisal; is that right?
14 A. Yes.
15 Q. And one of those things that you see offhand
16    right now --
17 A. Picture of Michael Roozioni playing in the
18    World Championships against Russia when they
19    won the gold medal.
20 Q. Is there something else you mentioned there?
21 A. Andy Berkley, the other Bruins picture.
22 Q. Then the bottom picture you said was at
23    Cai's?
24 A. Yes.

Page 76

1  Q. And there are various --
2  A. Hockey sticks.
3  Q. Right behind the gentleman in the middle of
4     the photograph, there's a number of hockey
5     sticks that are on the wall?
6  A. Yes.
7  Q. And is this a picture of a jersey here on
8     the left side?
9  A. Yes.
10 Q. Am I looking through an opening in the wall
11    there, and then is that where it's hanging?
12 A. That's Craig Janny's. That's behind the --
13    that is behind the bar.
14 Q. And that one is tacked on the wall?
15 A. Yes.
16 Q. The second page, where is the top photograph
17    taken?
18 A. Cai's.
19 Q. Okay. That was the middle bar?
20 A. Yes.
21 Q. And then in that photograph, there's the
22    large team Bruins team picture?
23 A. Yes.
24 Q. That's the one we already talked about,

Page 77

1     right?
2  A. Yes.
3  Q. Then we also have some of the amps in this
4     picture that you referred to on another
5     list?
6  A. No. That's --
7  Q. That's not included?
8  A. That's a karaoke player that came in and
9     provided his own equipment.
10 Q. That's not included?
11 A. Right.
12 Q. So this top photograph just depicts some of
13    the memorabilia on the wall?
14 A. Yes.
15 Q. This bottom picture, where's that one?
16 A. Scuttlebutts. That's Andy Moog's stick,
17    that's the other goalie's stick, and there's
18    Cam's gloves right there.
19 Q. And do you know when this was taken, this
20    bottom picture?
21 A. Could have been anytime from January -- I
22    mean '91 -- this is Scuttlebutts. This is
23    probably '97, '98, '99, 2001.
24 Q. Okay.

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 78

1  A.  Somewhere around there.  There's the band
2      Extreme over there.  There's Paul Geary,
3      that's the other one.
4  Q.  So any time between the mid '90s and when
5      Scuttlebutts closed this could have been
6      taken?
7  A.  That was taken when -- that was the night
8      that Scuttlebutts was open.
9  Q.  I'm saying the photograph could have been
10     taken any time between you said the mid '90s
11     up until the time Scuttlebutts closed?
12 A.  No.  I didn't say the mid '90s.  I said '98,
13     '97, '99, 2000, 2001.
14 Q.  So any time between 1997 and 2001?
15 A.  Correct.
16 Q.  The third page, what's depicted on the top?
17 A.  That's Cai's, and there's Celtics jerseys
18     too I forgot.  That's Cai's.  And that's
19     probably between 1990 and 1997.
20 Q.  And the bottom photograph?
21 A.  That was Cai's also.
22 Q.  What's the jerseys that we can see there?
23     What are those?
24 A.  It's either Lyndon Byers jersey or it's

Page 79

1      Craig Janny.  Doesn't show a number there.
2      We changed them around using the back of it,
3      the front of it sometimes, so I don't know
4      which one that is.
5  Q.  Okay.  The fourth page that has the Bass
6      sign in --
7  A.  That's Scuttlebutts.  There is the picture
8      of the platinum record by Extreme that they
9      gave me I listed on there.  That's listed on
10     there.  That's that one right there.
11     There's a Drew Bledsoe picture signed -- I'm
12     sorry.  That's him right there.  Every time
13     I look at the pictures, there's something
14     else on the wall that I neglected to bring
15     forward.  That's Drew's picture right there.
16     That was signed.
17 Q.  So when Scuttlebutts closed, you had taken
18     all this stuff off the wall and put it in
19     the pile to come pick up?
20 A.  Correct.
21 Q.  It was all off the wall and ready to be
22     picked up?
23 A.  Yes.
24 Q.  Okay.  And the bottom picture was Cai's,

Page 80

1      right?
2  A.  Yes.
3  Q.  And this is just showing some of the frame
4      memorabilia on the wall?
5  A.  Yes.
6  Q.  Are these tennis rackets anything of
7      significance or just decoration?
8  A.  Just decoration.  I never played tennis, and
9      I never knew anyone that played it so.
10 Q.  Not the kind of sports bar you were running?
11 A.  No.  Not at all.
12 Q.  The next picture it's someone with a child
13     there.  What is that?
14 A.  This is Cai's also.
15     THE WITNESS:  I apologize, Dean.
16 A.  That's a picture of -- I don't know what
17     it's worth, but that's a picture of all New
18     York Yankee memorabilia, shirts, hats, bats,
19     balls, gloves all put together in a big
20     collage and then pictures taken.  I have no
21     idea what that's worth.
22 Q.  Okay.  And this picture here, is that a real
23     parrot?
24 A.  That's Scuttles.  That's my parrot.  That's

Page 81

1      what the bar was based on.  That's taken at
2      Scuttlebutts.
3  Q.  Your parrot's name was Scuttlebutts?
4  A.  Scuttles.
5  Q.  Did the parrot make it?
6  A.  She was the first one in my car.
7  Q.  Good.  Is she still with us?
8  A.  Yes.  They live to be 75, 80 years old.  The
9      way she eats, she will probably live to be
10     120.
11 Q.  This picture we see, this one we already
12     talked about, right?
13 A.  Yes.
14 Q.  What is that one again?
15 A.  Mike Roozioni and --
16 Q.  That's right.  And the next page are two
17     women in red?
18 A.  Yes.
19 Q.  What is that?
20 A.  That's also at Cai's and -- excuse me.  I'm
21     missing here -- I don't know what's this
22     one, but that's not a player.  That was a
23     big one.  I don't know which one it was.  I
24     can't even read it.  These are both at

21 (Pages 78 to 81)

Page 82

1    Cai's.
2    Q. Okay. And the bottom picture shows that
3       team photograph that you see is signed,
4       right?
5    A. Yes.
6    Q. Okay. And the next page is at Scuttlebutts,
7       right?
8    A. Correct.
9    Q. And that shows that platinum record you were
10      talking about and some other memorabilia on
11      the wall?
12   A. Yes.
13   Q. The bottom photograph?
14   A. That's at Scuttlebutts also.
15   Q. You can't actually see any memorabilia
16      there. I guess you can see the platinum
17      record, right?
18   A. Yet.
19   Q. And this next page is a woman standing with
20      a picture.
21   A. Right.
22   Q. Who is that?
23   A. That's my mother, and this was a hand
24      painted picture a friend of mine that I grew

Page 83

1       up with gave to me. I don't know if I
2       included this. It's one of those things
3       that's irreplaceable. He took a bunch of
4       different players and put them in a collage.
5    Q. Is that something that he painted on the
6       wall or --
7    A. No. He did it on a regular foam piece of
8       paper.
9    Q. Okay.
10   A. Painted it and we put it up there.
11   Q. Where was this picture taken, top one?
12   A. That's at Scuttlebutts.
13   Q. The bottom one?
14   A. That's at Cai's.
15   Q. The next one shows what looks like an
16      office; is that right?
17   A. Right.
18   Q. And when was this taken?
19   A. This was down the end over there when they
20      ransacked the office. This was when the
21      landlords came in.
22   Q. So when you testified the last time that you
23      had pictures of the trashed facility, is
24      that what we are looking at here in these

Page 84

1       two photographs?
2    A. Well, these were all -- this one here they
3       had opened up all the drawers. It was paper
4       everywhere. I think they provided that.
5       And these were all tapes of all the Bruins
6       parties. This is my birthday party. This
7       is the Bruins breakup parties for seven
8       years. This was -- these are all government
9       parties and benefits we had. They were all
10      thrown out.
11   Q. Now, what I'm wondering is you had testified
12      last time that you had pictures of what, you
13      know, the people did when they trashed the
14      place, right?
15   A. Yes.
16   Q. Is this what you were referring to, these
17      two photographs?
18   A. This is one of them. There's a couple of
19      them, yes.
20   Q. These two are the pictures you were talking
21      about?
22   A. No. This isn't the one when it was trashed.
23      This one is one of them.
24   Q. Let me just clarify for the record. The top

Page 85

1       picture is a picture of your office?
2    A. Yes.
3    Q. That's in its normal condition; correct?
4    A. Correct.
5    Q. And then the bottom one shows that some
6       things were disturbed for lack of a better
7       way of saying it, right?
8    A. Right.
9    Q. Do you have any other pictures of the place
10      after people had gone through the stuff?
11   A. Yes.
12   Q. Why don't I have those yet?
13   A. Why?
14   Q. Right. Did you produce them to your
15      attorney?
16   A. I don't know if I did or not. To be
17      perfectly honest with you, that's when the
18      landlord come in there, and I was shocked
19      because he had a key and he went through all
20      my personal stuff and --
21   Q. I understand that must have been very
22      shocking but --
23   A. To say the least.
24   Q. But what I'm trying to get is where the

22  (Pages 82 to 85)

Page 86

1    pictures are so I can talk to you about
2    them.
3    A. If it's a picture of the thing being
4      trashed, what does that have to do with the
5      items that were taken?
6    Q. Unfortunately I get to ask the questions.
7    A. That's fine. But that's my question. I'm
8      concerned about the things that are
9      irreplaceable here, not my office was thrown
10     and ransacked.
11   Q. Do you have any additional pictures that you
12     haven't provided?
13   A. I think I have a couple.
14       MS. FLORIO: Can you agree to produce
15     those?
16       MR. CARNAHAN: If my client --
17       MS. FLORIO: If they exist.
18       MR. CARNAHAN: If they exist.
19   A. Yes. I have them. All it does is show
20     stuff thrown everywhere.
21   Q. That was something that was discussed at the
22     last deposition that we wanted, and I was
23     under the impression we had everything.
24   A. Well, if that's the case, that was my fault.

Page 87

1    But I don't see any relevance to that. That
2    has nothing to do with any of my stuff.
3    Q. That's for the attorneys to decide.
4    A. Yes. Well, whatever. I guess that's for
5      the jury to decide.
6    Q. This next picture, this is at Scuttlebutts.
7      It has the Bass sign and a sailboat picture?
8    A. Yes. That's a brass sailboat that I had at
9      my cottage up in Maine. Might as well
10     include that. It was gone.
11   Q. And then the last picture here, where's
12     that?
13   A. Scuttlebutts.
14   Q. Okay. And then you can see the memorabilia
15     on the wall in the back?
16   A. Yes.
17   Q. And then we have Exhibit 23 which is a
18     handwritten list of additional property that
19     was lost after Scuttlebutts closed; is that
20     right?
21   A. Yes.
22   Q. That's in your handwriting?
23   A. Yes, it is.
24   Q. The first item is a clothing chest that you

Page 88

1    just purchased?
2    A. Yes.
3    Q. And that figure there, $500 to $600, is that
4      what you paid for it?
5    A. Yes. It was an unfinished piece. You have
6      a picture right in there I just showed you
7      in the office if you want to look back on
8      it.
9    Q. This armoire here on the left?
10   A. Uh-huh.
11   Q. You have to say yes for the record.
12   A. Yes.
13   Q. What was that being used for?
14   A. My clothing, just personal items I used for
15     drawers.
16   Q. And do you have a receipt for that?
17   A. I don't know. I paid for it by check, and I
18     purchased it like I listed over here the
19     unfinished furniture store in Salem. I
20     don't know the name of the place.
21   Q. Okay. So do you know one way or the other
22     whether you have a receipt or canceled
23     check?
24   A. I don't know. That was probably included

Page 89

1    with my box of checks that I don't have.
2    They were listed at the top of the stairs
3    that I was planning on taking home with me.
4    Q. The second item the new mountain bike?
5    A. Correct.
6    Q. You had just purchased that in July of 2002?
7    A. Yes. 2001.
8    Q. I'm sorry. 2001.
9    A. Yes.
10   Q. Then I'm looking at the $200 you paid.
11   A. Yes.
12   Q. Is that right?
13   A. Yes.
14   Q. Where was that? Did you keep that in your
15     office?
16   A. Yes, I did.
17   Q. We were talking about the mountain bike.
18     Did you have that at the top of the stairs
19     with the rest of the items?
20   A. Yes, I did.
21   Q. And it was your personal mountain bike?
22   A. Yes, it was.
23   Q. What did you use that mountain bike for?
24   A. Working out every day.

23  (Pages 86 to 89)

Page 90

1    Q.  Going for bike rides?
2    A.  Yes.
3    Q.  The third item, it's a leather couch?
4    A.  Correct.
5    Q.  And you bought that in May of 2001 for $200?
6    A.  $600.
7    Q.  So is that a misprint?
8    A.  It's $600 is what I paid for it.  I bought
9        it in --
10   Q.  If you look at the --
11   A.  I understand that.  It was changed to $600
12       because it wasn't $200.  The whole is $600.
13   Q.  Let me clarify for the record.  I'm looking
14       at what I thought was the same list which we
15       marked as Exhibit 25B.
16   A.  Right.
17   Q.  And you're looking at Exhibit 23 which
18       appears to be the same list except on yours
19       the leather couch was changed from $200 to
20       $600; is that correct?
21   A.  That's correct.
22   Q.  You actually paid $600 for the leather
23       couch?
24   A.  It was a leather couch.  It was green, and

Page 91

1        it was purchased as half of a sectional
2        because we couldn't fit it in the office.
3        We purchased it up at the mall in Peabody,
4        furniture store behind there, the Liberty
5        Tree Mall.  There's an outlet store behind
6        there.
7    Q.  Was it new?
8    A.  Yes.
9    Q.  Okay.  And that was in the office?
10   A.  Yes, it was.
11   Q.  And then did you move that out to the top of
12       the stairs before --
13   A.  No.
14   Q.  That was still in the office when you left
15       that day?
16   A.  Yes.
17   Q.  And next you have a fax machine that you
18       purchased for $150 in March of 2001?
19   A.  Yes.
20   Q.  And then Collectable Liquors?
21   A.  Yes.
22   Q.  What's that about?
23   A.  Those are gifts from all the different
24       liquor companies from Collectable Liquors

Page 92

1        that were signed from dealers.  If you look
2        at the picture, you will see the little
3        shelf above my desk, it shows all the little
4        ceramic and wooden casings and cedar chest
5        and stuff like that.  There was maybe about
6        -- I don't know.  Maybe six or seven of
7        them.
8    Q.  Six or seven different bottles?
9    A.  Yes.
10   Q.  You don't know what those were worth?
11   A.  (Witness indicates.)
12   Q.  The next thing is an air conditioner
13       purchased in May 2001?
14   A.  Yes.
15   Q.  That you paid between $200 and $300 for
16       that?
17   A.  Yes.
18   Q.  Where did the air conditioning -- where was
19       that in the building?
20   A.  In the office because it was central air for
21       the entire building except in my office.
22   Q.  Was it a window air conditioner?
23   A.  Yes.
24   Q.  Was that still in the window when you left?

Page 93

1    A.  Yes.
2    Q.  The next thing is a safe you purchased in
3        the spring of 2001 for $150?
4    A.  I have 180 here.
5    Q.  I'm sorry.  I misspoke.  It's 180?
6    A.  Yes.
7    Q.  I apologize.
8    A.  Okay.
9    Q.  Was that still in the office?
10   A.  Yes.
11   Q.  Had you taken everything out of the safe
12       when you left?
13   A.  Yes, I did.
14   Q.  Then you have the platinum album set signed
15       by Extreme?
16   A.  Correct.
17   Q.  Do you have any idea what that is worth?
18   A.  That's a good question.  No, I don't.
19   Q.  When did you get that?
20   A.  It was given to me by the band in -- I don't
21       know if it was at Cai's or -- between '89,
22       '90 and '92 or somewhere around there.
23   Q.  Okay.
24   A.  '93.  May have been later.  I don't know.

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 94

```
1   Q.  And then we have the two awnings,
2       custom-made awnings, between $3,000 and
3       $4,000?
4   A.  Yes.
5   Q.  Were those outside?
6   A.  Yes, they were.
7   Q.  And when you came back to Scuttlebutts after
8       the day you closed, the awnings were gone?
9   A.  Everything was gone.
10  Q.  Including the awnings?
11  A.  They took the awnings down, correct.
12  Q.  And then you had assorted neon lights.  Are
13      those the lights that we saw on some of
14      those pictures on the wall?
15  A.  Yes.  I had three custom ones made with the
16      picture of the parrot, big 6-foot to 7-foot
17      custom neon lights that were taken.
18  Q.  Those particular lights weren't depicted in
19      the photographs --
20  A.  Well --
21  Q.  -- the ones you just mentioned, right?
22  A.  I don't know if you can see the smaller one
23      that was behind in the back wall.  I don't
24      know if -- you couldn't see the other ones.
```

Page 95

```
1       It was in the front window, and it was too
2       big.  But it was two or three of them.
3   Q.  Some were given as gifts, and some you
4       purchased?
5   A.  Yes.
6   Q.  What did you pay for the ones that you
7       purchased?
8   A.  You just kind of get them in auctions when
9       people close.  I had friends of mine that
10      their bars closed, and I purchased some of
11      those.  I purchased the -- what do they call
12      it?  The slush machine.  What was it called
13      there?  Island Oasis machine.
14  Q.  You're not sure of the value of the assorted
15      neon lights?
16  A.  Yes.
17  Q.  Then you have the leather swivel chair?
18  A.  Yes.
19  Q.  And you estimate the value was $100?
20  A.  It was somewhere in that vicinity, correct.
21  Q.  And where was that when you left the day you
22      closed?
23  A.  Right behind the desk.
24  Q.  Okay.  Still in the office?
```

Page 96

```
1   A.  Yes.
2   Q.  And then you have videos of the Bruins and
3       different functions, and we saw a picture of
4       those, right?
5   A.  Yes.
6   Q.  Those were all taken and thrown away or
7       somehow taken and not there when you came
8       back, right?
9   A.  Those were listed.  I told you there was a
10      big pile of all the important -- I mean you
11      just don't walk up to new bikes and sharks
12      and all this stuff and just consider it to
13      be trash when you clean out an apartment or
14      something so yes.
15  Q.  You came back and the videos were gone?
16  A.  No.  When I called her back to pick up all
17      my personal items that we couldn't fit from
18      the original trip, she says, oh, they threw
19      everything away, Steve.  That's all.  So
20      they were gone.
21  Q.  And you don't know what the value of those
22      videos would be, right?
23  A.  No.  But most of these, the value is that
24      they are irreplaceable.  These are things
```

Page 97

```
1       that I spent 25 years accumulating, and now
2       I don't have any of them.  That's what the
3       problem is on these.
4   Q.  Then you have a parrot stand for $200?
5   A.  Yes.  I think I have a check.  There was a
6       check I think I have.  I paid for that.
7   Q.  You think you have a canceled check for that
8       one?
9   A.  Yes.
10  Q.  Do you have any receipts for any of the
11      other items other than the parrot stand one
12      you just mentioned?
13  A.  No.  Because the checks I have --
14  Q.  It's just yes or no.
15  A.  I don't know.  They could have been thrown
16      out, could have been part of that other
17      business.  No.  I don't think so.
18  Q.  So is the answer to my question, you don't
19      think you have any other receipts?
20  A.  I don't think -- I don't know for sure.
21  Q.  Okay.  Now, we have now gone over Exhibit
22      25B and 23, right?
23  A.  Correct.
24  Q.  Then we have Exhibit 24, and this is another
```

25  (Pages 94 to 97)

# Exhibit 3B

Page 98

1    list that was provided, right?
2  A. Yes.
3  Q. And now we have already talked about the
4    shark, right?
5  A. Yes.
6  Q. That's included on another list?
7  A. Yes.
8  Q. We already talked about the Extreme picture,
9    right, the platinum CD?
10  A. Correct.
11  Q. That's on another list?
12  A. Yes.
13  Q. The bike is on another list, right?
14  A. Yes.
15  Q. Collectable Liquors we have gone over,
16    right?
17  A. Yes.
18  Q. The new armoire we went over, right?
19  A. Yes.
20  Q. And the Denis Leary picture was on another
21    list?
22  A. Yes.
23  Q. Robert Urich was on another list?
24  A. Yes.

Page 99

1  Q. Sylvester Stallone was on another list?
2  A. Yes.
3  Q. This 3 by 2 picture of the Bruins was on
4    another list?
5  A. Yes.
6  Q. This Island Oasis machine, this was
7    something new, right?
8  A. Yes.
9  Q. And you said you got that at auction for
10    about $3,000?
11  A. No. I bought it from a friend of mine that
12    closed his bar.
13  Q. You paid $3,000 for it?
14  A. Yes.
15  Q. When did you get that?
16  A. Probably in '88, '89.
17  Q. Was it still in working condition?
18  A. Yes. It's $6,000, $8,000 new.
19  Q. Okay. And in '88 or '89 you paid $3,000 for
20    it?
21  A. Yes.
22  Q. The next item is the leather couch which we
23    talked about already; correct?
24  A. Yes.

Page 100

1  Q. The air conditioner which was on the other
2    list?
3  A. Yes.
4  Q. The awning which was on the other list?
5  A. Yes.
6  Q. And then the last thing, the boxes of
7    various sports pictures, that's something
8    different, right?
9  A. Yes.
10  Q. Or is that the one on Castinetti --
11  A. No. Those are all various poses of
12    different players and things that were just
13    given to me and signed and all put in a box.
14    Some were on the wall as you can see them.
15  Q. Is this something different from what you
16    had Castinetti go over?
17  A. Yes.
18  Q. And you're obviously unable to put a value
19    on that, right?
20  A. Correct.
21  Q. So just to recap, Exhibit 24, we have gone
22    over this and then the other two previous
23    documents, and the new items on Exhibit 24
24    include the Island Oasis machine and the

Page 101

1    various boxes of sports pictures; is that
2    correct?
3  A. Correct.
4  Q. We have these other three items up top that
5    were circled, but we went over that they
6    were on Exhibit 23, right?
7  A. Yes.
8  Q. Okay. I believe the last item I have to go
9    over with respect to the property damage is
10    this typewritten document which has on top
11    of it typed Exhibit A. And for the purposes
12    of this deposition, we have marked it as
13    Exhibit 25A; is that correct?
14  A. Yes.
15  Q. And on the top of this, it has a fax line
16    that says "Riemer & Braunstein." Do you see
17    that?
18  A. Yes.
19  Q. Was that the trustee?
20  A. Yes. Bankruptcy trustee.
21  Q. Someone from that law firm?
22  A. Yes.
23  Q. Do you know who the trustee was?
24  A. Jonathan Yellin.

Page 102

1  Q. How do you spell that?
2  A. Last name Y-E-L-L-E-N I believe.
3       MR. CARNAHAN: I think it's I-N.
4  Q. Did you have an attorney represent you in
5     the bankruptcy?
6  A. Yes, I did.
7  Q. Who was that?
8  A. Carol Bankowski.
9  Q. Is that a man or woman?
10 A. She's a woman.
11 Q. And was she with a firm?
12 A. Yes. She was with Deutsch Williams.
13 Q. And that was your attorney?
14 A. Yes. For the corporation.
15 Q. Okay. And the bankruptcy trustee prepared
16    what we have marked as Exhibit 25A, right?
17 A. Correct.
18 Q. Did you assist the trustee in preparing this
19    document?
20 A. No. I wasn't there.
21 Q. Do you know where the trustee got the
22    information to include on this document?
23 A. Yes. He went in and he took a list of
24    everything in inventory of everything that

Page 103

1     was there.
2  Q. Okay.
3  A. Precisely what the bank should have done
4     before they said they threw everything away.
5  Q. So this list of items was made before
6     Scuttlebutts closed; is that correct?
7  A. Not at all, no.
8  Q. Okay. When was the list made as you
9     understand it?
10 A. When the bankruptcy trustee was notified
11    that the judge changed it from 11 to a
12    Chapter 7, we were evicted from the premises
13    because of a violation of the lease; so
14    therefore, we had to vacate the premises.
15    At that point, Jonathan Yellin who was the
16    trustee, he was in charge of securing the
17    facility which he contacted Harbor Realty.
18    He was also in charge of taking inventory of
19    everything that was listed there for the
20    bankruptcy purposes of reselling that under
21    the corporation bankruptcy obligations.
22 Q. Okay. So as I understand it, the trustee
23    came in to take a list of all of the
24    business property for the purpose of selling

Page 104

1     it as part of the bankruptcy?
2  A. Correct.
3  Q. So what he listed here was supposed to be
4     the inclusive list of all of the business
5     property?
6  A. Correct.
7  Q. But this list does not include some of the
8     sports memorabilia and other items; is that
9     correct?
10 A. I don't believe so.
11 Q. Now, is that because the sports memorabilia
12    was your personal property and not the
13    business property?
14 A. That was my -- that was all my personal
15    property. But they were all -- everything
16    was taken down from the ceilings and walls.
17    I mean I wasn't going to -- I wasn't going
18    to give these people, you know, my personal
19    items that I had there over a 20-year period
20    so I don't know why they did it. But they
21    were all taken down off the walls.
22 Q. But it wasn't included in the inventory of
23    the business property by the trustee?
24 A. No. I don't know why he did it or when or

Page 105

1     what the reason was.
2  Q. Well, is it because the other items were
3     your personal property as opposed to
4     property of Scuttlebutts?
5  A. I have no idea. Like I said, I was locked
6     out.
7  Q. So you weren't present when he did this
8     list?
9  A. No. I just said that.
10 Q. Okay. What happened with the items listed
11    on Exhibit 25A?
12 A. He gave me an opportunity to buy back these
13    for $5,500 which I did. And as I look at
14    these, there were color TVs that I think I
15    mentioned to you and I forgot about it and
16    stereo equipment, but this was all the
17    equipment that I bought back for $5,500.
18    And he took $5,500 and placed it in the
19    corporation asset.
20 Q. Okay. So you bought back these items, and
21    these are the items that you then took over
22    to the Blue Parrot?
23 A. Yes.
24 Q. And ultimately, the business with the Blue

27 (Pages 102 to 105)

Page 106

1    Parrot didn't work out, and he ended up with
2    all of these items that you had bought back?
3 A. He ended up selling these at an auction that
4    we saw in the newspaper.
5 Q. Okay.
6 A. So that's how we found out about that.
7 Q. Okay. So the items listed in Exhibit A, you
8    physically removed from Scuttlebutts and
9    took them over to the Blue Parrot?
10 A. We put them in trucks and sent them to
11    various locations. We put them into
12    storage, and we put them in different
13    locations. There was a lot of items here.
14    There was three truckloads full of stuff.
15 Q. I am trying to clarify. These items weren't
16    part of the property that was lost or
17    destroyed after you left Scuttlebutts on the
18    day it closed?
19 A. No. Some of this stuff was left up top. In
20    other words, we didn't take TVs and stereo
21    equipment and put them in an outdoor --
22 Q. You have to understand I wasn't there so
23    that's what I'm asking.
24 A. I know that. But you asked the question

Page 107

1    saying that everything was sent over when it
2    wasn't.
3 Q. That's what I thought you just told me, that
4    you purchased back these items, and you took
5    them in various trucks to different spots?
6 A. Right.
7 Q. Let me ask you, did you remove all of the
8    items in Exhibit 25A from the premises and
9    take them to different places, or were some
10    of these left on the top of the stairs with
11    the other items?
12 A. Again, some of them were left at the top of
13    the stairs.
14 Q. Which items?
15 A. The TV.
16 Q. Well, let's go one by one. You said there
17    are two color TVs.
18 A. No. I think there was about six of them.
19 Q. This says two color TVs, and then you have
20    one Sony wide-screen TV.
21 A. There was a big screen TV, and there was six
22    and -- 32, 36-inch TVs in the facility.
23    Now, I don't remember where -- I mean we
24    were bringing them over to people's houses.

Page 108

1    We brought some to the Parrot. You want me
2    to give you a list of what was left?
3 Q. I just want you to answer my question but I
4    haven't asked when yet.
5 A. Okay.
6 Q. According to that list, there were two color
7    TVs and one wide-screen TV that were on the
8    premises at the time the inventory was
9    taken; is that right?
10 A. Correct.
11 Q. And you're saying that the inventory is
12    incomplete, and there were actually
13    additional TVs that were on the premises?
14 A. No. What I'm saying is I don't know when he
15    come in here to take this. I know that my
16    personal property, which was my personal
17    property, my attorney called me and said,
18    Jonathan Yellin said take your personal
19    property or what you can, start getting it
20    off the walls and getting ready. And they
21    will give you a time. Harbor Realty will
22    contact you to take it out. What I did was
23    not to leave my personal TVs that I had
24    bought five, six, seven years ago and all my

Page 109

1    personal things and leave it just out in the
2    open, and so we took what we could. I kept
3    the remainder of these things because there
4    was no room to put them at the top of the
5    stairs.
6 Q. So all I'm trying to get a sense of is from
7    this list that you have in front of you that
8    we have marked as Exhibit 25A, which of
9    those items were lost as a part of the
10    closing of Scuttlebutts and which you claim
11    is a part of your property damage claim.
12 A. That's what I'm looking over right now. I
13    know there was TVs, and I know there was
14    stereo equipment. I'm not done looking at
15    it.
16 Q. But just according to the list --
17 A. That's what I'm looking at now is the list.
18 Q. Okay.
19 A. Color TVs, the wide-screen, fax machine, the
20    safe was still there. That looks like it.
21 Q. So the rest of the items on that inventory
22    you were able to remove from the premises?
23 A. Yes.
24 Q. In addition to the other items on the

28 (Pages 106 to 109)

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  different lists we have gone over, you also
2  lost some color TVs, the wide-screen TV and
3  we already went over the fax and the safe?
4  A. Yes.
5  Q. How many TVs?
6  A. We had the Sony TV, which I bought up there
7  in Salem along with three other TVs, 33-inch
8  to 32-inch to 36-inch TV. We had one, two,
9  three, four, five, six TVs hanging from
10  supported shelving.
11  Q. Let me just stop you real quick just to
12  recap. You have the Sony wide-screen that
13  was still left?
14  A. Right.
15  Q. And then you had did you say six additional
16  TVs?
17  A. Correct.
18  Q. And those were all mounted?
19  A. Yes.
20  Q. Were they still mounted when you closed?
21  A. We took the TVs off the stands. They were
22  hanging by the long rods, you know, into the
23  ceiling, yes. We took the TVs off of those.
24  Q. You put them with the rest of the stuff?

**Page 111**

1  A. Correct.
2  Q. There was six TVs sitting there with all of
3  this other stuff?
4  A. There could have been five or four. I don't
5  know what we did. We tried to place as many
6  things as we could in people's cars or
7  trucks. We put them in like three different
8  locations. You know what I mean? I don't
9  -- there may not have been six TVs. I know
10  we didn't fit the Sony big screen because
11  that was clearly right at the top on the
12  stage. I know there was at least three TVs,
13  maybe four. And I don't know where the
14  other ones went.
15  Q. So as I understand it, at the time of the
16  judge's ruling in the bankruptcy court, you
17  received a call from -- was it your attorney
18  that told you of the ruling?
19  A. Correct.
20  Q. And then did your attorney tell you to go
21  remove the property from the premises?
22  A. No. He just said, start taking down your
23  personal items, getting the things off the
24  wall.

**Page 112**

1  Q. You say "he," but your attorney was a woman.
2  So who are you referring to?
3  A. No. That wasn't a woman that I'm talking
4  about. She was the bankruptcy attorney for
5  the corporation. My attorney at the time
6  was Kelley Landolphi that represented me in
7  Scuttlebutts during this lease procedure.
8  Q. Who did Carol Bankowski represent?
9  A. The corporation during bankruptcy.
10  Q. The corporation meaning Jenna's Pub, Inc.?
11  A. Correct.
12  Q. And so it was Kelley Landolphi that called
13  you and said that the judge had changed it
14  from Chapter 11 to Chapter 7 and that the
15  sheriffs were coming to close the place
16  down?
17  A. Yes. He says, you know, they are going to
18  be there shortly, and so you might as well
19  start taking things down off the wall.
20  Q. Okay. Did he tell you that you were
21  supposed to remove your property from the
22  premises?
23  A. No. He just said your personal items --
24  you're allowed to take your personal items

**Page 113**

1  and that Harbor Realty would be in contact
2  with me.
3  Q. What did you understand that to be, your
4  personal items?
5  A. My personal items?
6  Q. Yes.
7  A. There's four sheets of paper of my personal
8  items that we just went over. Those are the
9  ones I'm talking about.
10  Q. So when he told you to remove your personal
11  items, you understood that to be all of the
12  various items that we have already gone over
13  today including all of the sports
14  memorabilia?
15  A. Yes.
16  Q. Okay. And there was some additional
17  personal items of yours that you were able
18  to remove from the property?
19  A. Correct.
20  Q. You took what you could fit?
21  A. Yes.
22  Q. And then when the sheriffs came, you didn't
23  have any additional time to remove any of
24  the other personal property?

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 114

1   A. Harbor Realty showed up along with the
2    sheriffs, and Harbor Realty was assigned by
3    the bankruptcy court, Jonathan Yellin, and
4    they were the keeper of the property so they
5    were called keeper -- I guess it's the
6    keeper.
7   Q. Okay.
8   A. And she said to me, I will call you, and you
9    get a bunch of friends together and get all
10   the stuff out of here. And that's when we
11   set up a time where she showed up with a
12   police detail, and we removed as much as we
13   could.
14  Q. Okay. Was it ultimately determined that you
15   were not able to declare bankruptcy in this
16   case? Do you understand my question?
17  A. No.
18  Q. Did the business ultimately close because of
19   the bankruptcy proceeding?
20  A. Yes. That's exactly the reason.
21  Q. And so the corporation dissolved
22   involuntarily; is that right?
23  A. No. The question was asked the last time I
24   was here. And what was his name? I'm

Page 115

1    sorry.
2   Q. Mr. Chapman.
3   A. Mr. Chapman asked a question whether we
4    weren't doing as well business wise and
5    that's why we had to close, and I said that
6    was quite the contrary. We did a phenomenal
7    business. The reason we had to file for
8    bankruptcy was based on the landlord
9    attempting to consistently over a three,
10   four-year period trying to break the lease
11   because he owned a small little bar on the
12   South Shore and tried to take this over
13   because he saw the lines and everything that
14   went along with it. To make a long story
15   short, there was a problem with the water,
16   water bill. It went exorbitantly high, and
17   it should have been reduced drastically by
18   at least 50 percent when we changed the
19   hours of operation from 11:00 in the morning
20   to 6:00 at night, and so there was a water
21   consumption drop considerably. I wrote a
22   check for $4,500. Kelley Landolphi who was
23   representing the corporation at the time
24   neglected to get back to the landlords

Page 116

1    demanding that we make a payment and then
2    work it out later on. As a result -- I'm
3    almost done. As a result, they went to
4    court and told the judge that we neglected
5    to pay the water bill, and that's why we
6    were recommended to file for bankruptcy. It
7    wasn't because of the inadequate business.
8   Q. So after the judge made the ruling which
9    changed it from Chapter 11 to Chapter 7,
10   what happened after that with respect to the
11   bankruptcy proceeding?
12  A. Meaning?
13  Q. What was the next thing that happened with
14   respect to the court proceeding? Did
15   anything else happen? Was it over? What
16   was the status after that?
17  A. That was it. The landlord went to the court
18   and told him that I had bounced checks which
19   I didn't. I paid them money orders every
20   single month. I was never late. He said I
21   owed him three months, and I never did. I
22   had payments right up to date on it. This
23   was his way of breaking the lease. So I
24   wasn't there. Kelley Landolphi, as it

Page 117

1    turned out, was malpracticed in a number of
2    different occasions here, and that was the
3    problem. We just didn't -- there was
4    nothing else to do. Proceedings were
5    followed the way they were dictated to us.
6   Q. Was it the bankruptcy court judge that
7    determined that the lease was broken?
8   A. No. It was the superior court judge in
9    Salem.
10  Q. Okay. So was it as a result of the superior
11   court judge's ruling in Salem that the
12   business closed?
13  A. The lease was broken and was --
14  Q. Right.
15  A. Now, the jurisdiction between superior court
16   judge in Salem didn't have the authority to
17   overrule the bankruptcy, and that is what we
18   are going to be following up on shortly. In
19   other words, he didn't have the right to
20   break the lease on that.
21  Q. Because you were in bankruptcy?
22  A. That's correct.
23  Q. So you said you're going to be following up
24    on that?

30 (Pages 114 to 117)

Page 118

1   A. Absolutely.
2   Q. So what do you mean by that?
3   A. Well, I will file suit against the landlord
4      No. 1, against the -- whether it's the judge
5      or whoever made that decision. I mean I
6      have a document from Kelley Landolphi
7      stating that, that it was an erroneous
8      error. She had no right doing that, and it
9      superseded whatever the jurisdiction was.
10     It was the superior court superseding the
11     bankruptcy or the bankruptcy superseding the
12     jurisdiction of the Superior. Which one or
13     the other couldn't do it.
14  Q. So is it my understanding based on what you
15     have told me that the corporation filed for
16     bankruptcy to protect itself from the
17     superior court action that was pending with
18     respect to Harbor Realty?
19  A. Correct. No. Not Harbor Realty.
20  Q. The landlord?
21  A. Correct.
22  Q. Who was the landlord?
23  A. Salem Lafayette, LLC.
24  Q. So it was your attorney's advice to you that

Page 119

1      if you had a pending action in the
2      bankruptcy court, the superior court would
3      be unable to take any action to break the
4      lease with the landlord?
5   A. Correct.
6   Q. But ultimately, what happened was the
7      superior court judge did rule against you?
8   A. Right.
9   Q. And what happened after the superior court
10     judge made that ruling that the lease was
11     broken? What happened after that that
12     brought the bankruptcy court back involved
13     with the closing?
14  A. I was served, and the landlord gave us a
15     notice to quit to vacate the premises.
16     That's with the superior court judge.
17  Q. And is that when the sheriffs then came?
18  A. Yes.
19  Q. So the series of events with respect to the
20     closing of the property and the sheriff
21     coming down and having you leave was as a
22     result of the superior court's ruling with
23     respect to the lease being declared broken?
24  A. Yes.

Page 120

1   Q. Simultaneously with that because there was a
2      pending bankruptcy action, the trustee came
3      down to take an inventory of the property
4      since you had to vacate the premises?
5   A. Correct.
6   Q. And then the only part I'm confused about at
7      this point is the impact of the judge
8      changing it from a Chapter 11 to a Chapter 7
9      proceeding and how that impacted the closing
10     of the business.
11  A. The landlord went to the bankruptcy judge
12     and said that I had not paid the last two
13     months rent and I had bounced two checks on
14     him. I never bounced ever a check on this
15     guy, ever. And he told the judge that I
16     neglected to pay the water bill, and he said
17     that I neglected to pay the meals tax which
18     was incorrect also because we paid it every
19     two months. I had it submitted from -- the
20     bookkeeper had it submitted to me. I signed
21     it and sent it over to the accountant. The
22     accountant and CPA filled out the proper
23     forms and then submitted it, and then we
24     wrote the checks.

Page 121

1   Q. Okay.
2   A. Some people don't pay their taxes for a
3      year. It takes that long to calculate some
4      of the big businesses. This was a two-month
5      --
6   Q. Who was your accountant?
7   A. Joe Mavilio.
8   Q. Joe?
9   A. Joseph Mavilio, M-A-V-I-L-I-O.
10  Q. Where was he out of?
11  A. He's out of Wakefield.
12  Q. Is he still there?
13  A. Yes, he is.
14  Q. Okay. And was he your accountant for
15     Scuttlebutts?
16  A. Yes.
17  Q. So did your landlord intervene somehow in
18     the bankruptcy action?
19  A. (Witness indicates).
20  Q. Is that yes?
21  A. Yes. They also -- he also by intervening --
22     what he did is he also put in a fraudulent
23     claim for back rent which never included,
24     and so I mean this was what they were doing.

31 (Pages 118 to 121)

Page 122

1  Q. What was the time period that the judge
2      changed it from a Chapter 11 to a Chapter 7
3      bankruptcy?
4  A. A few weeks.
5  Q. Now, about when was it?
6  A. I have no idea. It was after the place
7      closed probably first of September or
8      somewhere around there. And this was -- I
9      don't know. It was the end of -- it was the
10     end of August sometime. I don't know
11     exactly when and what dates but --
12 Q. Let's just go over the time line briefly.
13     When approximately was it when Scuttlebutts
14     first declared bankruptcy or filed for
15     bankruptcy?
16 A. April of 2001.
17 Q. Okay. And do you know when the landlord
18     filed suit against you in superior court?
19 A. Somewhere in 2001.
20 Q. Before or after the bankruptcy?
21 A. Before.
22 Q. And that's when your attorney advised you to
23     file for bankruptcy?
24 A. Correct.

Page 123

1  Q. Okay. And you filed for Chapter 11
2      bankruptcy?
3  A. Yes.
4  Q. And then it was in August of 2001 that the
5      superior court declared that the lease was
6      broken and that you were to vacate the
7      premises?
8  A. Yes. Somewhere around there.
9  Q. And it was sometime in August of 2001 that
10     you were issued a notice to quit?
11 A. I don't know exactly what the date was
12     whether it was August or September. It was
13     somewhere in that vicinity.
14 Q. And as a result of receiving that notice to
15     quit, that's when you packed up what you
16     could and vacated the premises?
17 A. Right.
18 Q. And then sometime subsequent to that,
19     sometime after that, the judge in the
20     bankruptcy court changed this from a Chapter
21     11 bankruptcy to a Chapter 7 bankruptcy?
22 A. No.
23 Q. When did that happen?
24 A. We wouldn't have had to vacate the premises

Page 124

1      if it stayed in 11. The only time when you
2      have to vacate the property is when they
3      change it from 11 to 7. When he did that --
4      and I don't know the date -- that's when we
5      were forced to vacate the premises. Cease
6      and desist is the way they put it in
7      writing.
8  Q. So after the superior court judge's ruling
9      that the lease was broken, you didn't
10     immediately have to vacate the premises
11     because at that point in time, you were
12     still in Chapter 11 bankruptcy?
13 A. He filed for bankruptcy to offset that legal
14     decision, right.
15 Q. So the lease was declared broken, but you
16     didn't yet have to leave because it was in
17     Chapter 11 bankruptcy; correct?
18 A. I don't know exactly how it was -- how the
19     procedure went, but that's what it was.
20     Once it came down that we were supposed to
21     vacate the premises --
22 Q. Who did that come down from?
23 A. By superior court judge in Salem. At that
24     point, the attorney said, we will file for

Page 125

1      bankruptcy until we work this out, and
2      that's what we did.
3  Q. So it was after the lease was declared
4      broken that you filed for bankruptcy?
5  A. Right.
6  Q. And then it wasn't until it was changed from
7      Chapter 11 to Chapter 7 that you had to
8      actually vacate the premises?
9  A. Correct.
10 Q. Changing gears here, you sent a letter to
11     the division of insurance with respect to
12     your dealings with Medallion Insurance; is
13     that right?
14 A. Yes.
15     MS. FLORIO: I'm going to have this
16     marked as the next exhibit.
17     (Exhibit No. 26, Package of
18     Information, so marked.)
19 Q. Exhibit 26 is a package of information that
20     appears to be what you filed with the
21     division of insurance.
22 A. Right.
23 Q. Is that right?
24 A. Yes, it is.

32  (Pages 122 to 125)

Page 126

1  Q. You sent them a package of information with
2     documents to support your claim?
3  A. Yes.
4  Q. And then you had a handwritten --
5  A. Pretty long.
6  Q. -- five-page letter, right?
7  A. Right.
8  Q. Okay. And the letter outlines your various
9     concerns with respect to Medallion; is that
10    right?
11 A. Yes.
12 Q. And then the beginning of the letter starts
13    outlining the series of events with respect
14    to your personal property; is that right?
15 A. Yes.
16 Q. And it says you had removed everything but
17    your personal property to a warehouse?
18 A. Right.
19 Q. And it was the personal property that you
20    left and were going to go back and get,
21    right?
22 A. Yes.
23 Q. The first issue is the personal property,
24    and the second issue was disability income.

Page 127

1     Do you see that?
2  A. Yes.
3  Q. And you said that you purchased the policy
4     it was for $1,500 a week?
5  A. Correct.
6  Q. And according to this, you were told that
7     you didn't have a disability policy; is that
8     right?
9  A. He told me I didn't have one, right.
10 Q. Okay.
11 A. He said I didn't have anything. That's
12    basically what he said.
13 Q. The third thing listed here is the claim
14    that was against Cai's case, and it says
15    while moving to a new location and
16    divorcing, you never got notice from your
17    attorney on the attachment to your property,
18    right?
19 A. Correct. They neglected to let me know what
20    the procedure was. I -- obviously my wife
21    held onto all the certified mail as to what
22    steps they were taking. But in addition to
23    that, and more importantly, Medallion had
24    heard -- was working hand in hand obviously

Page 128

1     with the insurance company, and they
2     neglected to contact me. And he had my cell
3     phone, came to the house and came to the
4     bar, and I never heard anything from him.
5  Q. And from what I understand, you received one
6     or maybe two letters from Joseph Cuttichia's
7     attorney back in 1998, right?
8  A. Yes.
9  Q. And it was that first letter that you
10    testified to that you gave to John
11    D'Addario?
12 A. Yes.
13 Q. It's come to my attention from your attorney
14    that you don't have a copy of the letter you
15    gave to D'Addario?
16 A. No. Whatever I got a claim over the 15
17    years, I would call up Jack, come on down,
18    and I hand it to him.
19 Q. So the answer to my question is you don't
20    have a copy of the letter?
21 A. Correct.
22 Q. What I said is correct, right?
23 A. Correct.
24 Q. And aside from that initial letter that you

Page 129

1     claim you gave to D'Addario, you didn't
2     receive these other notices of the lawsuit
3     and the filing of the claims because they
4     were going to your wife?
5  A. Correct. I received one letter of another
6     intention. You know, it was another step up
7     as opposed to the initial injury supposedly,
8     and I laughed it off because I was there
9     every day, and it didn't happen. So I
10    didn't receive anything from the police
11    department, and so I know it didn't happen.
12    The liquor board didn't contact me which
13    they normally do, and so I know that was the
14    third verification that it didn't happen.
15    When I got the letter again, and I don't
16    know if he changed attorneys, I said, Jack,
17    you're supposed to take care of this, take
18    care of it. It was all right, all right,
19    all right. And this was the whole
20    procedure. He just kept blowing everything
21    off constantly and constantly.
22 Q. Aside from the initial letters, you didn't
23    receive the other documentation regarding
24    the claim?

33 (Pages 126 to 129)

Page 130

1  A. No. No.
2  Q. And your wife had that, right?
3  A. She had all the correspondence, right.
4  Q. As part of what you produced to the
5     insurance company, this is the same letter
6     we were talking about before?
7  A. That's the one.
8  Q. You will see it's the same letter we marked,
9     right?
10 A. That's the one I was looking for, correct.
11 Q. So let me just finish. The other one we
12    marked had "file" on it because it was the
13    file copy. But you see this is the one you
14    received because it has the letterhead on it
15    and it's signed?
16 A. Correct.
17 Q. Now, is this your handwriting on this page?
18 A. Yes.
19        MS. FLORIO: And why don't we mark
20    this so we can talk about it more clearly.
21        (Exhibit No. 26A, Document, so
22        marked.)
23 Q. We marked this as Exhibit 26A, and this is
24    part of the documents that you submitted to

Page 131

1     the division of insurance?
2  A. Yes.
3  Q. And this is Chapter 11 monthly operating
4     report. Do you see that?
5  A. Yes.
6  Q. Is this your handwriting?
7  A. Yes, it is.
8  Q. And we required as part of the Chapter 11
9     bankruptcy to submit these monthly operating
10    reports?
11 A. Yes.
12 Q. And you had to provide documentation of your
13    insurance?
14 A. Correct.
15 Q. Okay. And you filled out this form to
16    indicate that you had insurance through --
17    well, you had what is it, the standard
18    insurance? Is that like the Standard
19    Financing Company?
20 A. Yes, it is.
21 Q. And that was the financing agreement number
22    here 343095?
23 A. Correct.
24 Q. And then it lists the liability policy that

Page 132

1     you had?
2  A. Yes.
3  Q. Policy No. LGL012603?
4  A. Yes.
5  Q. And the worker's compensation policy that
6     you had, Policy No. WC60291018?
7  A. Yes.
8  Q. And other, was this the liquor liability
9     policy? I think we referred to that policy
10    number before.
11 A. I don't know if that is or not. That says
12    GHL. Liquor liability is listed on the
13    other breakdown sheets as LLL, liquor
14    liability policy. So it would be LLP.
15 Q. Let me just show this to you so we can just
16    confirm it.
17 A. Okay.
18 Q. On these three cover letters we went over,
19    we had the general liability policy, the
20    worker's compensation and the other general
21    liability policy which was for the liquor
22    liability, right?
23 A. No -- no. This doesn't say this. This
24    would -- general liability would include all

Page 133

1     the different -- you know, the other sheet
2     of paper you had with all the different
3     variation of the subtitles.
4  Q. Let me pull it up for you.
5  A. Dram shop which includes falling down, a
6     fight in the bar or employees, patrons.
7  Q. Okay.
8  A. All that stuff.
9  Q. Okay. As part of Exhibit 2, let me just
10    show you, this is the declaration page for
11    policy GHL01324, right?
12 A. Right.
13 Q. That's the policy you reference on Exhibit
14    26A?
15 A. Yes.
16 Q. And you will see here that's for the liquor
17    liability policy, right? That's the only
18    premium listed here on this cover page?
19 A. Yes. But this would say liquor liability
20    LLC. This shouldn't say G. This is under
21    general. How could that be --
22 Q. But you do agree --
23 A. Right. This is the master liability so
24    that's what I mean.

34  (Pages 130 to 133)

Page 134

1  Q. Hold on.
2  A. That's $4,000.
3  Q. Hold on one second. We already got the
4     general liability. And just looking at the
5     policy number here, this is also the same
6     company Lloyd's of London?
7  A. Correct.
8  Q. It has your liquor liability coverage with
9     the $4,000 premium?
10 A. Right.
11 Q. And it has Policy No. GHL01346 at the top?
12 A. Yes. All right.
13 Q. Okay.
14 A. The other one is a liability.
15    MR. CARNAHAN: 346 did you say?
16    MS. FLORIO: I'm sorry. It's 342.
17    Thanks, Dan.
18 A. That's the other variation of liability.
19 Q. So you got the liability, the worker's comp
20    and liquor liability?
21 A. Yes.
22 Q. That's what you listed on the report to the
23    bankruptcy court, right?
24 A. Right.

Page 135

1  Q. When you submitted your claim to or your
2     complaint rather to the division of
3     insurance, you stated you wanted to be
4     reimbursed for three things, your claim
5     against you by Joe Cuttichia to the claim
6     for items stolen under jurisdiction, and
7     responsibility of the keeper of 53 Lafayette
8     Street in Salem?
9  A. Yes.
10 Q. And 3, your claim for disability income that
11    you purchased and paid for from Medallion
12    Insurance?
13 A. Correct.
14 Q. What happened after you submitted this claim
15    to the division of insurance?
16 A. I spoke with him and I followed up, and he
17    called me back and said that -- oh, no. He
18    sent me a letter. And included, he said he
19    spoke with Medallion and that the only form
20    of insurance that I had was canceled. And a
21    piece of paper that he sent me was with
22    Medallion sent and circled cancellation as
23    of November 2001 which was ridiculous
24    because we were closed, and he knew that the

Page 136

1     first of September.
2  Q. Okay.
3  A. So that was like a quick way for them to get
4     out of it and say he had no insurance and
5     look, it was canceled. Of course we were
6     canceled. We were closed for three months.
7     That's the type of business he did and they
8     did for that matter. He recommended to me
9     to get an attorney and that they couldn't
10    handle that.
11 Q. Okay. So in response, you wrote this
12    follow-up letter; is that right?
13 A. Yes.
14    (Exhibit No. 27, Two-Page Letter, so
15    marked.)
16    (Exhibit No. 28, Two-Page Document,
17    so marked.)
18 Q. Showing you Exhibit 28 and Exhibit 27, here
19    you're referencing the response received
20    from John D'Addario, and that's the response
21    that I marked as Exhibit 28, right?
22 A. Yes.
23 Q. So although I marked them out of order,
24    Exhibit 27 was in response to Exhibit 28,

Page 137

1     right?
2  A. Yes.
3  Q. Okay. Now, Mr. D'Addario said in this
4     letter to the division of insurance that the
5     last insurance policies written by my agency
6     or a general liability, liquor liability and
7     worker's compensation. Do you see that?
8  A. Yes.
9  Q. Then it goes on to explain that in
10    January the package policy was offered to
11    you for a premium of $19,757. Do you see
12    that?
13 A. Yes.
14 Q. And that it wasn't accepted?
15 A. Correct.
16 Q. Do you see that?
17 A. Yes.
18 Q. And it wasn't accepted because the premium
19    was too expensive?
20 A. Under the liquor liability.
21 Q. Okay. And so that finance agreement wasn't
22    signed, right?
23 A. Correct.
24 Q. Okay. And then in March, the general

35  (Pages 134 to 137)

Page 138

1    liability, liquor liability and worker's
2    compensation policy was written for the
3    lower premium; correct?
4  A. Correct.
5  Q. And the lower premium was $7,160; is that
6    right?
7  A. No. Because -- no. Because I gave him a
8    deposit of like $4,800 or $4,600 or
9    something like that.
10 Q. Okay. And in addition to the amounts that
11   were financed, you gave them a separate
12   check?
13 A. Yes.
14 Q. Now, do you have the canceled check for
15   that, or was that part of what was left and
16   isn't available?
17 A. No. I submitted that to you, the deposit.
18   And I told the other attorney last time I
19   was here. He had it. It was $4,400 or
20   $4,600 or $4,200. That was the contention
21   of how they took the available money in
22   deposit and, you know, placed it on which I
23   think is exactly what happened with the
24   liquor liability along with the boat.

Page 139

1  Q. Okay. Are you referring to this check? Is
2    that what you're talking about, the date of
3    March --
4  A. Yes. It was $6,800.
5  Q. Let's just go over this real quick. This is
6    Exhibit 15. Now, you see if we look at the
7    signed finance agreement for the policies
8    that are effective March 22, 2001, you see
9    that the total premiums for the policies
10   that were financed through this particular
11   finance agreement was $9,191?
12 A. Correct.
13 Q. And then that required the cash down payment
14   of $2,297.75?
15 A. Correct.
16 Q. And when we flip through to the last page,
17   we see that you paid the deposit of
18   $2,297.75?
19 A. Right.
20 Q. And then in return, Standard Funding,
21   because you're financing this, they write a
22   check on your behalf to pay the other
23   premiums and the outstanding balance which
24   was $6,893.25. Do you see that?

Page 140

1  A. Correct.
2  Q. And then, in turn, you have monthly payments
3    through the funding?
4  A. Yes.
5  Q. Okay. So when you finance something with
6    the finance company, like in this case, you
7    have to put that initial cash down payment?
8  A. Yes.
9  Q. That initial deposit?
10 A. Yes.
11 Q. That's what you did in this case?
12 A. Yes, I did.
13 Q. Now, when you said that there was the
14   initial down payment of $4,500, were you
15   referring to this down payment of $2,200 and
16   change?
17 A. No. I don't remember -- that 22 is one of
18   it. I don't know if the other policy
19   required more. I just remember seeing a
20   check for like 40, 40 something, $4,000 made
21   out to them. That could have been --
22 Q. Made out to whom?
23 A. To Medallion.
24 Q. Do you have a copy of that check?

Page 141

1  A. I think I submitted it to you.
2      MS. FLORIO: Mr. Carnahan, do you
3    have a copy of that?
4      MR. CARNAHAN: I don't think I do. I
5    might but I don't think I do.
6  Q. Okay. Was the other check that we went over
7    on Exhibit 17, this bank check which says
8    April, May, June was insurance payments,
9    right?
10 A. (Witness indicates.)
11 Q. Is that yes?
12 A. Yes.
13 Q. And that's for $2,569.74, right?
14 A. Correct.
15 Q. Okay. And that references on the first page
16   the three policies, right?
17 A. No. I know what it was. No. You went back
18   to this. I'm sorry. The April, May and
19   June, he sent me -- he says, you know, you
20   have to redo this and renew the policies
21   because it's going to be running out as of
22   March or something like that. And then they
23   submitted that initial 19,000, and I says,
24   that's too much for that. And then we

36  (Pages 138 to 141)

Page 142

1  renegotiated. And then Jack, like he
2  normally did, blows everything off and
3  doesn't come back. And I find -- when I
4  call him back and I says, where's the
5  renewal policy, he says, you haven't had any
6  insurance for a couple of months.
7  Q. Okay.
8  A. I said how could that be? Well, you know,
9  like I said before, this is the payment --
10  this is the payment I made to pay for those
11  months, and then he ran down with the new
12  policy. You see what I'm saying? There was
13  a check for $4,000 on the deposit on the
14  renewal. This is just to catch up because
15  he allowed it to lapse after the initial
16  declaration.
17  Q. We already went over that this Standard
18  Funding agreement was for the March 2001
19  renewal, right?
20  A. Right.
21  Q. Okay. And you're saying after you agreed on
22  this renewal, and so you
23  had to then write a check to Standard
24  Funding to make up for those payments --

Page 143

1  A. Yes.
2  Q. -- that weren't made?
3  A. Right. Because Jack D'Addario did not
4  follow up with what -- he was supposed to be
5  working there, and then they said he got
6  fired.
7  Q. Now, did you make the payments -- on the
8  Standard Funding agreement, it looks like
9  the payments were $792.49, right?
10  A. Correct.
11  Q. Did you make those through Medallion or
12  directly to Standard Funding?
13  A. No. Directly to Standard Funding. You have
14  a copy of the cut sheet there.
15  Q. Once the policy was set up with Standard
16  Funding, you dealt directly with them,
17  right, in terms of making those $700
18  payments?
19  A. Correct.
20  Q. In looking at Exhibit 25, there's another
21  monthly operator report for the month of
22  June '01 for the bankruptcy court, right?
23  A. Yes.
24  Q. And this references your insurance; correct?

Page 144

1  A. Yes.
2  Q. And it references the $792.49 monthly
3  payment that you had, right?
4  A. Yes.
5  Q. Okay. And that's the same thing for the
6  July report to the bankruptcy court?
7  A. Yes.
8  Q. Because that was the agreement you had with
9  Standard Funding, right?
10  A. Yes.
11  Q. And then you have this monthly operating
12  report with the detailed listing of the
13  dispersements with the July '01 date on it,
14  right?
15  A. Yes.
16  Q. And then this references the Check No. 1001
17  to Standard Insurance, right?
18  A. Correct.
19  Q. And that amount is for $689.46?
20  A. Yes, it is.
21  Q. Okay. And then in the June breakdown, we
22  see that there's the June 15, '01 Standard
23  Funding payment that we talked about is
24  Exhibit 18 for $2,569.74, right, this one

Page 145

1  right here the Standard Funding?
2  A. Yes.
3  Q. So you're reporting all of these payments to
4  the bankruptcy court, right?
5  A. Correct.
6  Q. In looking at Exhibit 25, Attorney Carnahan
7  references Attachment No. 4 which is all of
8  these, you know, delivery attempts and court
9  documents, and it represents that these were
10  the documents retained by your wife; is that
11  right?
12  A. Yes.
13  Q. And those were the letters and notices that
14  you didn't receive until after the lien was
15  placed on your property, right, because your
16  wife had them?
17  A. That was seven months into the divorce that
18  she refused to spend any --
19  Q. My question to you is that you didn't have
20  these until after the lien was --
21  A. I don't know when the lien was put on
22  because I didn't receive anything.
23  Q. Okay.
24  A. I don't know when it was put on.

37  (Pages 142 to 145)

Page 146

```
 1   Q.  Okay.  In any event --
 2   A.  But the attempt was and they kept sending
 3       notifications to the house, and she just
 4       kept signing for it and keeping it.
 5   Q.  Do you know when she ultimately gave you
 6       these documents?
 7   A.  No.  It was -- I don't know.  She held onto
 8       them for about eight months, seven, eight,
 9       nine months.  I finally had to call her
10       attorney and say I was going to go to court
11       unless she handed me over and gave me the
12       bag of mail to me, and then she finally met
13       me in Belmont and gave me the bag.  It was
14       2003.
15   Q.  Just going through these documents produced
16       by your attorney, there's some documents
17       here with respect to your disability about
18       your knee.
19   A.  Yes.
20   Q.  It says that you had some treatment at
21       Beverly Hospital, you had some x-rays it
22       looks like.  And then there's also a record
23       from a Eugene Ostroff, and I know you also
24       referenced one other doctor.
```

Page 147

```
 1   A.  Sweetland.
 2   Q.  So other than those medical providers, can
 3       you tell me where else you received
 4       treatment with respect to your knee?
 5           MR. CARNAHAN:  What time period?
 6   Q.  Well, let me just back up.  Your claim is
 7       you became disabled sometime in August of
 8       2001, right?
 9   A.  No.  I got hurt in three different stages
10       and the worst one happening in August where
11       I could not -- could not walk or do
12       anything, but initially it was in '99, and
13       then I hurt it again in 2000.  And in 2001,
14       which is verified by that last doctor as
15       quote saying, the straw that broke the
16       camel's back, and that's when I could not
17       ride the bike, could not walk, could not
18       play basketball, couldn't do anything.
19   Q.  We talked about the fact that you never made
20       a disability claim prior to August of 2001
21       because prior to that time you were still
22       able to work, although you had problems, you
23       were still able to work and it wasn't until
24       the August 2001 time period that you became
```

Page 148

```
 1       fully disabled?
 2   A.  I hurt my knee in '99, and I went to the
 3       hospital.  It was bad, but it wasn't nearly
 4       as bad as in 2000.  Then I hurt it again,
 5       and then that's when I had to curtail most
 6       of my activities.  I had to go on a Monday,
 7       Tuesday and Wednesday.  I had to be in the
 8       office on the couch because I couldn't stand
 9       up.  It would swell up, and I could not
10       stand.
11   Q.  When was that?
12   A.  Right around 2000, 2001 definitely.  And
13       then when we moved, when I started moving
14       all that stuff around, I had hurt it.  I was
15       the only one in that place at 8:00 in the
16       morning.  No one else came in until 10:00 or
17       11:00.
18   Q.  Other than Dr. Sweetland, did you treat with
19       any other physicians with respect to your
20       knee?
21   A.  Just the people that the state sent me to
22       under the Social Security.
23   Q.  Okay.
24   A.  There was a person in Woburn I saw.
```

Page 149

```
 1   Q.  Do you know who that was?
 2   A.  No.
 3   Q.  Do you have any of the documentation with
 4       respect to your Social Security Disability?
 5   A.  Sure.
 6   Q.  When did you first apply for Social Security
 7       Disability?
 8   A.  I think it was the end of 2001.
 9   Q.  Okay.
10   A.  Right around there.  November, December I
11       think.  There was a waiting period, you
12       know.
13   Q.  Okay.
14   A.  There's a waiting period, and then they do
15       an evaluation, and then they send you to all
16       these different doctors.  Then once you get
17       cleared for that, they take back six months
18       to a year, and then they start paying you.
19   Q.  Okay.
20   A.  I think it was in somewhere around October.
21   Q.  And when did you move to Florida?
22   A.  Last February.
23   Q.  February '04?
24   A.  Yes.
```

38 (Pages 146 to 149)

Page 150

1  Q. Okay. So you had to fill out an application
2     for Social Security Disability?
3  A. Yes.
4  Q. And did anyone help you fill that out?
5  A. There was a representative up in Salem.
6  Q. An SSDI representative?
7  A. Yes.
8  Q. You didn't have an attorney or anything help
9     you?
10 A. No.
11 Q. And other than filling out an application,
12    did you have to submit anything else?
13 A. Yes. I had to go see doctors. I had to
14    submit -- well, they did all the
15    investigation.
16 Q. But what you had to submit was the
17    application, and then they did an
18    investigation to determine whether or not
19    you were disabled?
20 A. Right.
21 Q. And they did that investigation --
22 A. Yes.
23 Q. -- and determined that you are disabled?
24 A. Yes.

Page 151

1  Q. Did they determine that you're totally
2     disabled?
3  A. Yes.
4  Q. And when did they make that determination?
5  A. 2002 I think.
6  Q. Okay. Do you know about when?
7  A. No.
8  Q. Okay.
9  A. Because they hold back the six months. I
10    think they disregard six months or something
11    like that. I don't know exactly when. I
12    have the documentation if you need it.
13         MS. FLORIO: I would like to make a
14    request for that.
15 Q. And you also saw a physician in Woburn who
16    conducted an evaluation of you?
17 A. I saw three doctors associated with the
18    state. I saw my doctor, and they sent me to
19    three other ones.
20 Q. You saw Sweetland?
21 A. Yes.
22 Q. Okay. Then they sent you to three
23    additional doctors?
24 A. No. They saw the documentation from

Page 152

1     Sweetland, and I think they sent me back to
2     Sweetland. And then they -- you have to
3     have an impartial. They sent me to another
4     doctor, and then they sent me to their own
5     private.
6  Q. Okay.
7  A. So I saw three knee specialists.
8  Q. And you're not aware of their names as you
9     sit here today, but you can obtain that
10    information?
11 A. Yes.
12 Q. And was it in 2000 that you saw these
13    physicians?
14 A. I saw three or four or five doctors over a
15    three-year period. I don't know how many --
16    but yes. They were all different ones.
17 Q. And other than the doctors that you saw and
18    for the state to determine your eligibility
19    and Dr. Sweetland, who was your treating
20    physician, did you see any other physicians
21    with respect to your disability?
22 A. No. Like I said, there was one in -- there
23    was one in Woburn, and there's one in
24    Boston.

Page 153

1  Q. I'm just talking about your treating
2     physician. Was Sweetland the only one that
3     was treating you?
4  A. You just said my disability. For my
5     disability, for the social security?
6  Q. No. When I refer to your disability, I
7     meant, you know, your injury here and not
8     just with respect to getting the disability
9     income. I want to know Dr. Sweetland was
10    your treating physician, right?
11 A. Right. I saw Dr. Sweetland three different
12    occasions and how it got progressively
13    worse, and then he says that it's the worst
14    thing he has ever seen and that I need a
15    knee replacement. But because of the
16    complications with the infection I had over
17    that, that had to be taken into
18    consideration. Because now if you go on the
19    table with the bacteria that's been there
20    since '72 in the small cartilage operation I
21    had, there still exists bacteria which would
22    cause serious complications with a knee
23    replacement.
24 Q. So you haven't had a knee replacement?

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 154

1  A. No. And I don't intend to.
2  Q. Back to my question, have you treated with
3     any other physicians other than Sweetland?
4  A. Went to the hospital, two different
5     hospitals two different times.
6  Q. Which hospitals?
7  A. Beverly Hospital was one, maybe the
8     Wakefield Hospital. I mean I saw an intern,
9     you know, up in Beverly Hospital, and he put
10    me in a walking splint and gave me
11    medication. He told me to go see a
12    specialist. I mean that's what they do at
13    the hospital. They took an x-ray. Then I
14    went back to Sweetland. I went to -- I saw
15    a lot of doctors. But there was -- I went
16    to the hospital twice, two different
17    hospitals and two, three, four different
18    doctors.
19 Q. I need to have a list of the different
20    places that you treated so I can obtain
21    those records.
22 A. I think you have most of them there.
23 Q. Let me just make sure I have an
24    understanding of everything that is

Page 155

1     included. We have Beverly Hospital,
2     Wakefield Hospital, Sweetland and then the
3     physicians you saw through obtaining Social
4     Security Disability?
5  A. I will give you all the lists of all the
6     doctors and all the recommendations and
7     everything that you can have. I will get
8     everything there for you.
9  Q. What do you receive in Social Security
10    Disability?
11 A. I receive $1,178 a month.
12 Q. Do you receive any other income?
13 A. No.
14 Q. Do you have to periodically be evaluated for
15    Social Security Disability, or is that
16    done --
17 A. They told me that every two years they
18    evaluate to see if you're still, you know,
19    hurt enough to continue with it, but I
20    haven't heard anything. And the last two
21    doctors I saw, they said you need a knee
22    replacement; and therefore, we are satisfied
23    you're totally disabled. That was it. That
24    was brought up at the workman's comp

Page 156

1     hearing.
2  Q. Did you have to have a hearing or anything
3     with respect to the Social Security
4     Disability?
5  A. No.
6  Q. Okay.
7  A. They just notify you after you submit all
8     the paperwork, and they contact the doctors
9     in their evaluations.
10 Q. Okay. And you tried to work the last time
11    was the Blue Parrot, right?
12 A. Yes.
13 Q. And that was in the fall of 2001?
14 A. Yes.
15 Q. And that was on Route 1 in Peabody?
16 A. Yes.
17 Q. Is it still in existence?
18 A. No.
19 Q. As far as you're aware, when was the last
20    time it was in existence?
21 A. It's been four or five businesses since I
22    left, and now it's not a bar anymore. It's
23    not a restaurant. I don't know what it is
24    up there. I haven't been there. But

Page 157

1     there's been four different.
2  Q. Where was it on Route 1 in Peabody? Are
3     there other landmarks near there?
4  A. It was up by the trailer park before
5     Fridays.
6  Q. And if you're heading north, is it on the
7     right side?
8  A. Right-hand side, yes.
9  Q. And who were the individuals that you were
10    planning to go into business with?
11 A. Joe Bocelli.
12 Q. Was it just that one person? He was the
13    person that auctioned off the equipment you
14    received, you bought from the bankruptcy for
15    $5,500?
16 A. Yes.
17 Q. And you found out after the fact?
18 A. I tried to go get my equipment back because
19    I put all brand new stools there, all new
20    TVs, all of the equipment, the whole works,
21    and then we just -- we just found out
22    what he had done in the past with a couple
23    of other people, and we just really didn't
24    want any part of him. So we went up to

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 158

1    collect all the equipment and stuff like
2    that, and he wouldn't let us take it. And
3    then when I contacted him, I found out
4    through a newspaper article that he was in
5    conjunction with someone else selling -- was
6    holding auctions at some location and sold
7    everything.
8  Q. Okay. Do you know Rhonda Fogel?
9  A. No.
10        (Exhibit No. 29, Settlement
11        Statement, so marked.)
12 Q. On Exhibit 29, this is the settlement
13    statement at the time of the closing that
14    indicates the amount of money that was paid
15    to Steve Whitman's office for the Cuttichia
16    claim, right?
17 A. Yes.
18 Q. It says it was $35,000?
19 A. Correct.
20        (Exhibit No. 30, Letter, so marked.)
21 Q. Exhibit 30 is the letter from Whitman's
22    office indicating they would accept the
23    $35,000 in full settlement; correct?
24 A. Correct.

Page 159

1  Q. I'm just about finished. I just have a
2    couple of other questions. There are a
3    couple of other lawsuits that you have been
4    involved in prior to this one, right?
5  A. Correct.
6  Q. And I definitely do not need the details.
7  A. Why not?
8  Q. Because I have places I need to be.
9  A. Well --
10 Q. So I'm looking here, and there's this
11    Picardi V. Caiazzo. Do you remember that?
12 A. No. I think that was through the bar. That
13    was another -- there was an insurance claim
14    I believe, yes.
15 Q. It was filed in 1995, and you were one of
16    the defendants?
17 A. Right.
18 Q. Okay. And who was your attorney, was it
19    Daniel Gibson?
20 A. Never heard of Daniel Gibson.
21 Q. Patricia Nigro?
22 A. Nigro, yes.
23 Q. Was that your attorney?
24 A. Yes. Well, no. She didn't handle -- she

Page 160

1    wouldn't have handled that one. How did
2    Patricia Nigro get up there?
3  Q. So do you know what this claim was about?
4  A. Picardi was someone who had filed a claim at
5    the bar and said he got in a fight or
6    something like that.
7  Q. Okay. So it was a claim against --
8  A. Donna's Pub, Inc.
9  Q. Was that claim settled?
10 A. Yes.
11 Q. And then there's Morabito vs. Caiazzo, and
12    that was filed in 1992?
13 A. Correct.
14 Q. And you were a defendant in that case?
15 A. Correct.
16 Q. Who was your attorney? Was it George
17    Warren?
18 A. Correct.
19 Q. What was that case?
20 A. That was the landlord of the first bar that
21    neglected to keep the premises in working
22    order.
23 Q. Landlord for which bar?
24 A. First bar. This is Caiazzo's Play-off Pub.

Page 161

1  Q. What was the resolution of this claim?
2  A. Resolution was that the 15 people went to
3    court to force him out of there as they all
4    owned a piece of it because the place was
5    run down, and it brought him to court --
6    what's the word they use? I forget the
7    term. They force him to sell it so they can
8    all get the piece of the action because he
9    was allowing the building to go down, go
10    into disarray.
11 Q. Was --
12 A. That's when we built Cai's.
13 Q. Did your brother have a cross-claim against
14    you in this?
15 A. Yes. I filed suit against him, and he filed
16    suit against me.
17 Q. Then you had to pay him $2,400 to settle it?
18 A. Yes.
19 Q. Then there's Clifford vs. Caiazzo?
20 A. Yes.
21 Q. Do you remember that?
22 A. Certainly do. I remember all these people.
23 Q. And John Froio represented you?
24 A. Right.

41 (Pages 158 to 161)

Page 162

1    Q. And you were a defendant in that case?
2    A. Yes.
3    Q. This had something to do with Donna's Pub?
4    A. What was the name on that again?
5    Q. Clifford vs. Caiazzo.
6    A. Yes.
7    Q. Was this a personal injury claim that
8       happened at the pub?
9    A. No.
10   Q. What was this?
11   A. Mr. Clifford was owed $5,000 that he wanted
12      to be a partner. He was a friend of my
13      brothers. And I wouldn't allow him in. And
14      as a result, he split, and my brother and I
15      had a little beef over this, and he sent
16      Mr. Clifford packing. And then he filed a
17      lawsuit, wanted to settle for the money, and
18      I told him in no uncertain terms what he
19      could do with it. And another judge sitting
20      over there awarded him -- I don't know. It
21      was $6,000 or something like that.
22   Q. Was it $13,693.56?
23   A. Yes.
24   Q. That's what the defendants had to pay the

Page 163

1       plaintiff in that case, right?
2    A. That's correct.
3    Q. He was someone who was claiming that he had
4       some interest in the business?
5    A. He had lent my brother money in the bar and
6       wanted to get too close to everything. You
7       know what I mean? If you know who he is,
8       you would see why. You get in the bar
9       business, and you run into all kinds of
10      people.
11   Q. It was some type of loan?
12   A. Yes.
13   Q. There's AJ Freddy, Inc. vs. Caiazzo?
14   A. Correct.
15   Q. A lot of people in this one?
16   A. There's going to be more believe me. That's
17      what Landolphi --
18   Q. Tom Collins represented you in this one?
19   A. No, he didn't. Kelley Landolphi did.
20   Q. I see. Jenna's Pub and Donna's Pub were
21      both named. And I see that Kelley Landolphi
22      represented Jenna's, and Tom Collins
23      represented Donna's? Does that make sense?
24   A. You don't even want to know about that.

Page 164

1    Q. Was this the one involving the landlord?
2    A. No. We were building Scuttlebutts. This
3       kid came up to me and wanted to buy my bar.
4    Q. AJ Freddy?
5    A. And offered $190,000 to purchase it. He
6       gave me $20,000 down. We drew up a purchase
7       and sale. He neglected to show up on six
8       consecutive occasions that we had settled
9       for $50,000, another $50,000, and I was
10      going to take back the rest of the paper.
11      When he didn't show up, it was null and
12      void.
13   Q. Okay.
14   A. He turned around and went to the landlord,
15      and the landlord tried to sell it back to
16      him. And this was where we filed suit
17      against -- what is it called? Combined
18      Properties. Combined Properties made an
19      offer to settle, and I told him it couldn't
20      be worth much more than what he was
21      offering. Kelley Landolphi went in and
22      represented it and screwed the whole thing
23      up and told me not to show up.
24   Q. Did Kelley Landolphi try the case?

Page 165

1    A. Yes.
2    Q. Then there was a judgment against the
3       defendants for $42,125?
4    A. Supposedly.
5    Q. And then with interest it was $75,566?
6    A. Yes. I didn't hear too much of that because
7       I wasn't allowed anywhere near the
8       courtroom.
9    Q. Okay.
10   A. So that's one of the reasons.
11   Q. Why was that?
12   A. You tell me. I don't know. I was the one
13      that was -- I was the one that lost the
14      business over this, and I was the one that
15      got stiffed in the money. And Kelley
16      Landolphi wouldn't allow me to go in, and I
17      don't know why. And come to find out when
18      I put all the pieces together after what he
19      did to me up at the other bar, that's when
20      we filed suit against him. I called the
21      board of bar overseers on him for allowing
22      himself to screw up the two businesses.
23   Q. Did you end up paying this judgment?
24   A. No.

42  (Pages 162 to 165)

Page 166

1  Q.  Did they try to come after you for the
2      money?
3  A.  Come after me for what?  He owes me
4      $190,000.
5  Q.  So what happened after the judgment?
6  A.  What happened?
7  Q.  Yes.
8  A.  I wasn't notified about the judgment for
9      four months.  The attorney lied to me and
10     told me one thing, and come to find out
11     something else happened.  I wasn't there to
12     hear anything.  I was never given anything,
13     and that's when I called the board of bar
14     overseers.  And then this is the next
15     procedure we are taking, so that goes hand
16     in hand with all my illustrious attorneys
17     that represented me.
18 Q.  The BBO is the next thing.  Is that what
19     you're saying?
20 A.  Yes.
21 Q.  But is AJ Freddy still trying to get the
22     money from you?
23 A.  No.  How can he get the money from me?  He
24     owes me $190,000.  I'm going back to sue him

Page 167

1      and Combined Properties.
2  Q.  Is Mr. Carnahan representing you in that?
3  A.  We haven't discussed it yet.  Combined
4      Properties offered me on four different
5      occasion "X" amounts of money.  That's what
6      the thing was there.
7  Q.  Did you pay the prior judgments against you?
8  A.  What judgments against me?
9  Q.  There was the one for a few thousand
10     dollars.  Did you pay that one?
11 A.  For who?
12 Q.  Let me just flip back to it.  Did you pay
13     Clifford?
14 A.  Yes.
15 Q.  Okay.
16 A.  Back then I had more money than God.  Well,
17     2,000, 10,000, 13,000 was peanuts compared
18     to aggravation that you're going through
19     when you're running a bar and everybody
20     wants to be a partner.  After the bar and
21     after the attorneys screwed it up, that's
22     when you find out what the real
23     circumstances are.
24 Q.  Then we have Donna's Pub vs. North Shore

Page 168

1      Community Newspaper.
2  A.  Who?
3  Q.  Donna's Pub, Inc. vs. North Shore Community
4      Newspaper?
5  A.  Never heard of it.
6  Q.  Do you know Michael Smith?
7  A.  Yes.
8  Q.  Was he your attorney?
9  A.  Yes.
10 Q.  You don't remember one way or the other as
11     to whether or not he filed a case against
12     North Shore Community Newspaper?
13 A.  No.
14 Q.  Western Alliance Insurance Company vs.
15     Picardi, and you're one of the other
16     defendants.
17 A.  No.  I don't remember that one either.
18 Q.  Then let's see.  Patricia Nigro was
19     defending you and then --
20 A.  No.
21 Q.  Kerri Bidgood?  Do you remember Kerri
22     Bidgood?
23 A.  No.
24 Q.  Is that name familiar at all?

Page 169

1  A.  Not at all.  Patricia Nigro represented me
2      on my original knee injury back in 1997.
3  Q.  This looks like a claim by an insurance
4      company with respect to whether they had a
5      duty to defend Donna's Pub for injuries
6      suffered by Michael Picardi?
7  A.  I remember that one.  That was what I was
8      telling you about.  He got beat up
9      supposedly there, and that was it.  But
10     Patty -- maybe she did it.  I don't know.
11     Usually the insurance companies handled --
12     they handled it with a firm, and that was
13     it.
14 Q.  And then this was a determination that the
15     insurance company had no obligation to
16     defend you.  You had to hire your own
17     attorney to defend that?
18 A.  No.
19 Q.  Do you remember that?
20 A.  No.  Not at all.
21 Q.  And you brought a claim against the Malden
22     Board of Licensing Commission?  Do you
23     remember that?
24 A.  No.  Unless it had to do with the --

43  (Pages 166 to 169)

Page 170

1   Q. 1995?
2   A. -- moving into the new facility. That may
3     have been.
4   Q. Michael Smith?
5   A. Yes. Because I held two licenses, and you
6     couldn't hold two licenses. You had to have
7     a location for one. I was in the process of
8     selling one and building another one.
9   Q. Do you know David Guthro?
10   A. Yes.
11   Q. Was he your attorney?
12   A. Yes, he was.
13   Q. There was something back in early '90s. It
14     says Caiazzo vs. Caiazzo.
15   A. That was my brother.
16   Q. Oh, I see.
17   A. Yes. Because when we built the new
18     location, that's when we split up. So he
19     tried to just hold up the business, and so
20     we just settled it. That was it.
21     Everything is fine now.
22   Q. There was an accounting issue with respect
23     to who gets what in terms of money?
24   A. No. There was no accounting at all because

Page 171

1     I was the president, I ran the whole show, I
2     was there 24 hours, and my brother just
3     wanted to be part of the new business that
4     -- we couldn't allow it because he just --
5     some people have the ability to work in a
6     bar atmosphere, and some people don't. He
7     didn't. I love him to death, and he knows
8     that.
9   Q. What happened? Did you settle?
10   A. Yes. We settled. Best friends. Gave him a
11     call. That was him on the phone right
12     there.
13   Q. Evans vs. Caiazzo?
14   A. Yes.
15   Q. Early '90s?
16   A. Yes.
17   Q. Do you recall that?
18   A. Sure.
19   Q. What was that about?
20   A. Another one of my brother's friends.
21   Q. George Warren represented you?
22   A. Yes. He tried to buy in as a partner.
23     Couldn't do it.
24   Q. How did that one end?

Page 172

1   A. It ended when he's 66 years old and he's
2     drinking a bottle of vodka by himself trying
3     to pick up 21-year-old women and putting his
4     hands on them left and right, and I threw
5     him out of the bar so we just settled.
6   Q. Did you make a payment to him?
7   A. Yes.
8   Q. What did you pay him?
9   A. It was 20,000 or something.
10   Q. And then Caiazzo vs. Medallion Insurance
11     which is this one?
12   A. I'm familiar with that.
13   Q. And then there's Williams vs. Caiazzo?
14   A. Correct.
15   Q. John Andrews is your attorney?
16   A. Yes.
17   Q. And is this ongoing?
18   A. No. I filed suit against these people. I
19     filed suit against John and against
20     Mr. Williams, and that was it. He just
21     backed off. He was one of the contractors
22     that never showed up. He was a pretty good
23     friend of mine and still is, but he had to
24     be fired.

Page 173

1   Q. So looks like this case was dismissed
2     because Williams failed to go forward with
3     the case?
4   A. There was nothing to go forward on.
5   Q. So nothing happened with that case, right?
6   A. No.
7   Q. But he was an employee --
8   A. Yes, he was.
9   Q. -- that brought suit against you?
10   A. No. He was the employee that contracted to
11     start building Scuttlebutts. He was caught
12     drinking across the street seven consecutive
13     days for two and a half hours, and he was
14     fired on the spot. He could understand
15     that.
16   Q. Then do you recall another one where Western
17     Alliance Insurance Company brought an action
18     against you and --
19   A. For what?
20   Q. That's what I'm asking you. Do you recall
21     this?
22   A. No. Not at all.
23   Q. It also --
24   A. Who is Western Alliance? That's the one

44 (Pages 170 to 173)

Page 174

1  with my knee injury.
2  Q. It involves a Michelle Bruno. Do you know a
3     Michelle Bruno?
4  A. Yes.
5  Q. Who was that?
6  A. She was a girl that had a fight with another
7     girl at the bar. That's who it was. That's
8     who Western is.
9  Q. Did she make a claim?
10 A. Yes.
11 Q. And was Western Alliance, did they file suit
12    to determine whether or not they had to
13    defend the claim?
14 A. Yes. They defended it.
15 Q. They did?
16 A. Yes.
17 Q. Okay. Philbrook vs. Donna's Pub, Inc.?
18 A. Who?
19 Q. Philbrook, Melanie Philbrook?
20 A. Doesn't ring a bell.
21 Q. Donna's Pub and some type of negligence
22    claim?
23 A. Doesn't ring a bill. What kind of
24    negligence?

Page 175

1  Q. Michael Williams?
2  A. Michael Williams was the last one we talked
3     about. I don't know a Philbrook.
4  Q. Archibald vs. Donna's Pub from 1993?
5  A. Yes.
6  Q. Daniel Gibson represented you?
7  A. Who?
8  Q. Daniel Gibson.
9  A. No. That was someone who had a speaker --
10    she was watching -- she was standing next to
11    a band that was playing, and she said a
12    speaker fell on her knee.
13 Q. What happened?
14 A. Insurance company settled. What else could
15    they do?
16 Q. Donna's Pub vs. Liquor Liability Joint
17    Underwriting Association from 1993, and it
18    was also involving a Raymond Stock and
19    Western Alliance Insurance Company.
20 A. That's the same one as the one you mentioned
21    before, Western Alliance.
22 Q. This is a different one involving Western
23    Alliance.
24 A. Well, it isn't because I don't know anything

Page 176

1  about it. So if someone brought suit
2  because of something at the bar, I handled
3  it through the proper procedures. I don't
4  remember that name at all.
5  Q. Do you remember Stock vs. Donna's Pub?
6  A. No.
7  Q. Negligence claim?
8  A. No. That's another dram shop insurance
9     claim, but I don't remember that name.
10    Stock?
11 Q. Yes.
12 A. I don't remember it. A lot of times what
13    they do is they submit them like the other
14    one, and the insurance company -- the law
15    firm handles it, and then they either deal
16    with it or they settle or what. I don't
17    know.
18 Q. So this one is Thompson vs. Grasshopper, but
19    you were also a defendant in that case?
20 A. Who was it?
21 Q. It was Amy Lynn Thompson and Joyce Sellers
22    against Cai's?
23 A. No. Doesn't ring a bell. Who is the
24    attorney?

Page 177

1  Q. Let's see here. There was John Dodge, James
2     Riley, Scott Tucker, Michael Kuppens,
3     Richard O'Neil.
4  A. I don't know. It might have had to do with
5     a fight or similar for what they did and
6     they might had, you know, the firm just
7     handled it. That doesn't ring a bell none
8     of the names.
9  Q. Do you think it was something to do with the
10    dram shop?
11 A. Yes. Probably. A lot of those get
12    disregarded. You hear from them initially
13    and then you don't because they can't back
14    it up with the --
15 Q. What about Steed vs. Donna's Pub in 1995?
16 A. Yes.
17 Q. And it looks like Patricia Nigro was
18    involved in that one?
19 A. He settled that claim. He got beat up. I
20    remember that one. That was outside.
21 Q. So it was the plaintiff had some injuries
22    and ended up being settled?
23 A. Right.
24 Q. Bruno vs. Donna's Pub, and it was Patricia

45 (Pages 174 to 177)

Page 178

```
 1     Nigro involved again.
 2  A. No.  I don't know.
 3  Q. Then Donna's Pub doing business as Cai's
 4     Food and Spirits vs. -- it looks like David
 5     Caiazzo and Elmer Evans?
 6  A. Yes.  That's what the settlement was with
 7     those two back then.
 8  Q. With respect to them wanting to be involved
 9     in the business?
10  A. Yes.  They tried to hold up the building of
11     the second -- of Cai's.  They were out of
12     the first bar that was Cai's Play-off Pub.
13     When I started building the second one, they
14     tried to hold it up because I couldn't hold
15     two liquor licenses to force me into
16     settling with them which we did anyway.  I
17     didn't mind.  Just as long as I was doing it
18     myself and I couldn't have those two with me
19     but --
20  Q. There was also the litigation with respect
21     to the lease.  That wasn't included in
22     there, was it?
23  A. Which lease?
24  Q. You said there was a superior court action
```

Page 179

```
 1     with respect to the lease?
 2  A. At Scuttlebutts?
 3  Q. Yes.
 4  A. Right.
 5  Q. Tell me who the parties were in that case.
 6  A. The parties were Salem Lafayette, LLC.
 7     That was the landlord that had submitted
 8     about 50 pages of threatening to quit, no
 9     paying.  Rents were sitting in his -- it was
10     just beyond control.  But anyway --
11  Q. It was in Essex Superior Court?
12  A. Yes.
13  Q. And was it just Salem Lafayette vs. Jenna's
14     Pub, Inc. doing business as Scuttlebutts?
15  A. Yes.
16  Q. And was that filed in 2001 or prior to that?
17  A. I have no idea.
18  Q. Okay.  And is there any other litigation
19     that you're aware of that?
20  A. No.  But I will send you all the new ones
21     coming up as soon as I come back even with
22     all the money I lost.
23  Q. Okay.  And as I understand it, you are
24     considering a claim against Kelley
```

Page 180

```
 1     Landolphi?
 2  A. Correct.
 3  Q. And you're considering a claim against Salem
 4     Lafayette or --
 5  A. Yes.  We are going to file a claim against
 6     Salem Lafayette because I wrote them a check
 7     for $75,000, and he illegally and
 8     fraudulently filed an illegal creditor's
 9     amount.
10  Q. I just want to go over the different --
11  A. Yes.
12  Q. So you have the claim with Kelley Landolphi
13     for his malpractice?
14  A. Yes.
15  Q. And then Salem Lafayette on account of the
16     alleged breaking of the lease and the
17     money --
18  A. Potentially.  And working with the City of
19     Salem.
20  Q. And then you also have a pending claim
21     against Attorney Collins, right?
22  A. Yes.
23  Q. And are there any other pending claims?
24  A. I don't think so.
```

Page 181

```
 1  Q. And are there other claims you're
 2     contemplating?
 3  A. Not that I know of.
 4  Q. Okay.
 5  A. I have to go after Joseph Bocelli for the --
 6     that's the criminal thing where he sold all
 7     my liquor and all the equipment.  And Kelley
 8     Landolphi has since been disbarred.
 9  Q. Are you considering a civil litigation
10     against him?
11  A. Landolphi?
12  Q. Like you did with Collins?
13  A. Anything that he has I'm going after.  This
14     guy cost me about 1.5 million.  I had the
15     business sold at the time he screwed up, not
16     once, but he did it about four, five times.
17  Q. Which business?
18  A. Scuttlebutts.  I was wondering how they
19     passed the bar after listening to these
20     people all these years.  It is just amazing
21     how they are going to have to turn this
22     thing up a little bit and make it a little
23     more difficult for some of my past attorneys
24     to get reinstated.
```

G&M COURT REPORTERS, LTD.
(617) 338-0030

Page 182

1    Q. You filed a BBO claim against Collins?
2    A. Correct.
3    Q. What was the resolution of the BBO claim
4       against him?
5    A. Well, it was so involved that they couldn't
6       -- they didn't have the time to get involved
7       with it.
8    Q. Did they instruct you to just file a civil
9       claim?
10   A. Yes. Get a civil claim.
11   Q. That's what you did?
12   A. Right.
13   Q. What is the status of that litigation?
14   A. To be honest with you, we haven't got into
15      it yet. We just filed initial paperwork and
16      that's it.
17   Q. You have filed suit, right?
18   A. I think we have.
19   Q. And you haven't had your deposition taken
20      for that case?
21   A. No. I'm looking forward to that one.
22      That's about 11 counts.
23   Q. I believe you told us that, and please
24      correct me if I'm wrong, that it does not

Page 183

1       have anything to do with his involvement in
2       the three different claims that you have
3       pending in this action?
4    A. No.
5    Q. What I said is correct?
6    A. Correct. He does not have anything
7       whatsoever to do with these three claims.
8       He's into the big stuff.
9    Q. All right. In the other lawsuits that we
10      covered, did you have your deposition taken
11      in any of those lawsuits?
12   A. I don't know. It was just probably a
13      couple. Mostly those were all just -- like
14      I told you initially, they were just
15      settled. I don't know how many depositions
16      there was. Maybe --
17   Q. I believe you already testified that you
18      have had your deposition taken before;
19      correct?
20   A. Correct.
21   Q. And can you tell me the cases where you had
22      your deposition taken?
23   A. No. I don't remember. There's only --
24   Q. Well --

Page 184

1    A. I probably had to take about four of them.
2    Q. Do you recall who was representing you at
3       those depositions, the attorney that was
4       representing you?
5    A. One was George Warren, and another one was
6       -- I don't know. It was maybe probably
7       about three.
8    Q. Okay.
9    A. Maybe three times.
10   Q. You don't remember any of the other
11      attorneys other than George Warren?
12   A. No. They weren't all that involved. Most
13      of them were all -- couple of those were the
14      bar was included. You know how they sue
15      everybody? So the ones, the names I didn't
16      recognize, they were either dismissed, or
17      they were settled by the insurance company
18      or --
19   Q. Okay.
20   A. -- someone else was involved. I don't
21      remember those names. I didn't ever have to
22      do any depositions on that.
23   Q. Okay.
24   A. I did one -- I really don't remember.

Page 185

1       There's probably about three of them, no
2       more than three. Four is stretching it.
3    Q. And as I understand it and from what you
4       have testified to and what your attorney has
5       represented to us, you have produced in this
6       case all of the documentation that you still
7       have with respect to the insurance policies
8       that you had in effect when you were running
9       Scuttlebutts; is that correct?
10   A. Well, you're going to have to say that one
11      again because the paperwork that I have I
12      gave to you.
13   Q. That's what I'm saying. I understand.
14   A. The paperwork I don't have is what could
15      possibly be thrown away.
16   Q. And I understand. But I just want to get on
17      the record is whatever you have in your
18      possession with respect to your claims in
19      this case regarding insurance documentation
20      you have provided to us through your
21      attorney; correct?
22   A. Correct.
23   Q. Okay.
24   A. The only other thing that I don't have is

47  (Pages 182 to 185)

Page 186

1  what Medallion Insurance over the last five
2  years has neglected to show or even -- I
3  mean they are the agent. They are required
4  by law to tell me what I can collect and if
5  I'm covered or not and whatever. They
6  didn't do anything. As a result, I had to
7  pay $35,000. I had to pay this. I had
8  to --
9  Q. I understand what your claims are.
10 A. I want you to be sure now what happens when
11    you mention that how it dropped
12    substantially there from $1,400 to $1,300 to
13    9, I was paying more money down on my
14    policy.
15 Q. Okay.
16 A. So that reflects not only the coverage drop
17    just in the liquor liability. But if I
18    hadn't put down $4,600 or whatever, then the
19    payment instead of $798 would have been
20    $1,100 or $1,200. See what I'm saying?
21 Q. I understand. And we have gone over the
22    details of what you --
23 A. I want you to know there that when John
24    D'Addario says you're not covered and the

Page 187

1  owner says you have no insurance and then
2  they turn around and say he was canceled in
3  November, they clearly show negligence over
4  and over and over and over again. And as a
5  result, this is my problem here. When you
6  can't get an answer from the insurance
7  company on all the hundreds of thousands of
8  dollars I pay these people, that's what
9  bothers me. So when you ask for
10    documentation, the other side should come up
11    with -- they are going to have to come up
12    with something.
13 Q. I'm not saying that you should have anything
14    else. I just need to know from my own
15    records.
16 A. I gave you everything I have, and I would
17    love to have the rest of what D'Addario has.
18 Q. Let me just try and have a clean record and
19    get it out. I'm not saying you should have
20    anything or that there is anything else. My
21    question to you is: You have in this
22    litigation through the documents, produced
23    by your attorney and the supplemental
24    documents produced, produced all of the

Page 188

1  documents you have to support the claims in
2  this case?
3  A. Yes.
4  Q. Okay.
5      MS. FLORIO: That's all I have.
6      (Whereupon the deposition concluded
7      at 3:05 p.m.)

Page 189

1          C E R T I F I C A T E
2
3  COMMONWEALTH OF MASSACHUSETTS
4
5      I, Aida Correia, Court Reporter and
6  Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that the
8  foregoing transcript of the deposition of
9  STEPHEN D. CAIAZZO, having been duly sworn,
10 on Friday, June 10, 2005, is true and
11 accurate to the best of my knowledge, skill
12 and ability.
13     IN WITNESS WHEREOF, I have hereunto
14 set my hand and seal this    10th    day
15 of    June    , 2005.
16
17
18
19
20          Aida Correia
21          Notary Public
22
23
24 My commission expires: June 18, 2010

48  (Pages 186 to 189)

Page 190

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4        The original of the Errata Sheet has
5    been delivered to Kerry D. Florio, Esq.
6        When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to
10   Kerry D. Florio, Esq. to whom the original
11   deposition transcript was delivered.
12
13       INSTRUCTIONS TO DEPONENT
14
15       After reading this volume of your
     deposition, indicate any corrections or
16   changes to your testimony and the reasons
     therefor on the Errata Sheet supplied to you
17   and sign it.  DO NOT make marks or notations
     on the transcript volume itself.
18
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20   COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24

Page 191

1    ATTACH TO THE DEPOSITION OF STEPHEN D.
     CAIAZZO
2    CASE:  STEPHEN D. CAIAZZO - VS - THE
     MEDALLION INSURANCE AGENCIES, INC.
3
         ERRATA SHEET
4
     INSTRUCTIONS:  After reading the transcript
5    of your deposition, note any change or
     correction to your testimony and the reason
6    therefor on this sheet.  DO NOT make any
     marks or notations on the transcript volume
7    itself.  Sign and date this errata sheet
     (before a Notary Public, if required).
8    Refer to Page 190 of the transcript for
     errata sheet distribution instructions.
9
     PAGELINE
10       CHANGE:
         REASON:
11       CHANGE:
         REASON:
12       CHANGE:
         REASON:
13       CHANGE:
         REASON:
14       CHANGE:
         REASON:
15       CHANGE:
         REASON:
16       CHANGE:
         REASON:
17       CHANGE:
         REASON:
18       CHANGE:
         REASON:
19       CHANGE:
         REASON:
20
21       I have read the foregoing transcript
     of my deposition and except for any
22   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
23   record of the statements made by me.
24

49  (Pages 190 to 191)

G&M COURT REPORTERS, LTD.
(617) 338-0030